## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Metropolitan Municipality of Lima, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| Rutas de Lima S.A.C., | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF METROPOLITAN MUNICIPALITY OF LIMA'S PETITION TO VACATE ARBITRAL AWARD (ORAL ARGUMENT REQUESTED)**

### I.      INTRODUCTION

Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), the Metropolitan Municipality of Lima (the "Municipality") hereby respectfully requests that this Court enter an order vacating the arbitral award dated May 11, 2020 (the "Award") that was rendered in favor of Rutas de Lima S.A.C. ("Rutas") and delivered to the parties on May 12, 2020, following an arbitration carried out under the Concession Contract for the design, construction, improvement, conservation, and operation and exploitation of the "Vías Nuevas de Lima" Project in Lima, Peru (the "Project"), which was signed by the parties on January 9, 2013 (the "Concession Contract").

As detailed below, vacatur is necessary because Rutas, which was composed of subsidiaries of Odebrecht S.A. – a company notorious for corrupt practices and which admitted in a 2016 plea agreement with the U.S. Department of Justice to having paid approximately $788

1

million in bribes in connection with more than 100 government projects in 12 countries –

obtained the Concession Contract and various benefits thereunder through the payment of bribes

to officials of the Municipality.  When Rutas commenced arbitral proceedings against the

Municipality in regard to a dispute that arose under the Concession Contract, it was able to avoid

the District of Columbia-seated arbitral tribunal nullifying the contract on grounds of corruption

through fraudulent misrepresentations made in the course of the arbitration that were designed to

obscure and cover-up its corrupt activities, which had included funneling millions of dollars in

bribes for purposes related to the Concession Contract's execution and performance.  By these

fraudulent means, Rutas obtained from the arbitration an award of damages valued in excess of

US $66 million.

Since the conclusion of the arbitration, however, new evidence has emerged, including

witness testimony from key participants in Rutas' corrupt scheme, that proves both the

underlying acts of corruption and demonstrates that Rutas engaged in serial fraudulent

misrepresentations during the arbitration, which had the effect of misleading the arbitral tribunal

into awarding Rutas a massive and undeserved financial windfall.  Vacating the Award is thus

warranted under Section 10(a)(1) of the FAA, which permits vacatur where an "award was

procured by corruption, fraud, or undue means," and because the Award is contrary to United

States public policy.

## II.    THE PARTIES

Petitioner, the Municipality, is a governmental entity with authority over Lima, the capital

of the Republic of Peru, with a registered office at Jirón Conde de Superunda 141 Cercado de

Lima, Peru.  The Municipality has three branches which are responsible for carrying out the

Municipality's governmental functions: (1) the Mayor of Lima (the chief executive of the Municipality); (2) the Council (a six-person body consisting of the Mayor and five elected aldermen); and (3) the Metropolitan Assembly (a deliberative body with advisory and coordination responsibilities).

Respondent Rutas is a company incorporated under the laws of the Republic of Peru, with a registered office at Panamericana Sur Km 19.65 s/n, Av. El Derby No. 250, Piso 18 Villa El Salvador Lima 42, Peru.

### III.     JURISDICTION AND VENUE

The Award falls under the provisions of Section 202 of the FAA because it arises out of a commercial legal relationship that is not between citizens of the United States. 9 U.S.C. § 202.  This Court has original jurisdiction over the Petition to vacate the Award, which "arise[s] under the laws and treaties of the United States," under Section 203 of the FAA.  9 U.S.C. § 203.  Venue is proper in the United States District Court for the District of Columbia because the underlying arbitration was seated, and the Award was issued in, the District of Columbia.  *See* 9 U.S.C. §§ 9,10.

### IV.     BACKGROUND

1.   **Facts**

    a.   Odebrecht's Wide Ranging Corruption Scheme

Odebrecht S.A. is a Brazilian holding company that, through various operating entities, conducts business in multiple industries, including engineering, construction, infrastructure, energy, chemicals, utilities, and real estate.  Exhibit ("Ex.") L at B-1 ¶ 2.  Odebrecht operates in 28 countries, including the United States.  *Id.*

3

Between 2001 and 2016, Odebrecht engaged in a wide-ranging scheme to corruptly provide hundreds of millions of dollars in payments and other things of value to governmental officials around the world in order to influence those individuals to grant government contracts to Odebrecht and affiliated corporate entities.  *Id.* at B-7 ¶ 19.  Odebrecht created an elaborate, secret financial structure to account for and disburse these bribery payments to governmental officials.  *Id.* at B-7 ¶ 21.  In furtherance of this scheme, Odebrecht created a stand-alone division within its corporate structure, the Division of Structured Operations, which "effectively functioned as the bribe department within Odebrecht."  *Id.*  To conceal its illicit activities, the division utilized an entirely separate and off-book communications system, which allowed members of the division to communicate with one another and with outside financial operators and other co-conspirators about the bribes through the use of secure emails and instant messages, utilizing codenames and passwords.  *Id.*

As Odebrecht admitted in a 2016 plea agreement ("Odebrecht Plea Agreement") with the United States Department of Justice, it, together with its co-conspirators, paid approximately US $788 million in bribes in association with more than 100 government projects in numerous countries, including Angola, Argentina, Brazil, Colombia, the Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru, and Venezuela.  *Id.* at B-8 ¶ 23.  Odebrecht earned approximately $3,336 billion in profits from the government contracts that it obtained through payment of these bribes.  *Id*

Odebrecht engaged in corruption in relation to multiple government projects in Peru.  The company has entered into a collaboration agreement with the country's law enforcement officials

under which it has admitted to making corrupt payments in connection with five Peruvian public infrastructure projects.  Ex. B, at ¶ 301.

      b.    <u>The Concession Contract</u>

On April 16, 2010, the Consortium "Lineas Viales de Lima," composed of the Odebrecht subsidiaries Constructora Norberto Odebrecht S.A. and Odebrecht Participacoes e Investimentos S.A., submitted to the Municipality a proposal for the Vías Nuevas de Lima Project, the purpose of which was the design, construction, operation, and maintenance of both new and existing highways in Lima, Peru.  Ex. A at ¶ 92.  On September 18, 2012, the Municipality awarded the Project to Líneas Viales de Lima.  *Id.* ¶ 94.  Líneas Viales de Lima then incorporated a new company, Vías Nuevas de Lima S.A.C., which later became Rutas, for the purposes of managing the Project.  *Id.* ¶ 96.  On January 9, 2013, Rutas and the Municipality (together, "the Parties") executed the Concession Contract.  *Id.* ¶ 97.

