# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Metropolitan Municipality of Lima, | ) |
| | ) |
| *Petitioner and Cross-Respondent*, | ) Case No. 20-CV-02155 (KBJ) |
| | ) |
| v. | ) |
| | ) |
| Rutas de Lima S.A.C., | ) |
| | ) |
| *Respondent and Cross-Movant.* | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO METROPOLITAN MUNICIPALITY OF LIMA'S
## <u>PETITION TO VACATE ARBITRAL AWARD</u>

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

1221 Avenue of the Americas
New York, NY 10020

December 23, 2020                    *Counsel for Rutas de Lima S.A.C.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

COUNTER-STATEMENT OF FACTS ............................................................................. 3

    A.    Background: The Parties and the Dispute ................................................. 3

    B.    The Arbitration ......................................................................................... 5

    C.    The Corruption Allegation ....................................................................... 6

    D.    The Award ................................................................................................ 8

    E.    The Vacatur Proceeding ......................................................................... 10

ARGUMENT ................................................................................................................... 11

I.    Petitioner Bears an Extraordinarily High Burden to Justify Vacatur of the
Award ............................................................................................................. 11

II.    Petitioner Has Not Satisfied Its Burden of Demonstrating that Any Basis for
Vacatur Under 9 U.S.C. § 10(a) Applies ....................................................... 13

    A.    Petitioner has not demonstrated fraud, corruption, or the exercise
of undue means during the course of the arbitration .............................. 14

    B.    Petitioner raised its allegation of corruption during the
arbitration—and the Tribunal rejected the allegation ............................ 20

    C.    Allegedly incorrect statements of counsel did not materially affect
the outcome of the arbitration ................................................................ 23

III.    The Purported Public Policy Ground Also Is Not a Basis to Vacate the Award .............. 25

CONCLUSION ................................................................................................................ 28

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*A.G. Edwards & Sons, Inc. v. McCollough,*
    967 F.2d 1401 (9th Cir. 1992) ................................................................................18, 20, 22

*Agility Pub. Warehousing Co. K.S.C., Prof'l Contract Admins., Inc.*
    *v. Supreme Foodservice GmbH,*
    495 F. App'x 149 (2d Cir. 2012) ..........................................................................25

*Am. Train Dispatchers Ass'n v. Burlington N. R.R.,*
    784 F. Supp. 899 (D.D.C. 1992) ..........................................................................25

\* *ARMA, S.R.O. v. BAE Sys. Overseas,*
    961 F. Supp. 2d 245 (D.D.C 2013) ................................................ *passim*

*Baltia Air Lines v. Transaction Mgmt.,*
    1994 U.S. Dist. LEXIS 17509 (D.D.C. Dec. 5, 1994)....................................12, 13, 15, 18, 19

\* *BCB Holdings v. Government of Belize,*
    110 F. Supp. 3d 233 (D.D.C. 2015) ......................................................................26

*BCB Holdings v. Government of Belize,*
    650 F. App'x 17 (D.C. Cir. 2016) ........................................................................26

\* *Belize Bank Ltd. v. Gov't of Belize,*
    852 F.3d 1107 (D.C. Cir. 2017) ..........................................................................25

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
    5 F. Supp. 3d 25 (D.D.C. 2013) ..........................................................................25

*Bonar v. Dean Witter Reynolds, Inc.,*
    835 F.2d 1378 (11th Cir. 1988) ........................................................................15, 21

*Bridgeport Rolling Mills Co. v. Brown,*
    314 F.2d 885 (2d Cir. 1963).............................................................................13, 18

\* *Cong. Sec., Inc. v. Fiserv Sec., Inc.,*
    2004 U.S. Dist. LEXIS 6573 (S.D.N.Y. Apr. 14, 2004)....................................13, 18

*Conoco, Inc. v. Oil, Chem. & Atomic Workers Int'l Union,*
    26 F. Supp. 2d 1310 (N.D. Okla. 1998)..............................................................15

*Contech Constr. Prods. v. Heierli,*
  764 F. Supp. 2d 96 (D.D.C. 2011) ........................................................................12

\* *Cook Chocolate Co. v. Salomon, Inc.,*
  748 F. Supp. 122 (S.D.N.Y. 1990)................................................................17, 23

*Cook Chocolate Co. v. Salomon, Inc.,*
  932 F.2d 955 (2d Cir. 1991)...................................................................................17

*Dangdong Shuguang Axel Corp. v. Brilliance Mach. Co.,*
  2001 U.S. Dist. Lexis 7493 (N.D. Cal. Jun. 1, 2001) ............................................15

*DeMartini v. Johns,*
  693 F. App'x 534 (9th Cir. 2017) ..........................................................................27

*Duffy v. Legal Aid Soc'y,*
  2013 U.S. Dist. LEXIS 19456 (S.D.N.Y. Feb. 12, 2013).......................................15

*Employers Ins. of Wausau v. National Union Fire Ins. Co.,*
  933 F.2d 1481 (9th Cir. 1991) ...............................................................................20

*Envtl. Chem. Corp. v. Coastal Envt'l Grp., Inc.,*
  2018 U.S. Dist. LEXIS 157246 (S.D.N.Y. Sep. 14, 2018)......................................17

*Hall Street Assocs., LLC v. Mattel, Inc.,*
  552 U.S. 576 (2008)................................................................................................12

*Johnson v. Gruma Corp.,*
  614 F.3d 1062 (9th Cir. 2010) ...............................................................................20

*Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.,*
  791 F.2d 1334 (9th Cir. 1986) .........................................................................13, 18

*LaPrade v. Kidder, Peabody & Co.,*
  246 F.3d 702 (D.C. Cir. 2001) ...............................................................................25

*Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  481 F.3d 813 (D.C. Cir. 2007) ...............................................................................27

*MCI Constructors, LLC v. City of Greensboro,*
  610 F.3d 849 (4th Cir. 2010) .................................................................................18

*Merrill Lynch, Pierce, Fenner & Smith v. Lambros,*
  1 F. Supp. 2d 1337 (M.D. Fla. 1998).....................................................................21

*MPJ v. Aero Sky, L.L.C.,*
  673 F. Supp. 2d 475 (W.D. Tex. 2009)...................................................................15

*Nuyen v. Hong Thai Ly*,
74 F. Supp. 3d 474 (D.D.C. 2014) .........................................................12

*Owen-Williams v. BB&T Inv. Servs.*,
717 F. Supp. 2d 1 (D.D.C. 2010) ..........................................................23

*Oxford Health Plans LLC v. Sutter*,
569 U.S. 564 (2013)................................................................12, 13

*Pac. & Arctic Ry. & Nav. Co. v. United Transp. Union*,
952 F.2d 1144 (9th Cir. 1991) ..............................................................14

*PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship*,
187 F.3d 988 (8th Cir. 1999) ...............................................................15

*Ray v. Chafetz*,
236 F. Supp. 3d 66 (D.D.C. 2017) .........................................................14

*Republic of Arg. v. AWG Grp. Ltd.*,
211 F. Supp. 3d 335 (D.D.C. 2016) .......................................................11

*Sununu v. Philippine Airlines, Inc.*,
792 F. Supp. 2d 39 (D.D.C. 2011) .........................................................17

*Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*,
272 F.3d 600 (D.C. Cir. 2001) ..............................................................11

*Unite Here Local 23 v. I.L. Creations of Maryland Inc.*,
148 F. Supp. 3d 12 (D.D.C. 2015) .........................................................12

*United Bro. of Carpenters and Joiners of America, AFL-CIO v.*
*Operative Plasterers' & Cement Masons' Int'l Ass'n*
*of U.S. & Can., AFL-CIO,*
721 F.3d 678 (D.C. Cir. 2013) ..............................................................26

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
484 U.S. 29 (1987)............................................................................12

## STATUTES AND RULES

9 U.S.C. § 10(a) ...............................................................................3

9 U.S.C. § 10(a)(1).........................................................................2, 13

\* authorities upon which counsel chiefly relies are marked by an asterisk

Respondent and Cross-Movant Rutas de Lima ("Rutas" or "RDL") respectfully submits this Opposition to the Petition to Vacate an Arbitral Award of Petitioner and Cross-Respondent Metropolitan Municipality of Lima ("Petitioner," the "Municipality," or "MML").

