## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Metropolitan Municipality of Lima | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No.  1:20-cv-02155-ACR |
| | ) | |
| v. | ) | |
| | ) | |
| Rutas de Lima S.A.C. | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Respondent. | ) | |
| | ) | |

### PETITION TO VACATE ARBITRAL AWARD

Pursuant to section 10 of the Federal Arbitration Act ("FAA"), the Metropolitan Municipality of Lima (the "Municipality") hereby petitions and moves this Court for an order vacating an arbitral award (the "Award") that was rendered in favor of Rutas de Lima S.A.C. ("Rutas") on May 11, 2020 by an arbitral tribunal constituted under the Concession Contract for the design, construction, improvement, conservation, and operation and exploitation of the "Vías Nuevas de Lima" Project in Lima, Peru signed by the Parties on January 9, 2013.

### PARTIES

1.      Petitioner, the Municipality, is the administrative authority of the capital of the Republic of Peru, with a registered office at Jirón Conde de Superunda 141 Cercado de Lima, Perú.

2.      Respondent Rutas is a company incorporated under the laws of the Republic of Peru, with registered office at Panamericana Sur Km 19.65 s/n, Av. El Derby No. 250, Piso 18 Villa El Salvador Lima 42, Perú.

1

## JURISDICTION AND VENUE

3.      The Award is subject to enforcement in the United States pursuant to the Inter-American Convention on International Commercial Arbitration. 9 U.S.C. §§ 301 *et seq*. The Award arises out of a commercial legal relationship that is between two parties that are not citizens of the United States.  *See id*. § 202; *see also id*. § 302 (incorporating Section 202 by reference "except that for purposes of this chapter 'the Convention' shall mean the Inter-American Convention").  Accordingly, this Court has original jurisdiction over the Municipality's petition to vacate the Award pursuant to Section 203 of the FAA.  *Id*. § 203; *see also id*. § 302 (incorporating Section 203 by reference "except that for purposes of this chapter, 'the Convention' shall mean the Inter-American Convention").

4.      Venue is proper in the United States District Court for the District of Columbia because the underlying arbitration was seated, and the Award was issued in, the District of Columbia.  *Id*. § 204; *see also id*. § 302 (incorporating Section 204 by reference "except that for purposes of this chapter, 'the Convention' shall mean Inter-American Convention"); 9 U.S.C. § 10.

## GROUNDS FOR VACATING THE AWARD

4.      This Petition is brought pursuant to 9 U.S.C. § 6.  *See* 9 U.S.C. § 6 ("Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided.").

5.      Section 10 of the FAA provides the statutory grounds for vacatur of an arbitral award.  Specifically, pursuant to 9 U.S.C. § 10, an award may be vacated for: (1) corruption, fraud, or undue means; (2) evident partiality or arbitrator corruption; (3) arbitrator misbehavior that prejudiced a party's rights; or (4) excess of authority.  9 U.S.C. § 10.

6.     An arbitration award may also be vacated if it is contrary to an "explicit public policy."  *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

7.     The Award here should be vacated pursuant to 9 U.S.C. § 10(a)(1) because the award was procured due to corruption, fraud, or undue means.  The Award should also be vacated because it is contrary to an explicit public policy.

8.     The Municipality's petition for an order vacating the Award in its entirety is based on the accompanying memorandum of points and authorities and the supporting exhibits filed contemporaneously herewith, and upon such other and further evidence or argument as may be presented hereafter and/or at any hearing upon this Petition.

9.     Pursuant to Local Rule 7(f), the Municipality requests oral argument.

Dated: March 31, 2021                    Respectfully submitted,

THE METROPOLITAN MUNICIPALITY OF LIMA

By its attorneys,
*/s/ Andrew B. Loewenstein*
Andrew B. Loewenstein (D.D.C. Bar No. MA0018)
Nicole Elizabeth Smith (admitted *pro hac vice*)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
Tel: 617-832-1000
aloewenstein@foleyhoag.com
nsmith@foleyhoag.com

Shrutih Tewarie (*pro hac vice forthcoming*)
Nicholas Marcus Renzler (D.D.C. Bar No. 983359)
José M. Garcia Rebolledo (*pro hac vice forthcoming*)
FOLEY HOAG LLP
1301 Avenue of the Americas, 25th Floor
New York, NY 10019
Tel: 646-927-5500
stewarie@foleyhoag.com
nrenzler@foleyhoag.com
jrebolledo@foleyhoag.com

3

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Metropolitan Municipality of Lima,
Jiron Conde de Superunda
141 Cercado de Lima, Peru,

Petitioner,

v.

Rutas de Lima S.A.C.,
Panamericana Sur Km 19.65 s/n,
Av. El Derby No. 250, Piso 18 Villa El Salvador
Lima 42, Peru,

Respondent.

Civil Action No. 1:20-cv-2155 (ACR)

**Oral Argument Requested**

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE METROPOLITAN MUNICIPALITY OF LIMA'S PETITION TO VACATE ARBITRAL AWARD

Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), the Metropolitan Municipality of Lima (the "Municipality") hereby respectfully requests that this Court vacate the arbitral award dated May 11, 2020 that was rendered in favor of Rutas de Lima S.A.C. ("Rutas") and delivered to the parties on May 12, 2020, following an arbitration carried out under a concession contract for the design, construction, improvement, conservation, and operation and exploitation of the "Vías Nuevas de Lima" Project in Lima, Peru, which was signed by the parties on January 9, 2013 (the "Concession Contract").  Exhibit ("Ex.") A.

### I.      INTRODUCTION

Vacatur is necessary because Rutas, which was composed of subsidiaries of Odebrecht S.A. ("Odebrecht")—a notoriously corrupt global construction conglomerate that admitted in a 2016 plea agreement with the U.S. Department of Justice ("Odebrecht Plea Agreement") to having

paid over three-quarters of a billion dollars in bribes in connection with more than 100 government projects around the world—obtained the Concession Contract and various benefits thereunder through the payment of bribes to officials of the Municipality.

When Rutas commenced arbitral proceedings against the Municipality in regard to a dispute that arose under the Concession Contract, Rutas fraudulently misrepresented to the District of Columbia-seated arbitral tribunal that Rutas had not engaged in any corrupt acts in relation to the Concession Contract. And, by fraudulently misrepresenting that it had committed no such acts—representations on which the arbitral tribunal expressly relied in finding that the Concession Contract should not be voided for corruption—Rutas improperly obtained an award that it now values in excess of $150 million.

Since the conclusion of the arbitration, evidence has emerged through unfolding criminal investigations which proves that Rutas misled the arbitral tribunal into awarding Rutas a massive and undeserved financial windfall on the basis of its misrepresentations. Such evidence establishes, among other things, that Rutas promised and paid millions of dollars in bribes to municipal officials; coordinated the transfer of illicit payments through offshore accounts; and entered into sham subcontracts through which Rutas laundered payments to municipal officials. Significantly, in a subsequent arbitration arising out of the same Concession Contract, an arbitrator who had also served on the first tribunal considered some of the new evidence, revisited her prior finding, which had been made in reliance on Rutas' false denials, and concluded that the Concession Contract was, in fact, tainted by corruption.

For the reasons detailed below, vacating the award is warranted under Section 10(a)(1) of the FAA because Rutas procured the award "by corruption, fraud, or undue means." Vacatur is further required because the award is contrary to the United States' long-established and vital

public policy of not permitting corrupt actors—like Odebrecht and affiliated entities—to profit from their own malfeasance.

## II.    THE PARTIES

The Municipality is a governmental entity with authority over Lima, the capital of the Republic of Peru.  Its registered office is at Jirón Conde de Superunda 141 Cercado de Lima, Peru.  The Municipality has three branches that are responsible for carrying out governmental functions: (1) the Mayor of Lima (the chief executive of the Municipality); (2) the City Council (a six-person body consisting of the Mayor and five elected councilmembers); and (3) the Metropolitan Assembly (a deliberative body with advisory and coordination responsibilities).

Rutas is a company incorporated under the laws of Peru, with a registered office at Panamericana Sur Km 19.65 s/n, Av. El Derby No. 250, Piso 18 Villa El Salvador Lima 42, Peru.  Rutas was founded as a wholly owned subsidiary of Odebrecht and was Odebrecht's subsidiary when the corrupt acts chronicled below occurred.

## III.    BACKGROUND

### A.    ODEBRECHT'S GLOBAL CORRUPTION SCHEME

Odebrecht is a Brazilian holding company that, through various operating entities, conducts business in multiple industries, including engineering, construction, infrastructure, energy, chemicals, utilities, and real estate.  Ex. B at B-1 ¶ 1.  Odebrecht operates in 28 countries, including the United States.  *Id.*

Between 2001 and 2016, Odebrecht engaged in a wide-ranging corruption scheme to influence government officials around the world to grant government contracts to Odebrecht and affiliated corporate entities by paying those officials hundreds of millions of dollars in cash and other things of value.  *Id.* at B-7 ¶ 19.

In furtherance of its scheme, Odebrecht created an elaborate, secret financial structure to account for and disburse bribery payments. *Id.* at B-7 ¶ 21. Specifically, Odebrecht created a stand-alone division within its corporate structure, known as the Division of Structured Operations, which, in the words of its Plea Agreement, "effectively functioned as the bribe department within Odebrecht." *Id.* To conceal Odebrecht's illicit activities and those of its affiliated companies, the division used an entirely separate and off-book communications system. This allowed members of the division to communicate with one another and with outside financial operators and other co-conspirators about the bribes through secure emails and instant messages, utilizing codenames and passwords. *Id.* at B-9, ¶ 25.

The Division of Structured Operations recorded some of the illegal payments made by Odebrecht and affiliated companies on accounting ledgers, with notations identifying the project to which the payment corresponded and the codename of the individual to whom payment was made. *Id*. Other payments were unrecorded. *Id*. at B-9 and B-10, ¶ 26. Odebrecht and affiliated companies used numerous vehicles for transferring bribes. Vehicles included dispatching couriers to deliver cash directly to recipients. Odebrecht and affiliated companies also arranged for intermediaries to deliver payments laundered through sham subcontracts. Odebrecht and affiliated companies also set up offshore bank accounts in the name of government officials or their co-conspirators and paid "success fees" to co-conspirators following the financial closings of government contracts. *Id*. Odebrecht and affiliated companies laundered illicit payments by funneling them through up to four levels of offshore bank accounts, including accounts in the United States, to create maximum distance from the recipient. *Id*. at B-8, ¶ 22; *see also id*. at B-10, ¶¶ 27-28. Through this scheme, Odebrecht and affiliated companies hid the source and destination of illicit payments that it and its subsidiaries made. *Id*. at B-10, ¶ 27.

Eventually, Odebrecht got caught.  In 2016, Odebrecht entered into its plea agreement with the U.S. Department of Justice.  Odebrecht admitted to having paid approximately $788 million in bribes in association with more than 100 government projects in numerous countries, including Angola, Argentina, Brazil, Colombia, the Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru, and Venezuela.  *Id.* at B-7, ¶ 20 and B-8 ¶ 23.  Odebrecht earned approximately $3.336 billion in profits from the government contracts that it obtained through payment of these bribes.  *Id*.  Odebrecht confessed that it not only paid bribes to *procure* government contracts but also continued to make corrupt payments *after signing* those contracts to extract additional benefits thereunder and to ensure continuity of its business.  *Id*. at B-7, ¶ 19. Odebrecht confessed that it employed this corrupt *modus operandi* in Peru, admitting to paying approximately $29 million in bribes to Peruvian political officials or candidates in connection with multiple government contracts.  *Id*. at B-20, ¶ 65.

