## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN MUNICIPALITY OF LIMA, <br><br> *Petitioner*, <br><br> v. <br><br> RUTAS DE LIMA S.A.C., <br><br> *Respondent*. | Case No. 1:20-cv-02155 (ACR) |
| METROPOLITAN MUNICIPALITY OF LIMA, <br><br> *Petitioner*, <br><br> v. <br><br> RUTAS DE LIMA S.A.C., <br><br> *Respondent*. | Case No. 1:23-cv-00680 (ACR) |

## <u>MEMORANDUM OPINION</u>

In January 2013, the Metropolitan Municipality of Lima, Peru, signed a Concession Contract for Rutas de Lima S.A.C to build, improve, and maintain urban highways.  To pay for this infrastructure, Lima agreed that Rutas would receive revenues from existing and new toll booths.  Rutas performed its obligations, and in late 2016 it opened the New Chillón Toll Unit (NCTU) in a major thoroughfare.  What happened next caught Lima's officials off guard.  Residents vehemently protested the new costs; some even rioted.  Public officials quickly

truckled to this political backlash.  Lima shuttered the NCTU and later nixed contractual rate increases at existing toll booths.  And it refused to compensate Rutas for its costs or lost revenues.

The litigation equivalent of *Groundhog Day*[1] ensued.  Rutas initiated an international arbitration claiming Lima had breached the Concession Contract.  Lima responded that Rutas, through its parent company, had bribed officials to obtain the Contract.  The tribunal heard and rejected this defense, held Lima in breach, and awarded damages.  Undeterred, Lima doubled down.  It barred Rutas from collecting tolls at the NCTU and implementing an agreed-upon rate increase at existing toll booths.  Rutas brought a second arbitration, also related to the Contract, and Lima again argued corruption.  A second tribunal also heard and rejected this defense, also held Lima in breach, and also awarded damages.  With interest and continuing damages accruing daily, the two arbitration awards now total more than $196 million.

Undeterred, Lima tripled down.  It threatened to terminate the Concession Contract altogether.  Rutas brought yet another arbitration.  And yet another tribunal ruled against Lima, this time issuing an interim decision enjoining Lima from terminating the Contract.  Lima responded by challenging the tribunal's three arbitrators on bias grounds before the Permanent Court of Arbitration (PCA).  That gambit failed.  Lima also filed a criminal complaint against all three arbitrators.  The charge?  That each arbitrator committed corrupt acts by invoicing their standard fees.[2]  Lima's appointed arbitrator resigned as a result, and Lima appointed a replacement arbitrator.  Lima then challenged *its* replacement arbitrator for bias,[3] and he

---

[1] *Groundhog Day* (Columbia Pictures 1993).

[2] Yes, you read that correctly.  Case No. 21-cv-2155, Dkt. 102 (Jan. 5, 2024 Hearing Tr.) at 23:8–24:15.

[3] Case No. 21-cv-2155, Dkt. 103 (Feb. 7, 2024 Hearing Tr.) at 27:2–16, 45:14–46:6.

resigned.  As of December 2023, the criminal investigation into the original three arbitrators was ongoing.

Lima petitions to vacate the first two awards under the Federal Arbitration Act (FAA), 9 U.S.C. § 10(a)(1), (3).  As to the First Award, Lima primarily argues that because Rutas *had* bribed officials, Rutas's denial of bribery before the tribunal was fraudulent, and the Court should therefore vacate the tribunal's ruling that Rutas *had not* bribed officials.  As to the Second Award, Lima argues that the tribunal committed misconduct in admitting some of—but not the annexes to—a 3,876-page prosecutorial indictment it introduced well after the close of evidence.  At bottom, Lima asks the Court to chuck out two arbitral awards that Rutas won fair and square.

The Court declines Lima's improvident invitation.  It will not upend well-settled law by rehearing a claim two tribunals have independently rejected.  It will not hold that Rutas's lawyers committed fraud by defending their client.  And it will not second-guess a well-founded procedural ruling.  Instead, the Court DENIES Lima's petitions to vacate the First and Second Awards and GRANTS Rutas's cross-motions to confirm them.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  *Bidding on the Concession Contract*

In April 2010, two Brazilian subsidiaries of Odebrecht S.A., a global construction conglomerate, created the Líneas Viales de Lima Consortium (the Consortium) in Lima, Peru.

Second Award ¶ 81.[4]  The Consortium submitted a proposal to Lima, called the Vías Nuevas de Lima Private-Sector Initiative, for the design, construction, improvement, and operation of new and existing roads in Lima.  *Id.* ¶ 82.  The Consortium then engaged with Lima to revise its proposal, ultimately producing a fifth and final version (the Proposal).  *Id.* ¶¶ 83–90, 391.  At Lima's request, the fifth version was sent to a law firm, which, on April 3, 2012, "concluded that the [Proposal] satisfied [Lima's] legal requirements."  *Id.* ¶¶ 90, 365, 391.

In May 2012, Lima issued its Declaration of Interest regarding the Proposal and invited third parties to submit proposals for the same, or an alternative, road construction and improvement project.  *Id.* ¶¶ 92–93.  Lima took numerous steps to attract bidders, including creating and publicizing virtual and physical data rooms and promoting the project at various events.  *Id.* ¶ 94.  No one bid.  *Id.* ¶ 95.  On September 18, 2012, Lima awarded the Vías Nuevas de Lima project to the Consortium.  *Id.* ¶ 96.  On January 9, 2013, the Consortium, at this point known as Rutas de Lima S.A.C.,[5] and Lima signed the Concession Contract, which established a rate system for the roads.  *Id.* ¶ 98.

In June 2016, a Toronto-based investment fund manager acquired 57 percent of Rutas's shares from Odebrecht.  Second Award ¶ 343; *Lima II*, Dkt. 41-4 (Interim Measures Decision) ¶ 39.  Odebrecht, as the Strategic Partner of the Concession Contract, retained twenty-five percent of Rutas's shares.  *Lima II*, Dkt. 41-4 ¶ 40.  Even though Lima accuses Odebrecht of

---

[4] Throughout this Opinion, the Court refers to Case No. 21-cv-2155, the First Arbitration matter, as *Lima I* and its award as the First Award, located at Dkt. 74-2.  It refers to Case No. 23-cv-680, which challenges the Second Arbitration matter, as *Lima II* and its award as the Second Award, located at Dkt. 1-3.  All pin citations are to the document's internal page or paragraph numbers, unless the citation notes "ECF."

[5] In October 2010, the companies forming the Consortium incorporated a company, which, in November 2011, became Rutas de Lima S.A.C.  Second Award ¶ 97 & n.22; *Lima II*, Dkt. 41-4 ¶ 33 n.17.

corruption, Lima has repeatedly refused to allow Rutas to replace Odebrecht as its Strategic Partner. *Id.* ¶¶ 40–43.

### 2.     *Mayor Villarán's Anti-Recall Campaign*

Susana Villarán was Lima's Mayor while the parties negotiated and signed the Concession Contract.  First Award ¶¶ 418, 420–21.  On April 4, 2012, the day after a law firm, at Lima's request, had reviewed the Consortium's fifth and final Proposal, "the Citizen Initiative Committee submitted 406,000 signatures to set in motion the recall process against [Mayor Villarán]."  Second Award ¶ 391.  On October 26, 2012, after Lima had awarded the Concession Contract to Rutas (on September 18, 2012), the "National Elections Office submitted the request for the recall of [Mayor Villarán] to the National Elections Tribunal."  *Id.* ¶ 373.  Five days later, on October 31, 2012, the Elections Tribunal "called for a referendum" on her recall on March 17, 2023, and Mayor Villarán ran an Anti-Recall Campaign. *Id.* ¶¶ 374, 591.  Mayor Villarán survived the recall, but she then lost her 2014 re-election campaign.  *Id.* ¶¶ 326–27 (referencing recall and re-election campaigns).

### 3.     *Terms of the Concession Contract*

Under the thirty-year Concession Contract, Rutas agreed to finance construction, improvement, and maintenance projects for sections of highway known as Panamericana Norte, Panamericana Sur, and Ramiro Prialé.  *Lima II*, Dkt. 26-3 (Contract) ¶¶ 1.13, 2.2, 7.1; First Award ¶ 95.  Rutas was entitled to collect toll revenue to recover its investment, operation, and maintenance costs.  Contract ¶ 11.1.  The Contract further required Lima, at its own expense, to perform certain "routine regular maintenance activities," known as "Prior Activities," to ensure that Rutas could begin its construction on the relevant highway sections.  *Id.* ¶ 1.13.  That same

provision provided that Rutas could instead perform the Prior Activities at Lima's expense. *Id.*; *see also* ¶ 5.33; First Award ¶ 98(xi)–(xii).

### 4. *Bankability Addendum and Memoranda of Agreement*

In February 2014, Lima and Rutas modified the Concession Contract in a document called the Bankability Addendum. Second Award ¶ 117. The Bankability Addendum provided that Rutas—not Lima—would perform some of the Prior Activities. *Id.* Rutas then undertook some of the Prior Activities, which included improving and maintaining certain sections of highway. Second Award ¶¶ 138–41, 153.

In December 2015, Lima and Rutas entered into a Memorandum of Agreement, under which Lima would pay Rutas for some of the Prior Activities by implementing toll rate increases. *Id.* ¶¶ 135–37. In June 2016, Lima and Rutas entered into another Memorandum of Agreement to increase the applicable toll rates. *Id.* ¶¶ 148–49.

### 5. *Odebrecht Plea Agreement*

In December 2016, Odebrecht S.A. entered into a plea agreement with the United States Department of Justice, and "Odebrecht's corrupt activities in Latin America and multiple countries around the world, including Peru, became public knowledge." Second Award ¶ 176 & n.109; *see also Lima II*, Dkt. 1-2 (Plea Agreement). This led Peruvian officials to "launch[] multiple investigations into Odebrecht's corrupt activities in Peru." Second Award ¶ 349. As part of the plea, Odebrecht agreed that between about 2005 and 2014, it "made and caused to be made approximately $29 million in corrupt payments to government officials in Peru in order to secure public works contracts," and that it "realized benefits of more than $143 million as a result of these corrupt payments." Plea Agreement, Statement of Facts ¶ 65. The agreement set out two examples of Odebrecht's corruption scheme in Peru, occurring in about 2005 and 2008

respectively.  *Id.* ¶¶ 66–67.  Neither example mentioned Rutas, the Concession Contract, or the Anti-Recall Campaign.  *Id.*

### 6.    *Social Protests Following New Tolls*

The Concession Contract required Lima to transfer existing toll booths and their proceeds to Rutas, which Lima did in February 2013.  First Award ¶ 102.  It also required Rutas to build and collect tolls at the NCTU, which it did in December 2016.  *Id.* ¶¶ 100–01, 118; Second Award ¶¶ 151–52.  But a few days later, in January 2017, "social protests took place in repudiation of the new toll implementation."  First Award ¶ 119.  "Specifically, on January 5, 2017[,] and January 12, 2017, two massive protests took place, causing social conflicts and riots."  *Id.* (footnotes omitted).  On January 12, 2017, Rutas informed Lima that the social protests "had prevented" it from collecting the toll rate at the NCTU and the Existing Chillón Toll Unit.  *Id.* ¶ 121.  In response to the protests, Lima first suspended and then permanently closed the NCTU—the key dispute at issue in the First Arbitration.  *Id.* ¶¶ 120–25; Second Award ¶¶ 174–75.

Though Lima had closed the NCTU, the other toll booths transferred to Rutas remained operational.  Second Award ¶¶ 152, 156.  The 2016 Memorandum required Lima to implement four toll rate increases at these booths, the last of which was scheduled for December 2017.  *Id.* ¶ 149.  But Lima feared more social protests.  *Id.* ¶ 159.  So Rutas agreed to suspend the final toll rate increase until February 2018 and proposed a draft compensation agreement to cover its lost revenues.  *Id.* ¶ 160.  A few days later, Lima prohibited Rutas from implementing the final toll rate increase at all.  *Id.* ¶ 161.  Throughout 2018, Lima informed Rutas that the final toll rate increase "was not in order" because Rutas—it now alleged—had not completed the Prior Activities.  *Id.* ¶¶ 165, 167.

In November 2018, Rutas invoked its contractual rights, stated that it would implement the final toll rate increase, and then did so.  *Id.*  ¶¶ 166, 168–69.  Lima moved in a Peruvian court to enjoin the toll rate increase.  *Id.* ¶ 169.  In December 2018, the court denied the request, "finding the requested injunction to amount to anticipated relief on the merits," but an appellate court reversed and requested the lower court to "recategorize" the requested injunction.  *Id.* ¶¶ 170–71.  The issues arising from the December 2017 final toll rate increase form the dispute in the Second Arbitration.  *Id.* ¶ 187.