The objective of the Concession Contract was to integrate 23 districts of the city of Lima through the construction, improvement, and maintenance of three sections of highway: (1) the North Pan-American section; (2) the South Pan-American section; and (3) the Ramiro Prialé section (collectively, the "Sections").  *Id.* ¶ 98.  Rutas' main obligation under the Concession Contract was to complete the construction, improvement, and maintenance of these highway Sections.  *Id.* ¶ 98(iv).  The Municipality's primary obligations were to (1) complete preliminary work on the existing highway structures to prepare them for Rutas' improvement and maintenance work, and (2) legally transfer to Rutas the land and any legal right of ways necessary for Rutas' new highway construction work.  *Id.* ¶98(xi).  Under Clause 7.1 of the Concession Contract, Rutas had 36 months from the completion of the Municipality's

preliminary work to complete its construction and maintenance of the highway Sections.  *Id.* ¶ 98(v).

The Concession Contract did not provide for the Municipality to use its own financial resources to directly compensate Rutas in exchange for Rutas' work under the Concession Contract.  Rather, the Municipality agreed to compensate Rutas by granting Rutas an exclusive right to operate income-generating toll stations on the highway Sections.  Under the Concession Contract there were two types of toll stations: (1) existing toll stations (those that pre-existed the Concession Contract), and (2) new toll stations, which were to be implemented by Rutas after it completed certain construction milestones under the Concession Contract.  *Id.* ¶ 98(v).  The Concession Contract contained specific provisions that determined the toll rates that Rutas was authorized to collect from each toll station.  *Id.* ¶ 98(v).  Because the collection of toll fares was the primary compensation method for Rutas under the Concession Contract, the Municipality had the obligation to ensure the successful operation of the stations.  *Id.* ¶ 98(xiii)-(xiv).

The Concession Contract included provisions that addressed the possibility of social protests occurring in reaction to the implementation of toll stations.  *Id.*  Clause 10.4 of the Concession Contract provided that, if Rutas was unable to operate the toll stations due to an outbreak of social protests, it was the Municipality's obligation to make efforts to quell the protests, and ultimately ensure that Rutas was able to operate the toll stations and collect normal payment.  *Id.* ¶ 98(xiv).  The Concession Contract further provided that, if the Municipality was unable to stop the protests and allow for resumption of toll station operations, the Municipality would pay Rutas an amount equivalent to what Rutas would have been able to collect if the toll station was in operation.  *Id.*

6

c.      Requirements under Peruvian Law for Entry into the Concession Contract

The Concession Contract between the Municipality and Rutas was governed by Peruvian law, including Legislative Decree 1012, which governs public works contracts between Peruvian municipalities and private entities.  *Id.* ¶¶ 503, 518.  Regulations issued pursuant to this Legislative Decree required that, before the Municipality and Rutas could conclude the Concession Contract, the Concession Contract had to be submitted to the Peruvian Ministry of Economy and Finance (the "Ministry") for review and approval.  *Id.*  The need for prior approval served important purposes, including enabling the Ministry to determine whether public funds would be used properly and in accordance with the law.[1]  *Id.* ¶ 98(ii), 504-505, 517-518.

Only after receiving the Ministry's approval would the Municipality have the authority to sign and enter into the Concession Contract.  *Id.* ¶ 504.  The regulations issued under Legislative Decree 1012 also required the Ministry's approval prior to the making of any modifications to the Concession Contract.  *Id.*  Despite these legal requirements, the Parties did not obtain prior approval from the Ministry before entering into the Concession Contract or at any time thereafter.  *Id.* ¶ 508.

_____

[1] Further, because the Concession Contract was presented as a private-public partnership and as a self-funded contract, a type of contract that is regulated under Peruvian law in a manner designed to ensure that the Peruvian State or its entities and subdivisions are not committing, or at risk of committing, more than a minimum amount of public financing, prior review and approval by the Ministry was necessary to ensure that the contract in fact qualified as a self-funded contract.  *Id.* ¶ 98(ii), 504-505, 517-518.

     d.     The Bankability Addendum

On February 13, 2014, approximately a year after executing the Concession Contract (without having obtained approval from the Ministry), the Parties made a first modification to the Concession Contract by signing the Bankability Addendum No. 1 (the "Bankability Addendum"). *Id.* ¶ 104. Under this Addendum, the Municipality agreed to grant Rutas additional work, and additional compensation, under the Concession Contract. *Id.* ¶¶ 104, 448-452. Specifically, the Municipality assigned to Rutas a portion of the preliminary preparation work on the existing highway structures for which the Municipality was originally responsible. *Id.* The Municipality agreed to compensate Rutas for this additional work through: (1) a direct payment of US $65 million, and (2) allowing Rutas to charge higher toll rates at certain toll stations. *Id.* While the Municipality was allowed to grant Rutas this additional work under the terms of the Concession Contract, *id.* ¶¶ 450-51, the Parties did not obtain approval from the Ministry for this modification, as required by Peruvian Legislative Decree 1012.

     e.     Social Protests

On December 29, 2016, Rutas implemented a new toll station on the North Pan-American highway section (the New Chillón Toll Station) pursuant to the terms of the Concession Contract. *Id.* ¶ 118. This toll station was located at the same location as an existing toll station, but began charging tolls to vehicles coming from the opposite direction as the existing station. Shortly after the implementation of New Chillón Toll Station, social protests commenced in opposition. *Id.* ¶ 119. Rutas informed the Municipality that, due to the protests, it was unable to collect tolls at the New Chillón Toll Station and the Existing Chillón Toll Station. *Id.* ¶ 121. When the Municipality proved unable to quell the protests, it requested that

8

Rutas suspend collecting tolls at the New Chillón Toll Station.  *Id.* ¶ 122.  On January 18, 2017, the Municipality permanently cancelled the collection of tolls at the New Chillón Toll Station. *Id.* ¶ 125.

## 2.    The Arbitration Proceedings

On May 3, 2018, Rutas initiated the underlying arbitration, invoking the arbitration clause found at Clause 19.12 of the Concession Contract, which provided that disputes under the Concession Contract would be settled through arbitration.  *Id.* ¶ 5, 152.  Pursuant to the Concession Contract, the arbitration was conducted under the Arbitration Rules of the United Nations Commission on International Trade Law of 2010 (the "UNCITRAL Rules").  *Id.* ¶ 7. The arbitral tribunal (the "Tribunal") was appointed in accordance with the UNCITRAL Rules, and consisted of three members: (1) Dr. Alexis Mourre, (2) Dr. Antonio Hierro Hernández-Mora, and (3) Dr. Elvira Martínez Coco.[2]  The seat of the arbitration was Washington, D.C.  *Id.* ¶ 11.