## PRELIMINARY STATEMENT

Vacatur of an arbitral award is an extreme remedy, warranted only in the rarest of circumstances, and specifically only in those circumstances enumerated in the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a).  Here, Rutas holds a valid and binding 135-page final arbitral award issued in its favor on May 11, 2020 (the "Award," ECF No. 1-3), by a Tribunal chaired by the President of the International Chamber of Commerce International Court of Arbitration after a lengthy arbitration proceeding that included briefing, discovery, a hearing, and post-hearing briefing.  There is no basis to interfere with the Award.

Rutas commenced the binding arbitration proceedings in May 2018 through a Notice of Arbitration pursuant to the arbitration clause in a concession contract between the parties. Thereafter, a three-arbitrator panel (the "Tribunal") was selected without objection by the parties to conduct an arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law (the "UNCITRAL Rules").  Pursuant to the arbitration clause, the seat of the arbitration was the District of Columbia.

In the Award, the Tribunal found that the Municipality had breached its contractual obligation to compensate Rutas for lost toll revenues related to work performed by Rutas in a road construction and maintenance project in the Municipality.  To compensate Rutas for these lost toll revenues in accordance with the contract, the Tribunal awarded Rutas over US$ 66 million, plus additional damages each month in the future for continuing lost revenues.[1]

---

[1]  Rutas has separately cross-moved for confirmation of the Award in this action on December 23, 2020.

Unhappy with the outcome, MML has filed a Petition before this Court seeking to vacate the award under the FAA, § 10(a).  MML's application is nothing more than a transparent attempt to avoid, or delay, paying the amounts it clearly owes under the Award.

Here, MML seeks vacatur of Rutas' Award on only one of the grounds enumerated in the FAA: that the award "was procured by fraud, corruption, or undue means."  Pet., ECF. No.1 at ¶ 7 (citing 9 U.S.C. § 10(a)(1)).  This limited ground is concerned with whether the arbitration *award* was procured through fraud, corruption or undue means, and has nothing to do with how the underlying *contract* may have been procured.  Thus, the fact that the subject matter of MML's claims here is alleged corruption in obtaining the concession contract is irrelevant to satisfying the FAA, § 10(a)(1).   To satisfy the FAA, MML must demonstrate fraud or corruption *in the arbitration itself*.

The "evidence" that MML presents does not demonstrate any fraud or corruption during the course of the arbitration (or any other time).  Rather, MML attaches to its Petition supposedly newly obtained documents that describe the *same* alleged, and unfounded, allegations related to the underlying procurement of the parties' concession that MML raised during the arbitration.  MML has not put forth a single piece of evidence indicating that there was fraud or corruption in the making of the award itself: not a witness or expert who supposedly lied in their arbitration testimony, not a document that was purportedly falsified, nor anything of the sort.  For this reason, denial of MML's Petition is straightforward.

Faced with this fatal flaw, MML has claimed that statements of Rutas' counsel during the arbitration—i.e., statements denying that MML's evidence showed illegal conduct related to the origins of the concession—were "false" and therefore amounted to fraud.  As numerous courts have held, however, statements of counsel denying claims or advocating in respect of what the

evidence does or does not show do *not* result in an award being "procured by corruption, fraud, or undue means" (9 U.S.C. § 10(a)), particularly where, as here, the party alleging corruption raised its disagreement with counsel's statements during the course of the arbitration.

MML has also attempted to manufacture a "public policy" argument that is equally baseless.  MML fails to articulate a specific applicable public policy that would warrant vacatur of the Award in the face of the strong U.S. policy in *favor* of upholding arbitral awards.  Moreover, MML's public policy argument does not empower this Court to re-decide issues that were squarely before and expressly decided by the Tribunal, even if MML did present truly new evidence— which it did not.

Accordingly, for the reasons discussed below, this Court should deny MML's Petition to Vacate the Award.

## COUNTER-STATEMENT OF FACTS

### A.      Background: The Parties and the Dispute

In April 2010, a consortium of companies submitted to the Municipality an unsolicited proposal for the design, construction, operation, and maintenance of new urban roads, as well as the improvement, operation, and maintenance of existing urban roads, within the Municipality (the "Vías Nuevas de Lima Project").  Award ¶¶ 92, 98.[2]

Over the course of more than two years, the Municipality evaluated multiple versions of the consortium's proposal with the assistance of independent, outside consultants.  Award ¶¶ 418, 425-426, 551.  On May 3, 2012, MML formally expressed its interest in the consortium's proposal

---

[2] Citations to the Award included herein refer to the English translation of the Award that MML submitted with its Petition.  *See* ECF No. 1-3.  That translation omits paragraph 398, and therefore all subsequent paragraphs are mis-numbered by one.  For ease of reference, Rutas refers to the paragraphs as they are numbered in the English translation.  For completeness, a translation of paragraph 398 of the Award is included at Exhibit 3 to the Declaration of Nicolle Kownacki ("Kownacki Decl."), attached hereto.

3

and, in accordance with applicable law, opened a bidding process that was open to any interested third party for a period of 90 days from the date the Municipality announced the process in the Peruvian official gazette "Diario El Peruano."  Award ¶ 93.

No other entities submitted a bid for the project (Award ¶¶ 416, 418), and the Municipality awarded the project to the consortium on September 18, 2012.  Award ¶ 418.  The consortium formed the company Vías Nuevas de Lima S.A.C. (which later became Rutas) to perform the project, and on January 9, 2013, Rutas and the Municipality signed the Concession Contract of the Vías Nuevas de Lima Project (the "Contract" (Kownacki Decl., Ex. 1)).  Award ¶¶ 96-97.

The Contract required Rutas to use its own resources and financing to complete certain construction, improvement, and maintenance works for highway sections known as Panamericana Norte, Panamericana Sur, and Ramiro Priale.  Award ¶ 98(iv); Contract ¶¶ 2.2, 7.1.  In return for its investment and operation costs, Rutas would be entitled to recover transit tolls collected for each highway section.  Award ¶ 98(vi)-(vii); Contract ¶ 11.1.  Rutas received no compensation under the Contract other than the transit tolls.

The parties also expressly agreed, in Clause 10.4 of the Contract, that in the event that Rutas was unable to operate any existing, new, or additional toll units due to acts of social protest in the country, MML would be required to adopt measures to restore order so that normal operation of the toll units could resume.  Award ¶ 98(xiv).  Further, if MML were unable to restore normal operation of the tolls, the Contract required the Municipality to reimburse Rutas for all toll amounts lost.  Award ¶¶ 98(xiv), 547-48; Contract ¶ 10.4.