### B.    RUTAS SECURED THE CONCESSION CONTRACT THROUGH CORRUPTION

#### 1.    The Evaluation and Approval of Odebrecht's Proposal

Odebrecht proposed, and Rutas ultimately signed, the Concession Contract under a public-private partnership arrangement under Peruvian law that allows private companies to design and propose public infrastructure projects.  Specifically, on April 16, 2010, the Consortium "Lineas Viales de Lima," composed of Odebrecht subsidiaries, submitted to the Municipality a proposal for the Vías Nuevas de Lima Project (the "Odebrecht Private Initiative"), for the design, construction, operation, and maintenance of new and existing highways.  *Id.* ¶ 82.

In October 2010, Susana Villarán de la Puente ("Villarán") was elected mayor of Lima. For two years under the Villarán administration, the municipal department charged with evaluating public-private partnership proposals—the Department for the Promotion of Private Investment

("GPIP," per its initials in Spanish)—declined to approve Odebrecht's Private Initiative, due to its many defects. As the municipal engineer responsible for reviewing the Odebrecht Private Initiative testified, the proposal received "multiple technical objections that caused it to not proceed." Ex. D at 2036, 2039, ¶¶ 16, 37.

Halfway through Villarán's term, an opposition group mounted a recall campaign against Villarán. By early April 2012, sufficient signatures to require a referendum on Villarán's recall had been amassed. Dkt. #60-1, ¶ 354. On April 13, 2012, Villarán's City Manager, José Miguel Castro Gutiérrez ("Castro"), met with two Odebrecht executives, Guillerme Borges Queiroz ("Queiroz") and Antonio Eleuberto Martorelli ("Martorelli"), at the behest of senior members of Villarán's political party. Ex. E, ¶ 9; *see also* Ex. F, ¶ 43. Castro admitted in sworn testimony that, during the meeting, the Odebrecht representatives sought the Municipality's support for the approval of the Vías Nuevas de Lima proposal. Ex. E, ¶ 11. Castro further testified that, while GPIP might agree to preliminarily approve the Odebrecht Private Initiative, the City Council still needed to vote in favor of the proposal before it could be submitted for public tender. *Id.* ¶ 9. This required support from councilmembers of the opposition party who had staunchly opposed Villarán's previous proposals. However, the Odebrecht executives told Castro that obtaining the support of those city councilmembers "would not be a concern" because Odebrecht "had a very good relationship" with them. *Id.* ¶ 11.

Within 14 business days of Castro's meeting with Odebrecht, on May 3, 2012, GPIP approved the Odebrecht Private Initiative and submitted it to the City Council for a vote. Ex. A, ¶ 93. Municipal officials charged with evaluating the proposal have since testified that, after Castro met with the Odebrecht representatives, Castro began insisting that "deadlines had to be

accelerated" and ordered the officials to urgently approve the Odebrecht Private Initiative. Ex. D at 2039, ¶ 34; *see also* Ex. G at 2030, ¶ 11; Ex. F, ¶¶ 57, 162.

When the Villaran administration put the Odebrecht Private Initiative before the City Council, it received an unanimous vote of approval, even garnering support from councilmembers of the opposition party—just as Odebrecht executives Martorelli and Queiroz had assured Castro would happen. Rarely during Villarán's administration had any vote initiated by her received support from *any* members of the opposition party; never before had such a proposal received *unanimous* support. Ex. E, ¶ 15. In fact, as Castro testified, "a group of councilmembers who had been completely opposed to all the initiatives of Mrs. Susana Villarán's [administration]," and who had previously only voted against her, "were the leading advocates of this private Odebrecht initiative at the aforementioned Council Session." *Id*. Castro testified that he was "surprised" at this apparent change of heart until he later learned that "they had received from Odebrecht a financial support of $200,000 for their electoral campaign that placed them [on the City Council]." *Id.*

After securing the City Council's approval, the Odebrecht Private Initiative was submitted to a 90-day public tender process. This required municipal officials at GPIP to solicit bids from other construction firms. Ex. A, ¶¶ 234, 319; *see also* Dkt. 60-1, ¶¶ 93, 602-604. However, Villarán's administration did little more than create a website and physical data room. Unsurprisingly, the Municipality received no competing bids. *See* Ex. C, ¶ 92, nos. 3.13-3.18. The Municipality then awarded the project, known as the Vías Nuevas de Lima, or Línea Azul, project, to the Odebrecht consortium on September 18, 2012. Ex. A, ¶ 94. Odebrecht incorporated a Peruvian subsidiary, Vías Nuevas de Lima S.A.C., which later became Rutas, to negotiate the final contract and carry out the project. *Id*. ¶ 97.

7

2.     Payment of Bribes to Secure the Concession Contract

Only a month after the Villarán administration awarded the Vías Nuevas de Lima project, the Peruvian national elections commission announced that there would be a recall referendum on March 17, 2013, to determine whether Villarán would remain in office.  Ex. E, ¶ 18; *see also* Ex. A, ¶ 421.

Odebrecht was gravely concerned about this development.  While the Vías Nuevas de Lima project had been preliminarily awarded to Rutas, the Concession *Contract* was not yet secured. Noda Yamada, the Municipality's technical engineer and legal counsel, explained in his testimony that while he had approved the Odebrecht Private Initiative, that was largely a *pro forma* step.  The terms of an eventual contract still needed to be agreed by the parties.  Ex. G at 2029-2030, ¶¶ 8, 12.  Castro similarly testified:

> Even if the project had already been awarded to Odebrecht, due to the lack of interest of any other bidder, the Municipality could still ultimately not sign the agreement. In fact, many private initiatives do not come to fruition, even if they are declared of interest [*i.e.*, approved].  In addition to the negotiation of the terms of the contract between the parties, which at the time was not finalized, there were other actions that the [Municipality] had to fill out before the agreement was viable and that depended on [the] municipal management.

Ex. E, ¶ 19.

Moreover, execution of the Concession Contract would not, alone, guarantee that the project would proceed.  Rutas was acutely aware of this reality.  Rutas' General Manager (effectively its Chief Executive Officer), Raúl Ribeiro Pereira Neto ("Pereira"), testified that after the signing of the Concession Contract, the project still needed to reach financial close—that is, secure financing from creditors for the construction project, a process that required the

involvement and authorization of Villarán's administration.  Ex. L at [PDF] 30-32.  Other concession contracts had dissolved because the parties could not reach financial close.  *Id.*  Rutas did not reach financial close until June 27, 2014, a year-and-a-half after signing the Concession Contract.  *Id.*

Thus, without continuity in the Municipality's administration, the Concession Contract remained at risk.  It was against this backdrop that Villarán's administration began discussions with Rutas concerning the terms of the Concession Contract.  *Id.*; *see also* Ex. E, ¶ 18.

At the end of October 2012, Villarán officially launched an anti-recall campaign (the "No Recall campaign") and appointed Castro (the City Manager who oversaw the contract negotiations) as her campaign director.  Castro has testified that, soon thereafter in November 2012, Odebrecht executive Antonio Martorelli approached Villarán and Castro and offered to assist Villarán's No Recall campaign by contracting media advisors, pollsters, and officials from Peru's electoral body, who Martorelli claimed he had "in his pocket."  Ex. E, ¶¶ 18-20; *see also* Ex. F, ¶ 43.  Castro further testified that, by December 2012, Martorelli had arranged for—and paid—the political consulting firm Imasen to advise Villarán's campaign.  Ex. E, ¶ 20.

In the weeks following Castro's meeting with Martorelli, the Villarán campaign contracted two Brazilian media advisors, Luis Favre and Valdemir Garreta, to manage her media campaign.  Ex. C, ¶ 78; Ex. M, ¶ 1.  Favre and Garreta had managed the campaigns of other political candidates, including former President of Peru Ollanta Humala, funded by corrupt payments from Odebrecht.  Ex. E, ¶ 21.  Castro testified that Favre informed him that "due to the interest that Odebrecht had in the Municipality of Lima," Odebrecht would pay his fees "without significant problem," as had been done previously.  *Id*.

Castro testified as well that between December 2012 and January 2013, Villarán's campaign team and executives of Odebrecht and Rutas met both in-person and over telephone to discuss funding a No Recall media blitz. *Id*. ¶¶ 21-24. Other participants in these meetings included Rutas General Manager/CEO Raúl Pereira; Jorge Henrique Simoes Barata ("Barata"), who served as Odebrecht's country lead in Peru and was the former president of Rutas (Ex. N); and Valdemir Garreta ("Garreta"), who was Villarán's Brazilian media advisor (Ex. M). Each confirmed an agreement was reached during these meetings to illegally pay $3 million in support of Villaran's campaign, $2 million of which went directly to Garreta. Ex. L at [PDF] 14-15; Ex. N at 1-2; Ex. M, ¶¶ 14-16.

Barata specifically testified that these bribes were paid to protect Rutas' Concession Contract. He explained the motivation in the following terms: "We had a concession with the Municipality of Lima, which is Rutas de Lima, so, whenever there is a change of [administration], it stops, reviews, manages [the contract negotiations process] and, even more… [the Concession] ran risk of being revoked." Ex. N at 1169.

On January 8, 2013, Odebrecht paid Garreta's media company the first of 14 payments in cash at its headquarters in Sao Paulo. Ex. M, ¶ 20; *see also* Ex. C, ¶ 108. The next day, on January 9, 2013, the Municipality and Rutas signed the Concession Contract. Ex. A, ¶ 97.

The Municipality, however, lacked the authority to sign and enter into the Concession Contract. Public works contracts between Peruvian municipalities and private entities, like the Concession Contract, are governed by Peru's Legislative Decree 1012. Ex. A, ¶¶ 503, 508. The Decree requires all finalized public works contracts to be submitted to Peru's Ministry of Economy and Finance (the "Ministry") for review and prior authorization before they may be signed. This prior approval requirement enables the Ministry, *inter alia*, to determine whether public funds

would be used properly and in accordance with the law.[1]  The Municipality nonetheless executed the Concession Contract without obtaining prior authorization from the Ministry.

          3.      <u>Illicit Payments to Villarán's Campaign Team Were Connected to the Concession Contract</u>

After securing the Concession Contract without the required supervision of the Ministry, Rutas continued funneling clandestine payments from Odebrecht's Division of Structured Operations to Villarán's campaign.  *See* Ex. E, ¶¶ 26-27; Ex. M, ¶ 20.  In sworn testimony, Pereira confessed that once the Concession Contract had been signed, he was responsible for facilitating the illicit payments to the Villarán anti-recall campaign.  Ex. L at [PDF] 14-15, 21-22, 37, 40-41.  Pereira's testimony is corroborated by the testimony of Castro, who confirmed that "Pereyra [*sic*] was in charge of payments to the political campaigns [on behalf] of Odebrecht."  Ex. O at [PDF] 3.