### 7.      *August 2022 Indictment of then-former Mayor Villarán*

On August 25, 2022, Prosecutor José Domingo Pérez filed an information, or what the parties call the Indictment, against then-former Mayor Villarán and others.  Second Award ¶ 185.  The Indictment's "thesis" was that "Odebrecht contributed" $3 million to Mayor Villarán's Anti-Recall Campaign, including $1 million that was "delivered directly to the Anti-Recall campaign."  *Id.* ¶ 659.  As for the $1 million, the Indictment alleged that Odebrecht made the payment "in cash" to José Miguel Castro Gutiérrez (Castro), the municipal manager and campaign director for Mayor Villarán, through Raúl Ribeiro Pereira Neto, Rutas's general manager.  *Id.* ¶ 661; *see also id.* ¶¶ 322, 400; *Lima I*, Dkt. 95-1 at 4.  The Indictment alleged that the $1 million "was paid under the scheme that is evidenced in the off-the-books accounting spreadsheet for structured operations departments, where illegal payments were identified for the electoral recall campaign."  Second Award ¶ 665 (cleaned up).  The Indictment pointed in support to three payments listed on a spreadsheet made in April, August, and November 2014.  *Id.* ¶¶ 665–66.

**B.      Procedural History of the Arbitrations**

      *1.      First Arbitration*

        a)      Arbitration Proceedings

Rutas initiated the First Arbitration in May 2018, seeking damages over Lima's failure to compensate Rutas for losses resulting from the NCTU closure.  First Award ¶¶ 15, 173–74, 380–81.  The arbitration was seated in Washington, D.C., under the 2010 Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).  *Id.* ¶¶ 7, 11.  The tribunal consisted of three experienced arbitrators,[6] and the parties were well represented, Rutas by ten attorneys and Lima by eleven.  *Lima I*, Dkt. 95-1 at 2.  The parties filed eleven pre- and post-hearing briefs; submitted 563 exhibits, offered nine fact and expert witnesses; and participated in a five-day evidentiary hearing.  *Lima II*, Dkt. 26 at 9.

Lima argued in a counterclaim that the tribunal could declare, on its own authority, the Concession Contract null because Rutas obtained it by bribing government officials.  First Award ¶¶ 293–306.[7]  Lima argued that Odebrecht, Rutas's parent company, unlawfully obtained the Contract in September 2012 by contributing to Mayor Villarán's Anti-Recall Campaign "between the end of 2012 and the beginning of 2013."  *Id.* ¶ 420.  It contended that the adjudication of the Contract in September 2012 and the Odebrecht contributions "align

---

[6] The tribunal included (1) Chair Alexis Mouree, an arbitration practitioner and, during the First Arbitration, the President of the International Chamber of Commerce International Court of Arbitration; (2) Antonio Hierro Hernández Mora, appointed by Rutas, an arbitration practitioner and professor at Rey Juan Carlos University; and (3) Elvira Martínez Coco, appointed by Lima, who had served as an arbitrator before various institutions, including the PCA and the International Arbitration Chamber of Paris.  *Lima I*, Dkt. 95-1 at 1–2 & n.1.

[7] The tribunal noted, however, that Lima "chose[] *not to expressly request* the total or partial nullity of the Contract or the June 2016 Memorandum for corruption."  First Award ¶ 499 (emphasis added).

perfectly" and had "dates . . . close enough to each other to facilitate an improper quid pro quo." *Id.* (cleaned up).  Lima also argued that two payments Odebrecht made in February 2014 to Castro, Lima's municipal manager, helped Rutas secure the Bankability Addendum.  *Id.* ¶¶ 440, 446.

At the hearing, Lima produced one in-person fact witness in support of its corruption allegations, Prosecutor Jorge Miguel Ramírez.  *Lima I*, Dkt. 95-1 at 8–9.  Prosecutor Ramírez did not have first-hand knowledge of how Rutas obtained the Concession Contract or its modifications.  He testified instead as to the nature of the criminal investigations into "alleged acts of corruption by former public officials and legal representatives of the Odebrecht company" relevant to the Contract.  First Award ¶ 466; *see also id.* ¶¶ 463–66.

Lima also submitted thirteen exhibits related to its corruption allegations.  *Lima I*, Dkt. 95-1 at 13–14.  During the discovery phase, Lima propounded several document requests.  *Lima I*, Dkt. 43-1.  One, Document Request No. 19, asked for documents reflecting payments from Rutas to government officials.  *Id.* at ECF 3–5.  Rutas responded that it was not aware of any such documents, and the parties moved on.  *Id.* at ECF 3.

Rutas's lawyers defended Rutas.  First Award ¶¶ 316–30.  As relevant here, Rutas denied any corruption in connection with the awarding of the Concession Contract.  *Id.*  Lima argues that in defending Rutas, Rutas's chairman and lawyers made a series of unsworn "false statements . . . throughout the arbitration."  *Lima I*, Dkt. 74 at 23–24.  (The Court quotes these allegedly false statements in full in Appendix A, attached to this Opinion.)

b)    <u>First Award</u>

In May 2020, the tribunal rejected Lima's arguments, declined to find the Concession Contract or its modifications void because of corruption, First Award ¶¶ 388–500, and ruled for

Rutas, *id.* ¶¶ 738, 758.  The tribunal granted Rutas damages for rate collection at the Existing Chillón Toll Unit and the NCTU, plus a formula for future damages due to Rutas's noncollection at the NCTU after January 13, 2017.  *Id.* ¶ 758(1).  The tribunal also awarded Rutas interest on the damages and over $2 million in arbitration costs.  *Id.* ¶ 758(2), (6).  With accruing interest, Rutas estimates that the damages (through January 2024) exceed $187 million.  *Lima II*, Dkt. 53 at 8.

At Lima's request, the tribunal applied a preponderance of the evidence standard to the corruption question.  First Award ¶¶ 393, 401.  The tribunal explained that even under this "flexible standard," *id.* ¶ 402, "it is not enough for an arbitral tribunal to annul a contract where there are indications that a party or its representatives at any time made illegal payments to public officials; [t]he [t]ribunal must also [find] that these payments are in some way *related to the contract* signed between the parties," *id.* ¶ 400 (emphasis added); *see also* ¶ 460.  On the other hand, the tribunal held that it would "not apply a high standard of evidence" because it "may prove impossible to prove with certainty the existence of" corrupt acts.  *Id.* ¶ 401.

The tribunal cautioned that it "cannot establish a presumption that any contract in which the Odebrecht Group has participated is necessarily stained with corruption."  *Id.* ¶ 404.  Even under a "low standard of evidence," the tribunal reasoned that to declare the Concession Contract null it had to find "reasonable indications . . . of the manner in which these [corrupt] payments are *linked* to the annulled acts, or at least that said acts include undue advantages, such as inflated prices or undue contractual advantages."  *Id.* ¶ 460 (emphasis added).  For at least six reasons, the tribunal found no such link.[8]

---

[8] Lima's appointed arbitrator, Martínez Coco, issued a partial dissent unrelated to the corruption allegations.  First Award, Dissent ¶¶ 1–2 (noting agreement with the tribunal's findings on the corruption allegations).

*First*, the tribunal found that Lima awarded Rutas the Contract before the recall referendum ever launched. *Id.* ¶ 422. For the tribunal, this timing undermined Lima's claim that Rutas bribed Mayor Villarán by contributing to the Anti-Recall Campaign. *Id.* ¶¶ 421–22. Lima awarded the Contract to Rutas on September 18, 2012. *Id.* ¶ 418. The tribunal found that the recall referendum for Mayor Villarán was not set up until October 2012 and was not legally organized until November 2012. *Id.* ¶¶ 421–22. Therefore, the tribunal reasoned, "any corrupt act linked to the financing of the electoral campaign . . . could not have happened prior to [November 2012] and, specifically, have been related to the adjudication of the [Contract], which took place on September 18, 2012." *Id.* ¶ 422.[9]

*Second*, the tribunal rejected Lima's contention that the testimony of an Odebrecht representative, Jorge Barata, supported its claims. *Id.* ¶ 435. In testimony to prosecutors (and not via in-person testimony before the tribunal), Barata had confirmed that Odebrecht made payments to the Anti-Recall Campaign. *Id.* But Barata also testified that those payments were unrelated to the Contract "because the contract had already been assigned." *Id.* (cleaned up). "It was a self-sustaining contract. The rates were already in place and the triggers for the increase in those rates were also established." *Id.* (cleaned up). The tribunal credited Barata's testimony and found it cut against Lima's theory. *Id.* ¶¶ 435–36; *see also* Second Award ¶¶ 315, 386, 700 (the second tribunal criticized Lima's habit of submitting "cherry-picked" evidence).

*Third*, the tribunal found that alleged Odebrecht payments in February 2014 to Castro, Lima's municipal manager, did not establish sufficient evidence of corruption. First Award ¶¶ 440–44, 458. Because, again, timing. The February 2014 payments would have been made

---

[9] The tribunal noted that the parties signed the Concession Contract later, in January 2013. First Award ¶ 433. But this did not affect the analysis because the signed January 2013 version had the same contractual terms as those in the Declaration of Interest, *id.*, which Lima issued in May 2012, *id.* ¶¶ 415–16.

"more than 18 months after the Adjudication and more than a year after the signing of the Concession Contract," *id.* ¶ 443; 18 months before the December 2015 Memorandum, *id.* ¶ 458; and "more than two years before the signing of [the June 2016] Memorandum," *id.* ¶¶ 444, 458. The tribunal noted that there was no "explanation of how these payments, had they existed, could have affected the validity of the Contract or the June 2016 Memorandum." *Id.* ¶ 442. And the tribunal had "no explanation as to whether these entries in the Odebrecht payrolls correspond to corrupt payments, and to the reason why these payments were made." *Id.* ¶ 445.

*Fourth*, the tribunal found that Lima's contention made little sense as to the Bankability Addendum, which Lima also claimed Rutas obtained by corruption. *Id.* ¶¶ 446–57. The Addendum was "*more onerous* for [Rutas]" than the Concession Contract, and there was no "indication that this Addendum allowed [Rutas] to obtain . . . more favorable conditions than the Concession [Contract] provided for." *Id.* ¶ 457 (emphasis added). Presumably, Rutas would not bribe officials to obtain less favorable terms. The tribunal concluded that all agreements that amended the Contract "are the implementations of contractual provisions agreed [to] in the same Contract," and "there is no indication that these acts were the means for [Rutas] obtaining . . . undue advantages." *Id.* ¶ 462.

*Fifth*, the tribunal rejected testimony based on conjecture. It attached "great importance to the testimony of" Prosecutor Ramírez, "who ha[d] direct access to the evidence available from the ongoing criminal investigations and [was], therefore, the best qualified person to inform the Arbitration Tribunal of the content of these investigations." *Id.* ¶ 464. But his testimony hurt Lima's cause because Prosecutor Ramírez "did not provide any specific element that [could] confirm that the [a]djudication, the signing, or the execution of the Contract were effectively stained by acts of corruption." *Id.* ¶ 467. Nor did he explain how Odebrecht's February 2014

"payments would have been related to the Contract and . . . the illicit advantages of which they would have been the counterpart." *Id.* ¶ 468. The tribunal was "struck" that "Prosecutor Ramírez was not able to provide any precise and circumstantial information that would lead to the conclusion that the Concession Contract was obtained by corrupt means nor that, in the course of its execution, [Rutas] obtained undue advantages by illicit means." *Id.* ¶ 476. And the tribunal highlighted that Prosecutor Ramirez's case had not yet "been submitted to a judge for evaluation or . . . accepted by a magistrate." *Id.* ¶ 482.

*Sixth*, the tribunal highlighted that corruption allegations concerning the Concession Contract were public knowledge in 2016, yet Lima "approved without reservation" additional extensions of the works thereafter. *Id.* ¶ 493. Lima also engaged in other "ordinary acts of execution of the Concession Contract," and "[i]n none of them did [Lima] make direct or indirect reference to the possible existence of corrupt acts that could affect the validity of the Concession." *Id.* ¶ 495. (For its part, the Court highlights that as of June 2023, Lima had not allowed Rutas to replace Odebrecht as its Strategic Partner. *Lima II*, Dkt. 41-4 ¶ 43.)

### 2. Second Arbitration

#### a) Arbitration Proceedings

Rutas initiated the Second Arbitration in March 2019, seeking damages resulting from Lima's refusal to permit the December 2017 toll rate increase agreed to by the parties. Second Award ¶¶ 4, 187–88. This arbitration, like the first one, was seated in Washington, D.C., and held under the UNCITRAL Rules. *Id.* ¶¶ 13, 15. The tribunal was again comprised of seasoned

arbitrators,[10] and the parties were again well represented, each by thirteen attorneys. *Lima I*, Dkt. 95-1 at 1–2. The parties filed eleven pre- and post-hearing briefs; submitted 1,506 exhibits; offered seventeen fact and expert witnesses; and participated in a seven-day evidentiary hearing. *Lima II*, Dkt. 26 at 12–13.