In the arbitration, Rutas claimed damages due to: (1) its inability to operate the New Chillón Toll Station and the Existing Chillón Toll Station as a result of the social protests, and (2) the Municipality's alleged failure, under Clauses 10.3 and 10.4 of the Concession Contract, to compensate Rutas in an amount equivalent to what Rutas would have been able to collect from these toll stations had they been operational.  *Id.* ¶¶ 174, 380-381.  Rutas requested approximately 140 million Peruvian soles in damages.

---

[2] Dr. Alexis Mourre, and Dr. Elvira Martínez Coco were appointed in August 2018.  *Id.* ¶¶ 18-19.  Dr. Antonio Hierro Hernández-Mora was appointed in May 2019 after the originally appointed Tribunal member, Dr. David Arias, resigned due to a conflict of interest.  *Id.*  ¶¶ 65-67.

The Municipality raised defenses to Rutas' claims under the Concession Contract. Principle among these defenses was that the Concession Contract was null and void, and the Municipality thus did not owe damages to Rutas under Clauses 10.3 and 10.4 of the Concession Contract. *Id.* ¶¶ 266; 274-276; 293-296. The Municipality argued that the Concession Contract was null and void for two principal reasons. First, the Concession Contract, and certain of its modifications, including the Bankability Addendum, had been obtained through acts of corruption by Rutas. *Id.* ¶¶ 293-306. Second, neither the Concession Contract, nor its modifications, including the Bankability Addendum, had been submitted to the Ministry for prior approval, in contravention of Peruvian law. *Id.* ¶¶ 266-68.

a.      Evidence of Corruption

During the arbitration proceedings, the Municipality presented evidence showing that the signing of the Concession Contract and its modifications had been the products of corruption. In particular, on May 24, 2017, a Peruvian Ad Hoc Public Prosecutor filed a criminal complaint against Rutas, among others, charging it with various crimes related to bribery in Peru. *Id.* ¶ 154. Around the same time, Peru also created a Multiparty Investigative Commission (the "Investigative Commission") in order to investigate allegations of corruption against Rutas, as well as other allegations relating to Odebrecht's corrupt activities in Peru. *Id.* ¶ 157.

In August 2018, the Investigative Commission published its Final Report. It found evidence indicating that Rutas had made payments to Peruvian government officials in connection with the Concession Contract. *Id.* ¶¶ 157-159. Specifically, the Report identified the following officials as being involved in Rutas' corrupt scheme:

(1) Susana María del Carmen Villarán de la Puente ("Villarán") (the former mayor of the Municipality);

(2) Domingo Arzubialde Elorrieta (the Manager of Private Investment Promotion of the Municipality); and

(3) Jaime Villafuerte Quiroz (the Promotion of Private Investment Manager of the Municipality).

*Id.*

The Investigative Commission uncovered payment ledgers from Odebrecht's Division of Structured Operations – that is, the Division identified in the Odebrecht Plea Agreement as the "bribe department within Odebrecht," Ex. L at B-7 ¶ 21.  The ledger notations included an entry for "Concessao Rutas de Lima," *i.e.*, the Rutas de Lima Concession, dated February 26, 2014, next to which appeared the amounts of "US $420,168" and "US $291,700."  Ex. A. ¶¶ 158, 441. These entries were related to a person identified by the codename "Budián," and the password "Tapete."  *Id.*  The Investigative Commission determined that "Budián" referred to José Miguel Castro Gutiérrez ("Castro Gutiérrez"), the former municipal manager for the Municipality.  *Id.*

On May 29, 2019, the Peruvian First Permanent National Criminal Appeals Chamber Specialized in Corruption Crimes against Officials (the "Peruvian Corruption Court") issued a pretrial detention order indicating that there was an ongoing corruption investigation targeting two of the former Municipality officials identified in the Investigative Commission's Report: former mayor Susana Villarán, and former municipal manager José Miguel Castro Gutiérrez.

11

The Peruvian Corruption Court accused these two former officials of soliciting money from Odebrecht in order to fund Villarán's election campaigns.  Ex. A ¶ 163.[3]

Using this evidence, the Municipality argued, among other things, that Rutas made corrupt payments in connection with: (1) the proposal and signing of the Concession Contract, and (2) the signing of the Bankability Addendum modification.  The Municipality argued that the signing of the Concession Contract was procured through corruption, as indicated by the fact that it had been awarded in September 2012 and then signed in January 2013, and Odebrecht's monetary contributions to former mayor Villarán's campaigns occurred during the same time period – between late 2012 and early 2013.  Id. ¶ 421.  The proximity of these dates indicated that Odebrecht had made the payments in exchange for the Municipality agreeing to enter into the Concession Contract.  Id.  The Municipality also argued that the Bankability Addendum was the product of corrupt payments, as evidenced by the fact that it was signed in February 2014, the same month that Odebrecht's payroll ledgers indicated that it had made some US $700,000 in payments relating to "Rutas de Lima" to José Miguel Castro Gutiérrez, the Municipality's former municipal manager.  Id. ¶¶ 441, 447.

---

[3] Additionally, on July 23, 2019, the Peruvian Consumer Defense Commission issued a final report regarding the advantages that Rutas had gained through its corrupt payments.  Id. ¶ 160. The report found that Rutas had been collecting excessive rates from the toll stations from December 29, 2016 to at least March 31, 2019.  The Commission referred these findings to Peruvian law enforcement, and recommended that Rutas be charged with various corruption crimes related to the Concession Contract.  Id. ¶ 162.

  b. <u>Rutas' Fraudulent Denials that the Concession Contract and its Modifications Were Procured Through Corruption</u>

During the arbitration, Rutas repeatedly denied that the Concession Contract and its modifications had been obtained through corruption or bribery.  For example, in its written submissions, Rutas stated:

> **Without prejudice to the fact that no irregular act was committed in connection with the Concession Contract, nor is there any evidence of the alleged acts of corruption by third parties, Rutas de Lima clearly dismisses and rejects its connection with the facts attributed to persons related to Odebrecht**. So much so that Rutas de Lima has expressed to the [Municipality] its willingness to accept the inclusion of an anti-corruption clause in the Contract whose text has even been agreed upon in the draft of the second Addendum to the Contract that is being negotiated with the [Municipality].

Ex. B. ¶ 96 (emphasis added).

In the same filing, Rutas also represented:

> Rutas de Lima is fully respectful of the investigations and has been collaborating with them and **strongly rejects any act of corruption** …. [the Municipality] cannot now claim to be unaware of the Concession Contract and the minutes of implementation of the Contract, based on alleged acts of corruption that would have been carried out by third parties, when the investigations are based on alleged economic contributions by third parties to the electoral campaign of the former mayor of the [Municipality]. **These facts occurred after the Project was awarded and were not carried out in exchange for any irregular benefit, as can be seen from the very statements and journalistic reports on which the [Municipality] is based**.