On December 29, 2016, after Rutas had undertaken substantial construction pursuant to the contract, Rutas established a new toll in the Panamericana Norte section, known as the New Chillón Toll Unit.  Award ¶ 118.   Within days, however, two massive protests took place in

opposition to the new tolls, causing significant and material damage to Rutas' assets, including the toll units.  Award ¶¶ 118-19.

On January 12, 2017, in response to Rutas' request for the Municipality's assistance under the Contract, MML asked Rutas to suspend collection of tolls at the New Chillón Toll Unit for a period of 30 days.  Award ¶ 122.  Six days later, the Mayor of Lima permanently—and unilaterally—closed the New Chillón Toll Unit.  Award ¶ 125.  As required under Clause 10.4 of the Contract, negotiations followed regarding how to compensate Rutas for the closing.  Award ¶¶ 122-52.  But the parties could not reach agreement, and on May 3, 2018, Rutas initiated arbitration proceedings against MML to recover damages, invoking the arbitration clause found in Clause 19.12 of the Contract.  Award ¶¶ 146-52.

### B.    The Arbitration

The arbitration was conducted before a three-member arbitral tribunal, chaired by Dr. Alexis Mourre of France, president of the ICC International Court of Arbitration, and also including Dr. Antonio Hierro Hernández-Mora of Spain and Dr. Elvira Martínez Coco of Peru. Award ¶ 9.  The Parties agreed to the Tribunal's jurisdiction and that the proceeding would be governed by the UNCITRAL Rules, as stated in the Contract.  Award ¶ 7; Contract ¶ 19.12.  Over a period of two years, pursuant to the agreed-upon procedural calendar, the parties made detailed written submissions and participated in an evidentiary hearing on the merits from November 4-8, 2019, at the World Bank in Washington, D.C.  Award ¶ 83.  The parties submitted nearly 300 exhibits and presented testimony of eight witnesses and experts.  Award ¶¶ 73, 78, 83.  After the hearing, the parties presented an additional round of post-hearing briefs.  Award ¶¶ 87-88.  On May 3, 2020, the Tribunal declared the proceedings closed.  Award ¶ 90.

In the arbitration, Rutas initially claimed approximately 140 million Peruvian soles in

damages due to its inability to operate the New Chillón Toll Station and the existing Chillón Toll Station as a result of the social protests and MML's failure to compensate Rutas for such losses. Award ¶¶ 174, 380-81, 165.  Rutas subsequently modified its claimed damages resulting from its inability to operate the New Chillón Toll Station to approximately 233 million Peruvian soles (approximately US$ 66 million) to account for the further passage of time.  Award ¶ 168.  In its initial briefing, MML presented counterclaims arguing that the Contract and certain of its amendments were null and void as a matter of Peruvian contract and administrative law.  Award ¶¶ 266-92.

### C.     The Corruption Allegation

In a second round of briefing, MML raised a new defense, alleging that the Contract had been obtained through corrupt means.  Award ¶ 388.  Specifically, MML argued that the Contract had been awarded as a result of a US$ 3 million contribution by Odebrecht, the former majority owner of Rutas, to the recall-referendum campaign of the former Mayor of Lima, Susana Maria del Carmen Villarán de la Puente, in the period between the end of 2012 and early 2013.  Award ¶ 420.  MML further alleged that a subsequent modification to the Contract, the "Bankability Addendum," also had been secured without the required approval from the Ministry of Economy due to payments of US$ 420,168 and US$ 291,700 by Odebrecht to José Miguel Castro Gutiérrez, the former municipal manager for MML, on February 26, 2014.  Award ¶¶ 440, 446.

To attempt to support these allegations, MML submitted a variety of evidence, including (i) Congressional Reports; (ii) a witness statement by Ad-Hoc State Attorney Jorge Miguel Ramírez, who presented a description of the findings of the ongoing criminal investigations against Mayor Villarán and other former public officers; (iii) an Audit Report of the Comptroller General regarding alleged irregularities related to the Bankability Addendum; and (iv) press reports from

journalists investigating the corruption allegations.  Award ¶ 389.  MML argued that the Tribunal had an official duty to assess MML's corruption allegations and supporting evidence and declare the Contract null and void.  Award ¶ 392.

After MML raised these allegations and provided its supporting evidence in its final written submission before the hearing, Rutas requested and was granted leave to make an additional submission addressing the corruption defense.  Award ¶ 78.  In that submission, Rutas argued that MML's evidence did not in fact show that the Contract or the Bankability Addendum were obtained as a result of any payments by any individual representing Odebrecht to officials of MML.  Award ¶ 317.  Specifically, Rutas emphasized that the Contract—which had been evaluated by the Municipality for more than two years and executed in compliance with Peruvian law—reflected terms that had been agreed to well before any alleged payments were made.  Award ¶¶ 319-21.  Moreover, Rutas argued that the signing of the Contract was a "natural consequence" of Rutas having been awarded the project, and further argued that the signing complied with Peruvian law, particularly given that no third parties had bid for the project.  Award ¶ 320.  In addition, and in any event, any alleged misconduct would have involved representatives of MML itself.

Rutas also pointed to the fact that the key witness whose testimony MML relied upon, Jorge Barata (who was the former superintendent of Odebrecht Peru), had expressly told State authorities that Rutas did *not* benefit from Odebrecht's contribution to the Villarán recall-opposition campaign.  Award ¶¶ 435-36.  As Rutas also noted, Barata's statement was consistent with the plea agreement Odebrecht entered into with Peruvian authorities in which Odebrecht admitted to corruption in connection with four *other* infrastructure projects in Peru, but made no such admission with respect to Rutas' Contract.  Award ¶ 322.  MML offered no basis to suggest that Odebrecht's plea was incomplete.

At the hearing, both sides further emphasized their respective arguments, and Rutas had the opportunity to cross-examine State Attorney Ramírez.  Award ¶ 83.  Rutas did not submit additional evidence or testimony regarding the corruption allegation, but maintained its position that MML had not satisfied its burden to prove that the Contract or Bankability Addendum were obtained through corruption.  MML made clear to the Tribunal that the investigations were ongoing (Award ¶¶ 479-81), but did not at any time request a delay, stay, or continuance of the arbitration on the basis of a purported need to further develop its corruption allegations or to obtain additional evidence.  *See generally* Award ¶¶ 15-90 (describing procedural history of the arbitration).  Nor did MML seek the Tribunal's or any court's assistance in obtaining any such evidence.  *See id.*

### D.     The Award

Based on the available evidence supporting Rutas' contract claims and the Municipality's counterclaims and corruption allegations, the Tribunal awarded Rutas approximately US$ 66 million, as well as arbitration costs in the amount of approximately US$ 2 million, and specified a formula for calculating additional future damages, an amount currently totaling over US$ 23 million.  Award ¶¶ 754-58.  In a partially dissenting opinion, Arbitrator Elvira Martinez Coco deviated from the majority with respect to one of the Municipality's contractual counterclaims and regarding the scope of contract liability and damages.

With respect to MML's corruption allegations, however, there was *no* dissent.  The Tribunal found that, based on principles of public international law, the Tribunal had a duty to assess whether any alleged acts of corruption affected the object of the arbitration.  Award ¶¶ 396-99.  On this basis, the Tribunal then proceeded to thoroughly assess all of MML's evidence and allegations relating to corruption.  *See* Award ¶¶ 401, 403-500.  Applying a preponderance-

8

of-the-evidence standard, the Tribunal unanimously rejected MML's corruption allegations, finding that, "in light of the evidence provided and the public information available at the date of issuing" the Award, "there are insufficient indications to conclude the existence of these corrupt payments and their link with the Contract," and therefore "insufficient elements to declare the total or partial nullity of the Contract."  Award ¶ 500.