Contemporaneous documentary evidence confirms that these payments to Villarán's campaigns were linked directly to the Concession Contract.  Encrypted emails between officials of Odebrecht's Division of Structured Operations uncovered in the course of criminal investigations in Peru included ledger entries recording no fewer than *twelve* illicit payments linked to Rutas' Concession, totaling millions of dollars.  These recorded payments began on February 7, 2013—less than one month after the signing of the Concession Contract—and continued until November 12, 2014.  Ex. P at 1102, 1104, 1172; Ex. Q.[2]

---

[1] Further, because the Concession Contract was presented as a private-public partnership and as a self-funded contract, a type of contract that is regulated to ensure that the Peruvian State or its entities and subdivisions are not committing, or at risk of committing, more than a minimum amount of public financing, prior review and approval by the Ministry was necessary to ensure that the contract in fact qualified as a self-funded contract. *Id.* ¶¶ 98(ii), 502-505, 517-518.

[2] Luis Da Rocha Soares ("Soares"), who was a manager in the Division of Structured Operations from 2012 to 2015, testified that setting up a bribery scheme was a multi-step process that required multiple approvals. He testified that an Odebrecht superintendent for an investment region had to request the Division to open a program in the payment system, indicating the total bribe amount, the term over which it would be paid, in which country and currency, and how the payments were to be made.  Ex. S at 0239-0240.  Soares confirmed that Barata was the superintendent for

Officials from Odebrecht's Division of Structured Operations provided sworn testimony explaining how Rutas' bribes were recorded in the ledgers.  Maria Luisa Guimaraes Tavares ("Tavares") testified that she sent emails to Odebrecht officials in the division with a weekly schedule of illicit payments.  Each payment was recorded in a table with columns related to the payment amount; date of payment; the project on behalf of which the payment was made; the codename of the individual to receive or benefit from the payment; and, if the payment was to be made in cash, the codename for the courier and a password that would be used to exchange the money in person.  Ex. P at 1102, 1104, 1167-1181, 1207-1208; Ex. Q. *See also* Ex. R at 0354-0358, 0407-0408.

Each of the twelve illicit payments were connected to the Concession Contract.  Each was assigned to one of three codenames: "Sexta-Feira" (a codename for Villarán's anti-recall campaign); "Careca" (a codename for Villarán); and "Budián" (a codename for Castro).  Ex. P at 1105.  Under the column titled "*Obra*" (in English, "Project" or "Work"), each payment was assigned to the "Blue Line" project; the "New Roads of Lima" project; or simply "Concession Rutas de Lima"—all names used to describe Rutas' project.  *Id.* at 1102, 1104.  When prosecutors showed Tavares two of the ledgers recording payments assigned to the "Rutas de Lima Concession" of $291,700 and $420,168, respectively, Tavares confirmed that the payments were "linked" to Rutas' Concession.  Ex. R at 0402.  Soares, another official from the Division of Structured Operations, corroborated Tavares' testimony.  Ex. S at 0244.

---

Peru during the relevant period.  *Id.* at 0235.  The superintendent's payment request then needed to be approved by company leadership.  *Id.* at 0240.  Once approved, the Division had to set up codenames for the beneficiaries of the bribes and arrange for the payments to be made through front companies in other countries, often Andorra and Uruguay.  *Id.* at 0241, 0245-0246, 0248-0250. Moreover, as Barata himself testified, he had multiple discussions with Castro and Villarán before the bribery agreement was finalized.  Ex. N at 1168-1169.  Accordingly, the February 7, 2013, payment could only have occurred *after* these steps had been completed and a network for transmitting funds to the Villarán campaign established, meaning that the bribes most likely were agreed upon before the Concession Contract was signed. This is further corroborated by Garreta's testimony that he received the first cash payment at his media company's offices in Brazil the day *before* the Concession Contract was signed.  Ex. M, ¶ 20.

Villarán's campaign team concealed the payments it received by failing to report them or falsely recording them as donations from fictitious donors.  Ex. F, ¶¶ 102-104, 112-119; Ex. C, ¶¶ 19, 125-128.  With this corrupt support, Villarán survived the recall vote on March 17, 2013.

### C.   RUTAS CONTINUED ITS CORRUPT CONDUCT AFTER THE CONCESSION CONTRACT WAS SIGNED TO SECURE ADDITIONAL BENEFITS

Rutas' corrupt relationship with Villarán's administration continued after the Concession Contract was signed and after the recall referendum.  Villarán survived the recall vote, but she remained unpopular and needed to wage another expensive campaign to win reelection in 2014. Rutas funded Villarán's reelection campaign as it had funded her No Recall campaign.

In exchange for campaign funding, the Villarán administration secured further benefits for Rutas by amending the Concession Contract.  The Concession Contract, as originally signed, did not provide for the Municipality to compensate Rutas directly for its work on the highway project. Rather, the Municipality had agreed to compensate Rutas by granting Rutas an exclusive right to operate income-generating toll stations at contractually determined toll rates on the sections of highway that Rutas would construct or maintain.  Ex. A, ¶ 98.  If Rutas wished to raise the toll rates, it was required to secure an amendment to the Concession Contract, and the increases needed to be justified by an increase in Rutas' investment.  Any such amendment to the Contract had to be submitted to the Ministry of Economy and Finances for its prior review and approval before it could be signed.  *Id.* ¶¶ 503, 518.

As explained further below, in exchange for illegal contributions to Villarán's reelection campaign, Rutas secured an amendment to the Concession Contract without any review or oversight by the Ministry of Economy and Finances.  This amendment, known as the Bankability Addendum, increased the value of the Concession Contract by 40 percent—from approximately $500 million to $700 million—only a year after the contract was signed.  The amendment not only

allowed Rutas to raise the tolls, it also entitled Rutas to a direct payment from the Municipality of $65 million, despite the fact that the Concession was awarded to Rutas on the basis that it would not require any public funding.  *Id.* ¶¶ 104, 448-452.

1.   Rutas Approached Castro Seeking "Additional Benefits" under the Concession

Castro, Villarán's City Manager and campaign director, admitted in his sworn testimony to "participat[ing] in funneling money" from Odebrecht to Villarán's re-election campaign in 2014.  Ex. T at [PDF] 2.  Castro further admitted that, in return for these payments, he caused the Municipality to execute the Bankability Addendum on February 13, 2014.  *Id.* at [PDF] 3.

Specifically, Castro testified that, on August 6, 2013, he met with Pereira—Rutas' General Manager/CEO—accompanied by Rutas' "financial advisor" Gerardo Sepúlveda, to discuss "additional benefits" to be awarded to Rutas.  Ex. OO at 9130; Ex. E, ¶¶ 28-34.  During the meeting, Pereira requested, and Castro agreed, to amend the Concession Contract to assign Rutas overvalued additional works and allow Rutas to increase toll charges.  Ex. E, ¶ 33; Ex. OO at 9133. Castro testified that these "additional works" included "the concept of 'Commissioning' [also referred to as "fine tuning works"] on the roads under the administration of the concessionaire Rutas de Lima."  Ex. T at [PDF] 3; Ex. E, ¶ 33.  This "fine tuning" work resulted in an increase in the total value of the Concession from $500 million to $700 million, entitling Rutas to commensurate additional compensation.  Ex. T at [PDF] 3.  However, Castro confessed that much of these "additional works" were sham or overvalued projects designed to give "only [the] appearance" of additional investment.[3]  Ex. OO at 9133.

---

[3] Following the execution of the Bankability Addendum and the subsequent financial close of the project, Gerardo Sepúlveda—Rutas' purported financial advisor who had attended the August 2013 meeting in Castro's office— received a "success fee" of $3.51 million paid to an LLC in the United States, Latin America Enterprise Fund Managers, LLC, which he cofounded with the former President of Peru Pedro Pablo Kuczynski.  Ex. T at [PDF] 3. Kuczynski has been indicted for corrupt dealings with Odebrecht on a number of other projects.  Payment of the

Three days after the August 6, 2013 meeting, Pereira had a bank account with the Private Bank of Andorra established in the name of the Municipality's then-Director of Public Safety, Gabriel Prado Ramos, to channel payments to Villarán's reelection campaign.  Ex. C, ¶¶ 129-133.

On February 13, 2014, the Municipality and Rutas executed the Bankability Addendum, once again, without the Ministry of Economy and Finance's prior authorization, as required by Legislative Decree 1012.  Ex. A, ¶ 104.  Castro has testified that soon thereafter, Pereira assured him that he "had all his [*i.e.*, Pereira's] support for the political campaign that was coming," that is, Villarán's re-election campaign.  Ex. T at [PDF] 3.

On February 26, 2014, just thirteen days after the Municipality and Rutas signed the Bankability Addendum, Odebrecht's Division of Structured Operations paid $420,168.00 to the Villarán campaign.  Ex. C, ¶ 20.  As discussed in Section III.C, *supra*, the division made numerous additional payments to Villarán's campaign throughout 2014.  Castro testified that these payments were "directly linked to the financial closure of the Rutas de Lima Concession, the Concept of Setup ['Tune-Up'] and the [Bankability] Addendum."  Ex. O at [PDF] 4.

    2.    Rutas Funneled Illegal Payments to Villarán's Campaign Through Sham
          Sub-Contracts

One of the ways that Rutas illegally funneled money to Villarán's campaign was by entering into fictitious sub-contracts under the ambit of the Concession Contract.  Rutas purported to enter into sub-contracts with Villarán's middleman, Cesar Meiggs Rojas ("Meiggs"), through his company Generación S.A.  Ex. U, Ex. V, Ex. W; *see also* Ex. X at [PDF] 4.  Meiggs himself confessed that these contracts were sham contracts and used to launder money to the campaign. *See* Ex. Y at [PDF] 4; Ex. Z at [PDF] 3-4; Ex. AA at [PDF] 3-4.

---

success fee is consistent with Odebrecht's confession in its plea agreement that it offered "success fees" to co-conspirators as bribes paid upon financial closing of government contracts.  Ex. B at B-9 and B-10, ¶ 26.

Both Meiggs and Castro testified that, through the sham sub-contracts, Meiggs' company submitted invoices for work it had not performed; Rutas paid the invoices; and Meiggs passed the funds through his company to Villarán's campaign.  Ex. O at 0195-0196; Ex. Z at [PDF] 4.  Meiggs identified in his testimony invoices for works that were never completed but were nonetheless paid for.  *See*, *e.g.*, Ex. BB.  Using those funds, as well as cash delivered directly to Meiggs' office, Meiggs transferred to Villarán's reelection campaign approximately 2.8 million Peruvian soles (approximately $740,000) in illegal payments originating from Rutas.  Ex. Y at [PDF] 6.

### 3.    Rutas Hedged Its Bets and Also Paid Off Villarán's Opponent

Despite Rutas' financial support, Villarán remained unpopular and risked losing reelection. If she were to lose, Rutas would lose too.  Rutas had paid bribes to her administration to secure and obtain an increase in the value of the Concession.  If a new administration were to come into power, it might cast a critical eye upon the project, endangering all that Rutas had extracted.

Rutas hedged its bets by making corrupt payments to Villarán's opponent, Luis Castañeda Lossio ("Castañeda").  Ex. DD at [PDF] 4-5.  Pereira (Rutas' General Manager/CEO) and an Odebrecht official, Raymundo Serra, promised half-a-million dollars to Castañeda's campaign. *Id.* at [PDF] 4.  The campaign director, Martín Bustamante Castro ("Bustamante"), testified that he acted as an intermediary to receive those payments on the campaign's behalf.  *Id.* at [PDF] 4-5.  Bustamante confirmed in his testimony that "Odebrecht's interest was to maintain the legal stability of the Rutas de Lima contract."  *Id*. at [PDF] 5.