Lima argued that the Concession Contract, Bankability Addendum, and 2015 and 2016 Memoranda of Agreement were null because Rutas obtained them by bribing officials. Second Award ¶ 189(d)(1)–(3). At the hearing, Lima proffered two fact witnesses regarding the corruption allegations: Prosecutor Rafael Ernesto Vela Barba, who described ongoing criminal investigations related to the Contract and Mayor Villarán's campaigns, and Castro, Lima's municipal manager. *Id.* ¶¶ 60, 695, 701–02; Second Award, Dissent ¶ 125 (quoting Vela's testimony).

Additional documentation from the criminal investigations had become public between the First and Second Arbitrations. Lima thus selected and introduced evidence from "the Prosecution Orders partially provided by the Prosecution Office," along with Prosecutor Vela's and Castro's witness statements. Second Award ¶ 695. Lima submitted dozens of exhibits related to its corruption allegations. *Lima I*, Dkt. 95-1 at 15–22. Rutas proffered its own witnesses and documents in support of its defense. *Id.* at 6–7, 9; *Lima II*, Dkt. 26 at 12.

The evidentiary hearing ended in February 2022, and the parties completed their post-hearing briefing the next month. Second Award ¶¶ 59, 68. In July, the tribunal reported that it would issue the award on August 31, 2022, a date it later moved back because an arbitrator had

---

[10] The tribunal included (1) Chair Eduardo Zuleta, an independent arbitrator, President of the Latin American Arbitration Association, and past Vice President of the International Chamber of Commerce International Court of Arbitration; (2) Pedro Claros Alegría, appointed by Rutas, an independent arbitrator and past Co-President of the Alternative Dispute Resolution Section of the Madrid Bar Association; and (3) Martínez Coco, appointed by Lima, who had also served on the first tribunal. *Lima I*, Dkt. 95-1 at 1.

become ill. *Lima II*, Dkt. 1-27 at ECF 5. On August 25, 2022, the press reported that Prosecutor Pérez had filed an Indictment against Mayor Villarán and others for several alleged crimes, including illicit association and collusion. *Lima II*, Dkt. 1-28 at ECF 6–7. Lima argued the alleged crimes were "related to the Concession Contract" and sought to submit and comment on "the relevant documents" once it acquired them. *Id.*; Second Award ¶ 70. Rutas objected. Second Award ¶ 71. After additional back-and-forth with the parties, *id.* ¶¶ 72–73, on September 30, 2022, the tribunal issued Procedural Order No. 12, which permitted Lima to introduce portions of the Indictment, "without additional annexes or writings," related to an alleged "route of the illicit money that was delivered by the company Odebrecht." *Lima II*, Dkt. 1-30 ¶ 16 (cleaned up).

> b)   <u>Second Award</u>

In December 2022, the tribunal issued the Second Award, granting Rutas lost-profit damages with non-compounding interest and over $1 million in arbitration costs. Second Award ¶ 1024. With interest, Rutas estimates that the damages (through January 2024) now exceed $9 million. *Lima II*, Dkt. 53 at 8. The tribunal once again rejected Lima's arguments that Rutas procured the Concession Contract and its amendments by corruption. Second Award ¶ 1024(b)–(c). The tribunal again applied, over Rutas's objection, a "flexible balance of probabilities standard." *Id.* ¶¶ 262, 277, 720. And the tribunal acknowledged the undisputed fact that Odebrecht made $3 million in payments to the Anti-Recall Campaign. *Id.* ¶ 704. But after hearing from witnesses and reviewing the evidence, it found "that there is not sufficient evidence to conclude that such payments were made as a *quid pro* [*quo*] for the award or execution of the Contract or the execution of the [Bankability] Addendum." *Id.* ¶ 705. It explained, at length, its

reasoning, which the Court summarizes here.  Lima's appointed arbitrator issued a partial dissent, which the Court summarizes after.

*First*, like the first tribunal, the second tribunal highlighted that the timeline of events undermined Lima's contention.  *Id.* ¶¶ 375–91, 599.  The parties exchanged, in negotiations, five versions of the Proposal, and Rutas incorporated changes requested from Lima before submitting the fifth version on March 23, 2012.  *Id.* ¶¶ 82–89, 378, 391.  At Lima's request, this fifth "consolidated version" was submitted to a law firm, which confirmed that it "satisfied [Lima's] legal requirements."  *Id.* ¶¶ 90, 391.  These negotiations and revisions all occurred before the date, April 4, 2012, that those seeking Mayor Villarán's recall submitted the 406,000 signatures "to set in motion the recall process."  *Id.* ¶ 391.

Lima alleged that the corruption scheme "to authorize and make arrangements for the payment of [$]3 million" to Mayor Villarán's Anti-Recall Campaign took shape between November 2012 and early 2013 in meetings involving Barata, the Odebrecht representative.  *Id.* ¶ 392.  But Lima had already awarded the Contract to Rutas in September 2012.  *Id.* ¶ 394.  So by the date of the meetings, the "next step" was "the negotiation and execution of the contract." *Id.* ¶ 593.  And Lima put in no evidence that Mayor Villarán had the power to "unilaterally suspend, prevent, or reverse the execution of a contract which had already been awarded."  *Id.* Thus, the tribunal found "no reason for Odebrecht to have to pay a bribe in order to secure the execution of the Concession Contract, as the contract had already been awarded."  *Id.*

*Second*, the tribunal highlighted several concerns with Prosecutor Vela's evidence. Though the criminal file spanned "several thousand pages," Prosecutor Vela produced "just what [he] needed to be able to structure [his] declaration."  *Lima II*, Dkt. 31-6 at ECF 3.  The tribunal did not understand why Lima and Prosecutor Vela refused to produce the entire criminal file,

given that it was not confidential.  Second Award ¶ 697.  The tribunal was also perplexed that neither Lima nor Prosecutor Vela ever explained what criterion they used to pick the excerpts presented.  *Id.* ¶¶ 700, 702.  Worse, Prosecutor Vela relied on uncorroborated, excerpted statements from "prospective cooperating witnesses."  *Id.* ¶ 700.  Those witnesses had "incentives in terms of punishment to cooperate with the courts," which caused the tribunal to regard their testimony with "reservations."  *Id.*  Their statements, "lack[ed] sufficient probative value, even under a flexible evidentiary standard."  *Id.*  The tribunal found that the Prosecution's evidence, including the Indictment, was not "*per se* evidence of corruption."  *Id.* ¶ 696.

*Third*, the tribunal found Lima's only witness with firsthand knowledge, Castro, the municipal manager, not credible, while it found the statement of Barata, the senior Odebrecht official, credible.[11]  Specifically, the tribunal "found serious inconsistencies in Mr. Castro's testimony," highlighted his "lack of knowledge of the Concession Contract," and found "serious flaws" in his explanation of the terms of the relevant amendments to the Contract.  *Id.* ¶ 714.  To support key testimony, Castro relied on press reports.  *Id.* ¶ 390.  The press reports he cited "[were] not conclusive either."  *Id.*  And, again, timing.  Castro testified that at a meeting in August 2013, Rutas requested "additional benefits."  *Id.* ¶ 714.  But that meeting would have occurred "more than 6 months after the Contract was signed," and neither he nor Lima ever identified what "additional benefits" Rutas allegedly received.  *Id.*

The tribunal also explained that Castro's understanding of the Contract was incorrect.  *Id.* ¶ 648.  And the tribunal found "no additional evidence to substantiate [his] statement" regarding meetings with Odebrecht or Rutas officials before September 2012.  *Id.* ¶ 595.  Castro's

---

[11] At the Second Arbitration, Castro submitted a written statement and testified live at the hearing.  *See Lima I*, Dkt. 95-1 at 4–5, 8.  Barata did not testify in-person at either arbitration hearing; instead, the tribunal cited a transcript of Barata's statement as a cooperating defendant.  Second Award ¶¶ 326 & n.246, 404.

testimony, the tribunal found, "raises doubt." *Id.* The tribunal also discounted Castro's statement because he was a cooperating witness facing his own legal jeopardy. *Id.* ¶¶ 700, 719.

In contrast, the tribunal credited Barata's statement. Barata, who was also a cooperating witness, had confessed that in meetings from November 2012 to early 2013, he arranged, at Castro's request, for Odebrecht to pay $3 million to the Anti-Recall Campaign. *Id.* ¶¶ 392, 407–08. Quoting the Indictment, the tribunal noted that Barata credibly explained many reasons for the payments, including (1) that Mayor Villarán "had good political prospects given her status as a woman" and (2) the need to avoid a change in administration "in the middle of the concession process." *Id.* ¶ 716 (cleaned up). The tribunal highlighted that Barata did not deny all wrongdoing, and he admitted that Odebrecht had bribed officials with respect to other projects. *Id.* But he "expressly denied that a link existed with respect to the Concession Contract." *Id.* ¶ 716 & n.416. The tribunal found his denial of a specific corruption scheme credible given, among other things, his acknowledgment of other corruption schemes. *Id.* ¶ 716.

*Fourth*, the tribunal rejected Lima's separate contention that Rutas bribed officials to obtain the Prior Activities work. *Id.* ¶ 715. The tribunal noted other legitimate reasons for the transfer, which occurred in compliance with the Concession Contract. *Id.* Those reasons included that "[Lima] failed to properly consider the scope of the Prior Activities from the time it negotiated the Private-Sector Initiative and entered into the Contract, or that [Lima] was not diligent in fulfilling the obligation to carry out the Prior Activities." *Id.*

All told, the tribunal found that Lima had failed to show a sufficient link between payments to Mayor Villarán's campaigns and the Concession Contract, Bankability Addendum, or Memoranda of Agreement. *Id.* ¶¶ 704–05, 719–20. Lima had produced only one witness with direct knowledge, Castro. The tribunal found him both not credible, *id.* ¶ 714, and "unable to

explain what those links consisted of or the alleged benefits that Rutas de Lima presumably obtained," *id.* ¶ 719.  The documentary evidence did not establish a sufficient link either.  *Id.* ¶¶ 715–17.  The tribunal was "not oblivious to the fact that Odebrecht and possibly Rutas de Lima were involved in acts of corruption by apparently financing Susana Villarán's Anti-Recall and re-election campaign[s]," but it found a lack of "sufficient evidence" to establish a link "between electoral corruption" and the Contract or its modifications.  *Id.* ¶¶ 716–17.

*    *    *

Arbitrator Martínez Coco's partial dissent identified three "red flags" of corruption. Second Award, Dissent ¶¶ 115–85.  The pretrial detention of Mayor Villarán and Castro confirmed that the Prosecution had a strong case.  *Id.* ¶¶ 120–35.  Unlike the majority, she credited Castro's statements and hearing testimony.  *Id.* ¶¶ 136–47.  And she found a "dramatic" change "between the Private Initiative [proposed] and the Concession Contract regarding the source of financing for the Prior Activities."  *Id.* ¶¶ 182, 184(iii); *see also id.* ¶¶ 148–83.

The majority addressed each point.  Second Award ¶¶ 721–724, 740–769.  The court decision ordering the pretrial detention did not link contributions to Mayor Villarán's campaigns to the Contract or its modifications, and instead listed other reasons—electoral corruption, flight risk, and obstruction of justice.  *Id.* ¶ 722.  Castro's statements and testimony were not credible for the reasons discussed above.  *Id.* ¶ 723.  Lastly, after extensive analysis, the tribunal found insufficient evidence that the financing and performance of the Prior Activities established corruption.  *Id.* ¶¶ 724, 764–67.

### 3.    *Third Arbitration*

Despite findings by two separate arbitral tribunals that Lima had breached the Concession Contract, and that Rutas had not obtained it by bribing officials, Lima refused to perform.  Rutas

20

therefore filed a third arbitration in December 2022. *Lima II*, Dkt. 41-4 ¶ 2. Lima responded in January 2023 by claiming again that Rutas had procured the Contract with bribes and threatening to terminate the Contract altogether. *Id.* ¶ 64(1).

Rutas asked the tribunal for interim relief enjoining Lima's termination process while the arbitration was ongoing and ordering Lima to refrain from making public statements that would aggravate the dispute. *Id.* ¶ 17. The tribunal granted the interim relief requested in June 2023. *Id.* ¶ 182. The next month, Lima announced its intention to ignore the tribunal's Interim Measures Decision and terminate the Contract. *Lima I*, Dkt. 95 at 17. Lima, according to Rutas, continues to defy the tribunal's Interim Measures Decision. *Lima I*, Dkt. 103 at 26:19–22. The Third Arbitration is ongoing as of the issuance of this opinion.