*Id.* ¶¶ 295, 297 (emphasis added).

Rutas expressly denied that Odebrecht carried out any acts of bribery or corruption with respect to the Concession Contract, or that Rutas benefitted from any such acts:

> **[T]he effective collaboration agreement signed by Odebrecht, in which the company admitted to having committed the crime of corruption of officials linked to four public infrastructure projects, did not include the New Roads of Lima Project**. Subsequently, a fifth project was included in the agreement, which is also unrelated to the Lima Roads Project …. **Therefore, there is no indication or evidence of acts of corruption directly linked to the Concession Contract**. According to press reports, the alleged payments made in favor of the former mayor were contributions to the political campaign for non-revocation, and there is no acceptance in the statements of those involved that they were bribes. **There is therefore no evidence to suggest that Rutas de Lima benefited from these contributions during the execution of the concession contract, even less so when there are no irregular conditions.**

*Id.* ¶¶ 301-302 (emphasis added).

Rutas made similar representations to the Tribunal in other written submissions. For instance, it stated:

> **[N]o evidence has been provided that in exchange for the campaign contributions made by Odebrecht, Rutas de Lima benefited from the conclusion of the Contract or during its execution.** The only thing that exists is a fiscal thesis that the [Municipality] intends to present as true, despite the fact that not even the prosecutor's office itself has formulated a fiscal accusation. This thesis would be based on supposed statements by effective collaborators who would have pointed out that contributions were made to the campaign of the No to the Revocation of Susana Villarán. However, without prejudice to the fact that the statements of effective collaborators are not in themselves evidence of corruption and need to be corroborated, the media reports provided by the [Municipality] itself on these statements only reveal the existence of campaign contributions and not that Rutas de Lima benefited from the contract in return.

Ex. C ¶ 195 (emphasis added).

Likewise, during the oral hearing, Rutas categorically denied having engaged in corruption. It stated:

> We want to convey that Rutas de Lima is respectful and sensitive to investigations and logically condemns any act of corruption. Rutas de Lima is not incorporated into investigations and rather collaborates with investigations. **We deny that there are any acts of corruption linked to the conclusion of this contract or to the execution of this contract which was reviewed by many and which was not – and that when it was acquired by Brookfield it was thoroughly reviewed and there is no evidence that this occurred.**
>
> The prosecutorial files, that is, the investigations referred to by the Municipality, are investigations of third parties that are also in a preliminary and preparatory stage. There are no prosecutorial charges, much less sentences. **Furthermore, there is no real relation between the facts investigated and this contract and the Municipality do not even present an indication of an alleged benefit for the concessionaire in relation to these investigations.**

Ex. D at 77:9-20 (emphasis added).

Indeed, Rutas accused the Municipality of "**contaminat[ing] the arbitration with allegations of corruption to avoid compliance with the contract**." Ex. E at 1228:2-1228:4 (emphasis added). Rutas emphasized that "Ms. Villarán and the Odebrecht representatives involved have denied that the changes – in exchange for campaign contributions – benefited Rutas de Lima." *Id.* at 1229:12-1229:15. And, Rutas stressed that, "among the projects in which corruption has been accepted [by Odebrecht], the Rutas de Lima contract does not figure and does not exist." *Id.* at 1229:18-1229:20.

c.      The Tribunal's Award

        i.      *Corruption*

The Tribunal rejected the Municipality's arguments that the Concession Contract should be declared null and void due to evidence of corruption relating to the Concession Contract. The Tribunal began its analysis by accepting that it had a duty to declare the Concession Contract null and void if there was sufficient evidence that it was obtained through corruption. Ex. A ¶ 400. The Tribunal stated that because:

> corruption is contrary to international public order, and to the detriment of the public interest of the State and of the citizens of Peru, the Tribunal is very clear that it has the duty to declare the Concession Contract null and void if there is sufficient evidence that it was obtained by corrupt means.

*Id.* But, the Tribunal also explained that it would not nullify the Concession Contract simply because there was evidence that Rutas had made illegal payments to Peruvian government officials. According to the Tribunal, in order to void the Concession Contract, there must be specific evidence indicating that the payments were made in direct exchange for benefits under the Concession Contract. *Id.* ¶ 401.

Assessing the available evidence, the Tribunal determined that the Concession Contract was not void due to corruption. It noted that, given Odebrecht's well-publicized history of corruption, the fact that Rutas was a fully-owned subsidiary of Odebrecht indicated the possible existence of corrupt acts related to the Concession Contract. *Id.* ¶ 405. Beyond this general evidence, the Tribunal stated that there were two main sources of evidence of potential corruption: (1) the payments made to the former mayor's election campaign, and (2) the ledger

16

from Odebrecht's internal files indicating that it had made approximately US $700,000 in payments in relation to "Rutas de Lima" in February 2014. *Id.* ¶¶ 421-23, 440-42.

      With respect to the payments in connection with the election, the Tribunal did not accept the Municipality's argument that the award of the contract for the Project to Rutas was the product of bribe payments made to Villarán's campaign. The Tribunal noted that her campaign had only become active in November 2012, so any corrupt act linked to the campaign was unlikely to have been related to the Municipality's award of the Project to Rutas, which occurred in September 2012, approximately three months earlier. *Id.* ¶¶ 422-23, 489. The Tribunal further noted that, although the Concession Contract was not signed until January 9, 2013, during which time corrupt campaign payments could have been made, there was no evidence that the Concession Contract's terms were more favorable to Rutas than those which had been provided in the September 2012 informal award of the Project to Rutas. *Id.* The Tribunal considered it unlikely that Odebrecht would have made corrupt payments in order to enter into a contract that had already been awarded to it, according to the same contractual terms and conditions established in the initial award.[4] *Id.* ¶ 435. In this regard, the Tribunal found there was insufficient evidence to prove that the Municipality's failure to ask for the Ministry's approval prior to the execution of the Concession Contract was due to corrupt acts committed by Rutas. *Id.* ¶ 491. In particular, the Tribunal stated that "the fact that some contractual procedures may have been breached … does not imply that the contractual condition was omitted because the

_____

[4] In addition, the Tribunal noted that, because Rutas was the only applicant for the award of the Project, it appeared to lack an incentive to engage in corruption to secure the contract. *Id.* ¶ 419.