Taking into account a number of factors, the Tribunal concluded quite sensibly that alleged payments related to the prior majority shareholder (Odebrecht) *post-dated* the award of the project, and thus did not create a sufficient basis for a finding of corruption in making the Contract.  Award ¶¶ 436-37.  In particular, the Tribunal observed that there was "no claim that the Contract signed on January 9, 2013 contains clauses and conditions more favorable to [Rutas]" than those from the May 2012 Declaration of Interest concerning the project, and the Tribunal stated that this circumstance "constitutes conclusive evidence that the signing of the Contract was not obtained by illegal means."  Award ¶¶ 433-34.[3]  The Tribunal also found that there was "no evidence to conclude" that the Bankability Addendum was obtained because of any payments by Odebrecht.  Award ¶ 457.  The Tribunal emphasized that MML had put forth "no study or evidence" that allowed the Tribunal to assess whether the toll rates increased disproportionately under the Addendum, and also noted that the terms of the Addendum in fact appeared to be "more onerous for [Rutas]."  Award ¶¶ 454, 457.

More generally, the Tribunal also noted that MML had not made any reference to illicit acts during the period that the parties were negotiating compensation for Rutas as a result of the cancellation of the New Chillón Toll Unit.  Award ¶ 498.  The Tribunal also observed that MML

---

[3] In MML's English translation of the Award (ECF No. 1-3), paragraph 434 remains in Spanish.  Rutas has provided an English translation of that paragraph (which is actually numbered paragraph 435 in the original Spanish version of the Award, *see supra* n.2).  *See* Kownacki Decl., Ex. 3.

had declined to expressly request as part of its counterclaim the total or partial nullity of the Contract on the basis of corruption, which was itself a "relevant indication of absence of sufficient evidence of the alleged acts of corruption."  Award ¶¶ 391, 499.

> ### E.     The Vacatur Proceeding

Following issuance of the Award, MML now attempts to revive its corruption allegations as a basis for vacatur of the Award under 9 U.S.C. § 10(a)(1) and D.C. common law.[4]  As explained below, however, the allegations MML presents in this case are the same as those presented to and considered by the Tribunal; the evidence has only taken a different form.  Specifically, as purportedly "new" evidence, MML has submitted three documents prepared by the Peruvian State Prosecutor's office (Disposición Fiscal No. 13, ECF No. 1-8, Disposición Fiscal No. 17, ECF No. 1-9, and Disposición Fiscal No. 78, ECF No. 1-13), as well as the written testimony of Valdemir Pereira Garreta, whose company provided political consulting services for Ms. Villarán's recall referendum campaign (ECF No. 1-10), and the written testimony of Jorge Barata, the former superintendent of Odebrecht Peru (ECF No. 1-11).

Several of these documents were expressly described by State Attorney Ramírez during the arbitration, and were referenced by the Tribunal in the Award.  *See* Ramírez Declaration ¶ 11 (Kownacki Decl., Ex. 2) (describing "preparatory investigations" that had been "formalized" in Disposición Fiscal No. 13, dated July 16, 2018, and Disposición Fiscal No. 17, dated May 6, 2019); Award ¶¶ 479-81.  More significantly, the documents describe the same factual accounts that were described in various reports MML presented in the arbitration—which the Tribunal considered and deemed insufficient to establish that the Contract and/or Bankability Addendum were obtained

---

[4] MML also is now seeking to nullify the Contract on the basis of the same recycled allegations packaged as a new strategy in a second arbitration commenced by Rutas that is currently ongoing.

through corruption.[5]  None of the "new" evidence suggests that any payments were made prior to the Contract being awarded or that any promises had been made before the Contract was awarded. And none of the "new" evidence suggests that the terms of the Bankability Addendum were any different from what the Tribunal understood them to be when it held that the Addendum did not provide Rutas any "undue advantages, that is more favorable conditions than the [Contract] provided."  Award ¶ 457.

In any event, the evidence MML presents—consisting largely of information contained in preliminary charging documents that are part of an ongoing criminal investigation in Peru—is not probative or material here, as none of the evidence even purports to demonstrate corruption during the course of the arbitration or in the making of the award.  Accordingly, and as discussed below, there is no basis for this Court to vacate Rutas' award.

## ARGUMENT

### I.    Petitioner Bears an Extraordinarily High Burden to Justify Vacatur of the Award

As MML acknowledges (Pet. Mem., ECF No. 1-1, at 24), "judicial review of arbitral awards is extremely limited." *ARMA, S.R.O. v. BAE Sys. Overseas,* 961 F. Supp. 2d 245, 253 (D.D.C 2013) (citing *Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001)) (internal quotation omitted).   Courts afford enormous deference to arbitrators.  *See Republic of Arg. v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 344 (D.D.C. 2016)

---

[5] For example, though MML references supposedly newly-obtained testimony of Jorge Barata (ECF No. 1-11; *see also* Pet. Mem. 22), similar testimony of Mr. Barata already was referenced in the Multi-Party Commission Report that MML submitted in the arbitration and was quoted by the Tribunal in the Award.  *See* Award ¶ 435.  As the Tribunal observes, Mr. Barata in his prior testimony "denied that the contributions to the [recall referendum campaign] of Susana Villarán were made to benefit Rutas de Lima with the conclusion of the Contract").  The "new" testimony states the same.  *See* ECF No. 1-11, at 2 ("Q: Were there any offers made by Susana Villaran . . . or other officials of [MML] in exchange for delivery of US$ 3 million?  BARATA: There was not.").  In addition, MML's "new" evidence from June and July 2020 regarding the Bankability Addendum (ECF Nos. 1-10, 1-13) merely re-asserts that certain individuals met to discuss the terms of the Bankability Addendum—terms that the Tribunal already assessed and took no issue with.  Just as in the arbitration, the documents MML supplies say nothing about any disproportionate or improper benefits to Rutas from the Bankability Addendum.  *See* Award ¶¶ 454-57.

(denying vacatur under § 10(a) and confirming the arbitral award where the arbitral tribunal was "arguably construing or applying the contract" within its interpretation of international law). "[W]hen the parties have agreed to arbitration, the law discourages the loser from seeking a second de novo (or even quasi-de novo) shot at obtaining its desired result in federal court." *Unite Here Local 23 v. I.L. Creations of Maryland Inc.*, 148 F. Supp. 3d 12, 23 (D.D.C. 2015) (citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)).  Thus, where an issue was assessed and considered and the arbitrators provided a reasoned opinion after a fair opportunity to be heard, courts will not vacate the award. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568-69 (2013) ("If parties could take full-bore legal and evidentiary appeals, arbitration would become merely a prelude to a more cumbersome and time-consuming judicial review process.") (internal quotations omitted); *id.* at 573 (an arbitral decision even "arguably construing" or applying the contract between the parties must stand, "however good, bad, or ugly").