Castañeda won the 2014 mayoral election.  Rutas' corrupt payments paid off.  The incoming Castañeda administration did not attempt to undo the Concession Contract or the Bankability Addendum.  Instead, it entered into agreements with Rutas to carry out the Bankability Addendum.  Following the numerous modifications of the Concession Contract, it was

unrecognizable from the agreement signed in January 2013. José Oviedo, a technical engineer who evaluated and approved Odebrecht's original Private Initiative proposal, testified that the works ultimately carried out by Rutas under the Concession Contract bear little resemblance to the works and designs evaluated and approved in the Private Initiative.  Oviedo testified that "what has been built several years later is very different from what was evaluated and declared of interest."  Ex. D at 2040, ¶ 39.

### D.   THE RISE OF THE DISPUTE

Odebrecht's widespread corruption in Peru, which ranged from the municipal level to the presidency, was publicly reported in Peru at the end of 2016 with the publication of Odebrecht's Plea Agreement with the U.S. Department of Justice. Just over a week later, on December 29, 2016, Rutas implemented a new toll station on the North Pan-American highway section (the New Chillón Toll Station) that charged traffic which had not hitherto been required to pay tolls.  Ex. A, ¶ 118.

The Odebrecht plea agreement prompted public protests over Rutas' tolls and the Concession Contract generally.  *Id.* ¶ 119.  The protests shut down the New Chillón Toll Station, impeding Rutas' ability to collect tolls.  *Id.* ¶ 121.  When the Municipality was unable to quell the protests, it asked Rutas to suspend collecting tolls at the New Chillón Toll Station.  *Id.* ¶ 122.  On January 18, 2017, the Municipality cancelled toll collection at the Station entirely.  *Id.* ¶ 125.

### E.   THE ARBITRATION

On May 3, 2018, Rutas initiated the underlying arbitration, invoking the arbitration provision in Clause 19.12 of the Concession Contract, which provided that disputes under the Concession Contract would be settled through arbitration.  *Id.* ¶¶ 5, 152.  The arbitration was conducted under the Arbitration Rules of the United Nations Commission on International Trade

Law of 2010 (the "UNCITRAL Rules").  *Id.* ¶ 7.  The arbitral tribunal consisted of three members: (1) Dr. Alexis Mourre; (2) Dr. Antonio Hierro Hernández-Mora; and (3) Dr. Elvira Martínez Coco.[4]  The seat of the arbitration was Washington, D.C.  *Id.* ¶ 11.

In the arbitration, Rutas claimed damages due to: (1) its alleged inability to operate the New Chillón Toll Station and the Existing Chillón Toll Station as a result of the protests; and (2) the Municipality's alleged failure, under Clauses 10.3 and 10.4 of the Concession Contract, to compensate Rutas in an amount equivalent to what Rutas would have been able to collect from toll stations had they been operational.  *Id.* ¶¶ 174, 380-381.  Rutas requested approximately 140 million Peruvian soles in damages.

The Municipality raised defenses to Rutas' claims under the Concession Contract. Principal among these defenses was that the Concession Contract was null and void.  *Id.* ¶¶ 266; 274-276; 293-296.  The basis for the Municipality's nullity argument was that neither the Concession Contract, nor its modifications, including the Bankability Addendum, had been submitted to the Ministry for prior approval, in contravention of Peruvian law.  *Id.* ¶¶ 266-268. The Municipality also noted that Rutas' parent company was under investigation for corruption with evidence emerging that the Concession Contract, and certain of its modifications, including the Bankability Addendum, had been obtained through acts of corruption by Rutas.  *Id.* ¶¶ 292-306.

        1.    <u>During the Arbitration, Only Limited Evidence of Corruption Was Available to the Municipality</u>

In parallel with the arbitration, prosecutorial authorities in Peru investigated Rutas for corruption.  Because it was part of a pending investigation, evidence it uncovered was under seal

---

[4] Dr. Mourre and Dr. Coco were appointed in August 2018.  *Id.* ¶¶ 18-19.  Dr. Hernández-Mora was appointed in May 2019 after the originally appointed tribunal member, Dr. David Arias, resigned due to a conflict of interest.  *Id.* ¶¶ 65-67.

and unavailable to the Municipality.  The Municipality was accordingly constrained in developing the evidentiary record on Rutas' corrupt conduct.

Peru began investigating Rutas in 2017, when it established two Special Prosecutor teams (one criminal and one civil) under its Attorney General to investigate the corruption to which Odebrecht had confessed in the Odebrecht Plea Agreement.  *Id.* ¶ 154.  On May 24, 2017, a Peruvian Ad Hoc Public Prosecutor filed a criminal complaint against Rutas, among others, charging it with various crimes related to bribery in Peru.  *Id.* ¶ 154.  The investigations into these crimes remained confidential and inaccessible to the Municipality.

Around the same time, the Peruvian Congress created a Multiparty Investigative Commission to investigate allegations of corruption against Rutas, as well as other allegations relating to Odebrecht's corrupt activities in Peru.  *Id.* ¶ 157.  The Commission published a report on its findings in August 2018, a few months after the arbitration began.  The Commission found evidence indicating that Rutas had made payments to government officials in connection with the Concession Contract.  *Id.* ¶¶ 157-159.  For example, the Commission uncovered two payment ledgers from Odebrecht's Division of Structured Operations, labeled "Concessao Rutas de Lima," *i.e.*, the Rutas de Lima Concession.  *Id.* ¶¶ 157-158, 440.   The report, however, was preliminary and broadly addressed Odebrecht's corruption nationwide.

The Special Prosecutor's team continued its investigation under cover of confidentiality. The Municipality was generally aware that the Special Prosecutor's investigation was occurring but was not privy to its findings or evidence it had uncovered.  Well into the arbitration, the media reported leaks from the investigations.   These media reports suggested that the Special Prosecutor's investigations had uncovered a link between Odebrecht's bribes and the Vías Nuevas de Lima Project.  *Id.* ¶ 153.  The Municipality asked the authorities for a copy of their internal

investigative files, but its request was denied.  Declaration of Municipal Attorney General Mariela Gonzalez Espinoza ("Espinoza Decl."), ¶¶ 3-4.  The Special Prosecutor informed the Municipality that, at that stage of the investigation, the files could not be released.  *Id.*

On May 29, 2019, a year into the arbitration, the Peruvian First Permanent National Criminal Appeals Chamber Specialized in Corruption Crimes against Officials (the "Peruvian Corruption Court") issued a pretrial detention order indicating that there was an ongoing corruption investigation targeting former mayor Susana Villarán and former City Manager José Miguel Castro Gutiérrez.  The Peruvian Corruption Court accused them of soliciting money from Odebrecht to fund Villarán's election campaigns.  Ex. A ¶ 163.

On the basis of the publicly available evidence, the Municipality argued in the arbitration that Rutas had made corrupt payments in connection with: (1) the proposal and signing of the Concession Contract; and (2) the Bankability Addendum.  Among other things, the Municipality pointed out that Odebrecht's payments to the Villarán's campaigns in late 2012 and early 2013 coincided with the award of the Concession Contract in September 2012 and its signing in January 2013.  *Id.* ¶ 421.  The Municipality also emphasized that the Bankability Addendum was signed in February 2014, the same month that Odebrecht's ledgers recorded payments totaling at least $700,000 to Castro, the Municipality's City Manager, relating to Rutas.  *Id.* ¶¶ 441, 446.

> 2.    Rutas Fraudulently Denied Engaging in Corruption in Connection with the
>        Concession Contract

In the arbitration, Rutas made false representations during the document discovery phase that materially impeded the Municipality's ability to develop the evidentiary record on Rutas' corruption, and then repeatedly and categorically denied that it had engaged in any corrupt acts in connection with the Concession Contract in its written pleadings and at the hearing.

a.   *Rutas' misrepresentations to the tribunal during the document discovery process*

The document discovery process during the arbitration was governed by procedural orders issued by the tribunal.  Pursuant to Procedural Order No. 1, the parties were required to serve document requests on the other side in the form of a Redfern schedule on or by April 29, 2019. *See* Ex. PP, ¶ 48.  The parties were then required to submit objections to each of the requests identified in the other side's Redfern schedule on or by May 10, 2019, and submit replies to the other side's objections to their own Redfern schedule on or by May 18, 2019.  *Id.*, ¶¶ 50-51.  The tribunal would then review the parties' positions in their respective Redfern schedules and issue an order directing which documents the parties were required to produce.  *Id.*, ¶ 53.

The Municipality served its Redfern schedule on Rutas on April 29, 2019.  In its requests, the Municipality asked Rutas to produce:

> Documents in [Rutas'] possession in which there is analysis, mention or discussion of any payment made or attempted to be made by [Rutas], its investors or directors, executives, employees, or agents to any entity, employee or official of the metropolitan municipal government of Lima, the federal government of Peru or any of its agencies, ministries, or divisions, including, but not limited to, (i) any payment made or attempted payment to the "No" campaign in the recall referendum against former mayor Susana Villarán, *see* Annexes R-23, R-24, R-25; (ii) any other payment made or attempted for the benefit of the former mayor Susana Villarán, *see* id., and/or (iii) payments made or attempted in the amount of approximately US$ 420 million, to individuals identified as "Budian," "Tapete" or "Sevite,

Dkt. # 43-1 at 23-25.  Rutas did not produce the requested documents.  Instead, it responded to the Municipality's request by asserting that it was "not aware of the existence of any documents that qualify under this request and accordingly does not have any document to present." *Id.* at 23.  The Municipality's completed Redfern schedule, including Rutas' responses, was submitted to the tribunal on May 18, 2019.  In reliance on Rutas' representation, the tribunal declined to order

production of documents in response to the Municipality's request: "The [tribunal] takes note of [Rutas'] statement regarding the non-existence of the requested documents.  Based on the foregoing, [the Municipality's request] is rejected."  *Id.*

New evidence obtained by the Municipality as well as the events that have unfolded since the first arbitration show that Rutas' representations in response to the Municipality's document request was false.  Below are just a sampling of the documents that Rutas must have had in its possession at the time of the arbitration, and falsely withheld in response to the Municipality's document request.

For example, the middleman for Villarán's campaign, Cesar Meiggs testified that his company, Generación S.A., entered into sham sub-contracts with Rutas through which illegal payments were laundered.  *See* Ex. U, Ex. V, Ex. W.  He admitted that he issued numerous invoices for works that were not completed and for which incomplete or no technical reports were produced, which Rutas paid so that he could transfer the funds to Villarán and Castro.  Ex. O at 0195-0196; Ex. Z at [PDF] 4; Ex. BB.  Meiggs also testified that Rutas employee Felipe Neves ("Neves"), Rutas' Director of Operations, signed the sham contracts on behalf of Rutas and "deal[t] directly" with Meiggs on the illegal payments.   Meiggs testified that Neves sent him the "formal quote," which Neves explained was "overvalued" to account for the payments to Villarán and Castro.  Ex. Y at [PDF] 6.  Neves was still an employee at Rutas while the arbitration was ongoing, only leaving his post in July 2020.[5]  Any written communications between Neves and Meiggs mentioning or discussing payments to Villarán, as well as any wire transfers, bank or other financial records evidencing such payments, would have been responsive to the Municipality's request.  In addition,

---

[5] *See* LinkedIn Profile of Felipe Ferreira Neves, *available at*: https://www.linkedin.com/in/felipe-ferreira-neves-ba483b1b4/?locale=es_ES.

given the ledger payments that have been uncovered directly linking payments made by Odebrecht to Villarán and Castro in connection with the "Rutas de Lima Concession," communications between Odebrecht and Rutas concerning such payments, as well as financial records responsive to the Municipality's request, almost certainly must have existed and been in Rutas' possession at the time of the arbitration. This is especially the case given the finding by the second tribunal that "Rutas de Lima is likely to have been used as a vehicle to finance Susana Villarán's re-election campaign." Dkt. # 60-1, ¶ 693.