After the Interim Measures Decision issued, Lima challenged the tribunal's three arbitrators on bias grounds before the PCA. *Lima I*, Dkt. 95 at 17; Dkt. 96-1 ¶¶ 7–8. The PCA rejected the challenge against two arbitrators in November 2023 (as noted below, the third arbitrator resigned before the PCA's decision). *Lima I*, Dkt. 96-1 at ECF 32–33. Lima also filed a criminal complaint against all three arbitrators regarding the Interim Measures Decision, *Lima I*, Dkt. 95 at 17; *Lima II*, Dkt. 36 at 2, alleging each had engaged in corruption by invoicing for their regular fees, *Lima I*, Dkt. 102 at 23:8–24:16. Lima's arbitrator, Martínez Coco, resigned to protect her ability to defend the arbitration tribunal "with complete freedom in the criminal context." *Lima II*, Dkt. 36-6 at ECF 3. Lima appointed a new arbitrator to replace Martínez Coco. *Lima II*, Dkt. 36 at 2. Lima then challenged *its* second chosen arbitrator on bias grounds and he resigned. *Lima II*, Dkt. 59 at 2–3. As of December 2023, the criminal investigation into the original three arbitrators was ongoing. *Lima II*, Dkt. 34 ¶ 8.

C.      **Procedural History Before this Court**

1.      *Case No. 20-cv-2155 (*Lima I*)*

Lima petitioned to vacate the First Award in August 2020, and Rutas cross-moved to confirm the award later that year.  *Lima I*, Dkts. 1, 2, 10.  The Court granted Lima's request for alternative service and for a stay to effect service on Rutas under the Inter-American Convention on Letters Rogatory and Additional Protocol.  *Lima I*, Dkt. 4.  Lima effected service in May 2023.  *Lima I*, Dkts. 82, 99 (May 19, 2023 Hearing Tr.) at 116:5–19.

While the case was stayed, in December 2021, Lima moved to serve discovery requests on Rutas.  *Lima I*, Dkt. 35.  The case was reassigned to the undersigned in February 2023.  The next month, the Court held a hearing, lifted the stay, and denied the parties' petition and cross-motion without prejudice, inviting them to submit new and updated briefs.  *Lima I*, Min. Order of Mar. 15, 2023.  The Court granted in part and denied in part Lima's motion for discovery, *Lima I*, Min. Order of May 19, 2023, and in February 2024, Lima filed Rutas's responses to its interrogatory and requests for admission, *Lima I*, Dkt. 105.  The Court held a two-day hearing on the petition and cross-motion in May 2023.  At that hearing, the Court ordered supplemental briefing in the form of a joint status report, which the parties submitted in July 2023.  *Lima I*, Dkt. 95.[12]

---

[12] Lima objected to certain sections of Rutas's supplemental briefing in Dkt. 95 as beyond the scope of the Court's order.  *Lima I*, Dkt. 95 at 3.  It is not.  Lima submitted a 42-page chart arguing the admissibility under the Federal Rules of Evidence of each document it believed established that corruption occurred, *Lima I*, Dkt. 95-3, and an 18-page chart addressing its "new evidence," *Lima I*, Dkt. 95-2.  Rutas was permitted to respond.  *Lima I*, Dkt. 95 at 7–19.

2.      *Case No. 20-cv-2680 (*Lima II*)*

In March 2023, Lima petitioned the Court to vacate the Second Award, and the case was docketed as related to *Lima I*.  *Lima II*, Dkts. 1, 3, 4.  That same month, the Court granted Lima's motion for alternative service of process under the Inter-American Convention on Letters Rogatory and Additional Protocol.  *Lima II*, Min. Order of Mar. 15, 2023.  Later in 2023, Lima effected service.  *Lima II*, Dkt. 33 at 3, Dkt. 59 at 1–2.  Rutas filed a cross-motion to confirm the Second Award in June 2023, Dkt. 25, and the Court held a multi-hour hearing in December 2023.  On February 12, 2024, the Court invited the parties to brief whether it should award Rutas attorney's fees on Lima's petitions to vacate.  *Lima II*, Min. Order of Feb. 12, 2024.  Both sides did so.  *Lima II*, Dkts. 52, 57, 60.  The Court will address the attorney's fees issue in a separate opinion.  Given the related nature of *Lima I* and *Lima II*, the Court has consolidated the two cases to issue this Opinion.  *See* Fed. R. Civ. P. 42(a); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 147 (D.D.C. 2002).[13]

## II.  LEGAL STANDARD

The FAA "provides for expedited judicial review to confirm, vacate, or modify arbitration awards."  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008).  As the D.C. Circuit has "repeatedly recognized, judicial review of arbitral awards is extremely limited" and courts "do not sit to hear claims of factual or legal error by an arbitrator."  *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (cleaned up).  To obtain vacatur of an

---

[13] In January 2024, Rutas filed a counterclaim and motion to confirm the Interim Measures Decision in the Third Arbitration, *Lima II*, Dkt. 41, but Rutas later requested, *Lima II*, Dkt. 53 at 4, that the Court stay any further proceedings on that filing pending the D.C. Circuit's forthcoming decisions in *Nextera Energy Global Holdings B.V. v. Kingdom of Spain*, No. 23-7031; *9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 23-7032; and *Blasket Renewable Investments LLC v. Kingdom of Spain*, No. 23-7038.  The Court will stay proceedings related to Rutas's filing regarding the Third Arbitration until after the D.C. Circuit issues its mandate in the three *Kingdom of Spain* cases.

arbitration award, a party "must clear a high hurdle," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010), which the D.C. Circuit has called an "onerous" burden, *Republic of Argentina v. AWG Grp.*, 894 F.3d 327, 333 (D.C. Cir. 2018) (cleaned up); *see also ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F. Supp. 2d 245, 253 (D.D.C. 2013).  For a court to vacate an arbitration award, a party must show that "the proceeding deviated significantly from the [FAA's] standards of fair adjudication."  *Republic of Argentina*, 894 F.3d at 332.  "It is not enough for petitioners to show that the panel committed an error—or even a serious error." *Stolt-Nielsen*, 559 U.S. at 671.

The FAA "lists only four grounds upon which an arbitration award may be vacated." *Kurke*, 454 F.3d at 354.  Two are at issue here: "where the award was procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), or "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy," *id.* § 10(a)(3).  In *Hall Street*, the Supreme Court explained that § 10 "provide[s] the FAA's exclusive grounds for expedited vacatur."  552 U.S. at 584.  The D.C. Circuit has "assumed without deciding that" a tribunal acting in "'manifest disregard of the law' survives as a separate ground for vacatur." *Mesa Power Grp. v. Gov't of Canada*, 255 F. Supp. 3d 175, 183 (D.D.C. 2017).  It has not addressed the parallel question whether an award being contrary to public policy is also a separate ground for vacatur.  *Cf. Thian Lok Tio v. Wash. Hosp. Ctr.*, 753 F. Supp. 2d 9, 16 & n.7 (D.D.C. 2010).

### III.    DISCUSSION

**A.    Vacatur of the First Award**

*1.    Legal Background on FAA Vacatur Under Section 10(a)(1)*

Section 10(a)(1) of the FAA states that a district court "may" vacate an arbitration award that "was procured by corruption, fraud, or undue means."  9 U.S.C. § 10(a)(1).  Although "§ 10(a)(1) has not been addressed in any detail by this Circuit," other "courts consistently refuse to vacate an arbitral award under § 10(a)(1) unless the movant's submissions meet three cumulative conditions."  *ARMA*, 961 F. Supp. 2d at 254; *see also Petruss Media Grp. v. Advantage Sales & Mktg., LLC*, No. 22-cv-3278, 2023 WL 5507306, at *12 (D.D.C. Aug. 25, 2023).

*First*, "the party seeking vacatur must demonstrate by clear and convincing evidence that its opponent actually engaged in fraudulent conduct or used undue means during the course of the arbitration."  *ARMA*, 961 F. Supp. 2d at 254.  "[O]rdinary misconduct will not suffice; the alleged fraudulent acts must have been so prejudicial that they effectively denied the opposing party a fundamentally fair hearing."  *Id.* (cleaned up).  "Conduct by an attorney that amounts to mere sloppy or overzealous lawyering does not constitute undue means," and "the term clearly connotes behavior that is immoral if not illegal."  *Ray v. Chafetz*, 236 F. Supp. 3d 66, 76 (D.D.C. 2017) (cleaned up).

*Second*, "the movant must show that the fraud could not have been discovered before or during the arbitration through the exercise of reasonable diligence."  *ARMA*, 961 F. Supp. 2d at 254.  "[I]f the misconduct came to light at some point during the course of the arbitral proceedings, but the movant nevertheless failed to raise its concerns in a timely fashion, it may be deemed to have waived its right to seek vacatur under § 10(a)(1)."  *Id.*

25

*Third*, "the alleged misconduct must materially relate to an issue in the arbitration," which means "[t]he movant must demonstrate a causal connection between its opponent's conduct and the outcome of the arbitration." *Id.* at 254–55 (cleaned up). "Courts in this District have also demanded proof that the misconduct or fraud had some bearing on the arbitrator's final decision." *Id.* at 255 (citing cases).

### 2.   *Analysis of Vacatur Under Section 10(a)(1)*

Lima's core contention is that "new evidence" proves that Rutas bribed officials to win the Concession Contract. *Lima I*, Dkt. 74 at 28–29. But the FAA does not list "new evidence" as a basis to vacate an award. Not a problem, Lima argues, because the FAA does allow a court to vacate an award procured by fraud. And, Lima argues, Rutas fraudulently told the tribunal it did not bribe officials. *Lima I*, Dkt. 74 at 32–40. Voilà, Lima proclaims, the Court can vacate away.

Not so fast. Lima's incantation would make it farcically easy to bypass the FAA's statutory text. A losing party could cry "fraud"—and seek vacatur under § 10(a)(1)—whenever the winning party had advocated for itself during an arbitration. That is to say, always. The FAA and binding precedent interpreting it bar the Court from entertaining such a loophole.

#### a)   Threshold Issues with Lima's FAA Fraud Argument

##### i.   *Lima Is Not Entitled to a Mulligan*

To find by "clear and convincing evidence," *ARMA*, 961 F. Supp. 2d at 254, that Rutas committed fraud by denying it bribed officials to win the Concession Contract, the Court would first need to find that Rutas *bribed officials to win the Concession Contract*. This would be, putting it mildly, difficult given that two tribunals found insufficient evidence of corruption under a lower preponderance of the evidence standard. Lima never acknowledges this; it

presupposes that its "new evidence" proves its corruption claim.  But, of course, Rutas has a right to defend itself.  And to defend itself (yet a third time), Rutas would be entitled to make arguments, proffer documentary evidence, present witnesses, and cross-examine Lima's witnesses.  The Court, in short, would need to retry the very claim that two tribunals have already considered and rejected.

Such an approach clashes with the FAA's provision for "expedited judicial review" of arbitral awards, *Hall St.*, 522 U.S. at 578, and with controlling precedent curtailing as "extremely limited" a court's power to review them, *Kurke*, 454 F.3d at 354 (cleaned up); *see Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 816–17 (D.C. Cir. 2007); *Republic of Argentina*, 894 F.3d at 332–33.  It ignores these clear principles in the case law.  *See generally Lima I*, Dkt. 74.[14]

Instead, Lima rests its petition on an inapposite case from the Third Circuit, *France v. Bernstein*, 43 F.4th 367 (3d Cir. 2022).  *See, e.g.*, *Lima I*, Dkt. 74 at 33–37, 40–41; Dkt. 98 (May 18, 2023 Hearing Tr.) at 149:4–25.  Its facts could have been ripped from a *Ballers*[15] script.  Two sports agents "fought over [Jason] Bernstein's claim that [Todd] France improperly organized a money-making event for a football player who was then one of Bernstein's clients."  43 F.4th at 370.  This was "all in an effort to induce that player to fire Bernstein and hire France," which ultimately occurred.  *Id.* at 370–71.  At the ensuing arbitration, France denied having relevant

---

[14] The only D.C. Circuit decision Lima bothers to cite in the § 10(a)(1) argument of its petition did not even involve an arbitration, much less the standard for vacatur under the FAA.  *See Lima I*, Dkt. 74 at 35 (citing *Summers v. Howard University*, 374 F.3d 1188 (D.C. Cir. 2004), for the proposition that discovery failures can constitute misconduct under Federal Rule of Civil Procedure 60(b)(3)).