[Municipality] officials were corrupt.  As previously stated, acts of corruption have to be proven based on reasonably convincing evidence."  *Id.*

 With respect to the references in Odebrecht's ledger to payments of US$ 420,168 and US$ 291,700 on February 26, 2014 in connection with "Rutas de Lima," the Tribunal agreed that "[t]hese [reports] are without a doubt an indication that, at that time, corrupt payments *could have been made* in relation to the [Concession] Contract."  *Id.* ¶ 442 (emphasis added). However, because the Tribunal lacked sufficient evidence "to confirm the existence of these corrupt payments, *which [were] denied by Rutas de Lima*," and no "explanation of how these payments, had they existed, could have affected the validity of the [Concession] Contract," the Tribunal found that there was not sufficient evidence to establish that the payments were linked to "[a]djudication or … the signing of the [Concession] Contract."  *Id.* ¶¶ 443-444 (emphasis added).

 The Tribunal acknowledged that the two payments occurred in the same month as the signing of the Bankability Addendum in February 2014.  *Id.* ¶ 447.  Nonetheless, the Tribunal considered that this was not necessarily proof that the addendum had been obtained through corruption, because: (1) there was no evidence that the payments had been made in exchange for the signing of the Bankability Addendum specifically, and (2) the Bankability Addendum was executed in accordance with the terms of the Concession Contract and the Tribunal lacked evidence to assess whether the compensation paid to Rutas pursuant to the Bankability Addendum was excessive in comparison to the costs of the additional work assumed thereunder. *Id.* ¶¶ 450-58.

ii.      *Failure to Obtain Ministry Approval*

The Tribunal ruled that the failure to gain prior approval from the Ministry did not nullify the Concession Contract or the Bankability Addendum.  In reaching this conclusion, the Tribunal gave substantial weight to the fact that it had been the Municipality's responsibility to obtain the Ministry's prior approval.  The Tribunal considered that the Municipality should not be permitted to benefit from its own failure by having the Concession Contract declared null and void.  *Id.* ¶ 545.  Specifically, the Tribunal stated:

> [T]he [Municipality] could not be allowed, without seriously breaking the principle of good faith, to invoke the lack notification of the draft contract to the [Ministry] upon its subscription to request today that the Contract be declared null and void. Indeed, it is not only that the [Municipality] had the responsibility with respect to the formality foreseen by article 9.3 of Legislative Decree 1012, but that the same the [Municipality] confirmed in the same Concession Contract the regular fulfillment of any formalities prior to the subscription of the contract and executed the Contract since 2013, without at any time making any objections or acting to protect the public interest allegedly affected by the lack of notification of the draft contract to the [Ministry].  It would therefore be totally contrary to the fundamental principle of good faith and to the doctrine that prohibits going against one's own acts, allowing the [Municipality] today to take refuge in the failure to carry out a formality that was in its charge to escape its contractual obligations, directly contradiction with the representations given to [Rutas] and against the protection that the contractor deserves in good faith.

*Id.*

The Tribunal issued the Award on May 11, 2020, and it was delivered to the parties the following day.  Having found there was insufficient evidence to connect the evidence of corruption to specific acts taken to execute or perform the Concession Contract, the Tribunal rejected the Municipality's argument that the contract should be declared a nullity due to

19

corruption.  It awarded monetary damages to Rutas pursuant to Clause 10.4 of the Contract, in

the amount of approximately US $67 million dollars. *Id.* ¶ 758.  In addition, the Tribunal ordered

that a specified monthly compensation formula be applied, and remain in effect until such time

as the Parties agree upon a compensation agreement for Rutas' work under the Concession

Contract.  *Id.* ¶ 758(c).  The Tribunal additionally ordered the Municipality to pay Rutas

approximately US $2 million in arbitration costs.  *Id.* ¶ 758(6).

3. **New Evidence Obtained by the Municipality Subsequent to the Issuance of the Award Reveals that Rutas Procured the Concession Contract and the Bankability Addendum Through Bribery**

a. <u>Odebrecht Paid $3 Million in Bribes to Cause the Concession Contract to be Signed Without Being Submitted for Approval by the Ministry</u>

Subsequent to the conclusion of the arbitration, on July 24, 2020, the Municipality

obtained a copy of Disposición Fiscal No. 13, SGF 506015504-2017-30-0 ("Disposición Fiscal

No. 13") filed by the prosecutor's office in Peru in the ongoing criminal investigation into

bribery and corruption by Odebrecht in connection with the Project.  Disposición Fiscal No. 13 is

a charging document prepared by the prosecutor, and is accompanied by evidence, including

witness statements, which support the charges.  Disposición Fiscal No. 13 charges multiple

government officials, including Villarán, the former mayor of the Municipality, and several

Odebrecht executives, with bribery and money laundering in connection with the Concession

Contract.

On August 2, 2020, the Municipality also obtained a copy of Disposición Fiscal No. 17,

SGF 506015504-2017-30-0 (Disposición Fiscal No. 17) from the prosecutor's office, which sets

out additional information and supporting evidence for the charges.  Subsequently, on August 5,

2020, the Municipality received from the prosecutor's office copies of written testimony by (1) Henrique Simoes Barata ("Barata"), the former superintendent of Odebrecht Peru, and (2) Valdemir Pereira Garreta ("Garreta"), whose company provided political consulting services for Villarán's referendum campaign.

Even though Disposición Fiscal Nos. 13 and 17 were prepared on July 16, 2018 and May 6, 2019, respectively, at the time of the arbitration, both documents were under seal. Declaration of Municipal Attorney General Mariela Gonzalez Espinoza ("Espinoza Decl.") at ¶¶ 3- 5; *see also* Ex. F and Ex. G. The same is true for the written testimony of Barata and Garetta, which were obtained by the prosecutor's office on June 2, 2017 and June 5, 2018, respectively. Ex. I and Ex. J. The prosecutor determined at the time of the arbitration that these documents could not be shared with the Municipality. Espinoza Decl. at ¶ 5.

Disposición Fiscal No. 17 establishes that sometime in late 2012 or 2013, José Miguel Castro Gutiérrez, the former manager of the Municipality and a key member of Villaran's administration, entered into an agreement with Odebrecht to have Odebrecht make a $3 million payment in the first quarter of 2013 towards Villaran's election campaign. Ex. G ¶ 36-37, 86. At the time, the contract for the Project had already been awarded to Rutas, but had not yet been signed. As explained above, under Legislative Decree 1012, prior to its execution, the Concession Contract had to be transmitted to the Ministry for its review and approval. In return for the bribe payment, however, Villarán and her staff skipped this mandatory step, and caused the Concession Contract to be signed on January 9, 2013 without having been reviewed or

approved by the Ministry.[5]

Disposición Fiscal Nos. 13 and 17 are supported by the written testimony of Barata and Garetta. Specifically, Barata testified that he met with Castro Gutiérrez "in the first half of 2013," during which Gutiérrez asked to meet at his offices in Lima. Ex. I at 1. At that meeting, Gutiérrez "request[ed] US $3 million from Odebrecht." *Id.* After that meeting, Barata received a "phone call … directly from then Mayor Susana Villarán, reaffirming the request for resources, under the argument that they would be destined to [her] revocation campaign." *Id.* Barata admitted that he "ended up accepting the request," and subsequently made the requested $3 million payment. *Id.* Part of the "amount[] was deposited in [Gutiérrez's] accounts …or made available in cash," and "approximately US $2 million" was "paid directly to … [V]aldemir Garreta." *Id.* at 2. Barata's testimony is corroborated by Garetta, who testified that he met with Barata at "Barata's office in Lima, probably at the end of 2012 and in the first months of 2013," to discuss Villarán's referendum campaign, and that he was subsequently paid $2,000,000.00 by Odebrecht. Ex. I ¶¶ 3, 6. The Disposición Fiscal are supported by telephone records, which show that Gutierrez made multiple calls in December 2012 and January 2013 to the two Odebrecht executives who ultimately signed the Concession Contract on behalf of Rutas. Ex. G ¶ 87.