Indeed, "[t]he grounds enumerated in Sections 10(a) and 11 of the FAA are the *exclusive* means for vacating, modifying, or correcting an arbitral award" that, like Rutas' award, is seated in the United States.  *Contech Constr. Prods. v. Heierli*, 764 F. Supp. 2d 96, 113 (D.D.C. 2011) (emphasis added) (citing *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008)); *see also Baltia Air Lines v. Transaction Mgmt.*, Civ. A. No. 94-1775, 1994 U.S. Dist. LEXIS 17509, *8 (D.D.C. Dec. 5, 1994) ("A District Court may not vacate an arbitral award for any reason not enumerated in the United States Arbitration Act, 9 U.S.C. § 10.").  A party seeking to challenge an arbitral award under any of the FAA's limited grounds "must clear a high hurdle." *Nuyen v. Hong Thai Ly*, 74 F. Supp. 3d 474, 484 (D.D.C. 2014) (denying vacatur request under § 10(a) and

confirming arbitral award).   "[C]onvincing a court of an arbitrator's error—even his grave error—is not enough."   *Oxford Health Plans LLC*, 569 U.S. at 572.

Here, MML contends that the award should be set aside under § 10(a)(1) or else under District of Columbia public policy, because, as MML alleges, "new evidence has emerged" that demonstrates both that the Contract was procured through corruption and that Rutas "engaged in serial fraudulent misrepresentations during the arbitration."   Pet. Mem. 2.   Notably, as courts uniformly have held, newly available or recently discovered evidence is not one of the enumerated grounds for vacatur specified by the FAA.   *See, e.g., Baltia Air Lines*, 1994 U.S. Dist. LEXIS 17509, at *8 (under § 10 "new evidence is not a ground for vacating an arbitral award"); *Cong. Sec., Inc. v. Fiserv Sec., Inc.*, No. 02 Civ. 3740, 2004 U.S. Dist. LEXIS 6573, at *11 (S.D.N.Y. Apr. 14, 2004) (holding same); *Bridgeport Rolling Mills Co. v. Brown*, 314 F.2d 885, 885 (2d Cir. 1963) (holding same); *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1339 (9th Cir. 1986) ("Newly discovered evidence does not justify vacation of an award.").   Thus, even if the evidence identified by MML were new or different (it is not) that would not provide a basis to vacate the Award under the extraordinarily high threshold for vacating the award under any of the bases available under the FAA.

## II.   Petitioner Has Not Satisfied Its Burden of Demonstrating that Any Basis for Vacatur Under 9 U.S.C. § 10(a) Applies

The only ground under which MML seeks vacatur under the FAA is § 10(a)(1), i.e., "where the award was procured by corruption, fraud, or undue means."   But MML does not argue that its supposedly "new" evidence itself shows corruption, fraud, or undue means in the arbitration. Rather, MML claims that its newly obtained evidence shows that certain statements Rutas made through its counsel during the course of the arbitration—specifically, arguments Rutas made regarding MML's corruption defense—were "false."   Pet. Mem. 26.   MML argues that *those*

13

*statements* constituted fraud in the making of the award, *id.* 26-27, despite MML's own opportunity to fully address and rebut Rutas' arguments during the arbitration. MML's argument rests on a distortion of the legal standard for vacatur, and MML's "new" evidence does not in any way show that Rutas committed conduct amounting to fraud or undue means during the arbitration.

As MML acknowledges (Pet. Mem. 25), to vacate an award under § 10(a)(1), the party seeking vacatur must meet three "cumulative conditions." *Ray v. Chafetz*, 236 F. Supp. 3d 66, 76 (D.D.C. 2017). First, the party must demonstrate by "clear and convincing evidence" that the other side "engaged in fraudulent conduct or used undue means during the course of the arbitration." *ARMA*, 961 F. Supp. 2d at 254. Second, the movant must show that "the fraud could not have been discovered before or during the arbitration through the exercise of reasonable diligence." *Id.* And third, "the alleged misconduct must 'materially relate[] to an issue in the arbitration.'" *Id.*

None of these three conditions is met here.

### A.   Petitioner has not demonstrated fraud, corruption, or the exercise of undue means during the course of the arbitration

As this Court has recognized, to satisfy the first condition for vacatur under § 10(a)(1), a party must show "by clear and convincing evidence that its opponent actually engaged in fraudulent conduct or used undue means during the course of the arbitration." *ARMA*, 961 F. Supp. 2 at 254 (collecting cases). "[O]rdinary misconduct will not suffice; the alleged fraudulent acts must have been so prejudicial that they effectively denied the opposing party a 'fundamentally fair hearing.'" *Id.* Indeed, the standard to demonstrate fraud in this context is so high that this Court has recognized that "'fraud' under § 10(a)(1) demands a greater level of impropriety than required to meet the common-law standard." *Id.* (citing *Pac. & Arctic Ry. & Nav. Co. v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991)). Likewise, the "undue means" standard under § 10(a)(1) "sets a similarly high bar, requiring 'nefarious intent or bad faith,' or conduct that is

'immoral, if not illegal.'" *Id.* (first quoting *PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 993 (8th Cir. 1999); then quoting *Conoco, Inc. v. Oil, Chem. & Atomic Workers Int'l Union*, 26 F. Supp. 2d 1310, 1320 (N.D. Okla. 1998)).

Here, MML has failed to show any such fraudulent conduct or undue means during the arbitration. Courts considering vacatur requests under § 10(a)(1) typically are presented with allegations that a party intentionally concealed evidence, proffered fraudulent evidence, or elicited perjurious testimony. *See, e.g. Duffy v. Legal Aid Soc'y*, 12 Civ. 2152 (PAC), 2013 U.S. Dist. LEXIS 19456, at *12 (S.D.N.Y. Feb. 12, 2013) (considering allegations that hearing witnesses committed perjury); *MPJ v. Aero Sky, L.L.C.,* 673 F. Supp. 2d 475, 495 (W.D. Tex. 2009) (considering allegations that affidavits submitted into the record were fraudulent). Even the cases on which MML relies (*see* Pet. Mem. 26) make clear that fraud is shown through perjury or misrepresentations of a party's witnesses or experts or other fraudulent *evidence*. *See Dangdong Shuguang Axel Corp. v. Brilliance Mach. Co.*, No. C 00-4480 SC, 2001 U.S. Dist. Lexis 7493, *18 (N.D. Cal. Jun. 1, 2001) (reviewing allegation that witness made "false statements" during the arbitration hearing); *Baltia Air Lines*, 1994 U.S. Dist. LEXIS 17509 at *10 (reviewing allegations of witness perjury); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383-84 (11th Cir. 1988) (reviewing allegations of expert witness perjury). Here, MML makes no allegation of fraudulent evidence or witness perjury or misrepresentation, because it cannot. Indeed, during the arbitration Rutas put forth *no* evidence with respect to MML's corruption allegation and no witness testified on that issue on Rutas' behalf. Thus, MML does not—and cannot—suggest that a witness of Rutas committed perjury with respect to the corruption allegation or that Rutas falsified a document related to this issue.