### b. Rutas' misrepresentations to the tribunal in its written submissions and at the arbitral hearing

Rutas' false statements continued throughout the arbitration. In its written submission, Rutas repeatedly and affirmatively denied to the tribunal that it had engaged in corruption as a matter of fact. For example, in its reply brief filed on July 29, 2019, Rutas asserted, "**We cannot fail to point out that**… the [Municipality] indicates that the Concession is subject to investigation as wanting to imply some illicit fact linked to [it]. **We reject the attempt to cast a shadow over these facts**," and "**ask[] the [Tribunal] not to be impressed by th[ese] type[s] of allegations that lack seriousness.**" Ex. GG (emphasis added). Further, in its rejoinder on counter-claims filed on September 24, 2019, Rutas represented "**We, Rutas de Lima S.A.C. . . . respectfully state … that no irregular act was committed in connection with the Concession Contract.**" Ex. EE, ¶ 96 (emphasis added). In the same filing, Rutas also averred that it "**strongly reject[ed] any act of corruption**," *Id*. ¶ 295, and that any contributions to Municipality officials' campaigns "**were not carried out in exchange for any irregular benefit**" in the Concession Contract. *Id.*, ¶ 297 (emphasis added). Even though Rutas' written submissions were sent to the tribunal by Rutas' counsel, the cover email to which they were attached made clear that the submissions and the

statements therein were those of Rutas.  Ex. CC ("Within the term established in the Procedural Calendar, Rutas de Lima proceeds to file its Reply and Response to Counterclaim.")

At the arbitration hearing held between November 4 and 8, 2019, Rutas reaffirmed its denials of corruption.  During Rutas' opening statement, Rutas' Chairman, Rodrigo Franco, criticized the Municipality for "**even [trying] to insinuate that the agreement is invalid, and even worse, that [the Municipality] seeks to tarnish this process with allegations of corruption to validate the Municipality's non-performance**."  Ex. HH at 30:11-21 (emphasis added).

Further, at the hearing Rutas stated categorically that **"[w]e deny that there are any acts of corruption linked to the conclusion of this contract or to the execution of this contract**," and represented that "**there is no real relation between the facts investigated [by the Special Prosecutor in Peru] and th[e] [Concession] [C]ontract."**  Ex. HH at 77:9-20, 78:4-14 (emphasis added).  Leaving no room for question, Rutas told the tribunal, "**we affirm that the contract is not affected by corruption**."  *Id.* 79:6-17.  Moreover, Rutas accused the Municipality of "**contaminat[ing] the arbitration with allegations of corruption to avoid compliance with the contract.**"  Ex. II at 1228:2-1228:4 (emphasis added).  And, Rutas stressed that, "**among the projects in which corruption has been accepted [by Odebrecht], the Rutas de Lima contract does not figure and does not exist**."  *Id.* at 1229:18-1229:20 (emphasis added).

3.  The Tribunal Issued an Award in Favor of Rutas, Relying on Rutas' Fraudulent Denials

Rutas' fraudulent denials of corruption were effective.  In an award issued on May 11, 2020, the tribunal declined to void the Concession Contract due to corruption.  The tribunal began its analysis by accepting that it had a duty to declare the Concession Contract null and void if there

was sufficient evidence that it was obtained through corruption.  Ex. A, ¶ 400.  The tribunal stated that because:

> corruption is contrary to international public order, and to the detriment of the public interest of the State and of the citizens of Peru, the Tribunal is very clear that it has the duty to declare the Concession Contract null and void if there is sufficient evidence that it was obtained by corrupt means.

*Id.* ¶ 399.

However, the tribunal determined that there was insufficient evidence available to show that the Concession Contract or its modifications had been stained by corruption.  In so holding, the tribunal expressly relied on the fact that the corrupt payments were "**denied by Rutas de Lima.**" *Id*. ¶ 442 (emphasis added).

The tribunal noted that, given Odebrecht's well-publicized history of corruption, the fact that Rutas was a fully owned subsidiary of Odebrecht indicated the possible existence of corrupt acts related to the Concession Contract.  *Id.* ¶¶ 404-405.  Beyond this general evidence, the tribunal stated that there were only two main sources of evidence of potential corruption: (1) the payments made to the former mayor's election campaign; and (2) the ledger from Odebrecht's internal files indicating that it had made approximately US $700,000 in payments in relation to "Rutas de Lima" in February 2014.  *Id.* ¶¶ 421-423, 440-442.

With respect to the payments in connection with the election, the tribunal did not accept the Municipality's argument that the Concession Contract was the product of bribe payments made to Villarán's campaign.  The tribunal understood that her campaign had only become active in November 2012, so any corrupt act linked to the campaign was unlikely to have been related to the Municipality's award of the Project to Rutas, which occurred in September 2012, approximately three months earlier.  *Id.* ¶¶ 422-23, 489.  The tribunal further noted that, although

25

the Concession Contract was not signed until January 9, 2013, during which time corrupt campaign payments could have been made, there was no evidence that the Concession Contract's terms were more favorable to Rutas than those which had been provided in the September 2012 informal award of the Project to Rutas. *Id.* The tribunal considered it unlikely that Odebrecht would have made corrupt payments to finalize and enter into a contract for a project that had already been awarded to it, according to the same contractual terms and conditions established in the initial award.[6] *Id.* ¶¶ 435-436. The tribunal also found there was insufficient evidence to prove that the Municipality's failure to ask for the Ministry's approval prior to the execution of the Concession Contract was due to corrupt acts committed by Rutas. *Id.* ¶ 491. In particular, the tribunal stated that "the fact that some contractual procedures may have been breached … does not imply that the contractual condition was omitted because the [Municipality] officials were corrupt. As previously stated, acts of corruption have to be proven based on reasonably convincing evidence." *Id.* ¶ 490. The tribunal also emphasized that it had been the Municipality's responsibility to obtain the Ministry's prior approval. *Id.* ¶ 545. However, it should be noted that this finding was premised upon the understanding that the procedural irregularity was a municipal oversight, not a benefit obtained through corruption. As discussed in Section III.B, *supra*¸ evidence arising after the conclusion of the arbitration shows otherwise.

With respect to the references in Odebrecht's ledger to payments of $420,168 and $291,700 on February 26, 2014, in connection with "Rutas de Lima," the tribunal agreed that "[t]hese [reports] are without a doubt an indication that, at that time, corrupt payments **could have been made** in relation to the [Concession] Contract." *Id.* ¶ 441 (emphasis added). However, because

---

[6] In addition, the tribunal noted that, because Rutas was the only applicant for the award of the Project, it appeared to lack an incentive to engage in corruption to secure the contract. *Id.* ¶ 419.

the tribunal lacked sufficient evidence "to confirm the existence of these corrupt payments, **which [were] denied by Rutas de Lima**," and no "explanation of how these payments, had they existed, could have affected the validity of the [Concession] Contract," the tribunal found that there was not sufficient evidence to establish that the payments were linked to "[a]djudication or … the signing of the [Concession] Contract." *Id.* ¶¶ 442-444 (emphasis added).

The tribunal acknowledged that the first of the two payments occurred February 2014, the same month the Bankability Addendum was signed. *Id.* ¶ 446. Nonetheless, the tribunal considered that this was not necessarily proof that the addendum had been obtained through corruption, because: (1) there was no evidence that the payments had been made in exchange for the signing of the Bankability Addendum specifically, and (2) the Bankability Addendum was executed in accordance with the terms of the Concession Contract and the tribunal lacked evidence to assess whether the compensation paid to Rutas pursuant to the Bankability Addendum was excessive compared to the costs of the additional work assumed thereunder. *Id.* ¶¶ 450-458.

New evidence which became available only after the conclusion of the arbitration fills each of the gaps identified by the tribunal, as detailed in Sections III.B and III.C, *supra*.

The tribunal awarded monetary damages to Rutas pursuant to Clause 10.4 of the Contract, in the amount of approximately $67 million dollars. *Id.* ¶ 758. In addition, the tribunal ordered that a specified monthly compensation formula be applied and remain in effect until such time as the parties agree upon a compensation agreement for Rutas' work under the Concession Contract. *Id.* ¶ 758(1.c). The tribunal also ordered the Municipality to pay Rutas approximately US $2 million in arbitration costs. *Id.* ¶ 758(6).

F.     NEW EVIDENCE OBTAINED AFTER THE CONCLUSION OF THE ARBITRATION

After the tribunal issued its award, extensive new evidence came to light.  As the Special

Prosecutor's investigation developed further, the prosecutor granted the Municipality access to the

following additional evidence:

- On July 24, 2020, the Municipality obtained a copy of Disposición Fiscal No. 13, SGF 506015504-2017-30-0 ("Disposición Fiscal No. 13"), an investigative file prepared by the Special Prosecutor, which contains evidence, including summaries and excerpts from witness statements provided by, *inter alia*, municipal officials who reviewed Odebrecht's Private Initiative proposal, which support charges against multiple government officials, including Villarán, for bribery and money laundering in connection with the Concession Contract.  Ex. F.

- On August 2, 2020, the Municipality obtained a copy of Disposición Fiscal No. 17, SGF 506015504-2017-30-0 (Disposición Fiscal No. 17) from the prosecutor's office, which sets out additional supporting evidence for the charges, including excerpts of testimony from Raúl Pereira and Susana Villarán.  Ex. C.

- On August 5, 2020, the Municipality received from the prosecutor's office copies of the transcripts of sworn testimony by (1) Jorge Barata, the former superintendent of Odebrecht Peru, Ex. N, and (2) Valdemir Garreta, whose company provided political consulting services for Villarán's referendum campaign.  Ex. M.

- On August 5, 2020, the Municipality obtained a copy of Disposición Fiscal No. 78, SGF 506015504-2017-31-0 ("Disposición 78"), containing a summary prepared by the Special Prosecutor of testimony received from Villarán's campaign manager and City Manager José Castro on his involvement with Rutas' corrupt payments. Ex. JJ.

- On September 23, 2020, Special Prosecutor Rafael Vela Barba submitted a sworn witness statement to a second arbitration arising out of the Concession Contract, in which he details at length the nature of the investigations and various discoveries made in relation to the Rutas Concession Contract.  Ex. KK.

- On September 26, 2020, the Municipality obtained Official Notice 118-2020-FSEDCF-EE-4D, a copy of a summary by the Special Prosecutor of sworn testimony by Castro on his involvement with Rutas' corrupt payments.  Ex. T.