[15] The Third Circuit likened the events to "something out of the film *Jerry Maguire*."  *France*, 43 F.4th at 370.  An apt comparison, but for this Court's money, *Ballers'* offbeat comedy edges out *Jerry Maguire*'s romantic storyline.  *Compare Ballers* (HBO television broadcast 2015–2019), *with Jerry Maguire* (TriStar Pictures 1996).

documents and under oath denied any involvement. *Id.* at 372. The arbitrator relied on the lack of documents and France's testimony to rule on his behalf. *See id.* at 374. Documents produced after the award in a parallel federal proceeding, however, proved France's claims to be outright lies. *See id.* at 374–75. The Third Circuit ordered the award vacated under § 10(a)(1) because it was procured by fraud. *Id.* at 382.

*France* does not help Lima. The disputed issue there was straightforward: whether one agent participated in one autograph-signing event for one professional football player. Just a few undisputed emails and texts gave up the ghost, and so France could not dispute that he had withheld responsive documents and committed perjury. *Id.* at 378. Without the need for any contested hearing, "[p]erhaps the easiest conclusion in th[e] case, even under a clear-and-convincing-evidence standard," the Third Circuit concluded, was "that France committed fraud." *Id.* And because the arbitrator's decision rested on the lack of evidence and France's perjured testimony, the court concluded that "the fraud was material, and obviously so." *Id.* at 381. The only close issue was whether Bernstein could have discovered the fraud during the arbitration. *Id.* at 380–81.

That is a far cry from this case, which involves an alleged multi-year corruption scheme by an international conglomerate—involving numerous entities and individuals, sham contracts and invoices, various meetings, and a political campaign—to bribe government officials in exchange for being awarded a major public works contract. Lima points to no perjured testimony. Two tribunals have found the available evidence insufficient to establish a link to the Concession Contract or its modifications. Rutas also continues to deny the underlying allegations of corruption linked to the Contract. The Court therefore cannot easily conclude, as the Third Circuit did in *France*, that Rutas committed fraud by denying Lima's corruption

charge.  The Court cannot even conclude that Rutas's statements were material to the tribunal's award.  Lima acknowledges that Rutas did *not* make similar statements during the Second Arbitration, *Lima I*, Dkt. 74 at 30, and yet the second tribunal also found in Rutas's favor.  *See supra* Section II.B.2.b.

ii.     *Lima's "New Evidence" Is Not Probative*

Lima insists that its "new evidence" is so compelling that the Court can find in its favor by simply relying on the exhibits attached to its petition.  *See Lima I*, Dkt. 74 at 28–29 (summarizing "new evidence").  It is not.

As a threshold matter, the parties dispute whether Lima's exhibits must be admissible under the Federal Rules of Evidence for the Court to consider them.  *Lima I*, Dkt. 95-3 at 1–2 (Lima) and Dkt. 95 at 5–6 (Rutas).  The parties also quarrel over whether, if the Federal Rules of Evidence do apply, Lima's exhibits comply with them.  *Lima I*, Dkts. 95-3 at 3–42 (Lima), 95 at 8–16 (Rutas).  The Court need not decide either issue.  Assuming that the Federal Rules of Evidence do not apply (or that, if they did apply, the exhibits are admissible), the Court does not find Lima's "new evidence" reliable, much less persuasive.

The "new evidence" consists of out-of-court statements made by cooperating witnesses to prosecutors and other cherry-picked documents.  *See, e.g.*, *Lima I*, Dkt. 74 at 28–29.  At argument, Lima did not know how the Prosecution obtained the witness statements, *Lima I*, Dkt. 98 at 178:22–179:14; when the interviews took place, *id.* at 133:11–15, 134:19–23, 190:6–20; who summarized or transcribed the interviews, *id.* at 178:22–179:14, 190:21–191:12; whether anyone checked the summaries or transcripts for accuracy, *id.*; whether the witnesses were under oath, *id.* at 99:23–100:10; whether the prosecutors offered the witnesses anything for their cooperation, *id.* at 26:12–27:6, 134:8–11; or even whether Rutas's counsel could cross-examine

29

them, *id.* at 100:9–25.  Further, Lima had not authenticated any of the statements or documents, *Lima I*, Dkt. 99 at 81:10–13.[16]

At the Court's invitation, Lima submitted additional briefing and a detailed chart to address the above questions.  *Lima I*, Dkt. 95-4.  Those details are not reassuring.  The statements were made during various investigative phases and not in any court proceeding or even in the presence of an independent adjudicator.  *Id.* at 2–5, 9–18, 22–23, 27–28.  Prosecutors obtained most witness statements through a process known in Peru as "effective collaboration," by which suspects exchange testimony for a reduced sentence or total immunity.  *Id.* at 5–7.  Some statements were spoken in Portuguese and translated into Spanish without any indication as to the validity of the translations or credentials of the translators.  *Id.* at 2–3.  Many exhibits are excerpts, without the full underlying documents available.  *Id.* at 5, 9, 11–18.  Many witnesses were not under oath.  *Id.* at 4–6, 9–18, 22–23.  Many of the witnesses were not subject to cross-examination.  *Id.* at 9–18, 22–23, 27–28.  The statements obtained through effective collaboration could not be used against the declarants in any court proceeding.  *Id.* at 7.

The Court cannot and will not rely on such a ramshackle record to re-weigh the evidence or review the merits of decisions made by two arbitral tribunals.  To shore up its evidence, Lima offered to bring witnesses to an evidentiary hearing.  *Lima I*, Dkt. 98 at 33:15–20.  But that approach—indeed this entire exercise of weighing Lima's proffered evidence—confirms that Lima's real request here is for a do-over because it now claims to have more evidence.  This, of course, the FAA prohibits.

---

[16] Lima eventually submitted authenticated documents on March 11, 2024.  *Lima I*, Dkt. 110; *Lima II*, Dkt. 62.

b)       Lima Cannot Satisfy § 10(a)(1)'s Requirements

i.       *Statements by Rutas's Chairman and Counsel*

Even if Rutas bribed officials to win the Concession Contract, Lima fails each of the

three elements a petitioner needs to meet to obtain vacatur.  *See ARMA*, 961 F. Supp. 2d at 254–

55.

*First*, Rutas's alleged fraud did not deprive Lima of a fair hearing, the *sine qua non* of the

analysis.  *See id.* at 254.  Lima concedes that the tribunal did not violate any UNCITRAL Rule.

*See Lima I*, Dkt. 95-1 at 12.  The tribunal members were well credentialed; the Chair was the

President of the International Chamber of Commerce International Court of Arbitration.  *Id.* at 1.

Lima was represented by no fewer than eleven lawyers.  *Id.* at 2–3.  The tribunal adopted the

"preponderance of the evidence" standard that Lima requested.  First Award ¶ 401.  Lima

introduced sixty-six factual exhibits; introduced four witnesses, including the prosecutor

investigating "corruption relating to the Rutas concession," who also testified in person; and filed

pre- and post-hearing briefs.  *Lima I*, Dkt. 95-1 at 3–9.  The tribunal held a five-day evidentiary

hearing in which Lima put on direct witness testimony and cross-examined Rutas's witnesses.

*Id.* at 4, 8–9; First Award ¶ 83.  The tribunal explained its reasoning and decision at exhaustive

length.  First Award ¶¶ 379–737.  The unremarkable fact that the opposing party contested

Lima's claim did not render the hearing unfair—especially given the ample procedural

safeguards Lima enjoyed.  It rendered the hearing contested.

Lima does not even point to any perjured testimony, which is arguably dispositive.  *See*

*ARMA*, 961 F. Supp. 2d at 257 (denying petition to vacate for fraud under § 10(a)(1) in part

because "[n]either party testified under oath or submitted affidavits").  Instead, Lima complains,

*see Lima I*, Dkt. 74 at 24, 35, that in an opening, unsworn statement, Rutas's chairman asserted

that Lima "seeks to stain this process with allegations of corruption to support [Lima's] non-performance." *Lima I*, Dkt. 74-31 at ECF 4 (underlying source with correct quotation). The arguably pejorative use of the word "stain," is hardly "clear and convincing evidence" of fraud. *ARMA*, 961 F. Supp. 2d at 254.

Lima also accuses Rutas's counsel of engaging in fraud by challenging the sufficiency of Lima's evidence and denying that corruption occurred. *See* Appendix A (setting forth the statements Lima challenges). To be sure, Rutas's counsel defended their client. But their statements "were not assertions of a testimonial nature." *Cook Chocolate Co., a Div. of World's Finest Chocolate v. Salomon Inc.*, 748 F. Supp. 122, 126 (S.D.N.Y. 1990), *aff'd*, 932 F.2d 955 (2d Cir. 1991). They were "legal arguments regarding the relevance of certain evidence or the proper inferences to be drawn from the evidence." *Id.* "Offering [an allegedly] meritless defense, however unfortunate, is part and parcel of the business of litigation; it carries no connotation of wrongfulness or immorality." *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1404 (9th Cir. 1992) (per curiam) (reversing vacatur under § 10(a)(1) due to alleged lawyer misconduct). Meritless defenses "occur[] with such frequency that, were [Lima's] rule to be adopted, the federal courts would be required to overturn arbitration awards regularly as procured by 'undue means.'" *Id.*; *see also MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 858 (4th Cir. 2010) (counsel's "legally objectionable" arguments not sufficient to vacate award under § 10(a)(1)).

*Second*, Lima provides no basis to conclude that Lima could not have discovered Rutas's alleged fraud during the arbitration. Lima complains that it asked Rutas for incriminating documents, but Rutas failed to produce any. *See Lima I*, Dkt. 74 at 41. As explained below, however, Lima has not shown that Rutas had responsive documents. Lima also complains that

some of the new evidence "did not yet exist" during the arbitration or came from then-sealed prosecution files. *Id.* Maybe so. But, as the saying goes, "them's the breaks."[17] The Court cannot accept a rationale that would require (or even permit) it to retry an arbitration anytime a litigant raises a discovery dispute or previously unavailable evidence emerges.

*Third*, Lima cannot establish that the "misconduct or fraud had some bearing on," or any type of "causal connection" to, the outcome. *ARMA*, 961 F. Supp. 2d at 255.[18] Lima itself explains why this is so. In discussing the Second Arbitration, Lima asserts that, with additional "evidence out in the open" since the First Arbitration ended, "Rutas was careful to avoid denying corruption in the second arbitration, in stark contrast to how Rutas passionately, and falsely, proclaimed its innocence during the first arbitration." *Lima I*, Dkt. 74 at 30. So the Second Arbitration is a control set—it is the same case but without statements by Rutas proclaiming its innocence. The result was the same, even though Lima provided additional evidence in support of its corruption allegations.

Lima rests its petition on the tribunal's observation that "corrupt" February 2014 Odebrecht payments "are denied by Rutas," *Lima I*, Dkt. 74 at 43 (quoting First Award ¶ 442), as if the tribunal based the First Award on Rutas's denial alone. Hardly. The tribunal addressed— in 113 paragraphs over twenty pages—each assertion Lima made, the exhibits Lima proffered,

---

[17] The phrase "comes from the game of pool or billiards. When the balls are racked up in formation one player 'breaks' or takes the first shot to try and send the balls around the table. The result of this break cannot be changed and the players must make do with what they are given." *Them's the Breaks or Brakes*, Grammarist, https://grammarist.com/spelling/thems-the-breaks-or-brakes/#more-24301 (last visited Mar. 10, 2024).

[18] Lima argues that the petitioner "need not demonstrate that the arbitrators would have reached a different result." *Lima I*, Dkt. 74 at 41 (quoting *Odeon Cap. Grp. v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017)). Even if that is so, § 10(a)(1) permits vacatur only where "the award was *procured* by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1) (emphasis added). Lima must show that the alleged fraud impacted the tribunal's award in some causal way. *ARMA*, 961 F. Supp. 2d at 254–55. It has not met that burden.

and the testimony of Lima's witnesses.  *See* First Award ¶¶ 388–500.  Based on its thorough

review of the evidence, it found numerous holes in Lima's case.  *See id*.

*ii.*     *Document Request No. 19*

Lima also contends that the Court should vacate the First Award under § 10(a)(1) because

Rutas committed fraud by denying that it had documents in response to a discovery request.  In

Document Request No. 19, Lima requested that Rutas produce:

> Documents in [Rutas'] possession in which there is analysis, mention or
> discussion of any payment made or attempted to be made by [Rutas], its
> investors or directors, executives, employees, or agents to any entity,
> employee or official of the metropolitan municipal government of Lima,
> the federal government of Peru or any of its agencies, ministries, or
> divisions, including, but not limited to, (i) any payment made or attempted
> payment to the "No" campaign in the recall referendum against former
> mayor Susana Villarán; (ii) any other payment made or attempted for the
> benefit of the former mayor Susana Villarán[;] and/or (iii) payments made
> or attempted in the amount of approximately []$420 million, to individuals
> identified as "Budian," "Tapete[,]" or "Sevite."