---

[5] Disposición Fiscal No. 13 explains that in exchange for the bribe payment by Odebrecht, "Domingo Arzubialde Elorrieta, Susana Villaran's private investment promotion manager, signed both the concession contract for the new Lima roads project known as Rutas de Lima, and Addendum No. 01 of Linea Amarilla, known as 'Via Parque Rimac', without the prior opinion of the Ministry of Economy and Finance." Ex. F ¶¶ 17-19.

Thus, the evidence set out in Disposición Fiscal No. 13 and 17, as well as Barata and Garetta's written testimony, establish that the Concession Contract was procured through Odebrecht's $3 million bribe payment to Villaran.

  b.  <u>Odebrecht Paid Bribes in Exchange for the Bankability Addendum</u>

In June 2020, Gutiérrez entered into an "effective collaboration" agreement with the prosecutor's office.  Espinoza Decl. ¶ 6.  Pursuant to this agreement, Gutiérrez provided testimony to the prosecution regarding his involvement in obtaining bribe payments from Odebrecht in connection with the Concession Contract, which the prosecutor recorded in a letter to the Attorney General of the Municipality dated July 20, 2020 (the "Prosecutor's July 20, 2020 Letter").  *See* Ex. H.  Subsequently, the prosecutor provided the Municipality with a copy of Disposición No. 78, SGF 506015504-2017-31-0 ("Disposición 78"), dated June 8, 2020, which contains excerpts from Gutiérrez's written testimony.

The Prosecutor's July 20, 2020 Letter establishes that Gutiérrez has admitted to "participat[ing] in and funneling money" from Odebrecht for Villaran's re-election campaign in 2014.  Ex. H at 1.  In return for these payments, Gutiérrez admitted that he caused the Municipality to execute the Bankability Addendum to the Concession Contract on February 13, 2014.  *Id.* at 2.  This is confirmed by Gutiérrez's testimony as set forth in Disposición No. 78, which states that "[i]n August 2013," Gutiérrez met with "Raúl Pereyra Neto [("Neto")], Odebrecht representative and General Manager of Rutas" and "Gerardo Sepúlveda, whom [Neto] introduced as his financial advisor.  Both of them … request[ed] additional benefits … that would materialize in the Addendum of Bankability."  Ex. K ¶ 4.1.  Gutiérrez further testified that "in the meetings prior to the financial closing and the signing of the [Bankability] Addendum …

23

[Neto] proposed the need to implement the concept of 'Tune-up' on the roads" that were being administered by Rutas." *Id.* "This concept implied the investment in additional works of $200 million that would be executed by Odebrecht, with this investment going from $500 million to $700 million, benefiting Odebrecht." *Id*.  As a result, "[w]ith the signing of the Bankability Addendum between Municipality and Odebrecht in February 2014, these supposed new investments of the Tune-up and its financing through a toll increase of S/. 0.30 per unit could be made." *Id*.

Thus, like the signing of the Concession Contract, the newly obtained evidence establishes that the Bankability Addendum was obtained through bribe payments made by Odebrecht.

## V.   ARGUMENT

### 1.   Vacatur of an Arbitration Award under the Section 10(a) of the FAA

As a general matter, "judicial review of arbitral awards is extremely limited." *ARMA, S.R.O. v. BAE Sys. Overseas*, 961 F. Supp. 2d 245, 253 (D.D.C 2013) (citing *Teamsters Local Union No. 61 v. United Parcel Serv., Inc*., 272 F.3d 600, 604 (D.C. Cir. 2001) (internal quotation omitted).  However, the degree of judicial deference owed to an arbitral tribunal "does not grant carte blanche approval" to every arbitral award.  *Universidad Interamericana v. Dean Witter Reynolds, Inc*., 208 F. Supp. 2d 151, 153 (D.P.R. 2002).  Instead, "[t]he United States court in and for the district wherein the award was made" may vacate an arbitral award based on one of four grounds set forth in Section 10(a) of the FAA.  9 U.S.C.§ 10(a).

### A.   Vacatur due to Corruption, Fraud, or Undue Means

One of these grounds is "[w]here the award was procured by corruption, fraud, or undue means." *Id.* § 10(a)(1).  *See also Owen-Williams v. BB&T Inv. Servs.,* 717 F. Supp. 2d 1, 16

(D.D.C. 2010) (citing 9 U.S.C. § 10(a)(1)).  To meet this standard, the party seeking vacatur

must meet three "cumulative conditions."  *Ray v. Chafetz*, 236 F. Supp. 3d 66, 76 (D.D.C. 2017).

First, the party must demonstrate by "clear and convincing evidence" that the other side

"engaged in fraudulent conduct or used undue means during the course of the arbitration."

*ARMA*, 961 F. Supp. 2d at 254.  Second, the movant must show that "the fraud could not have

been discovered before or during the arbitration through the exercise of reasonable diligence."

*Id.*  Third, "the alleged misconduct must 'materially relate[] to an issue in the arbitration.'"  *Id.*

*See also Stati v. Republic of Kaz.*, 302 F. Supp. 3d 187, 199-200 (D.D.C. 2018) (summarizing

standard).

Here, each of these three conditions is met.  Throughout the course of the arbitration,

Rutas repeatedly denied to the Tribunal that the Concession Contract or any of its modifications

were procured through corruption.  Evidence recently obtained by the Municipality – which was

unavailable to it at the time of the arbitration – however, establishes that both the Concession

Contract and the Bankability Addendum were secured by Rutas through bribes paid by

Odebrecht to public officials of the Municipality.  This evidence exposes Rutas' fraudulent

conduct, which was material to the Award issued by the Tribunal.  As the Tribunal stated in the

Award, evidence that the Concession Contract or its modifications were obtained through

corruption would have caused the Tribunal to declare the Concession Contract null and void.