Instead, MML relies on statements of counsel—written pleadings and arguments made at the hearing that MML characterizes as Rutas' "denials" of the supposed corruption—to allege that Rutas made "false statements to the Tribunal during the arbitration."  Pet. Mem. 13-15, 26-27.  To be clear, the *only* conduct of Rutas that MML alleges amounts to "fraud" in the arbitration is as follows:

| Allegation | Source |
|---|---|
| "Rutas represented that 'no irregular act was committed' by Rutas ' in connection with the Concession Contract," and that there was also no 'evidence' of 'alleged acts of corruption' by 'third parties.'" Pet. Mem. 26. | Rutas' Rejoinder Brief to MML's Counter-Claim ¶ 96. |
| "Rutas represented that there was 'no indication or evidence of acts of corruption' by Odebrecht 'directly linked to the Concession Contract,' and that '[t]here is . . .. no evidence to suggest that Rutas . . . benefited' from any 'contributions' made towards Villaran's campaign 'during the execution of the concession contract.'"  Pet. Mem. 26. | Rutas' Rejoinder Brief to MML's Counter-Claim ¶ 302. |
| "Rutas . . .stated that there was 'no evidence . . . that in exchange for the campaign contributions made by Odebrecht, Rutas . . . benefited from the conclusion of the Contract or during its execution.'" Pet. Mem. 26-27. | Rutas' First Post-Hearing Brief ¶ 195. |
| "[D]uring the oral hearing, Rutas stated that it 'denies that there are any acts of corruption linked to the conclusion of this contract or to the execution of this contract.'"  Pet. Mem. 27. | Statement of Rutas Attorney M. Tovar, Arbitration Hearing Day 1, Tr. 77:14-16. |
| "Rutas . . . went so far as to blame the Municipality for 'contaminat[ing]' the arbitration with 'allegations of corruption to avoid compliance with the contract.'" Pet. Mem. 27. | Statement of Rutas Attorney M. Tovar, Arbitration Hearing Day 5, Tr. 1228:2 – 1229:20. |

MML's theory is that the entire Tribunal was so duped by these generic statements of counsel that the entire Award is a fraud.  The Court need only look at paragraphs 403 through 500 of the Award to see that the Tribunal's decision was based on its own assessment of the evidence and had nothing

to do with innocuous comments made by Rutas' counsel that are consistent with comments that counsel make in every case. Indeed, if MML's position were accepted and comments from counsel about what the evidence shows and does not show or standard denials in pleadings could be a basis for vacatur under the FAA, then no arbitration award would be safe.

Moreover, none of these statements is a representation of fact upon which a fraud claim could even be premised. Attorney statements do not meet the high standard for vacatur under § 10(a)(1) because they are "not assertions of a testimonial nature, but rather legal arguments regarding the relevance of certain evidence or the proper inferences to be drawn from the evidence." *Cook Chocolate Co. v. Salomon, Inc.*, 748 F. Supp. 122, 126 (S.D.N.Y. 1990) (denying vacatur of award under § 10(a)(1)), *aff'd*, 932 F.2d 955 (2d Cir. 1991). "[T]he fact that there is an argument against the truth of any of the statements [by counsel] does not establish that the arbitration award was the result of fraud." *Id.*; *see also ARMA*, 961 F. Supp. 2d at 258 (stating that, for vacatur under §10(a)(1), even if attorney statements "were inaccurate," the movant would still need to provide evidence that the attorney statements were "fraudulent").

Notably, under D.C. law, "fraud requires that an accused party make the statement with knowledge of its falsity." *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 49 (D.D.C. 2011) (internal quotations omitted) (declining to find that fraud had occurred where proponent could point to "no evidence" that accused party "knew [the statement] to be false"); *see also Envtl. Chem. Corp. v. Coastal Envt'l Grp., Inc.*, 18 Civ. 3082 (GHW) (GWG), 2018 U.S. Dist. LEXIS 157246, at *18 (S.D.N.Y. Sep. 14, 2018) (holding that "fraud" under § 10(a)(1) requires "a knowing misrepresentation or knowing concealment of a material fact"). MML, however, has not identified any information supporting an inference—let alone establishing by clear and convincing evidence—that Rutas' counsel "knew" the Contract or Bankability Addendum were obtained

17

through corruption (and that is still denied to this day).  In fact, the State's Attorney, Jorge Miguel Ramírez, testified at the hearing that Rutas did not even have access to the corruption investigation files.  Hearing Tr., 310:6-7; 16-17 (Day 2) (Kownacki Decl., Ex. 4) (Rutas Counsel: "I asked you whether or not Rutas de Lima has access to it." Ramírez: "only the company LAMSAC is [under investigation], not Rutas de Lima.").  In this context, MML cannot credibly argue that it was "effectively denied . . . a fundamentally fair hearing" by advocacy statements made by Rutas' counsel.  *ARMA*, 961 F. Supp. 2d at 254.

Courts also have made clear that allegedly inaccurate attorney statements do not meet the standard for "undue means" under § 10(a)(1).  *See, e.g.*, *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403-04 (9th Cir. 1992) (holding that "overzealous lawyering" "carries no connotation of wrongfulness or immorality" and that challenging arbitral awards due to attorney advocacy is "inconsistent with the extremely limited scope of judicial review of such awards"); *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 858 (4th Cir. 2010) ("no court has ever suggested that the term 'undue means' should be interpreted to apply to actions of counsel that are merely legally objectionable").  Thus, this too cannot be a basis for vacatur of the award.

Further, it makes no difference here that MML claims that it relies on "new" evidence to argue that Rutas' statements during the arbitration were supposedly "false."  As noted, the emergence of new evidence is not a basis for vacatur.  *See, e.g. Baltia Air Lines*, 1994 U.S. Dist. LEXIS 17509, at *8; *Cong. Sec.*, 2004 U.S. Dist. LEXIS 6573, at *11; *Bridgeport Rolling Mills*, 314 F.2d at 885 (2d Cir. 1963); *Lafarge Conseils*, 791 F.2d at 1339 (9th Cir. 1986).

Moreover, the supposedly new evidence MML presents here tells precisely the same story of purported corruption that MML told during the arbitration and that the Tribunal rejected as not probative of corruption—meaning that Rutas' "denials" were not, in fact, "false."  In particular,

just as in its Petition now, MML alleged during the arbitration—on the basis of statements from Jorge Henrique Simoes Barata and Valdemir Flavio Pereira Garreta, whose testimony was summarized by State Attorney Ramírez—that Odebrecht paid $3 million in the first quarter of 2013 to Villarán's recall referendum campaign. *Compare* Pet. Mem. 22, *with* Award ¶¶ 301, 420, 435, 485. And MML also alleged during the arbitration, just as now, that additional payments by Odebrecht led to the Bankability Addendum. *Compare* Pet. Mem. 23-24, *with* Award ¶¶ 446-47.

The Tribunal concluded on the basis of those very same facts that there was no indication the alleged payment by Odebrecht in 2013 amounted to a bribe related to the Contract, including because the available evidence did not show how the alleged payment could have affected the validity of the Contract and because the decision to award the project was made *months before* Mayor Villarán's campaign had even begun. Award ¶¶ 442, 443, 461. Moreover, assessing the same facts that MML relies on now, the Tribunal further found that the Bankability Addendum was not obtained by corrupt means, including because the Addendum was executed in compliance with an express provision of the Contract, and it did not even reflect terms that were more favorable to Rutas than the original Contract. Award ¶¶ 449, 457, 460, 462.

Critically, MML had ample opportunity during the arbitration to rebut Rutas' arguments that this very same evidence did not demonstrate corruption in the making of the Contract or Bankability Addendum. *See Baltia Air Lines*, 1994 U.S. Dist. LEXIS 17509, at *9-10 ("many courts have held that the award is not fraudulently obtained when the protesting party had an opportunity to rebut his opponent's claims at the hearing") (collecting cases). The Tribunal found that MML did not do so. Award ¶¶ 431, 437, 442, 460, 500. Therefore, there is simply no basis for this Court to find now that Rutas' so-called "denials" during the arbitration amounted to fraud.