- On September 26, 2020, the Municipality obtained a copy of the transcript of sworn testimony by Castro on his involvement with Rutas' corrupt payments.  Ex. OO.

- On September 26, 2020, the Municipality obtained a copy of the transcript of sworn testimony by Martín Bustamante, campaign manager for Luis Castañeda Lossio on his involvement with Rutas' corrupt payments to Castañeda's campaign for election in 2014.  Ex. DD.

28

- On May 21, 2021, Castro submitted a sworn witness statement to a second arbitration arising out of the Concession Contract, in which he details at length the extent of the corrupt relationship between Rutas and Villarán's administration. Ex. E.

But it was not until the Special Prosecutor indicted Villarán and her co-conspirators on August 31, 2022, naming Rutas as a "civilly responsible third party," that the Municipality had a fuller picture of what Rutas had done. The Municipality received the documents supporting the indictment, and they revealed the corrupt scheme between Rutas and the mayor's office. These documents include:

- Documentation of bank transfers through the extensive money laundering network between Odebrecht's Division of Structured Operations and Villarán's anti-recall and reelection campaigns. *See* Ex. P.
- Numerous ledgers maintained by the Division of Structured Operations with notations of payments to Castro linked directly to the Concession Contract as well as coded emails sent via an encrypted communications network regarding those payments. S*ee* Ex. Q; Ex. P and Ex. LL.
- The original transcripts of sworn testimony by Pereira, Rutas's General Manager (*see* Ex. L); employees of the Division of Structured Operations Maria Guimaraes Tavares (*see* Ex. R) and Luis da Rocha Soares (*see* Ex. S); money handler and owner of fictitious sub-contracts with Rutas, Cesar Meiggs Rojas (*see* Ex. Y; Ex. Z; Ex. AA; Ex. BB); Castro, who served as Villarán's right hand (*see* Ex. O; Ex. X); and José Alonso Oviedo Lira and Carlos Ramón Noda Yamada, the technical engineer and legal counsel for the Municipality, respectively, who had each reviewed Odebrecht's Private Initiative before it was approved by the City Council, (*see* Ex. G and Ex. D).

As detailed in Sections III.B and III.C, *supra*, this new evidence leaves no room for doubt that, contrary to Rutas' repeated denials, there were numerous "acts of corruption linked to the conclusion of [the Concession] contract or to [its] execution." Ex. HH at 77:9-20.

## G.    THE SECOND ARBITRATION

While the first arbitration was in progress, Rutas commenced a second arbitration on March 18, 2019. In the Second Arbitration, Rutas sought uncollected toll revenues pursuant to the Bankability Addendum. As discussed above, the Bankability Addendum authorized Rutas to

increase toll charges.  To carry out these toll increases, the Municipality and Rutas entered into two agreements in 2015 and 2016 establishing a new graduated toll rate, providing for four toll increases between 2016 and 2017.  The final and most onerous of these toll increases was to be implemented at the end of 2017.  The Municipality asked Rutas to suspend that final toll increase in light of the public attention on the Odebrecht investigations and the mass protests that had erupted against the New Chillón Toll Station.  Rutas agreed to suspend the increase for one year before unilaterally moving to implement the increase.  Dkt. #60-1, ¶¶ 159-166.  On March 18, 2019, Rutas initiated the second arbitration to recover uncollected toll revenues.

By the time the second arbitration was underway, the Special Prosecutor's team investigating corruption of former Municipality officials had made some of the evidence linking corruption to Rutas and the Concession Contract available to the Municipality for submission in the arbitration.  Other investigative materials, however, remained classified and inaccessible to the Municipality.  Based on the evidence available to it, the Municipality sought dismissal of Rutas' claims and asked the tribunal to nullify the Concession Contract, Bankability Addendum, and subsequent 2015 and 2016 Acts as a matter of public policy and under Peruvian law.  *Id.* ¶ 189.  With such evidence out in the open, Rutas was careful to avoid denying corruption in the second arbitration, in stark contrast to how Rutas passionately, and falsely, proclaimed its innocence during the first arbitration.

While the proceedings in the second arbitration were pending, but after the first arbitration had concluded, the Special Prosecutor indicted the former mayor of Lima and others for corruption in connection with the Concession Contract (the "Indictment") on August 31, 2022 and unveiled the supporting documents referenced above.  The previously unavailable evidence included, *inter*

*alia*, sworn testimony from Odebrecht, Rutas, and Municipality officials, as well as forensic accounting reports that presented and analyzed financial records of Rutas' illicit payments.

The Municipality immediately alerted the tribunal in the second arbitration to the Indictment and its supporting evidence, and informed the tribunal that the Municipality would be moving to supplement the record with the newly available evidence.  Ex. MM.  The tribunal, however, preemptively refused to allow the Municipality to submit *any* such evidence.  And, when the Municipality asked the tribunal to revisit that decision, the tribunal permitted the Municipality to submit only narrowly circumscribed portions of the Indictment itself, and none of the evidentiary materials upon which the Indictment was based.  Ex. NN, ¶ 16; Dkt. #60-1, ¶ 74.

Thereafter, the tribunal in the second arbitration issued an award by majority vote, over a dissent, based on the Municipality's failure to present the very evidence that the Municipality had sought to introduce but which the tribunal had refused to allow.  Moreover, the tribunal's award relied on the award in the first arbitration, giving *res judicata* effects to parts of it and otherwise deferring in important respects to the earlier tribunal's legal and factual determinations.  The tribunal did so notwithstanding the pendency of these vacatur proceedings that seek to set aside that award.  In a separate, pending petition to vacate, the Municipality has explained why the evidence excluded by the tribunal in the second arbitration was dispositive and that tribunal's reliance on the findings in the first arbitration was improper and requires vacatur.  *See Metropolitan Municipality of Lima v. Rutas de Lima S.A.C.*, No. 23-cv-680 (ACR) (D.D.C. March 14, 2023), ECF No. 1.

Nevertheless, even based on the limited evidence that the tribunal had before it in the second arbitration, which was significantly more developed than the evidence available in the first arbitration, the tribunal found that "Rutas de Lima is likely to have been used as a vehicle to finance

Susana Villarán's re-election campaign."  Dkt. # 60-1, ¶ 693.  The tribunal's conclusions flout
Rutas' claim in the first arbitration that "no irregular act was committed in connection with the
Concession Contract, nor is there any evidence of the alleged acts of corruption by third parties,
[and] Rutas de Lima clearly dismisses and rejects its connection with the facts attributed to persons
related to Odebrecht."  Ex. EE, ¶ 96.

        1.    <u>Dr. Martínez Coco's Dissent</u>

Arbitrator Elvira Martinez Coco was the only arbitrator to serve on the tribunals in both
the first and second arbitrations.  In the first arbitration, she joined in the award in Rutas' favor in
connection with the Municipality's corruption-related arguments, but in the second arbitration, she
dissented.  She noted that the Municipality had presented additional evidence of corruption that
"was not available to the Arbitral Tribunal that issued the First Award."  Dkt. # 60-1, ¶ 142
(dissent); *see also id.* ¶ 133.  This new evidence led her to change her view from the first arbitration
and conclude that Rutas had engaged in corruption in connection with the Concession Contract
and its modifications.  Specifically, Coco concluded that the previously unavailable evidence
"shed[] light on the corruption present during the execution and performance of the Contract,
which resulted in its economic imbalance by turning the Self-Sustaining Concession contemplated
in the Private Initiative into a Co-Financed Concession Contract."  *Id.* ¶ 185.

## IV.    ARGUMENT

### A.    THE AWARD SHOULD BE VACATED BECAUSE RUTAS PROCURED IT THROUGH CORRUPTION, FRAUD, OR UNDUE MEANS

Rutas falsely represented to the tribunal that it had not bribed Municipality officials to
obtain the Concession Contract and Bankability Addendum, dishonestly withheld evidence of its
corruption from the Municipality and the tribunal, and thereby hoodwinked the tribunal into

finding that evidence of corruption was lacking.  This Court has no duty to let Rutas get away with

deceiving the tribunal.

The FAA empowers a federal court to vacate an arbitral award if "the award was procured

by corruption, fraud, or undue means."  9 U.S.C. § 10(a)(1).  To merit vacatur under § 10(a)(1),

the petitioner must meet "three cumulative conditions." *Ray v. Chafetz*, 236 F. Supp. 3d 66, 76

(D.D.C. 2017).  First, the petitioner must demonstrate by "clear and convincing evidence" that the

other party "engaged in fraudulent conduct or used undue means during the course of the

arbitration." *Arma, S.R.O. v. BAE Sys. Overseas*, 961 F. Supp. 2d 245, 254 (D.D.C. 2013).

Second, the petitioner must show that "the fraud could not have been discovered before or during

the arbitration through the exercise of reasonable diligence." *Id.*  Third, "the alleged misconduct

must 'materially relate[] to an issue in the arbitration.'" *Id*; *see also Stati v. Republic of Kaz.*, 302

F. Supp. 3d 187, 199-200 (D.D.C. 2018) (summarizing standard).  The Municipality satisfies all

three conditions.

        1.        <u>Rutas Deceived the Tribunal and Denied the Municipality a Fair Hearing</u>

A party engages in fraudulent conduct or uses undue means when it engages in deceptive

acts that "have been so prejudicial that they effectively denied the opposing party a fundamentally

fair hearing." *ARMA, S.R.O.*, 961 F. Supp. 2d at 254.  An award resulting from an unfair hearing

cannot stand because, as the Third Circuit recently explained, "An honest process is what those

who agree to arbitration have a right to expect." *France v. Bernstein*, 43 F.4th 367, 378-79 (3d

Cir. 2022). When a party makes material misrepresentations to a tribunal and withholds relevant

evidence, it subverts that expectation and denies its opponent a fair hearing. *Id.* at 378-79.

In *France*, the Third Circuit confronted a situation similar to the one here. One party,

France, stole a client from the other party, Bernstein, by organizing an autograph-signing event for

33

that client.  *Id.* at 371.  Bernstein brought a grievance, and the dispute went to arbitration.  *Id.*
During the arbitration's discovery phase, Bernstein asked France for documents relating to the
signing event, and France said that there were "none."  *Id.* at 3732-73.  Then, during the hearing,
France represented to the arbitrator that he was not involved with the signing event.  *Id.* at 373-74.
His lawyer likewise asserted, in his opening statement, that France "had no involvement" with the
event.  *Id.* at 379.  The arbitrator ruled in France's favor.  *Id.* at 374.  Later, in a federal court
action, Bernstein obtained information revealing that France had in fact organized the autograph
signing event and that France's, and his counsel's, representations to the contrary were false.  *Id.*
at 374-75.  Bernstein sought to vacate the arbitral award.  He lost in the district court, but the Third
Circuit reversed.  *Id.* at 375-77, 382.

     The Third Circuit stated that the "easiest conclusion in [the] case, even under a clear-and-
convincing evidence standard, is that France committed fraud."  *Id.* at 378.  He did so by falsely
denying that he was involved in the autograph event, by his lawyer reiterating that denial during
the hearing, and by falsely representing that he had no documents responsive to Bernstein's
discovery requests.  As the Third Circuit summed it up, "France lied to Bernstein and the
arbitrator" to get the outcome he wanted.  *Id.* at 370.  As a result, "the award was procured by
fraud." *Id.* at 382.