*Lima I*, Dkt. 43-1 at ECF 3–4 (cleaned up).  Rutas responded that it was "not aware of the

existence of any documents that qualify under this request and accordingly does not have

any document to present."  *Id.* at ECF 3.  The tribunal took "note of [Rutas's] statement

regarding the non-existence of the requested documents," and it rejected the request.  *Id.*

at ECF 3.  Lima did not follow up.

Again, Lima's contentions fall well short of the requirements for vacatur under

§ 10(a)(1).  *First*, there is no "clear and convincing evidence" of fraud, *ARMA*, 961 F. Supp. 2d

at 254, in Rutas's discovery response.  Lima primarily claims Rutas withheld documents

showing purported sham contracts used to funnel money to Mayor Villarán's re-election

campaign, the so-called "Meiggs Contracts" and related invoices.  *Lima I*, Dkt. 74 at 22–23;

*Lima I*, Dkt. 98 at 81:16.  As explained in the Second Arbitration, these were invoices related to

34

two contracts, dated August 12, 2014, and September 4, 2014, *Lima I*, Dkt. 74-18 at ECF 20, Dkt. 74-19 at ECF 19, entered into between Rutas and César Meiggs's company, Generación S.A. *See* Second Award ¶¶ 689–92.

But Lima concedes—as it must—that the Meiggs Contracts are not on their face responsive. *See Lima II*, Dkt. 35 (Dec. 6, 2023, Hearing Tr.) at 117:7–14. Indeed, when Lima asked for the same documents by name in the Second Arbitration, Rutas readily turned them over. *Id.* at 106:13–107:1. The Court invited Lima to cite any case holding that "it was intentional misconduct" for Rutas to not produce documents that it "should have known . . . were responsive, even though on the face of [them] they weren't." *Id.* at 125:21–126:10. Nearly three months later, Lima filed a notice of supplementary authority, *Lima I*, Dkt. 106, citing two cases in response, *Younes v. 7 Eleven Inc.*, 312 F.R.D. 692 (D.N.J. 2014), and *Bracey v. Valencia*, 2022 WL 1570812 (W.D. Pa. May 18, 2022). Both cases are inapposite. Neither involves the standard for misconduct under the FAA. Both involve counsel who engaged in sanctionable conduct through repeated discovery abuses on multiple fronts, intentional misrepresentations to the respective courts, and months of wasted court time addressing baseless discovery disputes that resulted.[19] Nothing remotely like either scenario exists here.

---

[19] In *Younes*, a magistrate judge sanctioned a defendant who intentionally lied in responses to two signed interrogatories, which led to "havoc" and "tens and probably hundreds of thousands of dollars in transaction costs" and court time "wrangling" over subsequent discovery issues. *Younes*, 312 F.R.D. at 704–06. In so doing, the court rejected as "meritless" the defendant's contention that certain documents were not responsive because the plaintiff had asked for "Operation Philadelphia" and not "Project P" documents, even though defense counsel *knew* that the two terms were "synonymous." *Id.* at 707–08.

*Bracey* is even further off base. There, the court sanctioned counsel for doing essentially nothing to locate responsive documents. *See Bracey*, 2022 WL 1570812, at *13. Separately, the court denied a motion to compel because the same party had represented that certain workers' compensation files did not include anything related to "disciplinary proceedings" at issue in the litigation. *Id.* at *8. In fact, however, the documents were "replete with such references." *Id.*

Lima's second contention that Rutas "almost certainly must have" had possession of documents linking ledger payments made by Odebrecht to Mayor Villarán and Castro, *Lima I*, Dkt. 74 at 22–23, is pure conjecture.  By the time of the arbitration in 2019, Odebrecht owned only twenty-five percent of Rutas.  *See* First Award ¶ 325.  Lima provides no factual or legal basis to suggest that, in 2019, Rutas had custody or control of 2014 documents belonging to one of its minority owners.  In any event, the question of "whether a subsidiary has control over documents possessed by a parent or a related corporation is a very fact specific inquiry," *Pitney Bowes, Inc. v. Kern Int'l, Inc.*, 239 F.R.D. 62, 65 (D. Conn. 2006) (cleaned up), one Lima has not addressed here.

Even so, the Court granted in part Lima's request to issue discovery to test Rutas's response to Document Request No. 19.  *Lima I*, Min. Order of May 19, 2023.  Lima issued an interrogatory and requests for admission aimed at having Rutas declare, in this federal court proceeding, whether it intentionally withheld responsive documents during the First Arbitration.  *See Lima I*, Dkts. 105-1, 105-2.  In response, Rutas described its document review efforts and again denied intentionally withholding responsive documents.  *See Lima I*, Dkts. 105-1 at 2–3, 105-2 at 3–4.  Lima provides no basis for the Court to suspect, much less conclude, that experienced lawyers are actively lying to protect Rutas.

*Second*, the proper audience for Lima's current speculation that Rutas must have had responsive documents was the tribunal.  But Lima did not challenge Rutas's discovery response during the arbitration.  *See Lima I*, Dkt. 43-1 at ECF 3.  And "[i]f the misconduct came to light at some point during the course of the arbitral proceedings, but the movant nevertheless failed to raise its concerns in a timely fashion, it may be deemed to have waived its right to seek vacatur under § 10(a)(1)."  *ARMA*, 961 F. Supp. 2d at 254.  If the rule were "otherwise, parties would

have an incentive to hold claims of fraud in reserve and engage in sandbagging strategies inimical to the very goals of the FAA."  *Id.* (cleaned up).

*Third*, Lima cannot show that the documents would have been material to the first tribunal.  Lima introduced the Meiggs Contracts, Odebrecht ledgers, and additional evidence in the Second Arbitration, yet the tribunal again rejected Lima's theory.  The tribunal found that although "Rutas de Lima might have been used as a vehicle for transferring the funds intended to finance Susana Villarán's re-election campaign, by apparently entering into fictitious contracts with Generación S.A.," Meiggs's company, there still was "not sufficient evidence to conclude that such payments were made as a *quid pro* [*quo*] *for* the award or execution of the Contract or the execution of the Addendum."  Second Award ¶¶ 704–05 (emphasis added).

### 3.      *Analysis of Public Policy Vacatur*

Lima also argues that the Court should vacate the First Award because it violates the United States' public policies against (1) "enforcement of contracts that are stained by corruption" and (2) "procuring contracts through corruption."  *Lima I*, Dkt. 74 at 43; *see id.* at 43–45.  The Court will assume, without deciding, that a public policy ground for vacatur remains valid after *Hall Street*.  *Cf. Mesa Power*, 255 F. Supp. at 183–84.

Lima's public policy arguments fail.  When, as here, "a party claims that an underlying contract"—rather than the arbitration award itself—"is invalid for violating public policy, that claim is to be determined exclusively by the arbitrators."  *Commodities & Mins. Enter. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 819 (2d Cir. 2022) (cleaned up), *cert. denied*, 143 S. Ct. 786 (2023).  Further, although "this Court recognizes that the United States has a strong public policy against corruption abroad," Lima "cannot point to any cases in which a court declined to enforce an arbitral award because it violated the United States' public policy against

government corruption." *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 250

(D.D.C. 2015) (cleaned up), *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016).  The Court will not vacate

the First Award on public policy grounds.

> **B.      Confirmation of the First Award**

A "court shall confirm the award unless it finds one of the grounds for refusal or deferral

of recognition or enforcement of the award specified in the [New York] Convention."  9 U.S.C.

§ 207; *see id.* § 302; New York Convention, art. V; Panama Convention, art. 5; *see also Republic*

*of Argentina v. AWG Grp.*, 211 F. Supp. 3d 335, 363 (D.D.C. 2016), *aff'd*, 894 F.3d 327 (D.C.

Cir. 2018).

Lima argues that the Court should refuse confirmation under these provisions of the New

York Convention (and corresponding provisions of the Panama Convention): Article V(1)(b), for

preventing Lima from presenting its case (stemming from Rutas's alleged false statements in its

discovery response, which prevented Lima from receiving documents); Article V(2)(b), because

enforcement of the award violates the United States' public policy against corruption; and

Article V(1)(e), because the award must be vacated under § 10(a)(1) of the FAA for fraud.  *See*

*Lima I*, Dkt. 81 at 29.  Lima's arguments opposing confirmation mirror its arguments for vacatur

under the FAA.  And because Lima has failed to establish the same grounds for FAA vacatur, its

"redundant claims under the New York [and Panama] Convention[s] must also fail." *Republic of*

*Argentina*, 211 F. Supp. 3d at 363.

Rutas timely sought confirmation, *see* 9 U.S.C. § 207, within three years of when the

First Award was issued on May 11, 2020, *see* First Award at ECF 135; *Lima I*, Dkts. 10, 73.  To

obtain confirmation of an award, the New York Convention also requires a party to submit (1) a

duly certified copy of the award, (2) a certified English translation of the award, and (3) a

certified copy of the arbitration agreement.  *See* New York Convention, art. IV.  Rutas has

satisfied these requirements.  *See Lima I*, Dkt. 73-4, 73-5, 1-3 (First Award and certified English

translation); *Lima I*, Dkt. 73-3 (contract including agreement to arbitrate).  The Court therefore

confirms the First Award.

> ### C.    Vacatur of the Second Award

> #### 1.    *Legal Background on FAA Vacatur Under Section 10(a)(3)*

The FAA states that a court may vacate an arbitration award "where the arbitrators were

guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy."

9 U.S.C. § 10(a)(3).  "The scope of review under this provision is narrow, however, because . . .

[i]n making evidentiary determinations, an arbitrator need not follow all the niceties observed by

the federal courts."  *Howard Univ. v. Metro. Campus Police Officer's Union*, 512 F.3d 716, 721

(D.C. Cir. 2008) (cleaned up).  And "[a]n arbitrator may . . . opt to expedite a proceeding by

excluding evidence and testimony that she finds irrelevant or duplicative."  *White v. Four*

*Seasons Hotel & Resorts*, 244 F. Supp. 3d 1, 5 (D.D.C. 2017).

"The arbitrator need only grant the parties a fundamentally fair hearing," and "[a] federal

court may vacate an award only if the panel's refusal to hear pertinent and material evidence

prejudices the rights of the parties to the arbitration proceedings."  *Howard Univ.*, 512 F.3d at

721 (cleaned up); *see also Selden v. Airbnb, Inc.*, 4 F.4th 148, 160 (D.C. Cir. 2021).  The

"ultimate question" is whether the tribunal's "refusal to hear" evidence "deprived [Lima] of a

fair hearing."  *Lessin*, 481 F.3d at 819.  Accordingly, "every failure of an arbitrator to receive

relevant evidence does not constitute misconduct requiring vacatur of an arbitrator's award."  *Id.*

(cleaned up).

### 2.    *Analysis of Vacatur Under Section 10(a)(3)*

The Indictment became public on the eve of the tribunal issuing its award.  Lima

contends that the Court should vacate the Second Award because the tribunal engaged in

misconduct by admitting the Indictment but not admitting its "annexes or writings."  *Lima II*,

Dkt. 3 at 33–37.  Even so, Lima insists, it was deprived of a fair hearing because the tribunal did

not let it admit the annexes that contained "complete transcripts of the sworn testimony of

individuals directly involved in the corruption scheme and documentary evidence of the

transmission of illicit payments to Villarán's campaigns."  *Id.* at 22.

Lima's complaint is spurious because it never asked the tribunal to admit the annexes.

Lima sought to introduce "the Indictment," and the tribunal admitted it.  In any event, given that

post-hearing briefing had been closed for months, the tribunal would have acted well within its

discretion to deny Lima's last-zeptosecond[20] request altogether.  That it admitted any evidence at

such a late date shows that Lima received *more*—not less—process than it was due.

### a)    The Tribunal Did Not Refuse to Hear Evidence

Lima successfully asked to introduce the Indictment.  It faults the tribunal for not

admitting "the evidentiary materials upon which the Indictment was based."  *Lima II*, Dkt. 3 at 3.

But any fault for that failure lies with Lima alone, as it never asked to admit those evidentiary

materials.  To the contrary, Lima emphasized that "the mere fact of the filing of the Indictment"

was probative and that the tribunal need look only "to the relevant pages of the document," *i.e.*,

the Indictment.  *Lima II*, Dkt. 1-29 at ECF 3.  It stated pointedly that it did *not* want to

_____

[20] A zeptosecond is a trillionth of a billionth of a second.  It takes on average 247 zeptoseconds
for a photon to cross a hydrogen molecule.  This is the shortest timespan that scientists have
successfully measured to date.  *Zeptoseconds: New World Record in Short Time Measurement*,
ScienceDaily, https://www.sciencedaily.com/releases/2020/10/201016090209.htm (last visited
Mar. 11, 2024).