Rutas was fully aware of this fact, which is why it chose to repeatedly lie in its written pleadings

and at the oral hearing.  Rutas' conduct thus denied the Municipality a "fundamentally fair

hearing," and constituted a fraud on the Tribunal, requiring that the Award be vacated.  *ARMA*,

961 F. Supp. 2d at 254.

     i.       *Evidence Obtained by the Municipality Subsequent to the Hearing Establishes that Rutas Engaged in Fraudulent Conduct Throughout the Arbitration By Making Repeated False Statements That The Concession Contract and its Modifications Were Not Procured Through Corrupt Acts*

A fraudulent course of conduct within the meaning of Section 10(a)(1) of the FAA is established by showing that the other party "knowingly ma[d]e false statements to or conceal[ed] evidence from the [tribunal]." *Dandong Shuguang Axel Corp. v. Brilliance Mach. Co.,* No. C 00-4480 SC, 2001 U.S. Dist. LEXIS 7493, *18 (N.D.Ca.  June 1, 2001).  In addition, "[p]erjury may [also] constitute fraud within the meaning of the statute." *Baltia Air Lines v. Transaction Management*, No. 94-1775, 1994 U.S. Dist. LEXIS 17509, *9 (D.D.C. Dec. 5, 1994); *see also Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383-1384 (11th Cir. 1988) (partially vacating award where movant submitted "clear and convincing evidence," including letters and affidavits, showing that opponent's expert witness committed perjury by misrepresenting his credentials at arbitration hearing).

Here, Rutas' oral and written submissions to the Tribunal are replete with false statements denying that the Concession Contract or any of its modifications were procured through corrupt acts.  For example, Rutas represented that "no irregular act was committed" by Rutas "in connection with the Concession Contract," and that there was also no "evidence" of "alleged acts of corruption" by "third parties."  Ex. B ¶ 96.  In the same submission, Rutas represented that there was "no indication or evidence of acts of corruption" by Odebrecht "directly linked to the Concession Contract," and that "[t]here is … no evidence to suggest that Rutas … benefited" from any "contributions" made towards Villaran's campaign "during the execution of the concession contract."  *Id.* ¶ 302.  Rutas reiterated this claim in another

submission, in which it stated that there was "no evidence …. that in exchange for the campaign contributions made by Odebrecht, Rutas … benefited from the conclusion of the Contract or during its execution."  Ex. C ¶ 195.

Likewise, during the oral hearing, Rutas stated that it "den[ies] that there are any acts of corruption linked to the conclusion of this contract or to the execution of this contract Ex. D at 77:14-16, and went so far as to blame the Municipality for "contaminat[ing]" the arbitration with "allegations of corruption to avoid compliance with the contract."  Ex. E at 1228:2-4.

The evidence obtained by the Municipality since the arbitration's conclusion exposes the falsity of these repeated denials of corruption by Rutas.  First, Disposición Fiscal Nos. 13 and 17, as well as the testimony from key participants – Barata and Garreta – establish that Odebrecht paid a $3 million bribe in the first quarter of 2013 to Villaran's referendum campaign in return for having the Concession Contract signed without prior submission to the Ministry by the Municipality, as required by Peruvian law.  Exs. F, G.  The compelling nature of this evidence is underscored by the fact that Barata made the bribe payment on behalf of Odebrecht, and that Garetta was one of the recipients of the bribe on behalf of Villaran's election campaign.  Ex. F ¶¶ 12, 58.

Second, testimony by Castro Gutiérrez establishes that Odebrecht paid additional bribes in exchange for causing the execution of the Bankability Addendum to the Concession Contract. Ex. K ¶ 4.14.

Thus, it is clear that Rutas made false statements to the Tribunal during the arbitration when it denied that the Concession Contract or any of its modifications, including the Bankability Addendum, had been secured by corruption.

   ii.  *The Municipality Could Not Have Discovered Rutas' Fraudulent Conduct*
       *During the Arbitration Through the Exercise of Due Diligence Because*
       *The Evidence Obtained Subsequent to the Arbitration Was Either Under*
       *Seal or Not in Existence At the Time of the Arbitration*

   The Municipality could not have discovered Rutas' fraudulent conduct before or during

the arbitration through the exercise of reasonable diligence.  This is because the evidence

establishing Rutas' fraudulent conduct was either (1) not available to the Municipality until July

24, 2020, when the prosecutor in Peru determined that evidence contained in the prosecutor's

confidential investigative file could be shared with the Municipality, or (2) not in existence at the

time of the arbitration.  *See Bonar*, 835 F.2d at 1383-1384 (partially vacating award on basis of

newly discovered evidence where procedural rules prevented movant from obtaining evidence

prior to hearing).  This is thus not a case in which fraudulent conduct by the opposing party

"came to light at some point during the course of the arbitral proceedings, but the movant

nevertheless failed to raise its concerns in a timely fashion."  *ARMA*, 961 F. Supp. 2d at 254

(denying motion to vacate).

   As set forth in the supporting declaration of Mariela Gonzalez Espinoza, the Municipal

Attorney General, at the time of the arbitration, Disposition Nos. 13 and 17, as well as the

written testimony by Barata and Garetta, were under seal.[6]  Espinoza Decl. at ¶ 5. As a result,

despite requests for access to this evidence by the Municipality, at the time of the arbitration, the

---

[6] The Tribunal also recognized in its Award the limited nature of evidence available at the time
of the arbitration from the prosecutor's file, noting that the Tribunal "could not have access to
the concrete acts of investigation or their result, which are subject to reserve or summary
secrecy, and so, forbidden from public knowledge."  Ex. A ¶ 479.

prosecutor's office determined that it could not be shared with the Municipality. *Id.* The Municipality did not obtain these documents until July 24, 2020 and August 5, 2020, after the prosecutor provided approval for providing these documents to the Municipality. *Id.* ¶ 8.

Further, Gutierrez did not enter into an effective collaboration agreement with the prosecution until June 2020, *i.e.*, after the Award was issued by the Tribunal in May 2020. Espinoza Decl. ¶ 6. Accordingly, his testimony was only recently obtained by the prosecutor's office, which was then recorded in a letter sent by the prosecutor to the Municipality on July 26, 2020. *See* Ex. H. Disposición Fiscal No. 78 was also only prepared on June 8, 2020 and transmitted to the Municipality on August 5, 2020. *See* Ex. K.

      iii.      *Rutas' False Statements That The Concession Contract and its Modifications Were Not Procured Through Corrupt Acts Materially Related to an Issue in the Arbitration*

To establish that the opposing party's fraudulent conduct "materially relate[s] to an issue in the arbitration," the party seeking to vacate the award must establish "a 'nexus' between the fraud and the decision of the arbitrators." *Stati*, 302 F. Supp. 3d at 200; *see also ARMA*, 961 F. Supp. 2d at 254-255 ("The movant must demonstrate a causal connection between its opponent's conduct and the outcome of the arbitration.").