19

**B.**     **Petitioner raised its allegation of corruption during the arbitration—and the Tribunal rejected the allegation**

Though MML's failure to satisfy the first condition for vacatur is dispositive, the petition for vacatur also fails because MML cannot satisfy the second condition for vacatur under § 10(a)(1).  Under the second condition, a party seeking vacatur for purported fraud in the making of the award "must show that the fraud could not have been discovered before or during the arbitration through the exercise of reasonable diligence."  *ARMA*, 961 F. Supp. 2d at 254.  "If the misconduct came to light at some point during the course of the arbitral proceedings, but the movant nevertheless failed to raise its concerns in a timely fashion, it may be deemed to have waived its right to seek vacatur under § 10(a)(1)."  *Id.* (citing *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1069 (9th Cir. 2010)).  And where the supposed fraud is discovered and brought to the attention of the arbitrators, courts will not give a movant a "'second bite at the apple.'" *Id.* (quoting *A.G. Edwards & Sons*, 967 F.2d at 1404); *see also Employers Ins. of Wausau v. National Union Fire Ins. Co.*, 933 F.2d 1481, 1485 (9th Cir. 1991) (noting that this rule is consistent with "the extremely narrow scope of [judicial] review of the arbitration panel's decision").

Here, relying on a declaration from the Municipal Public Prosecutor's Office (ECF No. 1-15), MML argues that, during the course of the arbitration, it could not access the "new" evidence that supposedly demonstrates the falseness of Rutas' counsel's statements, because the evidence was "either (1) not available to the Municipality until July 24, 2020, when the prosecutor in Peru determined" the evidence could be shared, or "(2) not in existence at the time of the arbitration." Pet. Mem. 28.  This argument is irrelevant.  In reality, MML never once asked the Tribunal for a delay or stay of the arbitration proceedings so it could develop additional evidence of the supposed corruption in the making of the Contract, despite knowing full well of the ongoing State Prosecutor investigations of Odebrecht and the former mayor.  And though the Municipal Prosecutor's

declaration states that MML only received approval from the State Prosecutor to access the new documents in July 2020, MML does not explain why it could not access these documents during the arbitration if it could be granted access to this information (which is still the subject of investigations) now.  MML thus fails to demonstrate that it exercised "reasonable diligence" in discovering the "new" information.  *See Merrill Lynch, Pierce, Fenner & Smith v. Lambros*, 1 F. Supp. 2d 1337, 1345 (M.D. Fla. 1998) (holding that a party did not use diligence to discover alleged fraud where it did not move to compel witness's appearance or move for a continuance).

MML relies on the Eleventh Circuit's decision in *Bonar* to argue that its lack of diligence may be excused by State Prosecutor rules limiting MML's prior access to the documents.  Pet. Mem. 28 (citing 835 F.2d at 1380).  In *Bonar*, the Eleventh Circuit affirmed a district court's partial vacatur of an arbitral award after it was discovered that an expert witness lied about his educational and professional credentials.  But the *Bonar* court determined that the movant could not have known about the witness's credentials (or lack thereof) because the rules applied during the underlying arbitration did not provide for a pre-hearing exchange of witness lists.  *Id.* at 1384. *Bonar*, of course, is inapplicable here because MML clearly was aware of the corruption investigations and had access to State Attorney Ramírez, who presented evidence of these investigations to the Tribunal.

Indeed, whether MML could have accessed the investigative documents of the State Prosecutor during the arbitration is beside the point.  MML claims that these new documents reveal the falseness of Rutas' "denials" of a supposed corruption scheme involving Rutas.  But throughout the arbitration hearing, MML expressly and vigorously attempted to rebut Rutas' supposed "denials" of the corruption charge.  *See, e.g.* Hearing Tr. (Kownacki Decl., Ex. 4) 157: 21–158:4 (Day 1), 170:21–171:11 (Day 1), 290:14-17 (Day 2), 291:11-14 (Day 2), 1404:14-17 (Day 5),

21

1405:21–1406:5 (Day 5).  MML even put forward a summary of precisely the same allegations it makes now, through the testimony of State Attorney Ramírez.  *See* Ramírez Decl. (Kownacki Decl., Ex. 2) ¶¶ 26-30.  Regardless of the availability or existence during the arbitration of the investigative materials MML now relies upon, MML here is undeniably trying to get a "second bite at the apple" in its accusations that the Contract and Bankability Addendum were procured through corruption.  This attempt should be rejected.  *A.G. Edwards & Sons*, 967 F.2d at 1404.

Though MML seeks to distinguish this Court's decision in *ARMA* (*see* Mot. 28 (arguing that the present case is not one "in which fraudulent conduct came to light at some point during the course of the arbitral proceedings")), that case in fact bears heavily on the circumstances here. In that case, ARMA argued that BAE's counsel had committed "perjury during oral argument," made "factual misrepresentations in its written briefings," and gave "false opinions in the form of testimony" during the arbitral hearing.  *Id.* at 257-58.  This Court, however, held that even if these acts were fraudulent—which ARMA had not shown to be the case—the allegedly fraudulent nature of the statements was "not only discoverable, but actually discovered, during the course of the arbitration."  *Id.* at 258-59.  Specifically, the Court noted that ARMA had informed the tribunal that it disagreed with counsel's statements and ARMA offered its own view of the record.  *Id.*  In light of those circumstances, the Court thus found that ARMA had "failed to make even a passable case for vacatur" under § 10(a)(1).  *Id*. at 251.

Similar to the allegations in *ARMA*, MML's disagreements with Rutas' counsel's "denials" were plainly brought to the attention of the Tribunal.  *E.g.,* Hearing Tr. (Kownacki Decl., Ex. 4) 157: 21–158:4 (Day 1), 170:21–171:11 (Day 1), 290:14-17 (Day 2), 291:11-14 (Day 2), 1404:14-17 (Day 5), 1405:21–1406:5 (Day 5).  In fact, by the final stage of briefing after the hearing, MML had made the corruption allegations a central defense in its case.  Thus, even assuming Rutas'

counsel's statements could constitute fraud under § 10(a)(1) (which they do not), the supposedly false nature of those statements not only was easily discoverable by MML, but actually was "discovered" during the arbitration *and* considered by the Tribunal—who, with full awareness that the State Prosecutor investigation was ongoing, rejected the suggestion that Rutas' "denials" were "false" or simply ignored them.   Thus, as in *ARMA*, this Court should deny MML's motion, because MML cannot satisfy the second condition for vacatur.

### C.   Allegedly incorrect statements of counsel did not materially affect the outcome of the arbitration

Assuming MML could satisfy the first two conditions under § 10(a)(1), which it cannot, there is no colorable basis to conclude that Rutas' counsel's statements materially affected the outcome of the arbitration in any way.   To demonstrate materiality, MML must show a causal connection between the alleged conduct and the outcome of the arbitration.   *ARMA*, 961 F. Supp. 2d at 254.   This requires "proof that the misconduct or fraud had some bearing on the arbitrator's final decision."   *Id.* at 255 (citing *Owen-Williams v. BB&T Inv. Servs.*, 717 F. Supp. 2d 1, 17 (D.D.C. 2010)).

Attorney advocacy, however, cannot materially affect an arbitral award because, as previously stated, statements from counsel are not sworn testimony or evidence.   *Cook Chocolate*, 748 F. Supp. at 126.   As several courts have held, attorney statements alone do not materially prejudice the outcome of an arbitration.   *See ARMA*, 961 F. Supp. 2d at 258 (denying vacatur and finding no nexus between alleged counsel misrepresentations and the outcome of the arbitration); *Owen-Williams*, 717 F. Supp. 2d at 17-18 (confirming arbitral award and holding that counsel misrepresentations that secured a delay in proceedings were immaterial to the outcome of the arbitration).   But even if such statements could materially affect the arbitration, they did not do so here.