     Here, like in *France*, Rutas lied to the Municipality and to the tribunal in the first
arbitration.  Indeed, Rutas lied every which way—before the hearing and during the hearing, orally
and in writing, directly and through counsel.  During pre-hearing discovery, Rutas falsely stated
that it had no documents responsive to the Municipality's document production request.  As set
forth above, the new evidence obtained by the Municipality as well as the events that have unfolded
since the first arbitration show that Rutas' must have had documents responsive to the request in

its possession, particularly given the finding by the second tribunal that "Rutas de Lima is likely to have been used as a vehicle to finance Susana Villarán's re-election campaign." Dkt. # 60-1, ¶ 693.  In reliance on Rutas' response, the tribunal rejected the Municipality's document request. *Id.* at 3.  Thus, Rutas succeeded in withholding key evidence from the arbitration.  Such withholding is "analogous to perjured testimony." *France*, 43 F.4th at 378-79; *see also Summers v. Howard Univ.*, 374 F.3d 1188, 1193 (D.C. Cir. 2004) ("failure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of Rule 60(b)(3).").  By withholding evidence, Rutas impaired the fairness of the arbitration by robbing the municipality of "an opportunity to discover and reveal the purported fraud at the arbitration hearing." *Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 138 (D.N.J. 1976).

Rutas also repeatedly, and falsely, denied in its written pleadings that it engaged in corruption with respect to the Concession Contract and Bankability Addendum.  In its rejoinder on counter-claims, Rutas represented that "no irregular act was committed in connection with the Concession Contract" and that "Rutas de Lima clearly dismisses and rejects its connection with the facts attributed to persons related to Odebrecht." *Id.*, ¶ 96. Rutas also represented in its reply that it "reject[s]" allegations of corruption and "asks the Court not to be impressed by th[ese] type[s] of allegations that lack seriousness."  Ex. GG, ¶ 459.

Rutas continued falsely denying corruption in the hearing.  Rutas's Chairman, Rodrigo Franco, opened the hearing by castigating the Municipality for "seek[ing] to stain this process with allegations of corruption."  Ex. HH, 30:11-21.  Following Mr. Franco's lead, counsel for Rutas categorically denied that Rutas had engaged in any corrupt acts connected to the Concession Contract:  "We deny that there are any acts of corruption linked to the conclusion of this contract

or to the execution of this contract." *Id.*, 77:9-20.  Rutas repeated that misrepresentation when it told the tribunal, "we affirm that the agreement is not affected by corruption." *Id.*, 79:6-17.

Like the aggrieved party in *France*, the Municipality later learned that Rutas' representations were false.  When the special prosecutor in Peru indicted Rutas' co-conspirators, it released documents and testimony demonstrating that Rutas and Odebrecht funneled cash to public officials' political campaigns as bribes in exchange for approving, signing, modifying, and maintaining the Concession Contract to Rutas' benefit.  By dishonestly denying these facts, and withholding evidence about them, Rutas prejudiced the arbitration proceedings in a manner "analogous to perjured testimony" and denied the Municipality a fair hearing.  43 F.4th at 378-79. If anything, Rutas acted even more egregiously than the bad actor in *France* because it repeated its misrepresentations in written pleadings in addition to statements at the hearing and responses to document requests.  Accordingly, Rutas' fraud easily justifies vacatur.

2.    Rutas Is Responsible for Its False Assertions of Fact Regardless of Whether It Uttered Them Directly or Through Counsel

Rutas cannot escape responsibility for deceiving the tribunal by mischaracterizing its false assertions as "advocacy statements" by counsel.  *See* Statement of Points and Authorities in Opposition to MML's Motion for Discovery, Dkt. # 37 at 16-17.

To begin with, Rutas made many of its false statements directly, without routing them through counsel.  *See* Ex. HH, 30:11-21.  For example, in the document production phase of the arbitration, Rutas responded to the Municipality's request for documents about the corrupt payments by falsely telling the tribunal that "**Rutas de Lima** is not aware of the existence of any documents that qualify under this request and accordingly does not have any document to present." Dkt. # 43-1 at 3.  This can only be understood as the representation of Rutas itself.  In *France*, the Third Circuit held the party, not his counsel, responsible for falsely asserting that he had no

36

documents responsive to his adversary's discovery request.  Rutas is likewise responsible for falsely asserting that it had no documents responsive to the Municipality's document request.  Dkt. # 43-1 at 3.

Rutas itself also denied corruption in the pleadings that it submitted to the tribunal.  Under the rules governing the arbitration, the tribunal was authorized to require written pleadings "from the parties."  UNCITRAL Arbitration Rules (as revised in 2010), Art. 24, (Apr. 2011).  In other words, Rutas' pleadings were its own statements.  Appropriately, Rutas prefaced its rejoinder with "**We Rutas de Lima S.A.C**. … respectfully state: That, in accordance with the provisions of Procedural Order No. 1 and the Amended Procedural Calendar, we proceed to file our Rejoinder to the Counterclaim submitted by MML."  Dkt. # 43-2, p. 3 (emphasis added).  The written pleading then went on to state that "no irregular act was committed in connection with the Concession Contract."  Ex. EE, ¶ 96.  And then, during the oral hearing, no less a figure than Rutas' own chairman accused the Municipality of seeking to "stain this process with allegations of corruption."  Ex. HH, 30:11-21.

Regardless, inasmuch as some of Rutas' misrepresentations may have passed the lips of a lawyer, that does not absolve Rutas of responsibility for fraud.  Courts considering whether to vacate an arbitral award for fraud under § 10(a)(1) do not distinguish between fact assertions that parties make directly and those they make through counsel.  When the *France* court listed the fraudulent assertions at issue, it included the lawyer's false assertion in his opening statement that his client "had no involvement" with the autograph signing event.  43 F.4th 367, 378-79; *see also Belmont Partners, LLC v. Mina Mar Group. Inc.*, 741 F. Supp. 2d 743, 753 (W.D. Va. 2010) (identifying a statement of counsel as the "only one statement. . . [that] could possibly constitute fraud or undue means"); *Collins v. NFL*, 566 F. Supp. 3d 586, 602 (E.D. Tex. 2021) (considering

whether a statement of counsel was true or false in assessing whether it could substantiate a fraud claim).

Moreover, Rutas' attempt to brush aside its misrepresentations as mere attorney advocacy is precluded by the rules under which the arbitration was conducted.  Article 5 of the 2010 UNCITRAL Rules provides that parties may be "represented or assisted by persons chosen by it." UNCITRAL Arbitration Rules (as revised in 2010), Art. 5, (Apr. 2011).  Communications making such appointments "must specify whether the appointment is being made for purposes of representation or assistance."  *Id*.  The distinction is critical.  Unlike mere assistants, representatives stand in the shoes of the party.  They are endowed with full authority to make representations on a party's behalf.  Indeed, their authority extends so far as to entitle a representative to not only amend claims on behalf of a party, but even "bind a party to a settlement agreement."  David Caron and Lee Caplan, THE UNCITRAL ARBITRATION RULES: A COMMENTARY, 351 (2d. ed. 2013).  This is consistent with the general practice in international arbitration.  *See* International Bar Association, *IBA Guidelines on Party Representation in International Arbitration*, 5, (2013) ("A Party Representative, acting within the authority granted to it, acts on behalf of the Party whom he or she represents.  It follows therefore that an obligation or duty bearing on a Party Representative is an obligation or duty of the represented Party, who may ultimately bear the consequences of the misconduct of its Representative.").

Here, on May 3, 2018, Rutas, submitted its notice of arbitration in which it designated, among others, María del Carmen Tovar, as its representative.  Ex. QQ.  It was Ms. Tovar who, at the hearing, denied any corruption, stating "[w]e deny that there are any acts of corruption linked to the conclusion of this contract or to the execution of this contract."  Ex. HH, 77:9-20; *see also* Ex. II, 1228:2-1229:20.

38

Parties to U.S. litigation are also responsible for statements counsel make on their behalf. It is well established that when counsel asserts a fact at trial, the client is bound by that assertion. *See Hewlett Packard Co v. Papst Licensing GmbH & Co.*, 767 F. Supp. 2d 1, 6-7 (D.D.C. 2011) ("The Supreme Court long ago recognized the binding nature of counsel admissions in the context of a trial."). Similarly, when a party's legal filings, signed by counsel, contain false assertions, the court may sanction the *party* along with the attorney. In *Elliot v. The M/V Lois B.*, the Fifth Circuit upheld the district court's decision to sanction the plaintiff for material misrepresentations in the complaint. It held:

> The record belies Elliott's efforts to avoid responsibility for the complaint that Ross filed in her behalf. The chief misrepresentation in the complaint was that Elliott had owned the vessel in question since 1987. The district court found that Elliott knew this to be untrue. Moreover, Elliott maintained this position at the trial. . . The district court did not abuse its discretion in sanctioning Elliott."

980 F.2d 1001, 1007 (5th Cir. 1993).[7]

Here, during the arbitration hearing, Rutas' officially designated representative "den[ied] that there are any acts of corruption linked to the conclusion of this contract or the execution of this contract," Ex. HH at 77:9-20 and insisted that such corruption "does not figure and does not exist," Ex. II at 1229:18-1229:20. Rutas' representative went so far as to "affirm that the contract is not affected by corruption." Ex. HH at 79:6-17. These statements are not legal arguments or characterizations of evidence. They are unequivocal false assertions of fact. Rutas is responsible

---

[7] *See also Schrag v. Simpson*, No. 96-3302, No. 96-3321, No. 96-3322, 1998 U.S. App. LEXIS 6797, at *8-9 (10th Cir. Apr. 6, 1998) ("parties do bear responsibility for false statements of fact within their personal knowledge. . . factual misrepresentation is example of wrongful conduct for which party may sanctioned in addition to, or instead of, counsel."); *Yan Zhao v. Keqiang Li*, No. 20-3138 (TJK), 2022 U.S. Dist. LEXIS 185062, at *12-14 (D.D.C. Oct. 11, 2022) (holding that sanctions against plaintiffs were warranted as the plaintiffs were responsible for Rule 11 violations); *Intelsat U.S. Sales LLC v. Juch-Tech, Inc.*, No. 10-2095 (RC), 2014 U.S. Dist. LEXIS 203540, at *8 (D.D.C. Oct. 15, 2014) ("The sanction should be imposed on the persons—whether attorneys … or parties—who have violated the rule or may be determined to be responsible for the violation.") (internal quotation omitted).

for those misrepresentations, just as it would be responsible for any admissions that its counsel made on its behalf before this Court under *Hewlett-Packard* or would face sanctions for its attorney's frivolous assertions under *Elliot*.  There is no "advocacy" escape hatch for fraud.

3.   The Municipality Could Not Have Discovered Rutas' Fraud During the First Arbitration

The Municipality meets the second requirement for vacating an arbitral award under § 10(a)(1) because the Municipality could not have discovered Rutas' fraud before or during the arbitration despite exercising reasonable diligence.  *See ARMA, S.R.O*, 961 F. Supp. 2d at 254; *Thomas Kinkade Co. v. Hazlewood*, No. C 06 7034 MHP, 2007 U.S. Dist. LEXIS 9136, at *9 (D.D.C. Jan. 25, 2007) (denying vacatur where a party "could have discovered the information. . . through the reasonable exercise of due diligence in the proceedings below.").  The purpose of this requirement is to prevent parties from "hold[ing] claims of fraud in reserve and engag[ing] in 'sandbagging' strategies inimical to the very goals of the FAA." *Id.*  There is no such concern, however, when a party attempts to root out fraud in the arbitration, and the opposing party stonewalls.