"indefinitely reopen[] the evidentiary debate or mak[e] arguments *de novo*." *Id.* Consistent with

this approach, during the proceedings, Lima did not mention the annexes or the information they

contained. The tribunal gave Lima what it requested without delaying the proceedings any

further than necessary. A rather sensible approach.

A not-so-brief recap of events leading to the evidentiary ruling Lima challenges brings

Lima's failure into stark relief. On August 30, 2022—well after the parties submitted their post-

hearing briefing on March 31, 2022, Second Award ¶ 68—Lima informed the tribunal that, per

press reports, Prosecutor Pérez had indicted now-former Mayor Villarán and others for alleged

crimes relating to the Contract. *Lima II*, Dkt. 1-28 at ECF 6–7. It asked for permission to submit

"the relevant documents" once it obtained them and to brief the issue further. *Id.* at ECF 7.

Rutas objected on several grounds, including that no rule permitted the tribunal to admit

evidence after the close of the evidentiary hearing. *See Lima II*, Dkt. 26-9 at ECF 3–5. The

tribunal responded on September 6, 2022, that a press release was no basis to permit the

submission of evidence after post-hearing briefing had concluded and as the tribunal was

finalizing the award. *Lima II*, Dkt. 1-27 at ECF 3.

Lima moved for, among other things, reconsideration. *Id.* at ECF 5–11. It requested the

introduction of "the document," which it defined as "the prosecutorial indictment document of

Susana Villarán et al." *Id*. at 7. It did *not* request introduction of any of the Indictment's

annexes. *See id*. at 7–8. Nor did Lima state that "the Indictment" contained "new evidence,"

much less that it contained, as it now argues, "complete transcripts of the sworn testimony of

individuals directly involved in the corruption scheme and documentary evidence of the

transmission of illicit payments to Villarán's campaigns." *Lima II*, Dkt. 3 at 18–19. Instead,

Lima sought to introduce "the indictment document" solely to (1) rebut Rutas's objection to the

admissibility of evidence it had introduced earlier; (2) rebut Rutas's argument that Prosecutor Vela's testimony was not relevant because a formal indictment had not (at that time) issued; and (3) to buttress Prosecutor Vela's independence.  *See Lima II*, Dkt. 1-27 at ECF 9–10.

The tribunal responded by asking for further clarification of precisely why Lima sought to introduce "the document."  *Lima II*, Dkt. 1-28 at ECF 3.  It reiterated that it did not want to permit "an indefinite and indeterminate reopening of the evidentiary stage in which all the facts and arguments presented by the [p]arties are controverted again."  *Id.*

In response, Lima took pains to cabin and downplay its request.  As stated above, it emphasized that the "mere fact of the filing of the Indictment" was probative and that the tribunal need look only "to the relevant pages of the document," *i.e.*, the Indictment.  *Lima II*, Dkt. 1-29 at ECF 3.  It explained that the Indictment "contain[ed] much of the same factual evidence that [Lima] ha[d] [already] presented to this [t]ribunal."  *Id.* at ECF 2.

Lima did add, for the first time, that the Indictment contained "new evidence" addressing "route of illicit money that was delivered by ODEBRECHT using BOX 2 or STRUCTURED OPERATIONS DIVISION, including overpriced contracts of Rutas de Lima with the company Generación for amounts that were never executed."  *Id.* at ECF 3.  But, as noted above, Lima emphasized that it did *not* want to "indefinitely reopen[] the evidentiary debate or mak[e] arguments *de novo*."  *Id.*  Its request was so limited, it said, that it could make "pointed observations on the Indictment" in only "10 pages" of additional briefing.  *Id.*  Lima still made no mention of the annexes or the information they contained.  *See id.*  Rutas again objected.  *Lima II*, Dkt. 1-30 at ECF 5.

The tribunal issued its decision in Procedural Order No. 12.  *Lima I*, Dkt. 1-30 at ECF 7.  It expressed skepticism of Lima's position.  It highlighted that "Prosecutor Vela[] had the right to

appear before the [t]ribunal and to produce any documents he considered relevant to his testimony." *Id.* The documents that Prosecutor Vela had, but chose not to produce, were not "new" simply because they had now become part of a formal, public indictment. *Id.* Nonetheless, and over Rutas's repeated objections, the tribunal permitted Lima to select portions of "the indictment" relevant to the Oderbrecht "illicit money trail" Lima had referenced. *Id.* at ECF 7–8. The tribunal instructed Lima not to submit "additional annexes or writings." *Id.* at ECF 8.

Lima did not seek reconsideration of Procedural Order No. 12 or even to clarify what the tribunal meant by "additional annexes or writings." Instead, Lima "selected extracts" numbering 495 pages out of the Indictment's 3,876 pages to introduce, all of which the tribunal accepted. *Lima II*, Dkt. 26-11 at ECF 4; *see* Second Award ¶ 75. The parties then submitted supplemental briefs on this new evidence, and in November 2022, the tribunal declared the proceedings closed. Second Award ¶¶ 76–78.

What occurred is clear. Lima made an untimely request to introduce the recently filed Indictment. The tribunal repeatedly made clear that it would not entertain any effort to reopen the evidentiary hearing, much less start the dispute from scratch. Lima in response made a strategic decision to downplay what it sought. The tribunal then accepted Lima's constrained request. That Lima now regrets its own request and strategic approach does not constitute misconduct on the tribunal's part.

b)    <u>Any Refusal to Hear Evidence Does Not Rise to Misconduct</u>

Even crediting Lima's argument that it asked for the annexes to be admitted, the tribunal's exclusion of them did not amount to misconduct.

To start, the Court is mindful of the substantial body of case law instructing it to defer to arbitral tribunals' evidentiary rulings.  To no great surprise, Lima cannot identify a single case in which a court vacated an award for a tribunal's failure to admit evidence so late in the proceedings.  *Lima II*, Dkt. 35 at 41:3–19.  At a hearing, the Court asked, "[s]o the answer to my question [of how many relevant cases counsel could cite] is zero?"  Lima's counsel's response: "Correct."  *Id.* at 41:18–19.

Lima instead relies on two inapposite cases.  In the first, *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1997), the arbitral panel refused to pause the proceedings and wait until a company's "sole negotiator" and "exclusive point-man" on the contract at issue— unavailable after his wife's cancer recurrence—could testify in person or by deposition.  *Id.* at 17–18, 20–21.  The Second Circuit vacated the award under § 10(a)(3) because the panel's decision to exclude a primary witness "amount[ed] to fundamental unfairness and misconduct."  *Id.* at 21.  The tribunal here did not preclude any witness.  Indeed, it took the unusual step of allowing a prosecutor to provide pure hearsay testimony *and* "to produce any documents he considered relevant to his testimony" from the criminal file.  *Lima II*, Dkt. 1-30 at ECF 7.

The second case Lima cites is even further off target.  In *Hoteles Condado Beach, La Concha Convention Center v. Union De Tronquistas Local 901*, 763 F.2d 34 (1st Cir. 1985), the arbitrator's ruling had the effect of preventing a party's only witness from testifying.  *Id.* at 37.  Instead, the arbitrator admitted a transcript of her testimony from a criminal trial but "refused to give any weight to this evidence."  *Id.* at 40.  The First Circuit vacated the award because the arbitrator's decision "effectively denied the [c]ompany an opportunity to present *any* evidence in

the arbitration proceeding." *Id.* (emphasis added). The first tribunal, here, on the other hand, permitted Lima to present several witnesses and hundreds of exhibits.[21]

Nor does the Court have any factual basis to vacate the award. *First*, Lima received yet another fair hearing, again, the *sine qua non* of the analysis. *See Lessin*, 481 F.3d at 819; *Republic of Argentina*, 894 F.3d at 332–33. The tribunal members were well credentialed, and Lima was represented by thirteen lawyers. *Lima II*, Dkt. 95-1 at 1, 3. Lima introduced 113 factual exhibits; presented six witnesses, including the testimony of the prosecutor in charge of the corruption investigation; and submitted pre- and post-hearing briefs. *Id.* at 3–4, 8–9. The tribunal held a seven-day evidentiary hearing in which it permitted Lima to put on direct testimony and cross-examine Rutas's witnesses. *Id.* at 4. The tribunal also rejected Rutas's claim that Lima had to prove corruption by "clear and convincing evidence" and adopted instead the lower "more likely than not" standard for which Lima advocated. Second Award ¶¶ 261–65, 271–77. The tribunal explained its reasoning and decision at exhaustive length. *See id.* ¶¶ 187–409, 590–1024.

*Second*, the tribunal did not violate the UNCITRAL Rules, which governed the arbitration. Those Rules vested the tribunal with wide discretion to "conduct the arbitration in such a manner as it consider[ed] appropriate, provided that the parties [were] treated with equality" and that "each party [was] given a reasonable opportunity of presenting its case." UNCITRAL Rules, art. 17(1) (2010). The Rules instructed the tribunal to exercise this

---

[21] Lima argues that the D.C. Circuit's citation of *Tempo Shain* and *Hoteles Condado* in *Howard University*, 512 F.3d at 721, supports its position. *See Lima II*, Dkt. 35 at 43:22–45:18. It does not. In *Howard*, the court *refused* to vacate an award because the arbitrator did not permit the union's negotiator to testify. It *distinguished Tempo Shain* and *Hoteles Condado* because in those cases, "the excluded evidence was critical to the proponent's case." *Howard Univ.*, 512 F.3d at 723. The excluded evidence here was not so "critical" that it deprived Lima of a fair hearing.

discretion "so as to avoid unnecessary delay and expense and to provide a fair and efficient process for resolving the parties' dispute." *Id.*  It was within the tribunal's sole discretion, "if it consider[ed] it necessary owing to exceptional circumstances[,] . . . to reopen the hearings at any time before the award [was] made." *Id.* art. 31(2).[22]

By August 2022, the proceedings had been ongoing for more than three years. *See* Second Award ¶ 4.  And the tribunal had granted Lima "a reasonable opportunity," and then some, to present its case.  Reopening the proceedings may well have prejudiced *Rutas's* right to "avoid unnecessary delay and expense."  So the tribunal would have acted well within the UNCITRAL Rules to deny Lima's request altogether.  But notwithstanding its deep skepticism that "exceptional circumstances" existed, it relented amid Lima's continued pleas to submit the Indictment.  Again, Lima received *more*—not less—process than it was due.

When the Court asked Lima to address the UNCITRAL Rules, Lima responded, "[t]o the extent the conduct or decisions of the tribunal violated the UNCITRAL Rules, the Municipality has elaborated on this conduct and how the Municipality attempted to remedy such violations in the briefing accompanying its petition to vacate" the Second Award.  *Lima I*, Dkt. 95-1 at 12.  Word salad, since Lima never identified any UNCITRAL Rule that the tribunal violated.  Nor could it.

*Third*, although Lima claims now that the Indictment made available "a trove of hitherto unavailable evidence," *Lima II*, Dkt. 3 at 2, it took the opposite position before the tribunal.  As discussed above, Lima presented the Indictment mainly to give additional probative weight to evidence already admitted.  It thus represented that it "contain[ed] much of the same factual

---

[22] Federal courts take a similar approach.  In ruling on a motion to reopen the record because of new evidence, a "district court has broad discretion." *Washington Mobilization Comm. v. Jefferson*, 617 F.2d 848, 850 (D.C. Cir. 1980).

evidence that [Lima] ha[d] presented to this [t]ribunal," *i.e.*, cumulative evidence.  *Lima II*, Dkt. 1-29 at ECF 2.  And the tribunal understood it as such.  *See Lima II*, Dkt. 1-30 at ECF 7.  There is "no statutory ground for [vacatur] of the arbitration award if the arbitrators refused to" admit evidence that "would be irrelevant or merely cumulative."  *Lessin*, 481 F.3d at 322.

*Fourth*, the tribunal acted well within its discretion to exclude documents Lima and Prosecutor Vela chose not to introduce during the hearing.  In Procedural Order No. 12, the tribunal highlighted that "Prosecutor Vela[] had the right to appear before the Tribunal and to produce any documents he considered relevant to his testimony."  *Lima II*, Dkt. 1-30 at ECF 7. Prosecutor Vela's voluntary decision "not to present before the Tribunal evidence in his possession" during the hearing "that might be relevant" was not a basis to "open a new stage" in the proceedings.  *Id.*  Lima does not argue that Prosecutor Vela lacked access to the documents in the annexes during the hearing.