Here, there is a clear nexus between Rutas' fraudulent course of conduct and the Award rendered by the Tribunal. First, the Tribunal expressly stated in its Award that because "corruption is contrary to international public order, and to the detriment of the public interest of the State and of the citizens of Peru, the Tribunal is very clear that … the Concession Contract [is] null and void if there is sufficient evidence that it was obtained by corrupt means." Ex. A ¶ 400 (emphasis added). In ultimately finding that it did not have sufficient evidence to establish

29

that the Concession Contract and its modifications were procured through corruption, the Tribunal expressly recorded that it gave weight to Rutas' denials.  Specifically, in considering the February 26, 2014 payments to Gutiérrez of US$ 420,168 and US$ 291,700 that are memorialized in Odebrecht's ledger, the Tribunal stated that "[t]hese [reports] are without a doubt an indication that, at that time, corrupt payments could have been made in relation to the [Concession] Contract.  The Tribunal, however, has no elements to confirm the existence of these corrupt payments, *which are denied by Rutas de Lima*."  Ex. A ¶¶ 441-443 (emphasis added).  As set forth above, testimony provided by Castro Gutiérrez himself, since the conclusion of the arbitration, establishes that these payments, in fact, were made by Odebrecht to cause the Municipality to execute the Bankability Addendum.

Furthermore, in determining that the Concession Contract was valid even though it was not submitted for approval to the Ministry, the Tribunal held that "the [Municipality] could not be allowed, without seriously breaking the principle of good faith, to invoke the lack notification of the draft contract" to the Ministry as a grounds for why the Concession Contract should "be declared null and void."  Ex. A ¶ 545.  This was because the Municipality not only "had the responsibility" of complying with "the formality foreseen by article 9.3 of Legislative Decree 1012" of submitting the Concession Contract to the Ministry for its approval, but the Municipality "also confirmed in the … Concession Contract" itself the "fulfillment of any formalities prior to the subscription of the contract and executed the Contract [in] 2013, without at any time making any objections."  *Id.*  As set forth in the Disposición Fiscal Nos. 13 and 17, testimony by Garreta and Barata establishes, however, that the reason that the Municipality did not submit the Concession Contract for approval to the Ministry was because Odebrecht had paid

a bribe to Villarán's campaign in exchange for the Municipality skipping this mandatory step in the contract's approval process.  Ex. G ¶¶ 36-37.

Accordingly, it is clear that Rutas' persistent false statements to the Tribunal denying that the Concession Contract and its modifications were procured by corruption "materially related to an issue in the arbitration," requiring vacatur of the Award.  *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp*., 791 F.2d 1334, 1339 (9th. Cir. 1986).

      b.    Vacatur on Public Policy Grounds

In addition to the grounds for vacatur set forth in Section 10(a) of the FAA, an arbitration award may also be vacated if it is contrary to an "explicit public policy."  *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).  This public policy ground for vacatur "is rooted in the common law doctrine of a court's power to refuse to enforce a contract that violates public policy or law" and "derives legitimacy from the public's interest in having its views represented in matters to which it is not a party but which could harm the public interest."  *Seymour v. Blue Cross/Blue Shield,* 988 F.2d 1020, 1023 (10th Cir. 1993).  The violated public policy must be "well defined and dominant and ascertained by reference to the laws or legal precedents" in order to qualify as a ground for vacatur.  *LaPrade*, 246 F.3d at 706.

Here, vacatur is warranted on grounds of public policy because the Award's recognition would violate the well-defined policy against enforcement of contracts that are procured through fraud, bribery, or corruption.  Indeed, there is no doubt that, under the United States' long-established common law, contracts tainted by corruption are unenforceable.  As the Supreme Court held more than a century ago in considering whether to enforce a contract for the sale of weapons to a foreign government that had been procured through corruption:

> The question then arises, Is this contract one which the court will enforce?  We have no hesitation in answering it in the negative.  The contract was a corrupt one, – corrupt in its origin and corrupting in its tendencies.  The services stipulated and rendered were prohibited by considerations of morality and policy which should prevail at all times and in all countries, and without which fidelity to public trusts would be a matter of bargain and sale, and not of duty.

*Oscanyan v. Arms Co.*, 103 U.S. 261, 271-272 (1880).  More recent decisions confirm the existence of this policy against enforcement of contracts that are tainted by corruption.  *See S.E.L. Maduro (Florida), Inc. v. M/V Santa Lucia*, 116 F.R.D. 289, 297 (D. Mass. 1987) ("In sum, it is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in the due administration of justice, cannot enforce a contract which is obtained by that means."); *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29 (1987) (explaining that "that no court will lend its aid to one who found a cause of action upon an immoral or illegal act").  The Tribunal in the underlying arbitration itself acknowledged that such contracts are null and void as a matter of law.  *Id.* ¶ 400.

It is now beyond doubt that Rutas procured the Concession Contract and associated benefits through bribery.  The central players in the scheme have admitted to that fact.  While the Tribunal did not have such evidence before it during the arbitral proceedings – due to Rutas' continuing obstruction and cover-up – this Court should exercise its role as the judicial supervisory authority for arbitrations conducted in this jurisdiction and deny to Rutas further ill-gotten gains in the form of a fraudulently obtained arbitral award under a contract secured by corruption.

**CONCLUSION**

For the foregoing reasons, the Court should vacate the Award.


Dated: August 7, 2020                     Respectfully submitted,

                                          THE METROPOLITAN MUNICIPALITY OF LIMA

                                          By its attorneys,
                                          /s/ Andrew B. Loewenstein
                                          Andrew B. Loewenstein (D.D.C. Bar No. MA0018)
                                          Christopher Modlish (*pro hac vice to be submitted*)
                                          FOLEY HOAG LLP
                                          Seaport West
                                          155 Seaport Boulevard
                                          Boston, MA 02210-2600
                                          Tel: 617-832-1000
                                          Fax: 617-832-7000
                                          aloewenstein@foleyhoag.com
                                          cmodlish@foleyhoag.com


                                          Shrutih Tewarie (*pro hac vice to be submitted*)
                                          José M. Garcia Rebolledo (*pro hac vice to be
                                          submitted*)
                                          FOLEY HOAG LLP
                                          1301 Avenue of the Americas, 25th Floor
                                          New York, NY 10019
                                          Tel: 646-927-5500
                                          Fax: 646-927-5599
                                          stewarie@foleyhoag.com