23

MML cherry-picks one reference in the Award to Rutas "denying" that certain payments were improperly made, but MML fails to acknowledge that the Tribunal did a comprehensive analysis of the corruption evidence that it was presented with and reached its *own* conclusions based on that evidence.

In addition, the section of the Award referencing Rutas' denial of corruption makes clear that, regardless of Rutas' position, MML did not meet its burden of proof:

> The Tribunal . . . has no elements to confirm the existence of these corrupt payments, which are denied by Rutas de Lima. Nor is there any explanation of how these payments, had they existed, could have affected the validity of the Contract or the June 2016 Memorandum. Indeed, as stated, these payments would have been made more than 18 months after the Adjudication and more than a year after the signing of the Concession Contract, and there is no evidence to conclude that they could be related to the Adjudication or with the signing of the Contract.

Award ¶¶ 442-43. The Tribunal clearly reasoned on its own that even if the purported payments were made as alleged by MML, (i.e. ignoring any "denial" by Rutas) they did not affect the terms, signing, or performance of the Contract. *See, e.g.*, Award ¶ 434[6] ("As a matter of fact, the [Tribunal] does not see the reason why Odebrecht would have needed to make corrupt payments to sign a contract that had already been awarded."). Thus, Rutas' counsel's statements denying a sufficient nexus between the alleged payments and the procurement of the Contract did not materially affect the Tribunal's decision—as the Award proves on its face. Not only is this a third basis on which to deny MML's vacatur motion, it also shows that the Tribunal did not rely on the statements of Rutas' counsel in reaching its decision, which is a necessary element of fraud.

---

[6] As noted, *supra* n.3, MML failed to provide a translation of paragraph 434 (which is paragraph 435 in the Spanish version of the Award). That translation is set forth in Kownacki Decl., Ex. 3.

III.   **The Purported Public Policy Ground Also Is Not a Basis to Vacate the Award**

MML's alternative argument to vacate the Award under common-law public policy grounds is merely an attempt to circumvent the limited grounds under § 10(a) for which an arbitration award may be vacated.

Generally, public policy favors leaving arbitration awards untouched.  *Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1110 (D.C. Cir. 2017) (recognizing arbitration award).  A court may vacate an arbitration award under public policy grounds only if the award is "contrary to some explicit public policy that is well defined and dominant and ascertained by reference to the laws or legal precedents." *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001) (internal quotations and citations omitted).  This exception "is construed extremely narrowly and applied only where enforcement would violate the forum state's most basic notions of morality and justice." *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 69 (D.D.C. 2013) (internal quotations and citation omitted); *see Am. Train Dispatchers Ass'n v. Burlington N. R.R.*, 784 F. Supp. 899, 904 (D.D.C. 1992) ("[The public policy] basis for reversing an arbitration is an 'extremely narrow' exception to the general deference accorded [to] arbitration awards.").

MML relies on a broad public policy that "under the United States' long-established common law, contracts tainted by corruption are unenforceable." Pet. Mem. 31.  Courts, however, consistently have confirmed arbitral awards when presented with a public policy defense against corruption in light of the equally strong U.S. policy favoring confirmation of arbitral awards. *See, e.g.*, *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 43 (D.D.C. 2013) (citing *Agility Pub. Warehousing Co. K.S.C., Prof'l Contract Admins., Inc. v. Supreme Foodservice GmbH*, 495 F. App'x 149, 151 (2d Cir. 2012)).

25

In *BCB Holdings v. Government of Belize*, this Court was presented with a similar policy argument where the Government of Belize argued that the arbitral award at issue "violat[ed] the public policy of the United States against government corruption."  110 F. Supp. 3d 233, 249-50 (D.D.C. 2015) *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016).  The Court, however, held that while the United States has a policy against corruption abroad, it is neither well-defined nor sufficient to overcome the "strong policy favoring confirmation" of arbitral awards.  *Id.* at 250.  In confirming the award, the Court further noted that Belize "cannot point to any cases in which a court declined to enforce an arbitral award because it violated the United States' public policy against government corruption."  *Id.*

Similar to the public policy at issue in *BCB Holdings*, MML's stated policy against allegedly corrupt contracts is neither explicit nor well-defined.  Rather, it is a generalized consideration of supposed public interest.  *See BCB Holdings*, 110 F. Supp. 3d at 250 (citing *United Bro. of Carpenters and Joiners of America, AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 697 (D.C. Cir. 2013)).  Nor does MML identify any cases in this Circuit—or any other Circuit—in which a court vacated an arbitration award for violating a U.S. policy against corruption.  In addition, the purported corruption upon which MML relies "implicates the politics of a foreign nation" and "would undoubtedly implicate politics abroad."  *Id.*  MML should not be permitted to use this limited, judicially created exception to the general policy in favor of confirming arbitration awards as a means to insert this Court into matters of international law and politics.

But even if MML identified a well-defined public policy, it fails to show that the Award violated that policy or that the Contract was secured through corruption.  As an initial matter, the Tribunal already evaluated this issue and decided that there was insufficient evidence of fraud or

26

corruption related to the Contract.  *See* Award ¶ 433-34 (noting that the contractual terms accepted by Rutas and MML "correspond exactly with the terms with the terms of the Declaration of Interest" from many months prior, which "constitutes conclusive evidence that the signing of the Contract was not obtained by illegal means").[7]  The "limited scope of judicial review does not extend to reweighing equities supported by the arbitration record." *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 821 (D.C. Cir. 2007); *see also DeMartini v. Johns*, 693 F. App'x 534, 537 (9th Cir. 2017) (affirming denial of vacatur on public policy grounds where the "public policy argument would require the Court to revisit the arbitrator's findings of fact and conclusions of law").

In addition, and as previously detailed, MML's "new" evidence does not demonstrate that the Contract was procured through illegal conduct.  Even if the alleged payments were made when MML claims, the Tribunal held that the payments could not have affected the execution of the Contract.  Award ¶¶ 442-45.  The evidence established (and the Tribunal found) that MML awarded the Contract to Rutas on September 18, 2012—more than 18 months before the purported payments were made.  Furthermore, the material terms of the Contract were agreed upon well before any of the alleged corrupt acts occurred, including those related to Mayor Villarán's campaign.  With respect to the subsequent Bankability Addendum, the Tribunal found that the Addendum did not modify the Contract in any way that was more favorable to Rutas.  If anything, the Tribunal found that the Addendum made Rutas' performance under the Contract more onerous.  Award ¶ 457.

---

[7] The translation of paragraph 434 is set forth in Kownacki Decl., Ex. 3, ¶ 435.

In sum, MML has neither stated a well-defined public policy nor established that the Award violates the same.  Accordingly, MML's request for vacatur on public policy grounds should be denied.

## **CONCLUSION**

For the foregoing reasons, Rutas respectfully requests that this Court deny the Municipality's Petition to Vacate without any further proceedings.

Dated:   December 23, 2020                                      Respectfully submitted,

/s/  Nicolle Kownacki
Nicolle Kownacki (D.C. Bar No. 1005627)
**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC  20005
Telephone:     + 1 202 626 3600
Facsimile:      + 1 202 639 9355
nkownacki@whitecase.com

David G. Hille (*D.D.C. admission pending*)
**WHITE & CASE**
1221 Avenue of the Americas
New York, New York 10020
Telephone:     + 1 212 819 8200
Facsimile:      + 1 212 354 8113
dhille@whitecase.com

*Counsel for Rutas de Lima S.A.C.*