In *France*, the Third Circuit determined that Bernstein could not have discovered information exposing France's lies using reasonable diligence before or during the arbitration.  The court explained that when France represented that he had no documents responsive to Bernstein's request and testified falsely at the hearing, he committed fraud "directly in response to the reasonable diligence that Bernstein exercised in his discovery attempts."  43 F.4th at 379.  A "reasonably diligent person in Bernstein's position was entitled to rely upon [France's] representations without launching a separate fact-checking investigation." *Id.* (citing *MidAmerican Energy Co. v. International Brotherhood of Electrical Workers Local 499*, 345 F.3d

616, 618-19 (8th Cir. 2003)).  "Reasonable diligence does not require parties to assume the other side is lying." *France*, 43 F.4th at 380.

Here, the Municipality asked Rutas to produce documents relevant to establishing that Rutas had engaged in corruption relating to the Concession Agreement.  Rutas responded to the Municipality by asserting that it did not have any responsive documents.  Rutas also insisted that it had not engaged in any corruption.  Faced with Rutas' repeated, categorical, and false assertions that it did not act corruptly and had no responsive documents, reasonable diligence did not require the Municipality to search further, as *France* explains.  Even so, the Municipality attempted to obtain probative evidence of corruption from sources other than Rutas, but its efforts were futile. The evidence the Municipality needed was either under seal or did not yet exist.  The Municipality could not obtain that evidence until after the arbitration when Peru's investigative authorities released their indictment.  Accordingly, the Municipality could not have discovered Rutas' fraud through due diligence before or during the arbitration.

4.    Rutas' Fraud Was Material to the Arbitral Award

The Municipality satisfies the third requirement to vacate the award because Rutas' misconduct was material to the outcome of the arbitration.  *See ARMA*, 961 F.3d at 254-55. Fraudulent conduct is "material" where there is a nexus between the purported fraud and the arbitrators' decision.  *Stati*, 302 F. Supp. 3d at 200; *see also France*, 43 F.4th at 381.  This standard is "relatively forgiving." *France*, 43 F.4th at 381.  Numerous federal courts of appeals have held that the petitioner "need not demonstrate that the arbitrators would have reached a different result." *Odeon Capital Grp. LLC v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017).[8]  Nevertheless, some

---

[8] Citing *Karaha Bodas Co., v. Perusahaan Pertamabangan Minyak Dan Gas Buni Negara*, 354 F.3d 274, 306 (5th Cir. 2004) ("It is not necessary to establish that the result of the arbitration would have been different if the fraud had not occurred."); *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503 (6th Cir. 2003) ("a movant need not establish that the result of the proceedings would have been different had the fraud not

courts in this District have considered whether the misconduct affected the result.  *See ARMA, S.R.O.* 961 F. Supp. 2d at 255 (requiring movant to show "a causal connection between its opponent's conduct and the outcome of the arbitration" such that the fraud have "some bearing on the arbitrator's final decision"); *Owen-Williams v. BB&T Inv. Servs.*, 717 F. Supp. 2d 1, 16 (D.D.C. 2010) (requiring that award be procured by fraud).  The Municipality easily clears either hurdle.

Rutas' misrepresentations about its participation in corrupt acts were material to the outcome of the arbitration.  If Rutas had not tricked the tribunal into concluding that there was insufficient evidence of corruption relating to the Concession Contract, the tribunal would have voided that contract and any amendments thereto.  The tribunal itself explained that "[a]s corruption is contrary to international public order, and to the detriment of the public interest of the State and of the citizens of Peru, **the Tribunal is very clear that it has the duty to declare the Concession Contract null and void if there is sufficient evidence that it was obtained by corrupt means**." Exhibit A, ¶ 399 (emphasis added).[9]

The tribunal, however, did not declare the Concession Agreement null and void because Rutas persuaded it that there was insufficient evidence of corruption.  Rutas did so by falsely representing that it lacked documents relevant to such corruption and by denying that it engaged

---

occurred.") (internal quotation omitted); *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1022 (9th Cir. 1990) ("We read this language as requiring a nexus between the alleged fraud and the basis for the panel's decision); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) ("The last element does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred.").

[9] In so holding, the tribunal followed a well-established rule.  *See, e.g.*, *World Duty Free Co. Ltd. v. The Republic of Kenya*, ICSID Case No. ARB/00/7, Award at ¶ 157 (Oct. 4, 2006) ("[C]orruption is an international evil; it is contrary to good morals and to an international public policy common to the community of nations. . . in light of the decisions taken in this matter by courts and arbitral tribunals, this Tribunal is convinced that bribery is contrary to the international public policy of most, if not all, States, or to use another formula, to transnational public policy. Thus, claims based on contracts of corruption or on contracts obtained by corruption cannot be upheld by this Arbitral Tribunal."); see also *Fynerdale Holdings BV v. The Czech Republic*, PCA Case No. 2018-18, Award at ¶ 550, (Apr. 29, 2021) (same).

in any corruption at all.  The tribunal expressly relied on those fraudulent denials, first to decline to order the production of highly probative documents when it "rejected" the Municipality's document request, Dkt. # 43-1 at 3, and later when it relied on the fact that "the existence of these corrupt payments. . . are denied by Rutas de Lima" to find there was insufficient evidence of corruption to nullify the Concession Agreement.  Ex. A at ¶ 442.  Accordingly, Rutas' fraud was material.

### B.    THE AWARD SHOULD BE VACATED BECAUSE IT VIOLATES PUBLIC POLICY

Even if the Municipality had not satisfied § 10(a)(1), the Court still should vacate the Award because it violates U.S. public policy.  Violation of public policy is an independent ground for vacatur.  A court may vacate an arbitral award that is "contrary to some explicit public policy that is well defined and dominant and ascertained by reference to the laws or legal precedents." *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001) (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486 (D.C. Cir. 1997) (internal punctuation omitted)).  Here, the award violates two well-defined public policies: the policy against enforcement of contracts that are stained by corruption and the policy against procuring contracts through corruption.

Longstanding U.S. law and public policy forbid enforcement of corrupt contracts.  *See, e.g.*, *Oscanyan v. Arms Co.*, 103 U.S. 261, 271-72 (1880) (holding a "corrupt" contract was "prohibited by considerations of morality and policy which should prevail at all times and in all countries, and without which fidelity to public trusts would be a matter of bargain and sale, and not of duty").  In fact, federal law prohibits "[e]xercising personal or political influence with government officials in order to obtain a government contract." *Kashfi v. Phibro-Salomon, Inc.*, 628 F. Supp. 727, 739 (S.D.N.Y. 1986).

This policy is rooted in core objectives of the U.S. legal system: "(1) to prevent the use of improper influence in connection with securing government contracts; (2) to eliminate arrangements which encourage inequitable and exorbitant fees that bear no reasonable relationship to the services rendered; and (3) to prevent contracts being awarded on a basis other than merit." *Id.* at 740. Simply put, "[p]ublic policy, congressional intent and case precedent all dictate against condoning any fraud or attempts to practice fraud during the course of contract performance." *Supermex v. United States*, 35 Fed. Cl. 29, 42 (Fed. Cl. 1996).[10]

By vacating the award, the Court can avoid condoning the corruption that Rutas used to procure the Concession Contract and its amendments. The evidence that the Municipality obtained after the first arbitration confirms that the award should be vacated on public policy grounds. The central players have admitted to the key facts—that Villarán and Castro asked Odebrecht for payments while the Concession Contract and Bankability Addendum were being negotiated, Odebrecht paid them, and Rutas received direct benefits from those payments. Municipal officials pushed the Odebrecht Private Initiative through and agreed to the Bankability Addendum in direct response to the corrupt payments. Odebrecht's own accounting ledgers expressly recorded that the corrupt payments were made for the Concession Contract.

---

[10] *See also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42 (1987) ("A court may refuse to enforce contracts that violate law or public policy. . . no court will lend its aid to one who founds a cause of action upon an immoral or illegal act."); *Seymour v. Blue Cross/Blue Shield*, 988 F.2d 1020, 1023 (10th Cir. 1993) ("The public policy exception is rooted in the common law doctrine of a court's power to refuse to enforce a contract that violates public policy or law."); *Walters v. Fullwood*, 675 F. Supp. 155, 162 (S.D.N.Y. 1987) ("Even in the context of a non-criminal contract, a prime and long-settled public policy closes the doors of our courts to those who sue to collect the rewards of corruption."); *S.E.L. Maduro (Fla.), Inc. v. M/V Santa Lucai*, 116 F.R.D. 289, 297 (D. Mass. 1987). ("[I]t is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in the due administration of justice, cannot enforce a contract which is obtained by that means."); *United States v. Davio*, 136 F. Supp. 423, 427 (E.D. Mich. 1955) ("It has long been held that contracts for payment of commissions for securing Government contracts or congressional favors which have a tendency to corrupt are void as against public policy.").

Indeed, this is the exceedingly rare case where the United States not only has a public policy that requires vacating the award, but where the U.S. Department of Justice has actually *prosecuted* Rutas' parent company for precisely the type of corruption that led to the Concession Contract and its modifications.  Pursuant to Odebrecht's plea agreement, the company admitted to making "approximately $29 million in corrupt payments **to government officials in Peru in order to secure public work contracts**."  Ex. B, at B-20, ¶ 65 (emphasis added).  That is precisely the conduct at issue in the Concession Contract.  U.S. officials proclaimed this effort was indicative of an "unwavering" commitment to act against "corrupt individuals" that "threaten a fair and competitive economic system or fuel criminal enterprises" and pledged that "[t]he FBI will use all available resources to put an end to this type of corrupt behavior."[11]  The award should be vacated for the same reasons.

## V.   CONCLUSION

For the foregoing reasons, the Court should vacate the award because the award was procured by corruption, fraud, or undue means, and because the award contravenes firmly established public policy.

Dated: March 31, 2023          Respectfully submitted,

THE METROPOLITAN MUNICIPALITY OF LIMA

By its attorneys,
*/s/ Andrew B. Loewenstein*
Andrew B. Loewenstein (D.D.C. Bar No. MA0018)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600

---

[11] Dep't of Justice, Office of Pub. Affs., Press Release, Odebrecht and Braskem Plead Guilty and Agree to Pay at Least $3.5 Billion in Global Penalties to Resolve Largest Foreign Bribery Case in History (Dec. 21, 2016), https://www.justice.gov/opa/pr/odebrecht-and-braskem-plead-guilty-and-agree-pay-least-35-billion-global-penalties-resolve.

Tel: 617-832-1000
Fax: 617-832-7000
aloewenstein@foleyhoag.com

Nicholas Renzler (D.C. Bar No. 983359)
FOLEY HOAG LLP
1301 Avenue of the Americas, 25th Floor
New York, NY 10019
Tel: 212-812-0400
Fax: 212-812-0399
nrenzler@foleyhoag.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system, will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing on March 31, 2023.

*/s/ Andrew B. Loewenstein*
Andrew B. Loewenstein