### c)   Lima Has Not Suffered Any Prejudice

Lima's § 10(a)(3) argument fails for the independent reason that it cannot show that exclusion of the annexes caused it any prejudice.  The tribunal was unimpressed by the excerpts *Lima* chose from the Indictment.  It found that "neither the [Indictment] nor the statements quoted by the Prosecution Office state or suggest that the illegal payments to Susana Villarán's campaign were made as consideration for the execution of the Contract, the Addendum, or the Memorandums of Agreement."  Second Award ¶ 684; *see also id.* ¶¶ 676, 678, 680.  The annexes that Lima complains the tribunal excluded do not fix this fundamental flaw with the evidence.  To the contrary, in statements contained in the annexes, witnesses *denied* or were unaware that a link existed between the alleged payments and the Contract.  *See, e.g.*, *Lima I*, Dkts. 74-9 at ECF 13, 15, 31–33; 74-15 at ECF 5–9; 74-16 at ECF 4.

Lima selectively quotes the tribunal's concern that it could not "access all the documents supporting the Prosecution Office's theses" in order to "conduct an independent, comprehensive analysis of the evidence." *Lima II*, Dkt. 3 at 36 (quoting Second Award ¶ 702). It claims that the annexes addressed this concern, so that the tribunal critiqued it for lacking the very evidence that the tribunal excluded. *Id.* at 36–37. That argument grossly misrepresents the tribunal's critique and the evidence.

The tribunal was focused on assessing Prosecutor Vela's testimony and "the evidence . . . put forward by Prosecutor Vela as a witness in this arbitration." Second Award ¶ 702. The critique had nothing to do with the evidence at issue in Procedural Order No. 12, which came well after Prosecutor Vela's testimony. The tribunal found troubling Prosecutor Vela's concession that he did not submit "the complete criminal investigation file." *Id.* Instead, he submitted "a number of passages selected by individuals other than the witness, following a criterion that [was] not entirely clear to the [t]ribunal, containing transcripts of selected—and on several occasions edited—sections from uncorroborated statements by prospective cooperating defendants." *Id.* Understandably, the tribunal discounted the one-sided, mishmash of excerpted evidence Prosecutor Vela put forward at the hearing. And Lima never told the tribunal that the annexes (allegedly) addressed these evidentiary gaps, presumably because it well knew the tribunal would not permit it to backfill its proof after the hearing.

Lima also claims that the annexes would have addressed the tribunal's concern that it could not base its decision solely on documents collected by prosecutors, and that it viewed statements of cooperating witnesses with suspicion. *See Lima II*, Dkt. 3 at 34–35. It is hard to see how. Prosecutors also selected the documents contained in the annexes, many of which appear to be excerpts instead of full transcripts. *See, e.g.*, *Lima II*, Dkts. 1-36; 1-38; 1-39; 28-10;

28-12.  The annexes also contained statements from cooperating witnesses.  *See, e.g.*, *Lima II*, Dkts. 1-36; 1-38.  And the annexes also consisted of evidence never tested or cross-examined in court, which greatly troubled the tribunal.  *See* Second Award ¶¶ 672, 696, 700.

In sum, the tribunal did not refuse to hear evidence.  Even if the tribunal had, that refusal did not rise to the level of misconduct.  And even if it did, the exclusion of the annexes did not prejudice Lima.  Therefore, Lima's § 10(a)(3) vacatur argument fails.

### 3.   Analysis of Vacatur for Reliance on the First Award

Lima also argues that if the Court vacates the First Award, the Court should also vacate the Second Award because the Second Award relied on the First Award's factual findings.  *See Lima II*, Dkt. 3 at 37.  This argument fails because, as explained above, the Court confirms the First Award.  In any event, in addition to some isolated references to the First Award's findings, *see, e.g.*, Second Award ¶¶ 248, 256, the second tribunal gave *res judicata* effect to a discrete issue of whether failure to secure approval from the Ministry of Economy and Finance required nullification of the Contract.  *See* Second Award ¶¶ 243–45.

For context on that discrete Ministry of Economy and Finance issue, the first tribunal rejected the argument because *Lima* (not Rutas) "had the responsibility" to comply with this "formality" and did not, so it "would . . . be totally contrary to the fundamental principle of good faith and to the doctrine that prohibits going against one's own acts" to nullify the Contract on this basis.  First Award ¶ 544; *see also id.* ¶¶ 501–44.  The second tribunal also rejected Lima's argument.  It found that the lack of approval from the Ministry of Economy and Finance "was not a unique circumstance related to the Concession Contract or to the Bankability Addendum, but a usual practice adopted by certain municipal entities."  Second Award ¶ 709.  Indeed, other entities and Lima itself "repeatedly failed to comply with the obligation to request a favorable

opinion from the [Ministry of Economy and Finance] in multiple projects, without such projects being tainted by corruption." *Id.*

The second tribunal cited the First Award's findings on this issue. *See id.* But the second tribunal also explicitly stated that it conducted its own independent analysis of that issue and reached the same conclusion. *See id.* ¶¶ 600–12. In any event, Section 10 "provide[s] the FAA's exclusive grounds for expedited vacatur," *Hall Street*, 552 U.S. at 584, and those grounds do not include a tribunal giving *res judicata* effect to part of an arbitration award in a related proceeding.

### 4.    *Analysis of Public Policy Vacatur*

Lima also argues that the Court should vacate the Second Award because it violates the United States' public policies against (1) the "enforcement of contracts that are stained by corruption" and (2) the "procurement of construction contracts through corruption." *Lima II*, Dkt. 3 at 37–38. As with the First Award, the Court will again assume, without deciding, that a public policy ground for vacatur remains valid after *Hall Street*. *Cf. Mesa Power*, 255 F. Supp. 3d at 183–84.

For the same reasons as with the First Award, Lima's public policy arguments are not persuasive. "[A]dditional evidence revealed by the Indictment" does not change this conclusion. *Lima II*, Dkt. 3 at 39.

### D.    **Confirmation of the Second Award**

Lima argues that the Court should refuse confirmation under the following provisions of the New York Convention (and corresponding provisions of the Panama Convention): Article V(1)(b) for failure to consider evidence; Article V(2)(b) because enforcement of the award violates the United States' public policy against enforcement of a contract procured by

corruption; and Article V(1)(e) because the award must be vacated under Section 10(a)(3) of the

FAA (for failure to consider evidence).  *See Lima II*, Dkt. 28 at 20–21.  As with the First Award,

Lima's arguments opposing confirmation mirror its arguments for vacatur under the FAA.  And

because Lima has failed to establish grounds for vacatur, its "redundant claims under the New

York [and Panama] Convention[s] must also fail."  *Republic of Argentina*, 211 F. Supp. 3d at

363.

Rutas timely sought confirmation, *see* 9 U.S.C. § 207, within three years of when the

Second Award was issued on December 16, 2022, *see* Second Award at ECF 197; *Lima II*, Dkt.

25.  As noted above, to obtain confirmation of an award, the New York Convention also requires

a party to submit (1) a duly certified copy of the award, (2) a certified English translation of the

award, and (3) a certified copy of the arbitration agreement.  *See* New York Convention, art.

IV(1).  Rutas has satisfied these requirements.  *See Lima II*, Dkts. 25-4 (Second Award and

certified English translation); 25-5 (contract including agreement to arbitrate).  The Court

confirms the Second Award.

## IV.   CONCLUSION

For the reasons stated above, the Court DENIES Lima's petitions to vacate the First and

Second Awards and GRANTS Rutas's cross-motions to confirm them.  A separate Order

accompanies this Memorandum Opinion.


Date:  March 12, 2024                    _____
                                         ANA C. REYES
                                         United States District Judge

**APPENDIX A**

1. **Statements Filed in Rutas's July and September 2019 Briefs:**

> We cannot fail to point out that in this section [Lima] indicates that the
> Concession is subject to investigation as wanting to imply some illegal act
> linked to the Minutes.  We reject the attempt to cast a shadow over these
> facts.  The Minutes were signed within what the Concession Agreement
> allows and they were given not for anything other than for non-
> performance with the delivery of land released by [Lima].  There is no
> doubt that [Lima], having no other response to its breach, wants to link
> these regular contractual facts with investigations that are unrelated to
> these actions.  [Rutas] rejects it and asks the Court not to be impressed by
> this type of allegations that lack seriousness.

*Lima I*, Dkt. 74-30 at ECF 2.

> Without prejudice to the fact that no irregular act was committed in
> connection with the Concession Contract, nor is there any evidence of the
> alleged acts of corruption by third parties, [Rutas] clearly dismisses and
> rejects its connection with the facts attributed to persons related to
> Odebrecht.  So much so that [Rutas] has expressed to [Lima] its
> willingness to accept the inclusion of an anti-corruption clause in the
> Contract whose text has even been agreed upon in the draft of the second
> Addendum to the Contract that is being negotiated with [Lima].

*Lima I*, Dkt. 74-28 at ECF 2 (cleaned up).

> [Rutas] is fully respectful of the investigations and has been collaborating
> with them and strongly rejects any act of corruption.  Thus, [Rutas], like
> few concessionaires in Peru, has expressed to [Lima] its willingness to
> accept the inclusion of an anti-corruption clause in the Contract whose text
> has even been agreed upon in the draft of the second Addendum to the
> Contract that is being negotiated with [Lima]."

*Id.* (cleaned up).

> Let us remember that, since the second quarter of 2016, [Rutas] is
> controlled by Brookfield, which owns 57% of the company's shares.
> Therefore, [Lima] cannot now claim to be unaware of the Concession
> Contract and the minutes of implementation of the Contract, based on
> alleged acts of corruption that would have been carried out by third
> parties, when the investigations are based on alleged economic
> contributions by third parties to the electoral campaign of the former
> mayor of [Lima].  These facts occurred after the Project was awarded and
> were not carried out in exchange for any irregular benefit, as can be seen

from the very statements and journalistic reports on which [Lima] is
based.

*Id.* at ECF 2–3 (cleaned up).

## 2. Opening Statement by Rutas's Chairman at November 2019 Hearing:

I have read the memorials submitted by [Lima] and I have tried to
understand their arguments, but the truth is I see excuses for not
complying with the covenants. For us, [i]t is unheard that after 6 years of
operation, billions invested and a constant and active contractual
execution, it is even intended to insinuate that the agreement is invalid,
and even worse, that it seeks to stain this process with allegations of
corruption to support the [Lima's] non-performance.

*Lima I*, Dkt. 74-31 at ECF 4.

## 3. Statements by Rutas's Counsel at November 2019 Hearing:

We want to convey that [Rutas] is respectful and sensitive to
investigations and logically condemns any act of corruption. [Rutas] is
not incorporated into investigations and rather collaborates with
investigations. We deny that there are any acts of corruption linked to the
conclusion of this contract or to the execution of this contract which was
reviewed by many and which was not—and that when it was acquired by
Brookfield it was thoroughly reviewed and there is no evidence that this
occurred.

*Id.* at ECF 2 (cleaned up).

The prosecutorial files, that is, the investigations referred to by [Lima], are
investigations of third parties that are also in a preliminary and preparatory
stage. There are no prosecutorial charges, much less sentences.
Furthermore, there is no real relation between the facts investigated and
this contract and [Lima] do[es] not even present an indication of an
alleged benefit for [Rutas] in relation to these investigations[.]

*Id.*

Finally, regarding this matter, I also want to say that without prejudice to
the fact that we affirm that the agreement is not affected by corruption,
that even if some fact linked to the previous regimes or the previous
officials with respect to corruption is determined, it is important to keep in
mind that in Peru there is a rule, Law 30,737, which protects those who
have acquired an asset and have acquired it in good faith, to prevent them
from being left—projects that left dropped and thwarted.

*Id.* at ECF 4 (cleaned up).

> Arbitration is to be contaminated with allegations of corruption to avoid compliance with the contract.  They want to rarify the environment, they want to do it where it doesn't belong, and we will surely still have to hear more of this.  And we must tell the Court that [Lima] is not asking for the nullification of the contract for corruption, because there are no signs or evidence of corruption to support it.  What [Lima] provided in this arbitration, at an already advanced stage, besides the arbitration, are two reports from the Congress of the Republic, made by confronted politicians, which are not binding, according to article 97 of the Constitution.  A report from the General Comptroller of the Republic, which is not competent to determine acts of corruption, but that report does not conclude by asking that they be made—that they generate actions of criminal responsibility but of administrative liability.  A witness, questioned and biased, who refers to criminal investigations that did not include [Rutas] or their representatives, are in the preliminary or preparatory investigation stage, and are based on a thesis by the prosecutor that has not yet been accepted or reached a judge.  Nor has any link been shown between the criminal investigations and the contract.  Susana Villarán, a former mayor of Lima, is being investigated for campaign contributions.  Ms. Villarán and the Odebrecht representatives involved have denied that the changes—in exchange for campaign contributions—benefited [Rutas].  And in the effective collaboration agreement that exists, and we have—and there is the ruling homologating that agreement in the file, among the projects in which corruption has been accepted, the [Rutas] contract does not figure and does not exist.

*Lima I*, Dkt. 74-32 at ECF 2 (cleaned up).