# Exhibit 4

# English Translation



## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the original document entitled "*R-133 Carpeta Fiscal No. 249-2023 Disposición No. 07 - No formalización ni continuación de la investigación preparatoria de fecha 15 de agosto de 2024 (002)*," which was written in Spanish.

City of Buenos Aires, September 12, 2024.

THE TR COMPANY TRANSLATION SERVICES



_____

Cynthia Farber
Certified Translator
License recorded on Page 226:Book XV
Buenos Aires Translators' Association
CTPCBA No. 5402

Manuel Ugarte 2187 1º (C1428BSE) Buenos Aires, Argentina
(54.11) 4896 2693
info@thetrcompany.com - www.thetrcompany.com



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**PROSECUTION FILE No.: 249-2023**

**INVESTIGATED PARTIES: LUCA G. RADICATI DI BROZOLO *ET AL***

**CRIME: SOLICITING OR ACCEPTING BRIBES IN THE COURSE OF COURT PROCEEDINGS *ET ALIUS***

**AGGRIEVED PARTY: THE STATE**

**PROSECUTOR IN CHARGE: EDWIN MANRIQUE DURAND**

**<u>PROSECUTION ORDER No. 07 – NO FORMALIZATION OR CONTINUATION OF THE PRELIMINARY INVESTIGATION</u>**

Lima, August 15

2024

**<u>IN VIEW OF:</u>**

The criminal complaint filed by Luis Fernando Moreno Berríos, Deputy State Counsel in charge of The Metropolitan Municipality of Lima, against Luca G. Radicati Di Brozolo, David Arias and Elvira Leonor Martínez Coco for the alleged commission of the crime of Soliciting or Accepting Bribes in the Course of Court Proceedings, and against Guilherme Borges de Queiroz, representative of Rutas de Lima, for the alleged commission of the crime of Offering or Giving Bribes in the Course of Court Proceedings, and in light of the preliminary proceedings conducted, the following ruling is issued:

**<u>WHEREAS:</u>**

**ONE. <u>THE ATTORNEY GENERAL'S OFFICE.</u>**

**1.1.** The Attorney General's Office is an administrative body qualified by its activity of collaborating in the exercise of jurisdictional power to guarantee the effective enforcement of the law. As established by the Constitutional Court, "The Constitution (Article 159) has assigned to the Attorney General's Office a number of constitutional functions, among which the power to initiate a criminal action, either *ex officio* or at the request of a party, as provided in Article 159(5) of the Constitution, is worth mentioning. Although it is a discretionary power granted by the Constitution to the Attorney General's Office —which is a body created by and therefore subject to the Constitution—, it is obvious that such power cannot be unreasonably exercised, in disregard of the constitutional principles and values,

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.

**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

or in violation of fundamental rights" (Constitutional Court Decision No. 6204-2006-PHC/TC).

1.2.    In this sense, the Attorney General's Office fulfills an objective function in the criminal proceeding that not only responds to an individual interest, but also to the interest of the community. Thus, the burden of proof on the Prosecutor is not only based on proving the guilt of the accused, but also represents a procedural and functional duty, since failure to comply with it would cause harm to the community. Therefore, Title IV, Preliminary Chapter of the Code of Criminal Procedure provides that the Attorney General's Office is in charge of public prosecution in criminal cases and has the burden of proof.[1]

1.3.    In this vein, Section 1 of Title IV, Preliminary Chapter of the Code of Criminal Procedure provides that: "the Attorney General's Office must act objectively, investigating the facts involved in the crime, which determine and prove the responsibility or innocence of the accused". The duty of objectivity, as Pedro Angulo Arana rightly points out, has a meaning of its own[2] that must be interpreted based on each action taken by the prosecutor in the criminal proceeding. That is why we agree with Rosas Yataco when he endorses the Constitutional Court's criterion: "although some legal scholars consider that the principle of impartiality can only be inherent in the judge,  we consider that the Prosecutor must also be impartial in the Preliminary Investigation, given that the Constitutional Court of Peru (Case No. 2288-2004-HC/TC, August 12, 2004) has stated as follows: "(...) 3.- (...) However, it must be specified that all the actions by the Attorney General's Office must be guided by the principle of legality (first paragraph of Section 4 of the Attorney General's Office Charter (LOMP)), which requires it to act in accordance with and in the best interest of the law, as well as by the principle of impartiality (Section 19 of the LOMP), according to which the Prosecutor must act with full objectivity and independence in defense of the interests entrusted to him, and should not have any particular interest in the elucidation of a given case"[3].

**TWO. <u>DESCRIPTION OF THE EVENT REPORTED</u>.**

---

[1] *The Constitution of 1993 considers the Attorney General's Office not only as a criminal prosecution body, but also, as one that defends legality, citizens' rights, and public interests, all of that by virtue of the legal system in force at the time, which established this functional duality: the Constitution of 1979 and the Attorney General's Office Charter of 1981. This framework adopted, likewise, a criterion in line with the Hispano-American regulatory bodies that introduced this type of entity in the past decades.*

[2] *Angulo Arana, Pedro.* La Función Fiscal. Estudio comparado y aplicación al caso peruano. El Fiscal en el nuevo proceso penal. *Jurista Editores. Lima, 2007, p. 203.*

[3] *Rosas Yataco, Jorge.* Derecho Procesal Penal, con aplicación al Nuevo Código Procesal Penal. *Jurista Editores. Lima, 2009, p. 135.*

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.

**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

2.1.  In a report included on page 01/08 of the case file, the reporting party, Luis Fernando Moreno Berríos, Deputy State Counsel in charge of The Metropolitan Municipality of Lima, described the following events:

2.2.  On March 7, 2023, the Rutas de Lima SAC Consortium resorted to an arbitration proceeding in which the fees of the arbitrators were set in USD 974,334.00, and the fees of the arbitral tribunal's clerk were set in USD 40,460.00. According to the reporting party, the referred consortium submitted a request for extension of the original notice of arbitration —in an act that it knew would be irregular and in violation of the laws—, asking that four aspects of its claim be broadened. The reporting party added that this arbitral tribunal made up by Luca G. Radicati di Brozolo, David Arias and Elvira Martínez Coco would not be qualified or have jurisdiction to order interim measures. The plaintiff also noted that the representative of Rutas de Lima, Guillerme Borges de Queiroz, presumably contacted the members of the tribunal not only to explain to them the alleged facts, but especially to offer them a benefit in exchange for the mere acceptance of the claims stated.

2.3.  Finally, the tribunal would receive, from the mere acceptance of such claims, a payment of USD 674,334.00 —which means that it would obtain the total sum of USD 1,348,668.00. The reporting party also mentions that the tribunal allegedly accepted the benefit offered by Rutas de Lima, and that from that point on the actions of the arbitral tribunal were arbitrary —including, for instance, the instruction that the MML refrain from doing anything against Rutas de Lima, or the establishment of a procedural schedule without determining if the supplemental claim would or would not be a part of the international arbitration, among others. The crime was crystallized upon the intervention of the members of the arbitral tribunal, who apparently benefited or received advantages or benefits from Guillerme Borges de Queiroz, a representative of the Líneas Viales de Lima Consortium, as the arbitral tribunal accepted the request to extend the arbitration and then issued a ruling on the matter, despite the fact that it had no jurisdiction to do so according to the reporting party.

**THREE. <u>EVIDENCE COLLECTED DURING THE INITIAL INQUIRIES STAGE</u>**

3.1.  **Report on pp. 01/08** of the case file, which describes the questionable events.

3.2.  **Concession Contract for the Vías Nuevas de Lima Project on pp. 11/71**, entered into between The Metropolitan Municipality of Lima and Rutas de Lima SAC.

3.3.  **Council Agreement No. 010 dated January 12, 2023 on pp. 72/73**.

3.4.  **Council Agreement No. 011 dated January 19, 2023 on pp. 74/85**, which established as follows: Section One. To DECLARE the Concession Contract for the Vías Nuevas de Lima Project entered into with Concessionaire Rutas de Lima SAC a MATTER OF PUBLIC INTEREST. Section Two: To CONFIRM the action instituted by the Private Investment

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.

**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

Promotion Office within the scope of its powers in order to continue with the proceeding envisaged in Section 17.7 of the Concession Contract for the Vías Nuevas de Lima Project regarding the Grantor's power to unilaterally terminate the Contract signed with Rutas de Lima SAC.

3.5.   **Letter No. 013979-VNL-MML dated December 29, 2022 on p. 86**, which contained Rutas de Lima's notice of arbitration against The Metropolitan Municipality of Lima in accordance with the UNCITRAL Arbitration Rules.

3.6.   **Brief dated December 29, 2022 on pp. 87/122** submitted by Estudio Echecopar, which contained Rutas de Lima's notice of arbitration against The Metropolitan Municipality of Lima in accordance with the UNCITRAL Arbitration Rules.

3.7.   **Supplemental claim and request for interim measures dated March 7, 2023 on pp. 128/149**.

3.8.   **Arbitral Tribunal Appointment Memorandum dated April 27, 2023 on pp. 179/199**.

3.9.   **Brief dated February 8, 2023 on pp. 202/204** submitted by Luca G. Radicati Di Brozolo, whereby he accepted his designation as Chairperson of the Arbitral Tribunal.

3.10.  **Brief dated January 27, 2023 on pp. 205/214** submitted by Elvira Martínez Coco whereby she accepted her designation as member of the Arbitral Tribunal and noted that she had never been appointed before by Rutas de Lima, White & Case SC, Rafael Llano or Mariele Coulet-Diaz, but acknowledged that she had been designated by Estudio Echecopar.

3.11.  **Brief dated January 31, 2023 on pp. 215/216** submitted by David Arias whereby he accepted his designation as arbitrator by Rutas de Lima SAC.

3.12.  **Brief dated July 12, 2023 on pp. 218/223** submitted by Carlos Enrique Cosavalente Chamorro, State Counsel for the Entity, indicating that during the 3rd International Ad Hoc Arbitration also filed by RUTAS DE LIMA SAC against the MML, the same female arbitrator was designated due to the fact that the proceeding involved the same Concession Contract.

3.13.  **Dissenting opinion of Arbitrator Elvira Martínez Coco dated December 12, 2022 on pp. 224/256**, issued by Elvira Martínez Coco.

3.14.  **Letter No. 003-2023-GPIP-MML dated January 31, 2023 on pp. 276/335**, whereby the following was agreed: Section One. To DECLARE the Concession Contract for the Vías Nuevas de Lima Project entered into with Concessionaire Rutas de Lima SAC a MATTER OF PUBLIC INTEREST. Section Two: To CONFIRM the action instituted by the Private Investment Promotion Office within the scope of its powers in order to continue with the proceeding envisaged in Section 17.7 of the Concession Contract for the Vías Nuevas de Lima Project regarding the Grantor's power to unilaterally terminate the Contract signed with Rutas de Lima SAC in representation of The Metropolitan Municipality of Lima, for having proved its nature as a matter of public interest.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**3.15.** **Brief dated August 20, 2018 on pp. 339/340** submitted by Elvira Martínez Coco whereby she accepted her designation as Chairperson of the Arbitral Tribunal that heard the dispute between The Metropolitan Municipality of Lima and Rutas de Lima.

**3.16.** **Brief dated April 26, 2019 on pp. 341/342** submitted by Elvira Martínez Coco whereby she accepted her designation as arbitrator for The Metropolitan Municipality of Lima in a proceeding against Rutas de Lima.

**3.17.** **Brief dated August 27, 2023 on pp. 343/347** submitted by Elvira Martínez Coco whereby she accepted her designation as arbitrator for The Metropolitan Municipality of Lima in a proceeding against Rutas de Lima.

**3.18.** **Email dated June 12, 2023 on pp. 423/426**, sent by Carlos Ricardo Torres Zavala (Carlos.torres_0@munilima.gob.pe) to Emilio Bettoni (Emilio.bettoni@aarblit.com), forwarding the objection made by The Metropolitan Municipality of Lima and attaching Procedural Order No. 3.

**3.19.** **Concession Contract for the Vías Nuevas de Lima Project on pp. 456/736**, signed between the Entity and Guilherme Borges de Queiroz, representative of RUTAS DE LIMA SAC.

**3.20.** **Articles of Incorporation of a Close Corporation with a Board of Directors named "Vías Nuevas de Lima SAC" dated October 13, 2012 on pp. 737/761**.

**3.21.** **Preliminary Statement of Elvira Leonor Martínez Coco dated August 24, 2023 on pp. 835/841,** who stated as follows: "5. The reasons given by the arbitral tribunal strictly applied section 19.2, subparagraph (b), which provides that this type of controversies must be solved through *ad hoc* arbitration. Subparagraph (i) notes that any non-technical controversies where the amount involved is higher than 10 million dollars must be submitted to international arbitration. The Metropolitan Municipality of Lima stated that the claims of Rutas de Lima were merely legal and could therefore not be addressed by an international tribunal. Rutas de Lima said that the amount involved was the value of the concession and that it added up to over 2 billion dollars (as far as the notice of arbitration was concerned). The arbitral tribunal considered that it had jurisdiction because the amount sought was higher than the 10 million dollar threshold established in the contract clause; then a supplemental claim was submitted due to the termination of the contract and termination also involves an amount which, under the contract, is the compensation that must be paid to the contractor when the contract is declared terminated. Rutas de Lima said that if the arbitral tribunal declares that the termination was valid, it should be paid approximately over 500 million dollars as compensation. The tribunal then held that the amount involved with respect to termination was higher than 10 million dollars in accordance with the clause referred to above; thus, we claim to have jurisdiction because termination occurred as per the contract and the applicable rules. Regarding one of the

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.

**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

aspects mentioned in the report about the order of interim measures, the Metropolitan Municipality of Lima points out that I would be contradicting myself if I ordered an interim measure in favor of Rutas de Lima, which is not correct since any interim measure is both temporary and provisional, safeguards the possibility that whoever requests it may be the successful party in the arbitration proceeding, and can be changed at any time. In the first two proceedings with Rutas de Lima, the arbitral tribunals of which I was a member unanimously ordered interim measures in favor of Rutas de Lima. However, in the award of the first case I issued a dissenting opinion stating that a memorandum subsequent to the contract was an invalid memorandum; in the second case, in which I also voted to impose an interim measure in favor of Rutas de Lima, I issued a dissenting opinion in the award. I said that the contract in general had been the result of corruption, as I compared the private initiative with the contract: under private initiatives, the works were carried out with funds obtained from the tolls, which means that the concession was financed by both parties; however, the contract changed this, as it had to be signed under the same terms of the private initiative that was approved by the municipal council at that time. Such change provided that all these works were financed by the MML with its own resources: I considered this fact, among others, as a red flag warning about the existence of corruption. In this third case, the MML declared the termination of the contract for violation of its public interest nature due to signs of corruption in the contract. The arbitral tribunal would have to decide whether the termination declared by the MML is valid or not; the MML would have to convince all the arbitrators of the existence of corruption. 6. This communication to the parties said that the proposal was made bearing in mind that in the two previous arbitrations between Rutas de Lima and the MML the same ICC maximum rate had been applied. The parties did not object to the application of this rate. When the amount was increased due to the supplemental claim, we —as arbitrators— discussed the matter and found out that, if this rate was applied, the fees would increase to nearly USD 1,500,000.00 for each arbitrator. The three of us discussed it further and finally decided that we would not apply the maximum rate, but only the average or mean rate, which resulted approximately in USD 890,000 for each arbitrator. … I hereby state for the record that the arbitral tribunal reduced its fees on its own motion because we took into account that one of the parties involved was a state entity, so despite the fact that we were entitled to the maximum rate approved by the parties, we still decided to lower our fees. It should be noted that the arbitrators' fees must be deposited by the parties with the Permanent Court of Arbitration in The Hague, which is the body in charge of administering the funds in accordance with the appointment memorandum. The arbitrators' fees have been deposited with the PCA, but we have not received our payment. Usually, a portion is paid when the arbitration is at an advanced stage, and the remainder is paid after the issuance of the arbitral award; however, as of this date, I have not received any payment whatsoever. 12. Question: HAS

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

MR. GUILHERME BORGES DE QUEIROZ, THE REPRESENTATIVE OF RUTAS DE LIMA, OR ANY OTHER PERSON, HAD A PRIVATE CONVERSATION WITH YOU TO REQUEST ACCEPTANCE OF THE SUPPLEMENTAL CLAIM AND INTERIM MEASURE? Answer: I have not had any conversations with him nor with anybody else. The decision was made by the members of the tribunal after analyzing the facts and the applicable law."

**3.22.** **Partially Dissenting Opinion of Elvira Martínez Coco on pp. 890/940**.

**3.23.** **Dissenting Opinion of arbitrator Elvira Martínez Coco dated December 12, 2022 on pp. 942/1006.**

**3.24.** **Procedural Order No. 5 (on the request for Interim Measures filed by the Claimant) dated June 13, 2023 on pp. 1008/1029**, which ruled as follows: i) To order that, until the dispute submitted in this proceeding is solved, the respondent maintain its *statu quo* by suspending the contract termination process. ii) To order that the respondent refrain from aggravating the dispute through public statements on the matter and against the claimant throughout the course of this arbitration.

**3.25.** **UNCITRAL Arbitration Rules (2021) on pp. 1031/1113**.

**3.26.** **Email dated April 4, 2023 on p. 1163** sent by Luca G. Radicati Di Brozolo (luca-radicati@arblit.com) to the parties, which attached the preliminary versions of the arbitral tribunal appointment memorandum and procedural order No. 1 (drafts).

**3.27.** **Arbitral Tribunal Appointment Memorandum (draft) on pp. 1165/1181**.

**3.28.** **Email dated April 19, 2023 on p. 1183** sent by Luca G. Radicati Di Brozolo (luca-radicati@arblit.com) to the parties, stating that the tribunal notes, in light of the quantum of the dispute determined by the claimant in its email dated April 17, 2023, that the new version of the memorandum specifies the arbitrators' fees and the administrative clerk's remuneration. In this regard, the tribunal highlights that, due to the increase in the quantum of the dispute resulting from the supplemental claim filed by the claimant, it has modified its proposal for the calculation of the arbitrators' fees. Specifically, instead of applying the maximum rate in the arbitrator's fee scale set out in Appendix III of the International Chamber of Commerce Rules of Arbitration in force as of January 1, 2021, the tribunal proposes to apply the mean rate in the arbitrator's fee scale established in Appendix III (....) likewise, the tribunal proposed that the remuneration of the administrative clerk be calculated as 20% (and not 30%) of the fees received by each co-arbitrator, and sent the preliminary versions of the tribunal appointment memorandum and of procedural order No. 1 (drafts).

**3.29.** **Preliminary Statement of Luca Radicati Di Brozolo dated October 6, 2023 on pp. 1212/1219**, who stated as follows: "5. and it must be said that this arbitration is the third one between the two parties, and that the parties agreed that the rules that were applied in the previous arbitrations will be applied in the third arbitration, and that also includes the

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

arbitrators' fees. The previous arbitrations specifically envisaged that the arbitrators' fees would be calculated based on the rules of the International Chamber of Commerce (ICC) using their maximum scale, so when this arbitration began, we proposed to replicate that, and the parties also accepted that the payment would be for the maximum amount allowed. On March 1, 2023, the MML stated and accepted that the same rules and fees would apply, and this was later confirmed in the arbitral tribunal appointment memorandum, which was signed by the parties. Then, when claimant Rutas de Lima added a new claim to the initial notice of arbitration and caused the total quantum of the dispute to increase a lot, we spontaneously decided to reduce our fees, something evidenced in an email from the clerk of the tribunal dated April 19, 2023. In the email, it was said that, as a result of the increase in the amount of the arbitration dispute, the tribunal modified its proposal for the calculation of the arbitrators' fees and that, instead of applying the maximum scale, it suggested applying the next lower scale; so that is how we decided to apply the mean scale. Once this was decided, the arbitration started and we, the arbitrators, began to exchange emails with information. We had to hear the supplemental claim because it is envisaged in the rules and it is allowed during its initial phase… After that, the MML filed a challenge request that was going to be decided by the International Court of Arbitration, and then the criminal complaint was filed, after which arbitrator Martínez Coco resigned. From that moment the arbitration was suspended. What we are being accused of —that is, having spoken with whom I believe must be the representative of the company— is not true; my co-arbitrators have not done that either... arbitrators' fees do not depend on whether an interim measure is ordered and, moreover, we have not received any payments so far, so the two accusations are totally false. 11. The UNCITRAL Rules, for example, regulate fees in Article 41; interim measures are regulated in Article 26 of the Rules, which also explains other issues related to interim measures; and the counterclaims and amendments to the claims are regulated in Article 22 of the Rules. In this case, the request for extension of the claim was filed two weeks after the claim was filed. 14. Question: IS IT FREQUENT OR LEGAL TO HAVE ADDITIONAL CLAIMS ADDED TO THE MAIN CLAIM AFTER THE NOTICE OF ARBITRATION IS FILED? Answer: Yes, this is allowed under Article 22 of the Rules, and extensions and requests additional to the initial claim can be submitted. 18. Question: IS IT POSSIBLE FOR THE ARBITRATORS TO CHARGE A FEE IF ONE OF THE PARTIES DOES NOT ACCEPT IT? Answer: No, because if a party does not accept the fee proposal, the arbitration cannot continue. Arbitration is based on the agreement of the parties, and both parties have to accept. In this case there were no problems since the arbitration rules were adopted. 21. Question: HOW MUCH HAVE THE ARBITRATORS RECEIVED IN THIS ARBITRATION AS FEES TO THIS DATE? Answer: We have received absolutely nothing."

**3.30. Preliminary Statement of David Arias Lozano dated October 20, 2023 on pp. 1224/1232**, who declared as follows: "5. The arbitrators' appointment memorandum was

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

signed by Rutas de Lima and The Metropolitan Municipality of Lima (all the parties) on April 27, 2023. In the appointment memorandum, the parties agreed on the quantum of the claim and that the arbitrators' fees should be calculated as per the ICC mean scale because we, the arbitrators, voluntarily reduced our fees (...) Also, it should be noted that the collection of the arbitrators' fees does not depend on whether the extension of the claim or the interim measures are accepted; that is not relevant in order for arbitrators to collect their fees — the fees are collected because they have been approved by the parties and are specified in the appointment memorandum based on the quantum of the claim, regardless of whether the claim is upheld or dismissed. 10. Question: HOW ARE ARBITRATOR'S FEES PAID? Answer: The parties must pay their share of the arbitrators' fees to the Permanent Court in The Hague, which is the entity that then pays the fees to the arbitrators; in this particular case we have not collected a single dollar to this date. In *ad hoc* arbitrations, it is possible to pay the fees directly to the arbitrators, but this is not the best practice, since there may be difficulties (taxes, possible death or incapacity of the arbitrator, possible agreement of the parties before the arbitration proceeding ends). It is more advisable to deposit the fees with a prestigious institution (in this case, the Permanent Court in The Hague), so that it can administer the funds and pay the arbitrators according to the work performed in the various stages of the arbitration. 20. The arbitrators' fees do not depend on each arbitrator's stance in the arbitration. Arbitrators are paid the same fees regardless of the outcome of the arbitration. The arbitration proceeding is impartial and independent of the parties, including the party appointing the arbitrator. 23. I never received any message, call or communication from a third party acting in representation of Mr. Borges de Queiroz. If I had been contacted in any way, I would have rejected such contact immediately and would have informed so to the parties to the arbitration, since that constitutes a very serious situation."

**3.31. Official Letter No. 012070-2023-MIGRACIONES-UGD dated October 19, 2023 on pp. 1233/1234**, which provided information on the migratory movements of Elvira Leonor Martínez Coco.

**3.32. Brief dated November 2, 2023 on pp. 1241/1278**, which contained a report prepared by a legal expert in arbitration matters.

**FOUR. <u>QUESTIONS OF FACT AND OF LAW OF THE DISMISSAL OF THE CASE FILE</u>.**

**<u>Functional jurisdiction</u>**

**4.1.** The Constitutional Court, in its Decision 01887-2010-PHC/TC, held that "the Constitution established in Article 139 a broad set of principles which (...) constitute true fundamental rights and stand as a set of minimum safeguards that the constituents themselves have considered convenient to incorporate into our *norma normarum* in order to affirm the legal

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

pulchritude of the jurisdictional and pre-jurisdictional activities performed by such authorities." Thus, the Attorney General's Office is compelled to observe those constitutional safeguards because "the right to due process of law also shows its legal efficacy within the pre-jurisdictional stage of criminal proceedings; that is, at the stage of the criminal proceeding in which the Attorney General's Office must observe the duty set forth in Article 159 of the Constitution" (Constitutional Court Decision 2725-2008-PHC/TC).

4.2. Following this premise, in order for a criminal proceeding to be validly instituted, certain procedural conditions or requirements must be satisfied. These are procedural requirements without which the proceeding may not be validly instituted, that is, the claim cannot be materially satisfied without them.[4] One of the procedural conditions for a tribunal to hear a case is the Prosecutor's jurisdiction.

4.3. Although the Prosecutor's functions have been described in detail in the Peruvian Code of Criminal Procedure, they are unavoidably subject to the principles and safeguards embodied in the Constitution. Thus, the provisions of Title II, Chapter III of Book One of the Peruvian Code of Criminal Procedure apply subsidiarily to determine the prosecutor's jurisdiction, to the extent they are compatible with its nature.

4.4. In view of the multiple bodies that make up the Attorney General's Office, implementing criteria to distribute cases has become essential. These criteria or rules are called jurisdiction criteria:[5] they assign jurisdiction over a given case to a prosecution Division and exclude the rest of them, something that creates for the Prosecutor both the right and the duty to conduct an investigation. The practical purpose of criminal jurisdiction thus consists in distributing cases to various prosecutors established by law; therefore, the work must be distributed among them, dividing the caseload into different groups to assign them to different prosecutors.

4.5. The jurisdiction of each prosecutor, what distinguishes them, is the objective limit within which they can exercise their functions. That constitutes the power quota or portion that they will be able to execute to perform their duties at any given time. Jurisdiction is a criterion used to organize territorial extension, specializations, etc.[6]

4.6. In this vein, the jurisdiction of prosecutors, pursuant to Section 63.2 of the Peruvian Code of Criminal Procedure, must be determined by the National Attorney General; as for Specialized Prosecution Offices, such jurisdiction is determined in accordance with Section 80-B of the Attorney General's Office Charter upon approval of the Supreme Prosecution Board.

---

[4] *Díaz Martínez, Manuel. Jurisdicción y Competencia. El Nuevo Proceso Penal Estudios Fundamentales. Palestra. Lima, 2005, p. 149.*

[5] *San Martín Castro, César. Derecho Procesal Penal. Volume I. Grijley, Lima, 2006, p. 179.*

[6] *Angulo Arana, Pedro. "La Función Fiscal", Juristas Editores, Lima, Peru, March 2007, p. 178.*

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**4.7.** The Peruvian Code of Criminal Procedure (Legislative Decree No. 957) became effective nationwide upon the publication of Law No. 29,574 on September 17, 2010, only with respect to the crimes categorized in Sections II, III and IV, Sections 382 through 401 of Chapter II, Title XVIII, Book II of the Criminal Code, and other related crimes.

**4.8.** Meanwhile, Law No. 29,648 dated December 21, 2010, provided for the coming into force of the Code of Criminal Procedure on January 15, 2011, only for the crimes categorized in Sections 382 through 401 of the Criminal Code for the judicial district of Lima. As a result, National Prosecution Office Resolution No. 031-2011-MP-FN dated January 12, 2011, resolved to convert the Specialized Provincial Prosecution Offices into *Corporate Provincial Prosecution Offices for Crimes of Corruption by Public Officials of Lima*, which would hear cases in compliance with Law No. 29,648.

**4.9.** When the Congress passed Law No. 29,574; *i.e.* the Law Providing for the Immediate Application of the Code of Criminal Procedure for crimes committed by public officials (as amended by Law No. 29,648), it did so in order for the crimes categorized as such in sections 382 through 401 of the Criminal Code to be heard subject to the rules of the Code of Criminal Procedure approved through Legislative Decree No. 957[7]. This means that when a reported event is classified within those categories of crimes, the Corporate Provincial Prosecution Offices for Crimes of Corruption by Public Officials of Lima have jurisdiction to hear the case.

**Purpose of Initial Inquiries**

**4.10.** Initial inquiries are aimed at conducting a probe in order to collect evidence, so that the Prosecution Office may decide, within its scope of authority, whether or not to formalize the relevant investigation. In making such decision, the following requirements should be considered: *there are signs of a crime, the criminal action is not barred by the statute of limitations, and the accused party has been identified*. If any of the above requirements is not met, the case shall be closed by the Prosecution Office.[8]

---

[7] *Citing Angulo Arana: "As a result of the criminal procedure reform, we may note that the criminal prosecutor, when it comes to investigating a crime, appears to be extremely stronger to perform his/her primary functions: a) the function of guiding the investigation of the crime, b) the compositional function of the criminal proceeding, and c) the precautionary function of the investigation and payment of damages, as well as a major coercive power." Angulo Arana, Pedro. La Función Fiscal. Jurista Editores. Lima, 2007, p. 57.*

[8] *Similarly, Cubas Villanueva points out that the preliminary investigation carried out by a prosecutor in his or her office or by the police under his or her supervision is intended to determine: (i) if the alleged act constitutes a crime, (ii) if the alleged perpetrator has been identified, and (iii) if the criminal action is not time-barred. If any of these requirements is not met, the prosecutor should provisionally or definitively close the case. This determines the recognition of discretionary powers for prosecutors, so that they may select cases to ultimately avoid case overload in the judicial system." Neyra Flores, José Antonio. Manual del Nuevo Proceso Penal & de Litigación Oral. Idemsa, Lima 2010. 290-291.*

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**4.11.** The Constitutional Court's case law is defined as "a set of constitutional decisions or orders entered to ensure the highest legality, hierarchy, content and strict compliance with the body of constitutional laws." This doctrine is established by the Constitutional Court in the different fields of law on a case-by-case basis. In this regard, reference is made to Judgment No. 01887-2010-PHC/TC, in which the Constitutional Court ruled as follows: "Article 139 of the Constitution contains a wide range of principles, which (...) constitute true fundamental rights, involving a set of minimum safeguards that the drafters of the Constitution themselves have seen fit to include in our Constitution to uphold the lawfulness of trial and pre-trial activities carried out by the authorities." This Prosecution Office, then, is required to observe such constitutional safeguards, insofar as "the right to due process is also legally effective at the pre-trial stage of criminal proceedings, i.e., a phase of criminal proceedings in which the Prosecution Office must act upon the mandate set forth in Article 159 of the Constitution" (Constitutional Court Judgment No. 2725-2008-PHC/TC).

**4.12**. In this regard, the time limit for initial inquiries is, in principle, sixty calendar days, unless the circumstances of the facts under investigation warrant otherwise, in accordance with Section 334(2) of the Peruvian Code of Criminal Procedure, as amended by Law No. 30076, which provides that "*the time limit for initial inquiries under Section 3 shall be sixty days (…); notwithstanding the above, the Prosecutor may set a different time limit based on the characteristics, complexity and circumstances of the facts under investigation.*" A time limit exceeding sixty days, if set by the Prosecutor, cannot be unrestricted, as ruled by the Criminal Division of the Supreme Court in Cassation Judgment No. 02-2008-La Libertad; therefore, in the most extreme scenario, such time limit must not exceed the maximum term of the Preparatory Investigation under Section 342 of the Code of Criminal Procedure.

**Identification of the Facts Under Investigation**

**4.13.** Before a legally logical analysis is provided in support of this decision, the facts under investigation need to be identified. As a result, it is necessary to determine **whether such facts involve the crime of Soliciting or Accepting Bribes in the Course of Court Proceedings and the crime of Offering or Giving a Bribe, and whether there are signs that the crimes have been committed by the accused parties**.

**Analysis of the Punishable Crime**

**4.14.** The principle of criminal legality enshrined in Article 2(24)(d) of the Political Constitution states that "*no one may be prosecuted or convicted for an act or omission that at the time of its commission was not previously regulated by the law, in an express and unequivocal manner, as a punishable offense or otherwise punished with a penalty provided by law.*" Furthermore, Section 9 of the Peruvian Criminal Code provides that "*a crime shall be deemed to be committed at the time that the perpetrator or accessory acted or failed to meet his or her obligation to act, regardless of the time in which its result occurred.*"

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**Examination Based on the Statutory Description of the Crimes**

**4.15.** It should be noted that Peruvian criminal law is described as "offense-based law," which relates to one of the axiological legal foundations of the social and democratic Rule of Law. Criminal sanctions, then, are based on a specific <u>action</u> described by the law and only represent a response to such individual act. In other words, the State is authorized to impose penalties or adopt security-related measures against persons based on a conscious and voluntary human act that adversely affected certain legally protected rights under criminal law.

**4.16.** The double jeopardy principle, as a manifestation of offense-based criminal law, has been constitutionally enshrined. Although it has been recognized in Section III of the Preliminary Title of the Peruvian Code of Criminal Procedure, the double jeopardy principle has been adopted as a constitutional guideline in repeated decisions of the Constitutional Court.[9] Under such principle, no one may be prosecuted or punished more than once for the same act; in other words, the State's prosecution powers are targeted at human conduct, which may amount to different crimes, but comprises only one act.

**4.17.** The first step to determine whether human conduct is punishable or not requires an examination of such conduct in accordance with criminal law. This means that the conduct under investigation must be analyzed to determine whether it qualifies as a crime previously regulated in the Criminal Code. This examination based on the statutory description of a crime is intended to ascertain whether the facts under investigation amount to or have resulted in any offense under criminal law. Therefore, in analyzing a criminal offense, the relevant conduct must be examined first, followed by the statutory description of the crime and, then, the other elements of the crime, since each one is a prerequisite for the next; in other words, one cannot exist without the others. This requires the coexistence of the relevant punishable offense, subjects and legally protected interest as prescribed by the criminal law in force at the time of commission.

**The Alleged Crime**

**4.18.** It should be noted that a legally protected interest is any social interest that is necessary for the normal development of individuals in society. The legally protected interest in crimes against the Public Administration is the proper functioning of the public administration and the law-abiding behavior of public officials based on the trust placed in them by the State. Breaching this trust

---

[9] *In this regard, the Court itself has ruled in previous decisions (STC 2050-2002-AA/TC, STC 2868-2004-AA/TC, STC 4587-2004-AA/TC, STC 003-2005-PI/TC, STC 8123-2005-PHC/TC, STC 0014-2006-PI/TC, STC 3954-2006-PA/TC, STC 4989-2006-PHC/TC, STC 10275-2006-PHC/TC, STC 2930-2007-PHC/TC, STC 03682-2007-PA/TC, STC 04511-2007-PA/TC, STC 00044-2008-PHC/TC, STC 2725-2008-PHC/TC, and STC 04225-2008-PHC/TC) that the double jeopardy principle is implicitly contained in the right to due process, as the right not to be tried (procedural dimension) or punished (material dimension) twice for the same facts has been recognized in Article 14.7 of the International Covenant on Civil and Political Rights, as well as in Article 8.4 of the American Convention on Human Rights.*

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

constitutes an offense, as it undermines the public interest in the proper performance of public servants for the benefit of the national treasury.[10]

**4.19.** In the case at hand, the First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima, Division 4, ordered that a preliminary investigation be opened against **LUCA G. RADICATI DI BROZOLO, DAVID ARIAS AND ELVIRA LEONOR MARTÍNEZ COCO**, for the alleged crime of **SOLICITING OR ACCEPTING BRIBES IN THE COURSE OF COURT PROCEEDINGS**, as regulated and punished by Section 395 of the Peruvian Criminal Code, and **GUILHERME BORGES DE QUEIROZ**, in his capacity as representative of Rutas de Lima, for the alleged crime of **OFFERING OR GIVING BRIBES IN THE COURSE OF COURT PROCEEDINGS**, as regulated and punished by Section 398 of the Peruvian Criminal Code, to the detriment of the Peruvian State. Thus, the scope of such punishable offenses needs to be analyzed in the abovementioned order:

### SECTION 395. SOLICITING OR ACCEPTING BRIBES IN THE COURSE OF COURT PROCEEDINGS:

"Any Judge, Arbitrator, Prosecutor, Expert Witness, Member of an Administrative Court or any other person acting in a similar capacity who, under any modality, accepts or receives a gift, promise or any other advantage or benefit, knowing that its intended purpose is to influence or decide on a matter brought to his or her knowledge or under his or her purview shall be punished with imprisonment of six to fifteen years and disqualification from office in accordance with Section 36(1) and (2) of the Criminal Code and with one hundred and eighty to three hundred and sixty-five day fines.

Any Judge, Arbitrator, Prosecutor, Expert Witness, Member of an Administrative Court or any other person acting in a similar capacity who, under any modality, solicits directly or indirectly a gift, promise or any other advantage or benefit, for the purposes of influencing the decision on a matter brought to his or her knowledge shall be punished with imprisonment of eight to fifteen years and disqualification from office in accordance with Section 36(1) and (2) of the Criminal Code and with three hundred and sixty-five to seven hundred day fines."

### SECTION 398. OFFERING OR GIVING BRIBES IN THE COURSE OF COURT PROCEEDINGS:

"Whoever offers, gives or promises, under any modality, a gift, advantage or benefit to a Judge, Prosecutor, Expert Witness, Arbitrator, Member of an Administrative Court or any other person acting in a similar capacity for the purposes of influencing the decision on a matter brought to his or her knowledge or under his or her purview shall be punished with

---

[10] *RODRÍGUEZ COLLAO, Luis. "Delimitación del concepto penal de corrupción" en REYNA ALFARO, Luis Miguel (Director) Delitos contra la Administración Pública, Jurista Editores, Lima 2009, p. 99.*

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

imprisonment of five to eight years, together with disqualification from office in accordance with Section 36(2), (3), and (4) of the Criminal Code.

If a gift, promise, advantage or benefit is offered or given to a court clerk, rapporteur, specialist, court assistant, witness, translator or interpreter or any other person acting in a similar capacity, the penalty of imprisonment shall be of four to eight years, together with disqualification from office in accordance with Section 36(2), (3), and (4) of the Criminal Code.

If the person offering, giving or bribing is a lawyer or is part of a law firm, the penalty of imprisonment shall be of five to eight years, together with disqualification from office in accordance with Section 36(1), (2), (3) and (8) of the Criminal Code and one hundred and eighty to three hundred and sixty-five day fines."

**4.20.** With respect to the crime of **SOLICITING OR ACCEPTING BRIBES IN THE COURSE OF COURT PROCEEDINGS**, the Supreme Court, in Appeal No. 15-2019/Cusco, established certain criteria for analysis.

**4.21.** The Permanent Criminal Division pointed out that the criminal offense under the second paragraph of Section 395 of the Peruvian Criminal Code, especially aggravated by the type of perpetrator, requires regularity and impartiality in the correct administration of justice as the legally protected interest. The key verb is "to solicit." A bribe includes a gift, promise or any other advantage or benefit. The perpetrator of the crime needs to be aware that his or her actions are intended to influence the decision-making process in a certain proceeding under his or her purview, where one of the parties to the proceeding is implicitly favored or harmed.

**4.22.** Such decision of the Supreme Court is relevant, since it specified that the crime under analysis is committed upon a direct or indirect request, and the decision sought from the person accepting the request is not required to be made for the crime to be deemed committed.

**4.23.** Furthermore, the **Supreme Court of Justice of the Republic of Peru, in Appeal No. 5-2017-HUÁNUCO**,[11] made the following findings:

"(...)

7.1. Regarding the legally protected interest, since a special crime of breach of duty is involved, public officials have —by virtue of their official capacity— a 'special affirmative duty' to act with impartiality, rectitude, transparency and objectivity. In this case, the public official's actions, under such principles, need to take place in the course of the initial inquiries, the preliminary investigation, the other phases of the criminal proceedings, and any act performed in his or her official capacity, in cases brought to his or her knowledge or under his or her purview.

---

[11] https://img.lpderecho.pe/wp-content/uploads/2021/01/Apelaci%C3%B3n-5-2017-Huanuco-LP.pdf

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.

**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

7.2. The external elements of the crime at hand include, but are not limited to:

Offender and perpetration. The offender is required to have a special quality and cannot be any person. He or she needs to hold a public office and fulfill a specific functional role. In the case at hand, this applies to prosecutors at all court levels involved in the outcome of prosecution investigations and in court proceedings.

"Soliciting and/or receiving directly or indirectly a gift and/or any other advantage." The criminal offense requires that the public official "solicits" a bribe in the form of a gift and/or any other advantage, including money, property, jewelry or sexual favors, from a lawyer or party to the proceedings or their direct or indirect relatives, third parties, intermediaries, etc. However, this also requires a regulatory relationship, intended to influence the decision on a matter brought to his or her consideration or under his or her purview.

The same requirements apply to the "receiving" modality, but no provision is made for indirect receipt.

"For the purposes of influencing the decision." The prosecutor's negative influence on his or her own final or future decision (closing of a case, requests, etc.) and the objective determination in such decision must be interpreted as acting in favor of one of the parties to the detriment of the other. The influence on the content of such decision must be real (for example, ignoring criminally relevant acts under investigation to close or prosecute a case, failing to give notice of a proceeding to the parties involved, etc.), or a decision is legally required but is not made.

"Matter brought to his or her knowledge or under his or her purview." In the case at hand, matters or procedural acts were brought to the prosecutor's knowledge as part of the prosecution investigation or the court proceedings; and the prosecutor is legally and constitutionally authorized in terms of time (relationship or functional role) to close the case and issue requests, among other decisions. This means that such influence can only occur before a public official has made or failed to make[12] a decision on the matter brought to his or her knowledge.

7.3. The internal elements of soliciting or accepting bribes in the course of court proceedings include direct malice. The perpetrator needs to be aware of the nature and purpose of the request and/or acceptance of a gift, promise or any other advantage and needs to willingly act in spite thereof. The internal element of "knowing" requires a deliberate intention to undermine or breach impartiality, transparency and objectivity, i.e., the prosecutor is under a duty to know that the request and/or acceptance of a gift and/or

---

[12] The concept of "improper omission" is regulated by Section 13 of the Peruvian Criminal Code: 'Whoever fails to prevent a punishable act from being committed shall be punished: 1. If he or she has a legal duty to prevent it or creates an imminent danger capable of causing it. 2. If the omission occurs by doing something [...].'

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.

**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

economic advantage from the parties or their relatives to influence a prosecution decision is a result of knowing all the external elements of the crime, thus violating his or her official roles constitutionally and legally established.[13]

7.4. Finally, regarding consummation, the crime at hand requires a mere action. This means that, in requesting and/or receiving a bribe, the final or future decision on a pre-trial, trial or administrative matter is not required to take place; however, an objective of purpose or material possibility of influencing such decision is required."

**4.24.** Regarding the crime of **OFFERING OR GIVING BRIBES IN THE COURSE OF COURT PROCEEDINGS**, this crime has been analyzed in various Peruvian court decisions:

− **In Appeal No. 47-2021-Piura[14] dated December 2, 2022, the Supreme Court of Justice of the Republic of Peru** ruled as follows with respect to the consummation of the crime: "Key Finding: 5.13. Notwithstanding the above, it should be noted that, for the purposes of its consummation, the crime at hand requires a mere action. This means that, in requesting a bribe, the final or future decision on a pre-trial, trial or administrative matter is not required to take place; however, an objective element of purpose or material possibility of influencing such decision is required."

− **In Appeal No. 08-2021-CORTE SUPREMA[15] dated December 2, 2022, the Supreme Court of Justice of the Republic of Peru** ruled as follows with respect to the "matter brought to his or her knowledge or under his or her purview": "Key Finding: 6.17. Regarding the external element of the crime at hand, which requires that a court officer perform an act with respect to a matter brought to his or her knowledge or under his or her purview, Professor Rojas Vargas has explained that:

The "matter brought to his or her knowledge or under his or her purview" refers to a wide range of actions to be taken or decided by each specific official involved in the crime, and such actions are related to the scope of authority (powers) or are examined, analyzed, planned or drafted by any of the public officials specifically described therein. "Brought to his or her knowledge" refers to a factual, regulatory and interpretative scenario where specialization by the division of roles and by subject-matter characterizes the role of a certain official responsible for examining a case in a wide range of thematic areas. "Under his or her purview," in turn, relates to powers resulting from his or her public office conferred by laws or regulations, and such powers must serve as the basis for the public

---

[13] This Prosecution Office concurs with the view of Fidel Rojas, who considered that this phrase should be interpreted as negative influence, that is, as necessarily referring to decisions against the right of one of the parties and to the benefit of the other. He reached this conclusion based on logically coherent criteria and the principle of harmfulness, considering the heavy penalty established for the crime, in both the requesting and receiving modalities. ROJAS VARGAS, Fidel. Delitos contra la Administración Pública. Cuarta edición. Lima: Grijley, 2007, pp. 718-719.

[14] https://img.lpderecho.pe/wp-content/uploads/2022/12/Apelacion-47-2021-Piura-LPDerecho.pdf.

[15] https://img.lpderecho.pe/wp-content/uploads/2022/11/Apelacion-08-2021-Corte-Suprema-LPDerecho.pdf.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

official's opinion and decision. The knowledge of the official involved in the crime may be based on discretionary criteria related to the division of roles; however, it may be previously determined by the public office itself. Thus, the terms "knowledge and purview" may be interpreted as separate or interrelated concepts."[16]

## CASE ANALYSIS

**4.25.** In view of the alleged facts, the Metropolitan Municipality of Lima and the Rutas de Lima Consortium were involved in an arbitration proceeding for breach of their contract and agreement. The Consortium filed a request for arbitration, with the arbitrators' fees set at USD 974,334.00 and the arbitral tribunal secretary's fees at USD 40,460.00. However, the Rutas de Lima SAC Consortium improperly filed a brief to amend its request for arbitration so that it included four items. Such brief was inadmissible and inappropriate and should not have been granted by the members of the Arbitral Tribunal, namely, Luca G. Radicati Di Brozolo, David Arias and Elvira Martínez Coco, including the interim measures sought. Rutas de Lima, through its representative Guillerme Borges de Queiroz, purportedly contacted the members of the tribunal to explain the alleged facts and, above all, to offer a benefit for the mere acceptance of its claims. Therefore, by accepting the amended request for arbitration, the arbitrators' fees increased to USD 1,348,668.00. This led the Tribunal to order that the Metropolitan Municipality of Lima refrain from any action against Rutas de Lima, as well as to set an arbitration schedule without determining whether or not the supplementary claim would be part of the international arbitration. Thus, the Tribunal's acceptance of the amended request for arbitration and its decision thereon without jurisdiction to do so was allegedly part of the benefit for the increased arbitrators' fees. Furthermore, the reporting party filed a **Brief**[17] on July 12, 2023, alleging that Elvira Martínez Coco had also acted as an arbitrator in the third Ad Hoc International Arbitration, commenced by RUTAS DE LIMA SAC against MML, which involved the same Concession Contract.

**4.26.** In view of the specific violations alleged in the report, an analysis will be carried out, including the evidence collected during this investigation. The purpose of such analysis is to determine whether the alleged facts constitute criminal conduct under the applicable laws.

**4.27.** It follows, then, that the report addresses the improper increase in the arbitrators' fees resulting from the amended request for arbitration. It has also been alleged that the amended request for arbitration and the interim measure were improperly granted by the Arbitral Tribunal, since it lacked jurisdiction to do so, as stated by the reporting party. Therefore, the alleged violations will be analyzed.

**Before the Arbitration Claim**

---

[16] ROJAS VARGAS, Fidel. (2020). Manual Operativo de los delitos Contra la Administración Pública. Third edition, Grijley, p. 484.
[17] Brief dated July 12, 2023, as recorded on pages 218-223 of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**4.28.** In view of the evidence at hand, the Metropolitan Municipality of Lima and Guilherme Borges de Queiroz, in his capacity as representative of the RUTAS DE LIMA SAC Consortium, entered into a **Concession Contract for the Vías Nuevas de Lima Project.**[18] With respect to the **Concession Contract for the Vías Nuevas de Lima Project**,[19] **Council Agreement No. 010**[20] dated January 12, 2023 provided that "the proposal or mechanism to solve the problem related to the Lima tolls shall be discussed in the next Plenary Session of the Lima Metropolitan Council." Therefore, on January 19, 2023, **Council Agreement No. 011**[21] provided as follows: "The Concession Contract for the Vías Nuevas de Lima Project entered into with Concessionaire Rutas de Lima SAC is hereby **DECLARED AS A MATTER OF PUBLIC INTEREST**. 2: The action filed by the Private Investment Promotion Office within its scope of authority is hereby CONFIRMED **so that it continues with the procedure set forth in Section 17.7 of the Concession Contract for the Vías Nuevas de Lima Project, regarding the Grantor's right to unilaterally terminate the Contract entered into with Rutas de Lima SAC**." Section 17.7 of the Concession Contract provides as follows:

"(...) GRANTOR'S RIGHT TO UNILATERALLY TERMINATE THE CONTRACT

17.7. THE GRANTOR shall be entitled to unilaterally terminate the Contract for duly grounded reasons of public interest, which shall be specified, substantiated and explained in an official communication delivered to the CONCESSIONAIRE at least one hundred and eighty (180) calendar days before the expected early termination date. Notice of such decision shall also be given to the Permitted Creditors within the term prescribed above."

**4.29.** Pursuant to Section 17.7 of the Contract, the Entity gave notice of termination to the RUTAS DE LIMA SAC Consortium in **Letter No. 003-2023-GPIP-MML**[22] dated January 31, 2023. In response to such notice and in accordance with Section 19.12(b) of the Contract, the dispute was submitted to arbitration according to law: "Non-Technical Disputes shall be settled by way of an ad hoc arbitration according to law, where the arbitrators shall reach their decision in accordance with the Applicable Laws and Regulations and the terms of this Contract. Such arbitration according to law may be local or international (…)." The Rutas de Lima SAC Consortium filed an arbitration claim, and in a **Brief**[23] dated December 29, 2022, Estudio Echecopar informed that notice of the arbitration had been given by Rutas de Lima to the Metropolitan Municipality of Lima in accordance with the UNCITRAL Arbitration Rules.

---

[18] Concession Contract for the Vías Nuevas de Lima Project, as recorded on pages 11-71 of the case file.
[19] Concession Contract for the Vías Nuevas de Lima Project, as recorded on pages 456-736 of the case file.
[20] Council Agreement No. 010 dated January 12, 2023, as recorded on pages 72-73 of the case file.
[21] Council Agreement No. 011 dated January 19, 2023, as recorded on pages 74-85 of the case file.
[22] Letter No. 003-2023-GPIP-MML dated January 31, 2023, as recorded on pages 276-335 of the case file.
[23] Brief dated December 29, 2022, as recorded on pages 87-122 of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**4.30.** As a result of the action filed, the Rutas de Lima SAC Consortium appointed David Arias as its ad hoc arbitrator, who accepted his appointment in a **Brief**[24] dated January 31, 2023. The Metropolitan Municipality of Lima, in turn, appointed Elvira Martínez Coco as its ad hoc arbitrator, who accepted her appointment in a **Brief**[25] dated January 27, 2023. Finally, both arbitrators appointed Luca G. Radicati Di Brozolo as President of the Arbitral Tribunal, who accepted his appointment in a **Brief**[26] dated February 8, 2023.

**4.31.** In the Brief[27] filed by the reporting party, it is alleged that in this third ad hoc international arbitration, which was also commenced by Rutas de Lima SAC against the Metropolitan Municipality of Lima, Elvira Martínez Coco was the same arbitrator who had previously ruled on the same Concession Contract.

**4.32.** In this regard, based on the documentary evidence at hand, Elvira Martínez Coco was appointed by the Metropolitan Municipality of Lima as its ad hoc arbitrator on two occasions, and on one occasion she was appointed President of the Tribunal. Such appointments were accepted in the following briefs:

**Brief**[28] dated August 20, 2018, filed by Elvira Martínez Coco accepting her appointment as President of the Tribunal in an arbitration where the Metropolitan Municipality of Lima and Rutas de Lima were involved.

**Brief**[29] dated April 26, 2019, filed by Elvira Martínez Coco accepting her appointment as arbitrator by the Metropolitan Municipality of Lima in a proceeding against Rutas de Lima.

**Brief**[30] dated August 27, 2023, filed by Elvira Martínez Coco accepting her appointment as arbitrator by the Metropolitan Municipality of Lima in a proceeding against Rutas de Lima.

**4.33.** In the two arbitration cases preceding this investigation, she issued a dissenting opinion or a partially dissenting opinion with respect to the majority decision, as detailed in the **Partially Dissenting Opinion**[31] and the **Dissenting Opinion**[32] dated December 12, 2022. The reporting party contends that, in her dissenting opinion, arbitrator Elvira Martínez Coco deemed the claims of Rutas de Lima SAC to be ungrounded. Consequently, the reporting party argues that her decision in this arbitration deviated from her previous stance by granting the interim measure and accepting the amended request for arbitration filed by the Consortium.

---

[24] Brief dated January 31, 2023, as recorded on pages 215-216 of the case file.
[25] Brief dated January 27, 2023, as recorded on pages 205-214 of the case file.
[26] Brief dated February 8, 2023, as recorded on pages 202-204 of the case file.
[27] Brief dated July 12, 2023, as recorded on pages 218-223 of the case.
[28] Brief dated August 20, 2018, as recorded on pages 339-340 of the case file.
[29] Brief dated April 26, 2019, as recorded on pages 341-342 of the case file.
[30] Brief dated August 27, 2023, as recorded on pages 343-347 of the case file.
[31] Partially Dissenting Opinion of Elvira Martínez Coco, as recorded on pages 890-940 of the case file.
[32] Dissenting Opinion of Arbitrator Elvira Martínez Coco dated December 12, 2022, as recorded on pages 224-256 of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**4.34.** Therefore, it is claimed that the arbitrator's decision conflicted with her previous dissenting opinion. However, the reporting party failed to consider that the claims in the previous arbitrations were of a different nature. In the second arbitration, Elvira Martínez Coco acted as the Entity's ad hoc arbitrator and ruled on issues different from those in this arbitration; therefore, a different decision was expected. The reporting party failed to demonstrate objectivity by neglecting to analyze the nature of the claims in the second arbitration, which involved the memorandums of agreement dated December 21, 2015 and June 30, 2016. Such memorandums of agreement are unrelated to the claims in this arbitration, which involve the unilateral termination of the Contract by the GRANTOR.

**4.35.** However, **Elvira Leonor Martínez Coco**[33] stated as follows: "Regarding an allegation in the report about interim measures, the Metropolitan Municipality of Lima claimed that I had contradicted myself by issuing an interim measure in favor of Rutas de Lima. This assertion is erroneous, as interim measures are temporary and provisional, intended to preserve the possibility of its applicant prevailing in the arbitration and can be modified at any time. In the first two proceedings involving Rutas de Lima, the arbitration tribunals I served on unanimously granted interim measures in favor of Rutas de Lima; however, **in the award entered in the first case, I issued a dissenting opinion stating that a post-contract memorandum was invalid; in the second case, in which I also voted for an interim measure in favor of Rutas de Lima, I issued a dissenting opinion in the award. I explained that the contract in general had been the result of corruption, contrasting it with a private initiative where the works were funded by toll revenues; thus, the concession was funded by both parties** (....)." Therefore, the arbitrator appointed by the Entity based her decisions on the claims presented in each arbitration proceeding. The reporting party's allegations lack objectivity and rely on a merely subjective criterion, without any evidentiary support to justify his inference, even more so when it was the Entity itself that had appointed such ad hoc arbitrator to represent it in the arbitration.

**The proceedings and the course of the THIRD arbitration between the Entity and the RUTAS DE LIMA SAC Consortium.**

**4.36.**     It follows from the proceedings that the RUTAS DE LIMA SAC Consortium filed the arbitration claim, which was notified to the Entity by means of Letter No. 013979-VNL-MML[34] of December 29, 2022, along with the arbitration claim. Accordingly, the parties appointed their *ad hoc* arbitrators, as discussed in the foregoing paragraphs and this Section, pursuant to Article 9 of the UNCITRAL Arbitration Rules (2021), which provides that "1. If three arbitrators are to be appointed, each party shall appoint one arbitrator. The two arbitrators thus appointed shall choose the third arbitrator who will act as the

---

[33] Preliminary Statement of Elvira Leonor Martínez Coco dated August 24, 2023, as recorded on pages 835-841 of the case file.
[34] Letter No.013979-VNL-MML of December 29, 2022, as recorded on page 86 of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

presiding arbitrator of the arbitral tribunal." Moreover, it has been established that the arbitrators, namely: 1) Mr. David Arias, in his **Brief**[35] dated January 31, 2023; 2) Ms. Elvira Martínez Coco, in her **Brief**[36] dated January 27, 2023; and 3) Mr. Luca G. Radicati Di Brozolo, in his **Brief**[37] dated February 8, 2023, did provide the relevant information concerning the arbitration proceedings in which they had taken part, and they stated that they were under no impediment to conduct this arbitration proceeding. This is in compliance with Article 11 of the referred Arbitration Rules, which provides: "When a person is approached in connection with his or her possible appointment as an arbitrator, he or she shall disclose any circumstances likely to give rise to justifiable doubts as to his or her impartiality or independence. An arbitrator, from the time of his or her appointment and throughout the arbitral proceedings, shall without delay disclose any such circumstances to the parties and the other arbitrators unless they have already been informed by him or her of these circumstances."

4.37.    As noted, following the communication on the individual circumstances of the arbitrators appointed by each party, including the Entity, which did not submit any challenge to the appointed arbitrators, both parties did accept the negotiations. Therefore, once the arbitration claim and the appointment of the *ad hoc* arbitrators by both parties have been notified, the RUTAS DE LIMA SAC Consortium submitted the Supplemental Claim and request for interim measures[38] of March 7, 2023, which brief resulted in the Arbitral Tribunal's issuing **Procedural Order No. 5 (on the Claimant's Request for Interim Measures)**[39] of June 13, 2023, with the decision to order "the Respondent that the *status quo* be maintained until the controversy that is the subject of this proceeding is resolved, suspending the termination process of the Contract in progress, during the process of this arbitration; (ii) Order Respondent to abstain from aggravating the dispute with public manifestations about the subject and against Claimant during the course of this arbitration."

4.38.    These actions appear to have given rise to a number of irregularities which the Entity reported, such as the admissibility of the supplemental claim and the interim measures as requested by the Consortium and an increase in the fees by the members of the

---

[35] **Brief dated January 31, 2023, as recorded on pages 215/216** of the case file.
[36] **Brief dated January 27, 2023, as recorded on pages 205/214** of the case file.
[37] **Brief dated February 8, 2023, as recorded on pages 202/204** of the case file.
[38] Supplemental Claim and request for interim measures of March 7, 2023, as recorded on pages 128/149 of the case file.
[39] **Procedural Order No. 5 (on the Claimant's Request for Interim Measures) of June 13, 2023, as recorded on pages 1008/1029** of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

Arbitral Tribunal as a result of the referred supplemental brief. With regard to these matters, below is our analysis:

**ADMISSIBILITY OF THE SUPPLEMENTAL CLAIM**

4.39.    As reported, the Entity noted that the referred supplemental claim is merely concerned with a matter of law and does not involve an amount which warrants a hearing by the tribunal members; thus, the request filed by the RUTAS DE LIMA SAC Consortium should not have been admitted. The Concession Contract for the Vías Nuevas de Lima Project provides as follows in Sections 17.7 and 17.8:

"(...) GRANTOR'S RIGHT TO UNILATERALLY TERMINATE THE CONTRACT

17.7.    THE GRANTOR shall be entitled to unilaterally terminate the Contract for duly grounded reasons of public interest, which shall be specified, substantiated and explained in an official communication delivered to the CONCESSIONAIRE at least one hundred and eighty (180) calendar days before the expected early termination date. Notice of such decision shall also be given to the Permitted Creditors within the term prescribed above."

17.8.    Within a term of thirty (30) calendar days from the date the CONCESSIONAIRE is served notice of the GRANTOR's decision, the CONCESSIONAIRE shall furnish to the GRANTOR evidence of the amount of the investments made, broken down into Concession's assets and CONCESSIONAIRE's assets, as used for the Concession; the CONCESSIONAIRE shall further provide a budget of all expenses to be afforded as a result of the early termination of the concession. Such evidence shall be furnished for the purpose of determining any applicable compensation, pursuant to Sections 17.13 *et seq*."

4.40.    As shown, by unilaterally terminating the contract, the Metropolitan Municipality of Lima caused economic damages to the consortium, which situation has been expressly included in the contract executed between both parties. Additionally, Section 19.12(b) provides as follows with regard to the type of arbitration proceeding available:

"b) Arbitration According to Law. Non-Technical Disputes shall be settled by way of an *ad hoc* arbitration according to law, where the arbitrators shall reach their decision in accordance with the Applicable Laws and Regulations and the terms of this Contract. Such arbitration according to law may be local or international, as follows:

(i) **Large-Claim Non-Technical Disputes: Non-Technical Disputes where (a) the disputed amount is higher than Ten Million Dollars (USD 10,000,000)** or an equivalent sum in Nuevos Soles; or (b) the claims cannot be quantified or valued in money terms; or (c) the Parties disagree on the amount in dispute shall be settled through international arbitration

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

according to law via a proceeding conducted pursuant to the Conciliation and Arbitration Rules of the International Centre for Settlement of Investment Disputes (…)."

**4.41.** Given that this contract contemplated an estimated rising investment in the sum of USD 498,831,411.98, and pursuant to the UNCITRAL Arbitration Rules, Article 23 on PLEAS AS TO THE JURISDICTION OF THE ARBITRAL TRIBUNAL provides that "1. The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, **an arbitration clause that forms part of a contract shall be treated as an agreement independent of the other terms of the contract**. A decision by the arbitral tribunal that the contract is null shall not entail automatically the invalidity of the arbitration clause." Therefore, the request submitted by the RUTAS DE LIMA SAC Consortium could be heard by the Arbitral Tribunal.

**4.42.** With regard to this matter, Ms. Elvira Leonor Martínez Coco stated that "the reasoning of the arbitral tribunal was delivered in strict application of Section 19.2(b), which provides that this kind of disputes should be resolved by resort to ad hoc arbitration. Under subparagraph (i), the contract mandates that non-technical disputes, where the disputed amount is higher than 10 million US dollars, shall be settled through international arbitration. The Metropolitan Municipality of Lima argued that the claims asserted by Rutas de Lima were merely matters of law and, therefore, the tribunal should not be an international one. Rutas de Lima contended that the amount involved was tantamount to the amount of the concession, and this involved more than two billion US Dollars, as far as the request for arbitration was concerned. The arbitral tribunal found that it did have competent jurisdiction because the amount claimed was more than 10 million US Dollars, as set forth in the contract's arbitration clause. Subsequently, the supplemental claim was filed, as arising from the termination of the contract, such termination also having a compensation amount which, in accordance with the contract, shall be paid to the contractor when the contract is terminated. Rutas de Lima contended that, were the arbitral tribunal to hold that the termination has been validly declared, compensation should be awarded for more than 500 million US Dollars, approximately; the tribunal then held that the amount involved in the matter of termination exceeded the sum of USD 10 million, as per the above-mentioned section and, therefore, we find that we have competent jurisdiction because this is in accordance with the contract and the applicable rules."

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

**4.43.** As regards **Luca Radicati Di Brozolo**,[40] he held that "the arbitration commenced and information e-mails were exchanged between the arbitrators; this supplemental claim had to be considered because so is regulated and allowed during the initial stage of the proceedings (...) as regards the answers and the increase in the claim amounts, the matter is regulated under Article 22 of the Rules, and in this case the amended request for arbitration was submitted approximately two weeks after the claim was filed," therefore, no irregularities existed in qualifying the arbitration claim or the supplemental claim, for these claims were admitted under the provisions of the contract executed between the Entity and the RUTAS DE LIMA SAC consortium. Moreover, the Arbitration Rules allowed the members of the Tribunal to qualify the claim and proceed with the steps of the arbitration. In this regard, there is no evidence of any irregularities concerning an alleged solicitation, request or offering of bribes, given that the actions of the members of the tribunal were in line with the contract provisions and the applicable Article of the Arbitration Rules, proper performance being thus guaranteed.

**ALLOCATION OF PROFESSIONAL FEES TO THE MEMBERS OF THE ARBITRAL TRIBUNAL**

**4.44.** From the preliminary statements, it follows that Mr. **David Arias Lozano**,[41] noted that "the memorandum recording the appointment of the arbitrators was signed by all parties, namely: Rutas de Lima and the Metropolitan Municipality of Lima, on April 27, 2023. Such appointment memorandum contains the consent of the parties as to the amount of the claim and the calculation of arbitrator's fees pursuant to an average of the ICC fee scale, **as we the arbitrators voluntarily reduced our fees**. (...) Furthermore, it is worth noting that the collection of arbitrator's fees by the arbitrators is not dependent on the acceptance of the amended claim or the admissibility of the interim measures, such aspects are not relevant to the collection of fees; **fees are charged because they have been consented to by the parties** and established in the appointment memorandum, pursuant to the amount claimed, irrespective of whether the claim is admitted or dismissed." Moreover, the arbitrator stated that "**the parties should pay their part of the arbitrator's fees to the Hague-based Permanent Court of Arbitration**, which entity will then pay the fees to the arbitrators; **in this particular case, we have not yet been paid one single dollar to this date**. (...) Arbitrator's fees are not dependent on the position adopted in the arbitration. Arbitrators are paid the same amount of fees,

---

[40] Preliminary Statement made by Luca Radicati Di Brozolo of October 6, 2023, as recorded on pages 1212/1219 of the case file.
[41] Preliminary Statement made by David Arias Lozano of October 20, 2023, as recorded on pages 1224/1232 of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

<span style="color:red">R-0133</span>

regardless of the outcome of the arbitration. An arbitrator is impartial and independent from the parties, even with respect to the party appointing them."

4.45.    As regards arbitrator **Elvira Leonor Martínez Coco**, she stated as follows: "When the amount was increased as a result of the supplemental claim, the arbitrators discussed the matter and noted that, by applying this rate, the fees due to each arbitrator would amount to nearly 1 and a half million US Dollars. We held a number of conversations among the three of us, and **we finally decided that we were not going to use the maximum fee, but instead charge an average or medium fee of approximately 890 thousand US Dollars for each arbitrator (...) I specifically call the attention to the fact that the arbitral tribunal decided, without any request by the parties, to reduce arbitrator's fees because we considered that one of the parties involved was a State entity and, even though we were entitled to apply the maximum fee as approved by the parties, we nonetheless reduced our fees**. I note that **an arbitrator's fees should be deposited by the parties with the Hague-based Permanent Court of Arbitration, which is responsible for managing the funds in accordance with the tribunal appointment memorandum. Arbitrator's fees have been deposited with the PCA, the arbitrators have not received any fees whatsoever**."

4.46.    In his answer, **Luca Radicati Di Brozolo**[42] explained that "it should be noted that this is the third arbitration between both parties, and **the parties mutually agreed that the rules applied in prior arbitrations** would be applied to this third arbitration, also with regard to arbitrator's fees and, specifically, prior arbitrations provided that arbitrator's fees would be calculated on the basis of the rules of the International Chamber of Commerce (ICC), pursuant to the maximum scale under such rules; thus, when this arbitration commenced, we proposed to the parties that the same should apply, and they agreed that the payment would be the maximum fee—**the MML noted and accepted on March 1, 2023 that the same rules and fees would apply, and this was later confirmed on the tribunal appointment memorandum, as signed by the parties**. Subsequently, when the Claimant Rutas de Lima added a further request to the initial claim which considerably increased the total amount of the dispute, **we decided, on our own initiative, to reduce our fees, as confirmed in an e-mail from the Secretary of the Tribunal dated April 19, 2023**, stating that the tribunal noted that, as a result of the increase in the arbitration dispute amount, they had decided to change

---

[42] Preliminary Statement made by Luca Radicati Di Brozolo of October 6, 2023, as recorded on pages 1212/1219 of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

the proposed calculation method to determine the arbitrator's fees and, instead of using the maximum scale, the tribunal proposed that the closest lower scale should be used, and **then we decided to use the medium scale, once such decision was adopted**." Moreover, as regards the matter on whether arbitrators can charge fees if one of the parties rejects the proposed amount, the arbitrator noted that "**it is irrelevant that a party fails to accept the proposal regarding fees, in order for the arbitration to proceed**, as the arbitration proceeding is based on an agreement between the parties, and the parties have to accept such agreement, and no problem arose in this respect, given that the arbitration rules were adopted."

4.47.   As observed in the preliminary statements, the items related to fees were initially set at the maximum sum agreed, for the disputed amount exceeded USD 10,000,000.00. In this context, after the filing of the claim and the Entity's answer, the President of the Tribunal, Mr. Luca G. Radicati Di Brozolo, sent an **e-mail message**[43] to the parties on April 4, 2023, from his own address (luca-radicati@arblit.com), and attached the draft version of the tribunal appointment memorandum and Procedural Order No. 1.

4.48.   The **draft of the tribunal appointment Memorandum**[44] stated the amounts the arbitrators were asking, in accordance with the criterion set forth in Article 41 of the Arbitration Rules, which provides as follows: "1. The fees and expenses of the arbitrators shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject matter, the time spent by the arbitrators and any other relevant circumstances of the case," and also according to the Rules of the International Chamber of Commerce (ICC). Furthermore, as a result of the filing of a supplemental claim and request of interim measures by the RUTAS DE LIMA SAC Consortium, the President of the Tribunal, Mr. Luca G. Radicati Di Brozolo, sent an **e-mail message**[45] to the parties on April 19, 2023, from his own address (luca-radicati@arblit.com), and attached, once again, the draft of the tribunal appointment Memorandum, but informed that "the tribunal underscores that, in light of the amount of the dispute assessed by the Claimant in the e-mail dated April 17, 2023, the new version of the memorandum states the amounts to be charged as tribunal's fees and the remuneration payable to the administrative secretary. In this regard, the tribunal notes that, as a result of the increase in the dispute amount arising from the supplemental claim filed by the Claimant, the proposed calculation method to assess the fees of their members was modified.

---

[43] **E-mail dated April 4, 2023, as recorded on page 1163** of the case file.
[44] Draft Tribunal Appointment Memorandum, as recorded on pages 1165/1181 of the case file.
[45] **E-mail dated April 19, 2023, as recorded on page 1183** of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

Specifically, instead of adopting the maximum scale of arbitrator's fees pursuant to Appendix III of the Arbitration Rules of the International Chamber of Commerce, effective from January 1, 2021, the tribunal proposes that an average of the arbitrator's fee scale under Appendix III (...) be used and, additionally, as regards the remuneration payable to the administrative secretary, the tribunal proposes that such remuneration should be calculated as 20 % (instead of 30 %) of the fees charged by each co-arbitrator."

**4.49.** Therefore, the parties executed the **Tribunal Appointment Memorandum**[46] on April 27, 2023. It is worth pointing out that the Tribunal members decided to reduce their fees, which decision was informed to the parties and signed in the same act by Mr. Diógenes Antonio del Castillo Loli, Municipal State Counsel on behalf of the Entity. It turns out to be contradictory that the Entity initially accepted the fees to be charged and, subsequently, another State Counsel ignored such acceptance and filed a merely subjective action, with no basis or objective evidence to support the allegation. All of this shows that the case file was not examined in depth prior to filing the reported charges.

**4.50.** Thus, and based on the foregoing considerations, there is no indication that the legal representative of the RUTAS DE LIMA SAC Consortium has made any offering of money to the members of the Arbitral Tribunal. What is more, the members of the Tribunal themselves claimed that they had not met such representative or ever received any kind of offer of money. Furthermore, it has been established that the acts adopted by the members of the Tribunal were in accordance with the provisions contained in the concession contract executed between the Entity and the referred CONSORTIUM, and they were also taken in compliance with the arbitration rules governing the performance and issuance of such acts pursuant to the law. Additionally, there is a report on record which was rendered by a legal expert on arbitration matters, and which confirms that the acts adopted by the tribunal members were in accordance with the applicable rules and the concession contract.

**4.51.** Based on the foregoing considerations, this action should be dismissed because the events are acts NOT CATEGORIZED as, and thus are not, crimes, given that they do not satisfy the requirements to fall under the definition of the criminal charge asserted. In addition, there is no evidence of any offering or solicitation to commit an unlawful act.

---

[46] Tribunal Appointment Memorandum, dated April 27, 2023, as recorded on pages 179/199 of the case file.

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

Furthermore, it should be noted that an interim measure is a provisional measure intended to preserve the *status quo* of the contract while the parties settle the dispute during the arbitration proceedings and while a determination is made as to who is right with regard to the matter at issue.

4.52.    In this vein, and considering the reasons discussed and the documents in the case file, it is deemed appropriate not to formally indict or to continue with the preliminary investigation, pursuant to Section 334(1) of the Code of Criminal Procedure.

**Dismissal of the prosecution case file**

4.53.    Section 94(2) of Legislative Decree No. 052, Attorney General's Office Charter, as amended by Law No. 29574, provides that: "*In the event of a reported act which may be considered a crime (...). Should the prosecutor deem the reported charge inadmissible, it may reject such charge automatically by means of a reasoned decision or, alternatively, it may open a preliminary investigation (…).*"

4.54.    Thus, Section 334(1) of the New Code of Criminal Procedure provides that: "*if the prosecutor considers, upon categorizing the charge or after having conducted or ordered preliminary measures, that the reported act entails no crime, that is, it is not criminally actionable, or where the grounds for termination are satisfied as set forth under the law, then the prosecutor shall issue a resolution and declare that a formal indictment and continuation with the preliminary investigation is inadmissible, and shall thus order the dismissal of the case file.*" Likewise, it is essential to note that the requirements to *formally indict and continue with the preliminary investigation* are laid down in Section 336(1) of the Code of Criminal Procedure: "*where indications show that a crime has been committed, that a criminal action has not been time-barred, that the accused has been identified and, where appropriate, that the relevant admissibility requirements have been met, the formal indictment shall be issued to continue with the Preliminary Investigation.*"

4.55.    In this line of reasoning, we believe the obligation of a Prosecutor is to make sure that any investigation conducted by their office should have a probable cause for a criminal action, that is to say, the prosecution should under no circumstance *issue a formal indictment just for the sake of issuing it*, but it should rather resort to the courts where sufficiently conclusive elements exist as to the real events, and with regard to the actual perpetration of a crime and to the involvement of the accused in such crime. In this vein,

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.



**ATTORNEY GENERAL'S OFFICE**
REPUBLIC OF PERU

*" Year of the Bicentennial, of the consolidation of our Independence, and of the commemoration of the heroic battles of Junín and Ayacucho "*

R-0133

as discussed,[47] we may conclude that no conclusive elements exist in the case at hand to warrant a formal indictment or to continue with the Preliminary Investigation; therefore, the case should be dismissed.

**BASED ON THE FOREGOING REASONS**: This Attorney General's Office, through the Second Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima - Prosecution Investigation Division No. 4, pursuant to the powers conferred upon it by Legislative Decree No. 052, Attorney General's Office Charter, hereby **RESOLVES** as follows: **NO FORMAL INDICTMENT SHALL PROCEED AND THE PRELIMINARY INVESTIGATION SHALL NOT CONTINUE** against **LUCA G. RADICATI DI BROZOLO, DAVID ARIAS LOZANO and ELVIRA LEONOR MARTÍNEZ COCO** for the alleged crime of **SOLICITING OR ACCEPTING BRIBES IN THE COURSE OF COURT PROCEEDINGS** and against **GUILHERME BORGES DE QUEIROZ for the alleged crime of OFFERING OR GIVING BRIBES IN THE COURSE OF COURT PROCEEDINGS**, which behaviors are defined and punished under Sections 395 and 398, respectively, of the Criminal Code, such acts being allegedly committed to the detriment of the Peruvian State. This Office has been represented by the Public Servant Anti-Corruption State Counsel's Office. This resolution shall be **NOTIFIED** pursuant to Section 334(1) of the Code of Criminal Procedure.

[Signature]. [Seal:]

EDWIN MANRIQUE DURAND

Provincial Assistant Attorney General

Second Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima

*By the undersigned, pursuant to a resolution of the higher-ranking Officer*

---

[47] "*The reasons, incidentally, may be succinct, concise and even cross-referenced, under certain circumstances. The sufficiency of these reasons, analyzed on a case-by-case basis, and not in advance, shall be deemed satisfied to the extent the reasons contain, both in terms of rationale and legal grounds, an adequate explanation enabling a knowledge of the basic factual and legal criteria underpinning the decision, even where such criteria are implied.* " *Decision adopted at* en banc *session No. 06-2011/CJ-116.*

[Signature] [Seal:] EDWIN MANRIQUE DURAND. Corporate Provincial Deputy Prosecutor. First Corporate Provincial Prosecution Office for Crimes of Corruption by Public Officials of Lima.

# Spanish Original



**MINISTERIO PÚBLICO**
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

CARPETA FISCAL N°: 249-2023
INVESTIGADO     : LUCA G. RADICATI DI BROZOLO Y OTROS
DELITO          : COHECHO PASIVO ESPECÍFICO Y OTRO
AGRAVIADO       : EL ESTADO
FISCAL RESPONSABLE  : EDWIN MANRIQUE DURAND

## DISPOSICIÓN N° 07 - NO FORMALIZACIÓN NI CONTINUACIÓN DE LA INVESTIGACIÓN PREPARATORIA

Lima, quince de agosto
Del año dos mil veinticuatro.

**VISTOS:**

La denuncia penal presentada por Luis Fernando Moreno Berríos, Procurador Público Adjunto encargado de la Municipalidad Metropolitana de Lima contra Luca G. Radicati Di Brozolo, David Arias y Elvira Leonor Martínez Coco, por la presunta comisión del delito de Cohecho Pasivo Especifico y Guilherme Borges de Queiroz representante de la empresa Rutas de Lima por la presunta comisión del delito de Cohecho Activo Específico y, estando a las diligencias preliminares efectuadas se emite el presente pronunciamiento:

**CONSIDERANDO:**

**PRIMERO.- EL MINISTERIO PÚBLICO.**

**1.1.** El Ministerio Público es un órgano administrativo cualificado por su actividad de colaborar al ejercicio de la potestad jurisdiccional en orden a garantizar el cumplimiento efectivo de la legalidad, así conforme lo tiene establecido el Tribunal Constitucional, "La Constitución (artículo 159°) ha asignado al Ministerio Público una serie de funciones constitucionales, entre las cuales destaca la facultad de ejercitar la acción penal ya sea de oficio o a pedido de parte, tal como lo dispone el artículo 159°, inciso 5, de la Constitución. Si bien es una facultad discrecional reconocida por el poder constituyente al Ministerio Público, es obvio que esta facultad, en tanto que el Ministerio Público es un órgano constitucional constituido y por ende sometido a la Constitución, no puede ser ejercida, irrazonablemente, con desconocimiento de los principios y valores constitucionales, ni tampoco al margen del respeto de los derechos fundamentales" (STC N° 6204-2006-PHC/TC).

**1.2.** En este sentido, el Ministerio Público cumple una función objetiva en el proceso penal que no sólo responde a un interés individual, sino también al interés de la comunidad, así la carga de la prueba del Fiscal no solo se basa en demostrar la culpabilidad del imputado, sino que a su vez representa un deber procesal y funcional, pues el incumplimiento de ello traería perjuicio a la comunidad, por ello el artículo IV del Título Preliminar

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

del Código Procesal Penal establece que el Ministerio Público es el titular del ejercicio público de la acción penal y tiene el deber de la carga de la prueba[1].

**1.3.** En ese orden, el artículo IV del Título Preliminar del Código Procesal Penal, en su numeral 1, señala que: "el Ministerio Público está obligado a actuar con objetividad, indagando los hechos constitutivos de delito, los que determinen y acrediten la responsabilidad o inocencia del imputado". El deber de objetividad, como bien señala Pedro Angulo Arana, posee un contenido propio[2] que debe interpretarse de acuerdo a cada participación del fiscal en el proceso penal.   Por eso coincidimos con Rosas Yataco cuando recoge el criterio del Tribunal Constitucional: "aunque existe alguna posición doctrinaria que el principio de la imparcialidad sólo puede ser inherente al juez, sin embargo, consideramos que al Fiscal también le corresponde esta imparcialidad en la Investigación Preparatoria, pues el Tribunal Constitucional peruano lo ha reseñado (Exp. 2288-2004-HC/TC, 12 de agosto de 2004) de la siguiente manera: "(…) 3.- (…) No obstante, debe precisarse que toda actuación del Ministerio Público debe orientarse por el principio de legalidad (primer párrafo del artículo 4 de la LOMP), que le exige actuar con respeto de las disposiciones del ordenamiento jurídico y en interés de la ley, así como por el principio de imparcialidad (artículo 19 de la LOMP), según el cual el Fiscal debe actuar con plena objetividad e independencia en defensa de los intereses que le están encomendados, no debiendo tener ningún interés particular en la dilucidación de un caso determinado"[3].

**SEGUNDO. - EXPOSICIÓN DEL HECHO OBJETO DE DENUNCIA.**

**2.1.** Mediante escrito de denuncia obrante a fs. 01/08 el denunciante Luis Fernando Moreno Berríos Procurador Público Adjunto encargado de la Municipalidad Metropolitana de Lima, señala el acaecimiento de los siguientes hechos:

**2.2.** Es así que el Consorcio Rutas de Lima SAC acude a la vía arbitral donde habrían quedado fijado los honorarios de los árbitros en $ 974,334.00 dólares y secretario arbitral en $ 40,460.00 dólares, esto el 07mar2023; según el denunciante, en un acto en el que el referido consorcio tenía conocimiento que sería irregular y que contravendría a las normas, presentó una solicitud de ampliación de la petición de arbitraje original,

---

[1] *La Constitución de 1993 considera al Ministerio Público no sólo como un ente persecutor del delito sino, también, de defensa de la legalidad y de los derechos de los ciudadanos y los intereses públicos; ello en virtud al soporte normativo existente en la época que consagraban esa dualidad funcional: Constitución de 1979 y Ley Orgánica del Ministerio Público de 1981. Adoptando con ello, igualmente, un criterio convergente con los cuerpos normativos hispanoamericanos que introdujeron esa figura jurídica en las décadas pasadas.*

[2] *Angulo Arana, Pedro. La Función Fiscal. Estudio comparado y aplicación al caso peruano. El Fiscal en el nuevo proceso penal. Jurista Editores. Lima, 2007. p.203*

[3] *Rosas Yataco, Jorge. Derecho Procesal Penal, con aplicación al Nuevo Código Procesal Penal. Jurista Editores. Lima, 2009. p. 135*

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

indicando se amplie su reclamo en cuanto a 4 puntos, asimismo agrega el denunciante que no resultaría admisible ni competente este tribunal arbitral compuesto por Luca G. Radicati di Brozolo, David Arias y Elvira Martínez Coco, para amparar medidas cautelares. Precisa también el demandante que el representante de Rutas de Lima, Guillerme Borges de Queiroz, se habría contactado con los miembros del tribunal a fin de explicar los presuntos hechos, pero sobre todo de manifestar el beneficio que se ofrecía a raíz de la sola aceptación de las pretensiones señaladas.

2.3. Finalmente, el tribunal se beneficiaría con la sola aceptación con un pago de $ 674,334.00 dólares, pasando a recibir $ 1'348.668.00 dólares, señala además que el tribunal habría aceptado el beneficio indicado por Rutas de Lima, que desde ahí los actos del tribunal arbitral habrían sido arbitrarios como indicar a la MML se abstenga de todo acto en contra de Rutas de Lima, así como el fijar un calendario procesal sin haber determinado si el reclamo suplementario formaría parte o no del arbitraje internacional, entre otros, materializándose el ilícito penal con la actuación de los integrantes del tribunal arbitral quienes se habrían beneficiado o recibido ventaja o beneficio por parte del representante del Consorcio Líneas Viales de lima Guillerme Borges de Queiroz, al haber aceptado el Tribunal arbitral la solicitud de ampliación de arbitraje y haber emitido pronunciamiento al respecto, a pesar que no tendría competencia para ello según el denunciante.

**TERCERO.- <u>ELEMENTOS DE CONVICCIÓN RECABADOS EN LA ETAPA DE LAS DILIGENCIAS PRELIMINARES</u>.**

3.1. **Denuncia a fs. 01/08,** que pone de conocimiento los hechos irregulares.

3.2. **Contrato de Concesión del Proyecto vías nuevas de Lima a fs. 11/71,** celebrado entre la Municipalidad Metropolitana de Lima y Rutas de Lima SAC.

3.3. **Acuerdo de Concejo N° 010 de fecha 12 de enero de 2023 a fs. 72/73.**

3.4. **Acuerdo de Concejo N° 011 de fecha 19 de enero de 2023 a fs. 74/85,** se acordó: Artículo primero. - DECLARAR la AFECTACIÓN AL INTERÉS PÚBLICO del Contrato de Concesión del Proyecto Vías Nuevas de Lima suscrito con el Concesionario Rutas de Lima SAC. Artículo segundo: CONFIRMAR la acción iniciada por la Gerencia de Promoción de la inversión Privada en el marco de sus competencias a efectos de que continúe con el procedimiento previsto en la cláusula 17.7 del Contrato de Concesión del Proyecto Vías Nuevas de Lima referido a la facultad del Concedente de poner término unilateral al Contrato suscrito con Rutas de Lima SAC.

3.5. **Carta N° 013979-VNL-MML de fecha 29 de diciembre de 2022 a fs. 86,** se comunica la notificación de arbitraje de Rutas de Lima contra la Municipalidad Metropolitana de Lima bajo el Reglamento de Arbitraje

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

CNUDMI.

3.6. **Escrito de fecha 29 de diciembre de 2022 a fs. 87/122,** presentado por el Estudio Echecopar comunicando la notificación de arbitraje de Rutas de Lima contra la Municipalidad Metropolitana de Lima bajo el Reglamento de Arbitraje CNUDMI.

3.7. **Reclamo suplementario y solicitud de medidas cautelares de fecha 07 de marzo de 2023 a fs. 128/149**

3.8. **Acta de Instalación del Tribunal Arbitral de fecha 27 de abril de 2023 a fs. 179/199.**

3.9. **Escrito de fecha 08 de febrero de 2023 a fs. 202/204,** presentado por Luca G. Radicati Di Brozolo comunicando su aceptación a la designación como Presidente del Tribunal Arbitral.

3.10. **Escrito de fecha 27 de enero de 2023 a fs. 205/214,** presentado por Elvira Martínez Coco comunicando su aceptación a la designación, a su vez indica que no ha sido nombrada con anterioridad por Rutas Lima, White & Case SC ni por Rafael Llano y Mariele Coulet – Diaz, indicando que sí fue designada por el Estudio Echecopar.

3.11. **Escrito de fecha 31 de enero de 2023 a fs. 215/216,** correspondiente a David Arias quien acepta la designación de árbitro por parte de Rutas de Lima SAC.

3.12. **Escrito de fecha 12 de julio de 2023 a fs. 218/223,** presentado por Carlos Enrique Cosavalente Chamorro, Procurador Público de la Entidad, indicando que en el 3° Arbitraje Internacional Ad Hoc también iniciado por RUTAS DE LIMA SAC contra la MML, la misma árbitra, tratándose del mismo Contrato de Concesión.

3.13. **Voto disidente de la Árbitra Elvira Martínez Coco de fecha 12 de diciembre de 2022 a fs. 224/256,** emitido por Elvira Martínez Coco.

3.14. **Carta N° 003-2023-GPIP-MML de fecha 31 de enero de 2023 a fs. 276/335,** se acordó: Artículo primero: DECLARAR la AFECTACIÓN AL INTERÉS PÚBLICO del contrato de concesión del Proyecto Vías Nuevas de Lima suscrito con el concesionario Rutas de Lima SAC. Artículo segundo: CONFIRMAR la acción iniciada por la gerencia de promoción de la inversión privada en el marco de sus competencias a efectos de que continúe con el procedimiento previsto en la cláusula 17.1 del contrato de concesión del proyecto vías nuevas de lima referido a la facultad del concedente de poner término unilateral al contrato suscrito con Rutas de Lima SAC en representación de la Municipalidad Metropolitana de lima, por haberse demostrado afectación al interés público.

3.15. **Escrito de fecha 20 de agosto de 2018 a fs. 339/340,** presentado por Elvira Martínez Coco quien acepta su designación como presidenta del Tribunal donde participó la Municipalidad Metropolitana de Lima y Rutas de

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

Lima.

**3.16. Escrito de fecha 26 de abril de 2019 a fs. 341/342,** presentado por Elvira Martínez Coco quien acepta su designación como árbitro de la Municipalidad Metropolitana de Lima en un proceso contra Rutas de Lima.

**3.17. Escrito de fecha 27 de agosto de 2023 a fs. 343/347,** presentado por Elvira Martínez Coco quien acepta su designación como árbitro de la Municipalidad Metropolitana de Lima en un proceso contra Rutas de Lima.

**3.18. Correo electrónico de fecha 12 de junio de 2023 a fs. 423/426,** emitido por Carlos Ricardo Torres Zavala (Carlos.torres_0@munilima.gob.pe) para Emilio Bettoni (Emilio.bettoni@aarblit.com), remitiendo la objeción de la Municipalidad Metropolitana de Lima, adjuntando la RP N° 3.

**3.19. Contrato de Concesión del Proyecto Vías Nuevas de Lima a fs. 456/736,** celebrado entre la Entidad y Guilherme Borges de Queiroz representante de RUTAS DE LIMA SAC.

**3.20. Constitución de Sociedad Anónima Cerrada con Directorio denominada – Vías Nuevas de Lima SAC de fecha 13 de octubre de 2012 a fs. 737/761.**

**3.21. Declaración indagatoria de Elvira Leonor Martínez Coco de fecha 24 de agosto de 2023 a fs. 835/841,** quien declaró que "5. el razonamiento del tribunal arbitral fue en estricta aplicación de la cláusula 19.2 literal b) que nos dice que estas controversias deben ser resueltas mediante arbitraje ad hoc. En el literal i, se señala que las controversias no técnicas en las que el monto involucrado sea superior a 10 millones de dólares, tienen que ser resueltas en un arbitraje internacional. La Municipalidad Metropolitana de Lima dijo que las pretensiones de rutas de Lima, eran meramente jurídicas, y por lo tanto el tribunal no podía ser internacional. Rutas de Lima dijo que el monto involucrado era el valor de la concesión y esto era de más de 2 mil millones de dólares, ello en cuanto a la solicitud arbitral. El tribunal arbitral entendió que era competente porque el monto era superior a los 10 millones de dólares que señala la cláusula del contrato, luego vino el reclamo suplementario, fue por la caducidad del contrato y la caducidad también tiene un monto involucrado que de acuerdo al contrato es la compensación que se le debe de pagar al contratista cuando se declara caduco el contrato, rutas de lima dijo que si el tribunal arbitral declara que la caducidad ha sido válida, le deben pagar por compensación más de 500 millones de dólares aproximadamente, el tribunal dijo entonces que el monto involucrado por el tema de caducidad era superior a los 10 millones de dólares, ello según la cláusula que ha señalado líneas arriba, por ello nos declaramos competentes porque estaba de acuerdo al contrato y al reglamento aplicable. En cuanto a uno de los puntos señalados en la denuncia sobre la emisión de medidas cautelares, la Municipalidad Metropolitana de Lima señala que me estaría contradiciendo al emitir una medida cautelar favorable a Rutas de Lima, lo

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

cual no es correcto ya que toda medida cautelar es temporal y provisoria, sirve para cautelar la posibilidad de que quien la solicita salga vencedor en el proceso arbitral puede ser cambiada en cualquier momento. En los dos primeros procesos con rutas de lima, los tribunales arbitrales que integré dictamos medidas cautelares a favor de rutas de lima, por unanimidad; sin embargo en el laudo del primer caso yo emití un voto discrepante señalando que un acta posterior al contrato era un acta inválida, en el segundo caso donde también voté por una medida cautelar favorable a rutas de lima, en el laudo emití un voto discrepante, allí dije que el contrato en general había sido producto de la corrupción porque comparé la iniciativa privada con el contrato, en la iniciativa privada las obras a punto eran realizadas con los fondos de los peajes, por lo tanto la concesión era financiada por ambas partes, sin embargo en el contrato se cambió esto, el contrato debía ser firmado con los mismos términos de la iniciativa privada que fue aprobada por el consejo municipal de ese entonces, en el cambio se dijo que todas estas obras eran financiadas por la MML con recursos propios, yo consideré a este hecho, entre otros, como una de las banderas rojas que alertan sobre la existencia de corrupción, en este tercer caso la MML ha declarado la caducidad del contrato por vulneración de interés público por corrupción en el contrato, el tribunal arbitral tendría que pronunciarse sobre si la caducidad declarada por la MML es válida o inválida, MML tendría que convencer a todos los árbitros sobre la existencia de corrupción. 6. en esa comunicación a las partes, se dijo que esa propuesta se hacía teniendo en consideración que los dos arbitrajes anteriores, entre Rutas de Lima y la MML, se había aplicado esta misma tasa máxima de la CCI. Las partes no objetaron la aplicación de esta tasa. Cuando la cuantía se incrementó a raíz del reclamo suplementario, los árbitros conversamos y vimos que, aplicando esta tasa, los honorarios por cada árbitro ascendían a cerca de 1 millón y medio de dólares para cada uno. Tuvimos una serie de conversaciones entre los tres, y finalmente decidimos que no íbamos aplicar la tasa máxima, sino la tasa promedio o tasa media, que eran aproximadamente 890 mil dólares por cada árbitro... dejo constancia que el tribunal arbitral sin petición de las partes bajó sus honorarios porque consideramos que una de las partes involucradas era una entidad estatal y a pesar que teníamos el derecho de utilizar la tasa máxima aprobada por las partes, reducimos nuestros honorarios. Señalo que los honorarios arbitrales deben ser depositados por las partes en la Corte Permanente de Arbitraje de La Haya, que es la encargada de administrar los fondos de acuerdo al acta de instalación. Los honorarios arbitrales han sido depositados en la CPA, los árbitros no hemos recibido honorario alguno. Normalmente se paga una parte cuando el arbitraje está bastante avanzado y lo restante se paga luego de la emisión del laudo arbitral, pero a la fecha no he recibido ningún pago. 12. ¿SI EL SEÑOR GUILHERME BORGES DE QUEIROZ REPRESENTANTES DE RUTAS DE LIMA O CUALQUIER OTRA PERSONA CONVERSO CON USTED DE FORMA PARTICULAR PARA SOLICITARLE LA ACEPTACIÓN DE LA DEMANDA SUPLEMENTARIA Y MEDIDA CAUTELAR? Dijo: que, no he

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

conversado con dicha persona ni con ninguna otra. La decisión la tomamos los miembros del tribunal analizando los hechos y el derecho aplicable".

**3.22. Opinión Parciamente Disidente de Elvira Martínez Coco a fs. 890/940.**

**3.23. Voto Disidente de la arbitra Elvira Martínez Coco de fecha 12 de diciembre de 2022 a fs. 942/1006.**

**3.24. Resolución Procesal N° 5 (relativa a la solicitud de Medidas Cautelares de la Demandante) de fecha 13 de junio de 2023 a fs. 1008/1029,** decide: i) Ordenar a la demandada que se mantenga el statu quo hasta que se dirima la controversia objeto del presente procedimiento, suspendiendo el procedimiento de caducidad del contrato en curso durante el trámite del presente arbitraje. ii) Ordenar a la demandada abstenerse de agravar la disputa con manifestaciones públicas sobre el asunto y contra la demandante durante el trámite del presente arbitraje.

**3.25. Reglamento de arbitraje de la CNUDMI (2021) a fs. 1031/1113.**

**3.26. Correo electrónico de fecha 04 de abril de 2023 a fs. 1163,** remitido por Luca G. Radicati Di Brozolo (luca-radicati@arblit.com) para las partes, remitiendo los proyectos de acta de instalación del tribunal y de resolución procesal N° 1 (borradores).

**3.27. Acta de instalación del tribunal arbitral – borrador a fs. 1165/1181.**

**3.28. Correo electrónico de fecha 19 de abril de 2023 a fs. 1183,** remitido por Luca G. Radicati Di Brozolo (luca-radicati@arblit.com) para las partes, indicando que el tribunal destaca que, a la luz de la cuantificación del valor de la controversia efectuada por la demandante en su correo del 17 de abril de 2023, la nueva versión de acta indica los montos de los honorarios del tribunal y la remuneración del secretario administrativo. Al respecto, el tribunal señala que, a raíz del incremento en el valor de la disputa derivado del reclamo suplementario presentado por la demandante, ha modificado su propuesta para el cálculo de los honorarios de sus miembros. En concreto en lugar de aplicar la adopción de la escala máxima del arancel de honorarios de árbitros establecido en el apéndice III del reglamento de arbitraje de la cámara de comercio internacional en vigor desde el 1 de enero de 2021, el tribunal propone se aplique la escala media del arancel de honorarios de árbitros establecido en el apéndice III (...) asimismo, en lo que hace a la remuneración del secretario administrativo, el tribunal propone que esta remuneración se calcule como el 20% (y no el 30%) de los honorarios percibidos por cada co-árbitro, remitiendo los proyectos de acta de instalación del tribunal y de resolución procesal N° 1 (borradores).

**3.29. Declaración indagatoria de Luca Radicati Di Brozolo de fecha 06 de octubre de 2023 a fs. 1212/1219,** quien declaró que "5. y hay que decir que este arbitraje es el tercer arbitraje entre las dos partes y las partes acortaron entre sí, que las reglas que aplicaron en los arbitrajes anteriores, se aplicarán en el tercer arbitraje y ello también en cuanto a los honorarios

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"*

de los árbitros y específicamente en los arbitrajes anteriores se preveía que los honorarios de los árbitros serian calculado en base a las reglas de la cámara de comercio internacional (CCI), bajo la escala máxima de estas reglas, con lo cual cuando empezó este arbitraje propusimos las partes que se hicieran lo mismo, y las partes también aceptaron que el pago sea el máximo, la MML el 01mrz2023 señaló y aceptó que se aplicarán las mismas reglas y honorarios, después esto fue confirmado en el acta de instalación de tribunal, ello firmado por las partes. Después cuando la demandante rutas de lima, añadió una nueva solicitud a la solicitud inicial, hizo que el monto total de la disputa aumentara mucho, nosotros espontáneamente decidimos reducir nuestros honorarios y esto está confirmado en un correo del secretario del tribunal del 19abr2023 en que decía que el tribunal señala que a raíz del incremento del valor de la disputa del arbitraje, ha modificado su propuesta de cálculo de honorarios de los árbitros y en vez de adoptar la escala máxima el tribunal propone se aplique la escala menor próxima, entonces nosotros hemos decidido aplicar al escala media y una vez que esto fue decidido, el arbitraje empezó y se empezó a intercambiar correos de información entre los árbitros, este reclamo suplementario tuvimos que atender porque está normado y es permitido cuando está en su fase inicial… luego de ello la MML presentó una solicitud de recusación que iba a ser decidida por la Corte Internacional de Arbitraje y posteriormente se interpuso la denuncia penal, luego de ello la árbitra Martínez Coco renunció y desde ese momento quedó suspendido el arbitraje. Lo que se nos acusa de haber hablado con lo que creo debe ser el representante de la empresa es falsa, mis co árbitros tampoco lo han hecho … los honorarios de los árbitros no dependen de si se dicta una medida cautelar y además no hemos recibido un pago hasta ahora, entonces las dos acusaciones son totalmente falsas. 11. que, está regulado en el reglamento de la CNUDMI por ejemplo lo de los honorarios está regulado en el artículo 41° del reglamento en cuanto a las medidas cautelares, está regulado en el artículo 26° del reglamento y explica los demás temas relacionados a medidas cautelares y en lo que respecta a las contestaciones y aumento en las demandas, eso está regulado en el artículo 22° del reglamento, en este caso la solicitud de ampliación de demanda fue presentada dos semanas después aproximadamente después de presentarse la demanda. 14. ¿SI ES FRECUENTE O LEGAL QUE DESPUES DE PRESENTADA LA DEMANDA ARBITRAL SE PRESENTEN DEMANDAS AMPLIATORIAS A LA PRINCIPAL? Dijo: que si, esto es permitido de acuerdo al artículo 22° del reglamento y se puedan presentar ampliaciones y solicitudes a la demanda inicial. 18. ¿SI ES POSIBLE QUE LOS ARBITROS COBREN UN HORANRIO SI UNA DE LAS PARTES NO LO ACEPTA? Dijo: que no porque si una parte no acepta la propuesta de honorarios no se puede avanzar con el arbitraje, el arbitraje se basa en el acuerdo de las partes, y las partes tienen que aceptar, y en este caso no hubo problemas ya que se adoptó las reglas de arbitraje. 21. ¿Cuánto HAN COBRADO LOS ARBITROS EN ESTE ARBITRAJE POR CONCEPTO DE HONOARIOS HASTA LA FECHA? Dijo: que, no hemos

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

cobrado absolutamente nada".

**3.30. Declaración indagatoria de David Arias Lozano de fecha 20 de octubre de 2023 a fs. 1224/1232,** quien declaró que "5. en el acta de instalación de los árbitros designados, la empresa Rutas de Lima y la Municipalidad Metropolitana de Lima, que firmaron todas las partes se dio el 27abr2023. En el acta de instalación las partes dan conformidad a la cuantía de la reclamación y a que los honorarios de los árbitros se calculen conforme a la escala media de la CCI porque los árbitros voluntariamente, redujimos nuestros honorarios. (…) Por otra parte, hay que destacar que el cobro de los honorarios por los árbitros no depende de aceptar la ampliación de la demanda o las medidas cautelares, eso no es relevante para el cobro de los honorarios, los honorarios se cobran porque han sido aprobados por las partes y señalados en el acta de instalación en función a la cuantía reclamada, tanto si se estima la reclamación o se desestima. 10. ¿Cómo SE HACE EL PAGO DE LOS HONORARIOS A LOS ARBITROS? Dijo: que, las partes deben pagar su parte de los honorarios de los árbitros a la Corte Permanente de la Haya, que es la entidad que luego paga a los árbitros los honorarios, en este caso concreto no hemos cobrado ni un dólar a la fecha. En los arbitrajes ad hoc, se puede pagar los arbitrajes directamente a los árbitros, pero no es la mejor práctica, porque puede haber inconvenientes (impuestos, posible muerte o incapacidad del árbitro, posible acuerdo de las partes antes de finalizar el arbitraje). Es más recomendable depositar los honorarios en una institución de prestigio (en este caso la Corte Permanente de la haya), para que ella lo administre y vaya pagando a los árbitros en función del trabajo que vayan haciendo en las diversas fases del arbitraje. 20. que, los honorarios del árbitro no dependen de la posición que asuma en el arbitraje. Los árbitros cobran lo mismo con independencia de cuál sea el resultado del arbitraje. El arbitraje es imparcial e independiente de las partes, también respecto de la parte que lo nombra. 23. que, jamás recibí mensaje, llamada o comunicación por tercera persona del señor Borges de Queiroz. Si hubiera recibido, la hubiera rechazado de inmediato y lo habría puesto de manifiesto a las partes en el arbitraje, por ser un hecho de extremada gravedad".

**3.31. Oficio N° 012070-2023-MIGRACIONES-UGD de fecha 19 de octubre de 2023 a fs. 1233/1234,** remitiendo la información del movimiento migratorio de Elvira Leonor Martínez Coco.

**3.32. Escrito de fecha 02 de noviembre de 2023 a fs. 1241/1278,** que contiene el reporte de experto legal en materia arbitral.

**CUARTO.- FUNDAMENTOS DE HECHO Y DERECHO DE LA DISPOSICION DE ARCHIVO.**

**La competencia funcional**

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

**4.1.** El Tribunal Constitucional en la STC 01887-2010-PHC/TC, señaló que "la Constitución ha previsto en su artículo 139° un amplio catálogo de principios, que (…) constituyen verdaderos derechos fundamentales, los que se erigen como un conjunto de garantías mínimas que el propio constituyente ha creído conveniente incorporar dentro de nuestra norma normarum para poder afirmar la pulcritud jurídica de las actividades de orden jurisdiccional y prejurisdiccional que realicen las autoridades". De este modo, el Ministerio Público se encuentra obligado a observar esas garantías constitucionales, pues "el derecho al debido proceso despliega también su eficacia jurídica en el ámbito de la etapa prejurisdiccional de los procesos penales; es decir, en aquella fase del proceso penal en la cual al Ministerio Público le corresponde concretizar el mandato previsto en el artículo 159° de la Constitución". (STC 2725-2008-PHC/TC).

**4.2.** Siguiendo esa premisa, para que se pueda constituir válidamente un proceso penal, resulta imprescindible que se cumplan con determinados requisitos o presupuestos procesales que, como su nombre indica, son requisitos del proceso, sin cuyo cumplimiento no puede válidamente constituirse; es decir, no puede satisfacerse materialmente la pretensión[4]. Uno de esos presupuestos procesales de conocimiento es la competencia del Fiscal.

**4.3.** La labor que el fiscal si bien ha sido desarrollada en detalle por el Código Procesal Penal, se encuentra ineludiblemente sujeta a los principios y garantías que señala la Constitución. Así pues, las disposiciones del Título II de la Sección III del Libro Primero del Código Procesal Penal se aplican supletoriamente para determinar la competencia fiscal, siempre que sea compatible con su naturaleza.

**4.4.** Atendiendo a la configuración pluriorgánica del Ministerio Público, ha resultado imprescindible instituir criterios para la distribución de las causas. Estos criterios o reglas son los que se llaman criterios competenciales[5], que, al señalar para un supuesto determinado la competencia de *un Despacho fiscal* con exclusión de los demás, produce a la vez un derecho y un deber en el Fiscal de conducir la investigación. El fin práctico de la competencia penal consiste, por tanto, en distribuir las causas entre diversos fiscales instituidos por ley; entre ellos ha de repartirse la tarea dividiendo el conjunto de asuntos en distintos grupos para asignarlos a unos u otros fiscales.

**4.5.** La competencia de cada fiscal, lo que le distingue, es el límite objetivo dentro del cual pueden ejercer sus funciones; ello constituye la cuota o parte de poder que podrán ejercer sus funciones en el momento dado. La

---

[4] Díaz Martínez, Manuel. Jurisdicción y Competencia. El Nuevo Proceso Penal Estudios Fundamentales. Palestra. Lima, 2005. P. 149.

[5] San Martín Castro, César. Derecho Procesal Penal. Volumen I. Grijley, Lima, 2006. P. 179

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

competencia, es un criterio que organiza la extensión territorial, las especializaciones, etc.[6]

**4.6.** En ese orden, la competencia fiscal, conforme lo señala el artículo 63°.2 del Código Procesal Penal, corresponde establecerla al Fiscal de la Nación; en el caso de las Fiscalías Especializadas corresponde, previa aprobación de la Junta de Fiscales Supremos, conforme al artículo 80°-B de la Ley Orgánica del Ministerio Público.

**4.7.** Mediante Ley 29574, publicada con fecha 17 de setiembre de 2010, se dispuso la entrada en vigencia a nivel nacional del Código Procesal Penal (Decreto Legislativo 957), sólo para los delitos tipificados en las Secciones II, III y IV, artículos 382° al 401°, del Capítulo II, del Título XVIII, del Libro II del Código Penal, y en el supuesto de delitos conexos.

**4.8.** En tanto, que mediante Ley 29648, de fecha 21 de diciembre de 2010, se dispuso que el día 15 de enero de 2011, entrara en vigencia el Código Procesal Penal sólo para los delitos tipificados en los artículos 382° al 401° del Código Penal para el distrito judicial de Lima; por lo que por Resolución de Fiscalía de la Nación No. 031-2011-MP-FN, de fecha 12 de enero de 2011, se dispuso convertir las Fiscalías Provinciales Especializadas en *Fiscalías Provinciales Corporativas Especializadas en Delitos de Corrupción de Funcionarios de Lima*, para que conozcan las causas conforme a la citada Ley No. 29648.

**4.9.** Cuando el legislador sanciona la Ley No. 29574, Ley que Dispone la Aplicación Inmediata del Código Procesal Penal para delitos cometidos por funcionarios públicos, modificada por la Ley No. 29648, lo hace con el objeto que los delitos tipificados en los artículos 382° al 401° del Código Penal, sean conocidos al amparo de las normas del Código Procesal Penal aprobado con Decreto Legislativo No. 957[7]. Esto quiere decir que cuando un hecho denunciado se encuentre tipificado en esa pluralidad de delitos, entonces, las Fiscalías Provinciales Corporativas Especializadas en Delitos de Corrupción de Funcionarios de Lima pueden avocarse al conocimiento del caso

## La finalidad de las diligencias preliminares

**4.10.** Las diligencias preliminares tienen como objetivo desarrollar una actividad de investigación dirigida a recabar los elementos de convicción que permitan al Fiscal, conforme a sus atribuciones, decidir si debe o no

---

[6] *Angulo Arana, Pedro. "La Función Fiscal", Juristas Editores, Lima, Perú, Marzo 2007. P. 178.*

[7] *Citando a Angulo Arana: "A resultas de la reforma procesal penal se advierte que el fiscal en lo penal, a nivel de la investigación del delito, aparece sumamente fortalecido para la realización de sus funciones primordiales: a) la función de dirección de la investigación del delito, b) la función compositiva del conflicto penal y c) la función cautelar del investigado y de la reparación civil y también se le adiciona una importante facultad coercitiva". Angulo Arana, Pedro. La Función Fiscal. Jurista Editores. Lima, 2007, P. 576*

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

Formalizar Investigación; decisión que debe considerar los siguientes presupuestos: *la aparición de indicios reveladores de la comisión de un delito, la acción penal no ha prescrito, y se haya individualizado al imputado*; en caso no concurran cualquiera de los presupuestos mencionados el Fiscal debe archivar el caso[8].

4.11. La jurisprudencia del Tribunal Constitucional define como "un conjunto de decisiones o fallos constitucionales emanados, expedidos a efectos de defender la superlegalidad, jerarquía, contenido y cabal cumplimiento de las normas pertenecientes al bloque de constitucionalidad". Constituye doctrina que desarrolla el Tribunal Constitucional en los diferentes ámbitos del derecho a través de cada caso concreto. Como consecuencia de lo anteriormente descrito, citamos la STC 01887-2010-PHC/TC, por la cual el Tribunal Constitucional señaló que "la Constitución ha previsto en su artículo 139 un amplio catálogo de principios, que (…) constituyen verdaderos derechos fundamentales, los que se erigen como un conjunto de garantías mínimas que el propio constituyente ha creído conveniente incorporar dentro de nuestra norma para poder afirmar la pulcritud jurídica de las actividades de orden jurisdiccional y prejurisdiccional que realicen las autoridades". Así, este Ministerio Público se encuentra obligado a observar esas garantías constitucionales, pues "el derecho al debido proceso despliega también su eficacia jurídica en el ámbito de la etapa prejurisdiccional de los procesos penales; es decir, en aquella fase del proceso penal en la cual el Ministerio Público le corresponde concretizar el mandato previsto en el artículo 159 de la Constitución". (STC 2725-2008-PHC/TC).

4.12. En ese orden, partiendo que el plazo de las diligencias preliminares en principio es sesenta días naturales, salvo que se presenten circunstancias propias del hecho objeto de investigación que amerite fijar un plazo distinto, tal como indica el artículo 334° numeral 2 del Código Procesal Penal, modificado por la Ley No. 30076, que establece "*el plazo de las diligencias preliminares conforme al artículo 3°, es de sesenta días (…) no obstante ello, el Fiscal podrá fijar un plazo distinto según las características, complejidad y circunstancias de los hechos objeto de investigación*". El plazo superior a los sesenta días, que fijaría el Fiscal, no puede ser ilimitado, como lo ha asumido la Sala Penal de la Corte Suprema en la Sentencia Casatoria No. 02-2008-La Libertad; por lo que, en la hipótesis más extrema, el plazo mencionado no puede ser mayor que el plazo máximo de la Investigación Preparatoria regulada en el artículo 342° de la

---

[8] *"De manera análoga, señala Cubas Villanueva que la investigación preliminar que realiza el fiscal en su despacho o la policía bajo su supervigilancia, la realiza con el fin de determinar: i) si el hecho denunciado es delito, ii) si se ha individualizado a su presunto autor, y iii) si la acción penal no ha prescrito. Si no existe alguno de esos requisitos el fiscal debe archivar provisionalmente o definitivamente los actos. Esto determina el reconocimiento de facultades discrecionales a los fiscales, para que tengan a su cargo la tarea de selección de casos con el objetivo final que el sistema judicial no este saturada de causas". Neyra Flores, José Antonio. Manual del Nuevo Proceso Penal & de Litigación Oral. Idemsa, Lima 2010. 290-291*

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

ley procesal penal.

## Delimitación del hecho objeto de investigación

**4.13.** Antes de entrar al análisis lógico jurídico de la presente decisión, debemos delimitar cuáles serán los hechos objeto de la presente decisión fiscal. Respecto a los hechos materia de investigación, se debe llegar a determinar: **Si los hechos señalados se subsumen dentro de los tipos penales de Cohecho Pasivo Especifico y Cohecho Activo Genérico; además, de determinar si hay indicios de la comisión del hecho ilícito por parte de los investigados.**

## Análisis del Tipo Penal

**4.14.** Por el principio de legalidad penal consagrado en el artículo 2° inciso 24 literal d) de la Constitución Política del Estado, se señala que *"nadie será procesado ni condenado por acto u omisión que al tiempo de cometerse no esté previamente calificado en la ley, de manera expresa e inequívoca, como infracción punible, ni sancionado con pena prevista en la ley"*. En tanto, que el artículo 9° del Código Penal señala que *"la comisión de un delito es aquel momento en el cual el autor o partícipe ha actuado u omitido la obligación de actuar, independientemente del momento en que el resultado se produzca"*.

## Juicio de tipicidad.

**4.15.** Es necesario indicar, que cuando nos referimos al derecho penal peruano como uno de acto, nos estamos refiriendo a uno de los fundamentos jurídico axiológicos del Estado social y democrático de Derecho, porque fundamenta la sanción penal a la <u>acción</u> concreta descrita típicamente y sólo representa la respuesta al hecho individual. En otras palabras, lo que legitima al Estado a imponer penas o medidas de seguridad a las personas es por el acto humano consiente y voluntario que transforma los bienes jurídicos penalmente tutelados de forma negativa.

**4.16.** Una de esas manifestaciones del derecho penal de acto, es la consagración con rango constitucional del principio *Ne bis in ídem*, que, si bien es reconocido por el artículo III del Título Preliminar del Código Procesal Penal, ha alcanzado el estatus de directriz constitucional en las reiteradas sentencias del Tribunal Constitucional[9]. Por el *Ne bis in ídem* nadie puede

---

[9] *En ese orden de ideas, el mismo Tribunal ha definido en su jurisprudencia (STC 2050-2002-AA/TC, STC 2868-2004-AA/TC, STC 4587-2004-AA/TC, STC 003-2005-PI/TC, STC 8123-2005-PHC/TC, STC 0014-2006-PI/TC, STC 3954-2006-PA/TC, STC 4989-2006-PHC/TC, STC 10275-2006-PHC/TC, STC 2930-2007-PHC/TC, STC 03682-2007-PA/TC, STC 04511-2007-PA/TC, STC 00044-2008-PHC/TC, STC 2725-2008-PHC/TC y STC 04225-2008-PHC/TC) que el principio Ne bis in ídem es un principio implícito en el derecho al debido proceso, pues el derecho a no ser juzgado (dimensión procesal) o sancionado (dimensión material) dos veces por los mismos hechos se encuentra reconocido por el Artículo 14.7 del Pacto Internacional de Derechos Civiles y Políticos, así como en el Artículo 8.4 de la Convención Americana de Derechos Humanos.*

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

ser procesado, ni sancionado más de una vez por un mismo hecho; es decir, el hecho que persigue el Ius Puniendi del Estado es la conducta humana que puede tener diferentes calificaciones o tipificaciones, pero es una sola.

4.17. La primera etapa para determinar si la conducta humana es punible, es la subsunción de la misma a la norma penal, esto es, encuadrar la conducta investigada en una figura que previamente exista en el Código Penal. Entendemos al juicio de tipicidad como una operación mediante la cual un hecho que se ha producido en la realidad es adecuado o encuadrado dentro del supuesto de hecho que describe el tipo penal. Por ello, al analizar una figura delictiva se examina primero la conducta, seguidamente la tipicidad, y luego los demás otros elementos del delito, porque cada uno es pre-requisito del siguiente; en otras palabras, no se puede dar uno sin el otro, esto es, debemos determinar la concurrencia obligatoria de la acción típica, sujetos y bien jurídico tutelado, que prevé la norma penal vigente a la comisión de los hechos.

**El delito denunciado.**

4.18. Es necesario señalar que bien jurídico es todo aquel interés social que se constituye necesario para el normal desenvolvimiento de la persona humana en sociedad. El bien jurídico protegido en los delitos contra la Administración Pública es el correcto funcionamiento de la administración pública y el comportamiento ceñido a la ley del funcionario público en atención a la confianza que le brinda el Estado, cuyo rompimiento origina el ilícito, puesto que ello determina engaño al interés público quien confía en la buena gestión del servidor público en beneficio de la hacienda nacional[10].

4.19. En el presente caso, este Despacho Fiscal de la Primera Fiscalía Provincial Corporativa Especializada en Delitos de Corrupción de Funcionarios de Lima – Cuarto Despacho dispuso iniciar investigación preliminar, contra **LUCA G. RADICATI DI BROZOLO, DAVID ARIAS Y ELVIRA LEONOR MARTÍNEZ COCO**, por la presunta comisión del delito de **COHECHO PASIVO ESPECÍFICO** conducta prevista y sancionada en el artículo 395° y **GUILHERME BORGES DE QUEIROZ** representante de la empresa Rutas de Lima por la presunta comisión del delito de **COHECHO ACTIVO ESPECIFICO,** conducta prevista y sancionada en el artículo 398° del Código Penal, en agravio del Estado peruano; por lo que, en ese orden, corresponde analizar los alcances de los supuestos normativos del delito denunciado:

**ARTÍCULO 395.- COHECHO PASIVO ESPECÍFICO:**

---

[10] RODRÍGUEZ COLLAO, Luis. *"Delimitación del concepto penal de corrupción"*, en REYNA ALFARO, Luis Miguel (Director) *Delitos contra la Administración Pública*, Jurista Editores, Lima 2009, p. 99.

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

"El Magistrado, Árbitro, Fiscal, Perito, Miembro de Tribunal Administrativo o cualquier otro análogo a los anteriores que bajo cualquier modalidad acepte o reciba donativo, promesa o cualquier otra ventaja o beneficio, a sabiendas que es hecho con el fin de influir o decidir en asunto sometido a su conocimiento o competencia, será reprimido con pena privativa de libertad no menor de seis ni mayor de quince años e inhabilitación conforme a los incisos 1 y 2 del artículo 36 del Código Penal y con ciento ochenta a trescientos sesenta y cinco días-multa.

El Magistrado, Árbitro, Fiscal, Perito, Miembro de Tribunal Administrativo o cualquier otro análogo a los anteriores que bajo cualquier modalidad solicite, directa o indirectamente, donativo, promesa o cualquier otra ventaja o beneficio, con el fin de influir en la decisión de un asunto que esté sometido a su conocimiento, será reprimido con pena privativa de libertad no menor de ocho ni mayor de quince años e inhabilitación conforme a los incisos 1 y 2 del artículo 36 del Código Penal y con trescientos sesenta y cinco a setecientos días-multa.".

## ARTÍCULO 398.- COHECHO ACTIVO ESPECÍFICO:

"El que, bajo cualquier modalidad, ofrece, da o promete donativo, ventaja o beneficio a un Magistrado, Fiscal, Perito, Árbitro, Miembro de Tribunal Administrativo o análogo con el objeto de influir en la decisión de un asunto sometido a su conocimiento o competencia, será reprimido con pena privativa de libertad no menor de cinco ni mayor de ocho años e inhabilitación accesoria conforme a los incisos 2, 3, y 4 del artículo 36 del Código Penal.

Cuando el donativo, promesa, ventaja o beneficio se ofrece o entrega a un secretario, relator, especialista, auxiliar jurisdiccional, testigo, traductor o intérprete o análogo, la pena privativa de libertad será no menor de cuatro ni mayor de ocho años e inhabilitación accesoria conforme a los incisos 2, 3 y 4 del artículo 36 del Código Penal.

Si el que ofrece, da o corrompe es abogado o forma parte de un estudio de abogados, la pena privativa de libertad será no menor de cinco ni mayor de ocho años e inhabilitación accesoria conforme a los incisos 1, 2, 3 y 8 del Código Penal y con ciento ochenta a trescientos sesenta y cinco días-multa."

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

**4.20.** Respecto al delito de **COHECHO PASIVO ESPECÍFICO**, la Corte Suprema, mediante Apelación N° 15-2019/ Cusco, determinó algunos criterios al momento de analizar el tipo penal de cohecho pasivo específico.

**4.21.** Así, la Sala Penal Permanente indicó que el enunciado típico –segundo párrafo del artículo 395° del Código Penal–, especialmente cualificado por el sujeto agente, tiene como bien jurídico tutelado la regularidad e imparcialidad en la correcta impartición de justicia. El verbo rector en ciernes es: solicite. Los medios corruptores: donativo, promesa u otra ventaja o beneficio. El sujeto agente del delito debe estar consciente que su accionar está dirigido a influenciar en la toma de decisión sobre determinado proceso bajo su competencia, donde medie, implícito, el favorecimiento o daño a una de las partes en un proceso.

**4.22.** La decisión de Corte Suprema es relevante ya que precisó que el ilícito se consuma con la petición directa o indirecta, no requiriéndose se produzca la decisión buscada por quien accede a la solicitud, para concebir consumado el delito.

**4.23.** Asimismo, la **Corte Suprema de Justicia de la República mediante Apelación N° 5-2017-HUÁNUCO**[11] desarrolla en sus fundamentos lo siguiente:

"(…)

7.1. Respecto al bien jurídico tutelado, como el tipo penal es un delito especial propio y de infracción del deber, el funcionario público por el estatus que ostenta, tiene el "deber especial positivo" de actuar con imparcialidad, rectitud, transparencia y objetividad. En el caso que nos ocupa, su actuación, bajo estos principios, debe darse durante las diligencias preliminares, en la investigación preparatoria en las demás fases del proceso penal, y en todo acto en que intervenga por razón del cargo, en casos sometidos a su conocimiento o competencia.

7.2. En cuanto a la imputación objetiva, dentro de la estructura de este tipo penal, se aprecian, entre otros elementos normativos, los siguientes:

Sujeto activo y autoría. Se exige al sujeto activo una cualidad especial, el autor no puede ser cualquier persona sino aquellos que ostentan el cargo público y cumplen el rol funcional específico. En este caso, se trata de fiscales de todas las instancias que intervienen en la decisión de las investigaciones fiscales y participan en los procesos judiciales.

"Solicitar y/o recibir directa o indirectamente, donativo y/o cualquier otra ventaja". El tipo penal exige que el agente público "solicite" al abogado o parte procesal o a sus familiares de forma directa o indirecta, terceros, intermediarios, etc., los medios corruptores de donativo y/o cualquier otra ventaja como dinero, bienes, alhajas, favores sexuales. Pero también se exige un vínculo normativo, que está dirigido a influir en la decisión de un

---

[11] https://img.lpderecho.pe/wp-content/uploads/2021/01/Apelaci%C3%B3n-5-2017-Huanuco-LP.pdf

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

asunto sometido a su conocimiento y competencia fiscal.

En la modalidad de "recibir" se exigen los mismos presupuestos, pero no se establece la recepción de modo indirecto.

"Con el fin de influir en la decisión". Se debe interpretar que la influencia negativa del fiscal sobre su propia decisión final o futura (disposiciones de archivo, requerimientos, etc.) y la determinación objetiva en su decisión consiste en adecuar sus actos a favor de una parte y en perjuicio de la otra. El influjo en el contenido de la decisión debe ser real (por ejemplo, no tomar en cuenta los actos de investigación relevantes penalmente para archivar una denuncia o formalizarla, no notificar a las partes procesales para la realización de la diligencia, etc.) o que jurídicamente exista la obligación de emitir una decisión y, sin embargo, no la dicta.

"Asunto sometido a su conocimiento o competencia". Con relación al caso que nos ocupa, el fiscal tiene asuntos o actos procesales sometidos a su conocimiento en la investigación fiscal o en el proceso judicial; y es competente legal y constitucionalmente en el ámbito temporal (vínculo o rol funcional) para emitir disposiciones de archivo, requerimientos, entre otros, lo que determina que el influjo solo puede darse antes de que el funcionario público decida u omite[12] el asunto sometido a su conocimiento.

7.3. En lo que respecta a la imputación subjetiva, el cohecho pasivo específico precisa del dolo directo. El sujeto activo tiene que ser consciente del carácter y finalidad de la solicitud y/o aceptación del donativo, promesa o cualquier otra ventaja, y querer actuar a pesar de ello. El elemento subjetivo "a sabiendas", exige un ánimo deliberado de faltar o quebrantar la imparcialidad, transparencia y objetividad, esto es, el fiscal tiene el deber de conocer que el solicitar y/o aceptar donativo y/o ventaja económica a las partes procesales o sus familiares, para influir en una decisión fiscal, es consecuencia del conocimiento de todos los elementos objetivos del tipo penal, con lo cual quebranta sus roles funcionariales conferidos por mandato constitucional y legal[13].

7.4. Finalmente, respecto a la consumación, el tipo penal es de simple actividad, por lo que al solicitar y/o recibir el medio corruptor, no se requiere que se produzca la decisión final o futura de un asunto prejurisdiccional, jurisdiccional o administrativo; sin embargo, se exige un

---

[12] El artículo 13 del Código Penal regula la institución de la omisión impropia: "El que omite impedir la realización del hecho punible será sancionado: 1. Si tiene el deber jurídico de impedirlo o si crea un peligro inminente que fuera propio para producirlo. 2. Si la omisión corresponde a la realización del tipo penal mediante un hacer [...]"

[13] Coincidimos con Fidel Rojas, quien considera que esta frase debe interpretarse en tanto influencia negativa, esto es, referirse necesariamente a decisiones contra el derecho de una de las partes y con beneficio de la otra, conclusión a la que arriba sobre base de criterios de coherencia lógica y por el principio de lesividad teniendo en cuenta la alta penalidad que el tipo establece, en las dos modalidades de solicitar o recibir. ROJAS VARGAS, Fidel. Delitos contra la Administración Pública. Cuarto edición. Lima: Grijley, 2007, pp. 718-719

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

objetivo de finalidad o posibilidad material de influencia en la decisión".

4.24. Respecto al delito de **COHECHO ACTIVO ESPECÍFICO**, se tiene diversos pronunciamientos que analizan el presente delito por parte de la jurisprudencia nacional tal como se detalla:

- **La Corte Suprema de Justicia de la República en la Apelación N° 47-2021-Piura[14] de fecha 02 de diciembre de 2022,** respecto a la consumación del delito señaló que, "Fundamento destacado: 5.13. Sin perjuicio de ello, debe tenerse en cuenta que para efectos de la consumación del delito el tipo penal es de simple actividad, por lo que, al solicitar el medio corruptor, no se requiere que se produzca la decisión final o la futura de un asunto prejurisdiccional, jurisdiccional o administrativo, empero se exige un dato objetivo de finalidad o posibilidad material de influencia en la decisión."

- **La Corte Suprema de Justicia de la República en la Apelación N° 08-2021-CORTE SUPREMA[15] de fecha 02 de diciembre de 2022,** respecto al asunto sometido a su conocimiento o competencia señaló que, "Fundamento destacado: 6.17. En lo atinente al cuestionamiento del elemento objetivo del tipo, referido a que el auxiliar jurisdiccional haya realizado un acto respecto a un asunto sometido a su conocimiento o su competencia, debe destacarse que el profesor Rojas Vargas ha señalado que:

El "asunto sometido a su conocimiento o competencia" da cuenta de un amplio catálogo de cuestiones a adoptar o decidir por parte de cada uno de los funcionarios específicos aludidos en el tipo penal y que están relacionados con el marco de atribuciones (competencias) o que son objeto de estudio, análisis, proyecto o redacción por cualquiera de los sujetos públicos específicamente designados en este tipo penal. "Sometido a su conocimiento" alude a un escenario factual- normativo interpretativo donde la especialización por división de roles y por materias caracteriza el papel de determinado funcionario encargado del estudio de un caso en una diversa gama de direcciones temáticas. En cambio "sometido a su competencia" alude a atribuciones propias del cargo público, derivadas de la ley o reglamento y con base a las cuales se va a pronunciar y decidir el sujeto público. El conocimiento que asume el funcionario nominado en el tipo puede obedecer a criterios discrecionales de división del trabajo, sin embargo, puede estar determinado ya por los ámbitos del cargo. "Conocimiento y competencia" son así dos términos que pueden ser concebidos en sus propios contenidos de significación o entendidos en su mutua interconexión dialéctica[16]".

---

[14] https://img.lpderecho.pe/wp-content/uploads/2022/12/Apelacion-47-2021-Piura-LPDerecho.pdf
[15] https://img.lpderecho.pe/wp-content/uploads/2022/11/Apelacion-08-2021-Corte-Suprema-LPDerecho.pdf
[16] ROJAS VARGAS, Fidel. (2020). Manual Operativo de los delitos Contra la Administración Pública. Tercera Edición, Grijley, p. 484

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

## ANÁLISIS DEL CASO

**4.25.** De los hechos denunciados se observa que la Municipalidad Metropolitana de Lima y el Consorcio Rutas de Lima participaron en un arbitraje correspondiente a un incumplimiento en los acuerdos arribados en el contrato y convenio que suscribieron, es así que el Consorcio acude a la vía arbitral, fijando los honorarios de los árbitros en UU$ 974,334.00 dólares y secretario arbitral en $ 40,460.00 dólares. Pero el Consorcio Rutas de Lima SAC en una acción irregular presentó una solicitud de ampliación de la petición de arbitraje, ampliando a 4 puntos su pedido. Acto que no era admisible ni competente que los miembros del Tribunal Arbitral compuesto por Luca G. Radicati Di Brozolo, David Arias y Elvira Martínez Coco amparen el mismo, incluso las medidas cautelares. Siendo que Rutas de Lima mediante su representante Guillerme Borges de Queiroz, este último, se habría contactado con los miembros del tribunal a fin de explicar los presuntos hechos, pero sobre todo de manifestar el beneficio que se ofrecía a raíz de la sola aceptación de las pretensiones señaladas. Por lo que los miembros del tribunal al aceptar la ampliación de arbitraje pasaron a recibir UU$ 1'348.668.00 dólares por sus honorarios por el arbitraje, lo que generó que el Tribunal indicara que la Municipalidad Metropolitana de Lima se abstenga de todo acto en contra de Rutas de Lima, así como fijar un calendario procesal sin haber determinado si el reclamo suplementario formaría parte o no del arbitraje internacional, por lo que al haber aceptado el Tribunal arbitral la solicitud de ampliación de arbitraje y haber emitido pronunciamiento al respecto, a pesar que no tendría competencia habría sido parte del beneficio por el aumento del honorario por su labor arbitral. Asimismo, el denunciante en fecha 12 de julio de 2023 mediante **Escrito**[17] indicó que en el tercer arbitraje Internacional Ad Hoc también iniciado por RUTAS DE LIMA SAC contra la MML, Elvira Martínez Coco fue la misma árbitra, tratándose del mismo Contrato de Concesión.

**4.26.** Una vez establecida la imputación específica relacionada con las irregularidades mencionadas en la denuncia, se procederá al análisis junto con los elementos de convicción recabados durante la investigación actual. Este análisis tiene como objetivo determinar si los hechos constituyen una conducta penal conforme a la normativa vigente.

**4.27.** De lo analizado se tiene que la denuncia se centra en el aumento irregular de los honorarios de los árbitros a consecuencia del escrito de ampliación y por otro lado se tiene la irregular aprobación del escrito ampliatorio junto a la medida cautelar aceptada por el Tribunal Arbitral

---

[17] Escrito de fecha 12 de julio de 2023 a fs. 218/223

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

pese que este sería incompetente, ello acorde a la sindicación del denunciante. En consecuencia, se procederá a realizar el análisis pertinente respecto al presunto desarrollo irregular de ambas irregularidades advertidas.

**Previo a la Interposición de la demanda arbitral.**

4.28. De los actuados recabados se tiene que la Municipalidad Metropolitana de Lima y Guilherme Borges de Queiroz representante del Consorcio RUTAS DE LIMA SAC suscribieron el **Contrato de Concesión del Proyecto Vías Nuevas de Lima**[18] y el **Contrato de Concesión del Proyecto Vías Nuevas de Lima**[19], siendo que mediante **Acuerdo de Concejo N° 010**[20] de fecha 12 de enero de 2023 se dispone que "la propuesta o mecanismo de solución de la problemática relativa a los peajes de Lima sea debatida en la próxima sesión del Pleno del Concejo Metropolitano de Lima", por lo que en fecha 19 de enero de 2023 mediante **Acuerdo de Concejo N° 011**[21] dispusieron "**DECLARAR la AFECTACION AL INTERÉS PÚBLICO** del Contrato de Concesión del Proyecto Vías Nuevas de Lima suscrito con el Concesionario Rutas de Lima SAC. Artículo segundo: CONFIRMAR la acción iniciada por la Gerencia de Promoción de la inversión Privada en el marco de sus competencias **a efectos de que continue con el procedimiento previsto en la cláusula 17.7 del Contrato de Concesión del proyecto Vías Nuevas de Lima referido a la facultad del Concedente de poner término unilateral al Contrato suscrito con Rutas de Lima SAC**". Acorde al contrato de concesión, en su cláusula 17.7 se establece lo siguiente:

"(...) FACULTAD DEL CONCEDENTE DE PONER TERMINO UNILATERAL AL CONTRATO
17.7. EL CONCEDENTE tiene la facultad de poner término unilateral al Contrato, por razones de interés público debidamente fundadas, las cuales deberán ser individualizadas, justificadas y desarrolladas en una comunicación de carácter oficial que realice al CONCESIONARIO con una afectación de por lo menos ciento ochenta (180) días calendario, respecto a la fecha de terminación anticipada prevista. En igual plazo deberá notificar tal decisión a los Acreedores permitidos.".

4.29. En virtud de lo dispuesto en la cláusula del Contrato, la Entidad notificó mediante **Carta N° 003-2023-GPIP-MML**[22] de fecha 31 de enero de 2023 la terminación del contrato al Consorcio RUTAS DE LIMA SAC. En respuesta a esta notificación y de conformidad con lo establecido en el

---

[18] Contrato de Concesión del Proyecto vías nuevas de Lima a fs. 11/71
[19] Contrato de Concesión del Proyecto Vías Nuevas de Lima a fs. 456/736
[20] Acuerdo de Concejo N° 010 de fecha 12 de enero de 2023 a fs. 72/73
[21] Acuerdo de Concejo N° 011 de fecha 19 de enero de 2023 a fs. 74/85
[22] Carta N° 003-2023-GPIP-MML de fecha 31 de enero de 2023 a fs. 276/335

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

artículo 19.12 del contrato, somete la controversia a un arbitraje de Derecho, conforme al literal b) del mencionado artículo, indicando que "Las controversias no técnicas serán resueltas mediante arbitraje de derecho ad hoc, procedimiento en el cual los árbitros deberán resolver de conformidad con las Leyes y Disposiciones aplicables y los términos del presente contrato. El arbitraje de derecho podrá ser local o internacional (…)". El Consorcio Rutas de Lima SAC interpone demanda arbitral y, mediante **Escrito**[23] de fecha 29 de diciembre de 2022, el Estudio Echecopar comunica la notificación del arbitraje de Rutas de Lima a la Municipalidad Metropolitana de Lima conforme al Reglamento de Arbitraje CNUDMI.

4.30.   A consecuencia de la acción realizada por el Consorcio Rutas de Lima SAC, este designa como su árbitro ad hoc a David Arias, quien mediante **Escrito**[24] de fecha 31 de enero de 2023 acepta la designación de árbitro. Del mismo, modo la Municipalidad Metropolitana de Lima designa como su árbitro ad hoc a Elvira Martínez Coco, quien mediante **Escrito**[25] de fecha 27 de enero de 2023 acepta la designación y finalmente ambos árbitros designan como Presidente del Tribunal Arbitral a Luca G. Radicati Di Brozolo, quien mediante **Escrito**[26] de fecha 08 de febrero de 2023 acepta su designación.

4.31.   En el Escrito[27] presentado por el denunciante, se alega que este tercer arbitraje internacional ad hoc iniciado también por Rutas de Lima SAC contra la Municipalidad Metropolitana de Lima, la persona de Elvira Martínez Coco fue la misma árbitra que se pronunció previamente respecto al mismo Contrato de Concesión.

4.32.   Respecto a ello, de las documentales recabadas se tiene que Elvira Martínez Coco fue designada por la Municipalidad Metropolitana de Lima en dos ocasiones como su árbitro ad hoc y en una ocasión se la nombró presidente del Tribunal, aceptando a dicha designación con los escritos:

**Escrito**[28] de fecha 20 de agosto de 2018, presentado por Elvira Martínez Coco aceptando su designación como presidenta del Tribunal donde participó la Municipalidad Metropolitana de Lima y Rutas de Lima.
**Escrito**[29] de fecha 26 de abril de 2019, presentado por Elvira Martínez Coco aceptando su designación como árbitro de la Municipalidad Metropolitana de Lima en un proceso contra Rutas de Lima.
**Escrito**[30] de fecha 27 de agosto de 2023, presentado por Elvira Martínez Coco aceptando su designación como árbitro de la Municipalidad Metropolitana de Lima en un proceso contra Rutas de Lima.

---

[23] Escrito de fecha 29 de diciembre de 2022 a fs. 87/122
[24] Escrito de fecha 31 de enero de 2023 a fs. 215/216
[25] Escrito de fecha 27 de enero de 2023 a fs. 205/214
[26] Escrito de fecha 08 de febrero de 2023 a fs. 202/204
[27] Escrito de fecha 12 de julio de 2023 a fs. 218/223
[28] Escrito de fecha 20 de agosto de 2018 a fs. 339/340
[29] Escrito de fecha 26 de abril de 2019 a fs. 341/342
[30] Escrito de fecha 27 de agosto de 2023 a fs. 343/347

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

4.33. Observándose que durante su labor en los dos arbitrajes que anteceden al de la presente investigación, su decisión se dio por voto disidente u opinión parcialmente disidente a la decisión que se tomaba de forma general, tal como aparece en la **Opinión Parciamente Disidente**[31] y el **Voto disidente**[32] de fecha 12 de diciembre de 2022. Ahora bien, el denunciante cuestiona que en el voto disidente emitido por la árbitra Elvira Martínez Coco, declaró infundadas las pretensiones que había señalado Rutas de Lima SAC. Frente a ello, el denunciante alega que el cambio en la decisión entre el anterior proceso arbitral y actual materia de investigación, esta habría concedido la medida cautela y aceptado la ampliación presentada por el referido Consorcio.

4.34. Por consiguiente, la árbitra estaría adoptando una opinión contradictoria respecto a la postura discrepante que habría manifestado en el arbitraje anterior. No obstante, el denunciante no consideró que las pretensiones en los arbitrajes anteriores eran de naturaleza diferente. Estando al segundo arbitraje, donde la árbitro Elvira Martínez Coco actuó como árbitro ad hoc de la Entidad, se pronunció sobre cuestiones distintas a las del presente arbitraje, por lo tanto, la decisión debía ser diferente. El denunciante no ha demostrado objetividad al no analizar la naturaleza de las pretensiones del segundo arbitraje, que se referían a los acuerdos registrados en actas del 21 de diciembre de 2015 y 30 de junio de 2016, los cuales no guardan relación con las pretensiones del presente arbitraje, centradas en la terminación unilateral del Contrato por parte del CONCEDENTE.

4.35. No obstante, **Elvira Leonor Martínez Coco**[33] declaró que "En cuanto a uno de los puntos señalados en la denuncia sobre la emisión de medidas cautelares, la Municipalidad Metropolitana de Lima señala que me estaría contradiciendo al emitir una medida cautelar favorable a Rutas de Lima, lo cual <u>no es correcto ya que toda medida cautelar es temporal y provisoria, sirve para cautelar la posibilidad de que quien la solicita salga vencedor en el proceso arbitral puede ser cambiada en cualquier momento</u>. En los dos primeros procesos con rutas de lima, los tribunales arbitrales que integre dictamos medidas cautelares a favor de rutas de lima, por unanimidad; sin embargo **en el laudo del primer caso yo emití un voto discrepante señalando que un acta posterior al contrato era un acta invalida, en el segundo caso donde también vote por una medida cautelar favorable a rutas de lima, en el laudo emití un voto discrepante, allí dije que el contrato en general había sido producto de la corrupción porque compare la iniciativa privada con el contrato, en la iniciativa privada las obras a punto eran realizadas con los fondos de los peajes, por lo tanto la concesión era financiada por ambas partes** (…)", observándose que la arbitro designada por la Entidad actuó en torno a la pretensión requerida en los referidos procesos arbitrales, siendo que lo alegado por el denunciante carece de objetividad,

---

[31] Opinión Parciamente Disidente de Elvira Martínez Coco a fs. 890/940
[32] Voto disidente de la Arbitra Elvira Martínez Coco de fecha 12 de diciembre de 2022 a fs. 224/256
[33] Declaración indagatoria de Elvira Leonor Martínez Coco de fecha 24 de agosto de 2023 a fs. 835/841

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

prestándose a un criterio meramente subjetivo, sin tener un soporte probatorio que justifique la inferencia dada por el denunciante, más aún cuando es la propia Entidad que designo a la referida Arbitra ad hoc para que los represente en el proceso arbitral.

### Respecto al trámite y desarrollo del TERCER proceso arbitral entre la Entidad y el Consorcio RUTAS DE LIMA SAC.

4.36.   De los actuados recabados se tiene que el Consorcio RUTAS DE LIMA SAC interpone su demanda de arbitraje, la misma que es notificada a la Entidad mediante Carta N° 013979-VNL-MML[34] de fecha 29 de diciembre de 2022 junto a la demanda de arbitraje. En consecuencia, las partes designaron sus árbitros ad hoc, conforme se analizó en los párrafos precedentes y este punto, acorde al artículo 9° del Reglamento de Arbitraje de la CNUDMI (2021), el cual establece que "1. Si se han de nombrar tres árbitros, cada una de las partes nombrar uno. Los dos árbitros así nombrados elegirán el tercer arbitro, que ejercerá las funciones de presidente del tribunal arbitral". Asimismo, se tiene que los árbitros: 1) David Arias, mediante **Escrito**[35] de fecha 31 de enero de 2023, 2) Elvira Martínez Coco, mediante **Escrito**[36] de fecha 27 de enero de 2023 y 3) Luca G. Radicati Di Brozolo, mediante **Escrito**[37] de fecha 08 de febrero de 2023, proporcionaron la información correspondiente respecto a los arbitrajes en los que participaron y declararon que no estaban impedidos para llevar a cabo el presente proceso arbitral. Ello en cumplimiento del artículo 11° del Reglamento antes señalado, el cual establece que "Cuando se haga saber a una persona la posibilidad de que sea designada para actuar como árbitro, dicha persona deberá revelar toda circunstancia que pueda dar lugar a dudas justificadas acerca de su imparcialidad o independencia. A partir de su nombramiento y a lo largo de todo el procedimiento, todo arbitro revelara sin demora a las partes y a los demás árbitros tales circunstancias, salvo que ya le hubiere informado al respecto".



4.37.   Como se observa, tras la comunicación de las circunstancias individuales de los árbitros designados por cada parte, incluida la Entidad que no presentó ningún escrito de recusación contra los árbitros designados, ambas partes aceptaron dichas negociaciones. Por lo que, una vez comunicada la demanda de arbitraje y designados los árbitros ad hoc por ambas partes, el Consorcio RUTAS DE LIMA SAC presentó el Reclamo suplementario y solicitud de medidas cautelares[38] de fecha 07 de marzo de 2023, escrito que tuvo como consecuencia que el Tribunal Arbitral emita la **Resolución Procesal N° 5 (relativa a la solicitud de Medidas Cautelares de la Demandante)**[39] de fecha 13 de junio de 2023,

---

[34] Carta N° 013979-VNL-MML de fecha 29 de diciembre de 2022 a fs. 86

[35] **Escrito de fecha 31 de enero de 2023 a fs. 215/216**

[36] **Escrito de fecha 27de enero de 2023 a fs. 205/214**

[37] **Escrito de fecha 08 de febrero de 2023 a fs. 202/204**

[38] Reclamo suplementario y solicitud de medidas cautelares de fecha 07 de marzo de 2023 a fs. 128/149

[39] **Resolución Procesal N° 5 (relativa a la solicitud de Medidas Cautelares de la Demandante) de fecha 13 de junio de 2023 a fs. 1008/1029**

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

ordenando que "la demandada que se mantenga el statu quo hasta que se dirima la controversia objeto del presente procedimiento, suspendiendo el procedimiento de caducidad del contrato en curso durante el trámite del presente arbitraje. ii) Ordenar a la demandada abstenerse de agravar la disputa con manifestaciones públicas sobre el asunto y contra la demandante durante el trámite del presente arbitraje".

4.38. Dicho actuar habría suscitado irregularidades advertidas por la Entidad, tales como la procedencia del reclamo suplementario con medida cautelar presentado por el Consorcio y el aumento de los honorarios por parte de los miembros del Tribunal Arbitral como consecuencia del referido escrito suplementario. en relación a estos puntos, se tiene el siguiente análisis:

**RESPECTO A LA PROCEDENCIA DEL RECLAMO SUPLEMENTARIO**

4.39. De la denuncia se advierte que el denunciante señala que dicho reclamo suplementario es meramente jurídico y no involucra una cuantía que justifique el conocimiento por parte de los miembros del tribunal por lo que no debió darse trámite al pedido del Consorcio de RUTAS DE LIMA SAC. Según el Contrato de Concesión del Proyecto Vías Nuevas de Lima, en sus artículos 17.7 y 17.8 establece lo siguiente:

"(...) FACULTAD DEL CONCEDENTE DE PONER TERMINO UNILATERAL AL CONTRATO

17.7. EL CONCEDENTE tiene la facultad de poner término unilateral al Contrato, por razones de interés público debidamente fundadas, las cuales deberán ser individualizadas, justificadas y desarrolladas en una comunicación de carácter oficial que realice al CONCESIONARIO con una afectación de por lo menos ciento ochenta (180) días calendario, respecto a la fecha de terminación anticipada prevista. En igual plazo deberá notificar tal decisión a los Acreedores permitidos."

17.8. dentro de los treinta (30) días calendario siguientes de notificado el CONCESIONARIO de la decisión del CONCEDENTE, el CONCESIONARIO deberá acreditar ante el CONCEDENTE el monto desagregado de las inversiones realizadas en los bienes de la concesión y en los bienes del CONCESIONARIO afectados a la concesión y presupuestara el monto de los gastos que deberá realizar con motivos de la caducidad de la concesión. Dicha acreditación es para efectos de determinar las compensaciones correspondientes, de conformidad con lo establecido en las clausulas 17.13 y siguientes."

4.40. Como se observa, la Municipalidad Metropolitana de Lima al poner término de forma unilateral al contrato, ocasiona una afectación económica al consorcio, situación que está reconocida en el propio contrato suscrito entre ambas partes. Además, el artículo 19.12 correspondiente a la modalidad de procedimientos arbitrales en su literal b) establece lo siguiente:

"b) arbitraje de Derecho.- Las controversias no técnicas serán resueltas mediante arbitraje de derecho Ad – Hoc, procedimiento en el cual los árbitros

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

deberán resolver de conformidad con las Leyes y Disposiciones aplicables y los términos del presente contrato. El arbitraje de derecho podrá ser local o internacional, de acuerdo a lo siguiente:

i) **Controversias No técnicas de mayor valor: Las controversias no técnicas en las que (a) el monto involucrado sea superior a diez millones de dólares (US$ 10'000,000.00)** o su equivalente en nuevos soles; o b) que no puedan ser cuantificadas o apreciables en dinero, o c) aquellas en la que las partes no estuvieran de acuerdo sobre la cuantia de la materia controvertida, serán resueltas mediante arbitraje internacional de derecho a través de un procedimiento tramitado de conformidad con las reglas de conciliación y arbitraje del centro internacional de arreglo de diferencias relativas a inversiones (…)".

4.41.  Siendo que el presente contrato tenía una inversión estimada ascendente a US$ 498'831.411.98 dólares, y estando al Reglamento de Arbitraje de la CNUDMI, en su artículo 23° correspondiente a la DECLINATORIA DE LA COMPETENCIA DEL TRIBUNAL ARBITRAL establece que "1. El tribunal arbitral estará facultado para decidir acerca de su propia competencia, así como acerca de toda excepción relativa a la existencia o a la validez de un acuerdo de arbitraje. A ese efecto**, una clausula compromisoria que forme parte de un contrato se considerara un acuerdo independiente de las demás estipulaciones del contrato**. La decisión del tribunal arbitral de que el contrato es nulo no entreñara ipso jure la nulidad de la clausula compromisoria". Por lo tanto, el pedido solicitado por el Consorcio RUTAS DE LIMA SAC era viable para ser conocido por el Tribunal Arbitral.

4.42.  Respecto a este extremo, Elvira Leonor Martínez Coco, declaró que "el razonamiento del tribunal arbitral fue en estricta aplicación de la cláusula 19.2 literal b) que nos dice que estas controversias deben ser resueltas mediante arbitraje ad hoc. En el literal i), se señala que las controversias no técnicas en las que el monto involucrado sea superior a 10 millones de dólares, tienen que ser resueltas en un arbitraje internacional. La Municipalidad Metropolitana de Lima dijo que las pretensiones de rutas de Lima, eran meramente jurídicas, y por lo tanto el tribunal no podía ser internacional. Rutas de Lima dijo que el monto involucrado era el valor de la concesión y esto era de más de 2 mil millones de dólares, ello en cuanto a la solicitud arbitral. El tribunal arbitral entendió que era competente porque el monto era superior a los 10 millones de dólares que señala la cláusula del contrato, luego vino el reclamo suplementario, fue por la caducidad del contrato y la caducidad también tiene un monto involucrado que de acuerdo al contrato es la compensación que se le debe de pagar al contratista cuando se declara caduco el contrato, rutas de lima dijo que si el tribunal arbitral declara que la caducidad ha sido valida, le deben pagar por compensación más de 500 millones de dólares aproximadamente, el tribunal dijo entonces que el monto involucrado por el tema de caducidad era superior a los 10 millones de dólares, ello según la cláusula que ha señalado líneas arriba, por ello nos declaramos competentes porque estaba de acuerdo al contrato y al reglamento aplicable".

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

**4.43.** Respecto a **Luca Radicati Di Brozolo**[40], declaró que "el arbitraje empezó y se empezó a intercambiar correos de información entre los árbitros, este reclamo suplementario tuvimos que atender porque esta normado y es permitido cuando está en su fase inicial (…) en lo que respecta a las contestaciones y aumento en las demandas, eso está regulado en el artículo 22° del reglamento, en este caso la solicitud de ampliación de demanda fue presentada dos semanas después aproximadamente después de presentarse la demanda.". por lo tanto, no hubo irregularidad al calificar la demanda arbitral ni su escrito suplementario, ya que su admisibilidad estaba contemplada en las cláusulas del contrato celebrado entre la Entidad y el consorcio RUTAS DE LIMA SAC. Además, el reglamento de arbitraje facultaba a los miembros del Tribunal para realizar dicha calificación y proceder con el trámite del proceso. En ese extremo, no se evidencia irregularidad alguna respecto a un presunto cohecho, pedido, solicitud u ofrecimiento, dado que el actuar de los miembros del tribunal estaba acorde a lo establecido en las cláusulas contractuales y en el artículo del reglamento aplicable, garantizando así su correcto cumplimiento.

## RESPECTO A LA ASIGNACION DE LOS HONORARIOS PROFESIONALES DE LOS MIEMBROS DEL TRIBUNAL ARBITRAL.

**4.44.** De las declaraciones recabadas se tiene que **David Arias Lozano**[41], señaló que "en el acta de instalación de los árbitros designados, la empresa Rutas de Lima y la Municipalidad Metropolitana de Lima, que firmaron todas las partes se dio el 27abr2023. En el acta de instalación las partes dan conformidad a la cuantía de la reclamación y a que los honorarios de los árbitros se calculen conforme a la escala media de la CCI **porque los árbitros voluntariamente, redujimos nuestros honorarios.** (…) Por otra parte, hay que destacar que el cobro de los honorarios por los árbitros no depende de aceptar la ampliación de la demanda o las medidas cautelares, eso no es relevante para el cobro de los honorarios, **los honorarios se cobran porque han sido aprobados por las partes** y señalados en el acta de instalación en función a la cuantía reclamada, tanto si se estima la reclamación o se desestima", Asimismo, declaró que "**las partes deben pagar su parte de los honorarios de los árbitros a la Corte Permanente de la Haya**, que es la entidad que luego paga a los árbitros los honorarios, **en este caso concreto no hemos cobrado ni un dólar a la fecha**. (…) los honorarios del árbitro no dependen de la posición que asuma en el arbitraje. Los árbitros cobran lo mismo con independencia de cuál sea el resultado del arbitraje. El arbitraje es imparcial e independiente de las partes, también respecto de la parte que lo nombra".

**4.45.** En caso de la árbitro **Elvira Leonor Martínez Coco,** declaró que "Cuando la cuantía se incrementó a raíz del reclamo suplementario, los árbitros conversamos y vimos que, aplicando esta tasa, los honorarios por cada

---

[40] Declaración indagatoria de Luca Radicati Di Brozolo de fecha 06 de octubre de 2023 a fs. 1212/1219
[41] **Declaración indagatoria de David Arias Lozano de fecha 20 de octubre de 2023 a fs. 1224/1232**

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

arbitro ascendían a cerca de 1 millón y medio de dólares para cada uno. Tuvimos una serie de conversaciones entre los tres, y finalmente **decidimos que no íbamos aplicar la tasa máxima, sino la tasa promedio o tasa media, que eran aproximadamente 890 mil dólares por cada arbitro** (...) **dejo constancia que el tribunal arbitral sin petición de las partes bajo sus honorarios porque consideramos que una de las partes involucradas era una entidad estatal y a pesar que teníamos el derecho de utilizar la tasa máxima aprobada por las partes, reducimos nuestros honorarios.** Señalo que **los honorarios arbitrales deben ser depositados por las partes en la Corte Permanente de Arbitraje de La Haya, que es la encargada de administrar los fondos de acuerdo al acta de instalación. Los honorarios arbitrales han sido depositados en la CPA, los árbitros no hemos recibido honorario alguno"**.

4.46. En su declaración **Luca Radicati Di Brozolo**[42], explicó que "hay que decir que este arbitraje es el tercer arbitraje entre las dos partes y **las partes acordaron entre sí, que las reglas que aplicaron en los arbitrajes anteriores**, se aplicaran en el tercer arbitraje y ello también en cuanto a los honorarios de los árbitros y específicamente en los arbitrajes anteriores se preveía que los honorarios de los árbitros serian calculado en base a las reglas de la cámara de comercio internacional (CCI), bajo la escala máxima de estas regalas, con lo cual cuando empezó este arbitraje propusimos las partes que se hicieran lo mismo, y las partes también aceptaron que el pago sea el máximo, **la MML el 01mrz2023 señalo y acepto que se aplicaran las mismas reglas y honorarios, después esto fue confirmado en el acta de instalación de tribunal, ello firmado por las partes**. Después cuando la demandante rutas de lima, añadió una nueva solicitud a la solicitud inicial, hizo que el monto total de la disputa aumentara mucho, **nosotros espontáneamente decidimos reducir nuestros honorarios y esto está confirmado en un correo del secretario del tribunal del 19abr2023** en que decía que el tribunal señala que a raíz del incremento del valor de la disputa del arbitraje, ha modificado su propuesta de cálculo de honorarios de los árbitros y en vez de adoptar la escala máxima el tribunal propone se aplique la escala menor próxima, **entonces nosotros hemos decidido aplicar al escala media y una vez que esto fue decidido"**. Asimismo, respecto a la cuestión de si los árbitros pueden cobrar honorarios en caso de que una de las partes no acepte el monto propuesto, indicó que "**no porque si una parte no acepta la propuesta de honorarios no se puede avanzar con el arbitraje**, el arbitraje se basa en el acuerdo de las partes, y las partes tienen que aceptar, y en este caso no hubo problemas ya que se adoptó las reglas de arbitraje".

4.47. Como se observa de las declaraciones, los conceptos de honorarios fueron inicialmente establecidos en monto máximo acordado, conforme a la cuantía que superaba los US$ 10'000,000.00 de dólares. En ese contexto, tras la presentación de la demanda y la respuesta de la Entidad,

---

[42] **Declaración indagatoria de Luca Radicati Di Brozolo de fecha 06 de octubre de 2023 a fs. 1212/1219**

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

el Presidente del Tribunal Luca G. Radicati Di Brozolo comunicó a las partes mediante **Correo electrónico**[43] de fecha 04 de abril de 2023, a través de su correo (luca-radicati@arblit.com), adjuntando los proyectos en borrador del acta de instalación del tribunal y de resolución procesal N° 1.

4.48.  En el **Acta de instalación del tribunal arbitral – borrador**[44] se consignó los montos que los árbitros estaban pidiendo, ello acorde al criterio señalado en el Reglamento de Arbitraje que en su artículo 41° establece que "1. Los honorarios y los gastos de los árbitros serán de una cuantía razonable, teniendo en cuenta el monto en disputa, la complejidad del tema, el tiempo dedicado por los árbitros y cualesquiera otras circunstancias pertinentes del caso", así como a las reglas de la Cámara de Comercio Internacional (CCI). Asimismo, a consecuencia del documento suplementario y medida cautelar presentados por el Consorcio RUTAS DE LIMA SAC, el Presidente del Tribunal Luca G. Radicati Di Brozolo remite a las partes el **Correo electrónico**[45] de fecha 19 de abril de 2023 a través de su correo (luca-radicati@arblit.com), adjuntando nuevamente el Acta de Instalación del Tribunal, pero comunicando que "el tribunal destaca que, a la luz de la cuantificación del valor de la controversia efectuada por la demandante en su correo del 17 de abril de 2023, la nueva versión de acta indica los montos de los honorarios del tribunal y la remuneración del secretario administrativo. Al respecto, el tribunal señala que, a raíz del incremento en el valor de la disputa derivado del reclamo suplementario presentado por la demandante, ha modificado su propuesta para el cálculo de los honorarios de sus miembros. En concreto en lugar de aplicar la adopción de la escala máxima del arancel de honorarios de árbitros establecido en el apéndice III del reglamento de arbitraje de la cámara de comercio internacional en vigor desde el 1 de enero de 2021, el tribunal propone se aplique la escala media del arancel de honorarios de árbitros establecido en el apéndice III (…) asimismo, en lo que hace a la remuneración del secretario administrativo, el tribunal propone que esta remuneración se calcule como el 20% (y no el 30%) de los honorarios percibidos por cada co-arbitro".

4.49.  Por lo tanto, las partes suscriben el **Acta de Instalación del Tribunal Arbitral**[46] de fecha 27 de abril de 2023, observándose que los miembros del Tribunal realizaron una reducción en el cobro de sus honorarios, acción que fue comunicada a las partes y que fue suscrita en dicho acto por Diógenes Antonio del Castillo Loli, Procurador Publico Municipal de la Entidad.  Resulta contradictorio que la propia Entidad inicialmente aceptara el honorario cobrado y posteriormente otro Procurador desconozca dicho acto y emita una denuncia meramente subjetiva, sin contar con el respaldo o la corroboración de elementos objetivos. Esto indica que no se realizó un estudio exhaustivo de los actuados antes de emitir denuncia.

---

[43] **Correo electrónico de fecha 04 de abril de 2023 a fs. 1163**
[44] Acta de instalación del tribunal arbitral – borrador a fs. 1165/1181
[45] **Correo electrónico de fecha 19 de abril de 2023 a fs. 1183**
[46] Acta de Instalación del Tribunal Arbitral de fecha 27 de abril de 2023 a fs. 179/199

MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

"Año del Bicentenario, de la consolidación de nuestra
Independencia, y de la conmemoración de las heroicas
batallas de Junín y Ayacucho"

**4.50.** Por lo que estando ante lo analizado, no se vislumbra que el representante legal del Consorcio RUTAS DE LIMA SAC haya realizado algún ofrecimiento de dinero a los miembros del Tribunal Arbitral. Más aún, los propios miembros del Tribunal negaron haberse reunido con el representante o haber recibido algún tipo de oferta monetaria. Asimismo, se tiene que los actos realizados por los miembros del Tribunal estaban acorde a lo estipulado en las cláusulas del Contrato de concesión celebrado entre la Entidad y el referido CONSORCIO, y además se ajustaron a lo dispuesto en el reglamento de arbitraje para la realización y emisión de dichos actos conforme conforme a ley. Además, se cuenta con el informe de un experto legal en materia arbitral que confirma que las acciones realizadas por los miembros del comité estaban acordes con la normativa y el contrato de concesión.

**4.51.** Estando a lo analizado, debe disponerse el archivo de los actuados dado que los hechos ATIPICOS y no constituyen delito, ello a razón que no se subsumen al tipo penal denunciado. Además, no existe evidencia de ofrecimiento o solicitud para la comisión de un acto ilícito. Asimismo, es importante señalar que una medida cautelar es una medida provisional destinada a preservar el status quo del contrato mientras las partes resuelven la disputa en el proceso arbitral y determinan quién tiene razón respecto a la litis en cuestión.

**4.52.** En ese sentido, atendiendo a los fundamentos expuestos y la documentación obrante en la carpeta fiscal, no resulta atendible formalizar ni continuar la investigación preliminar, conforme a lo establecido por el artículo 334° numeral 1 del Código Procesal Penal.

**Procedencia del archivo fiscal**

**4.53.** El Inciso 2) del Artículo 94° del Decreto Legislativo No. 052 -Ley Orgánica del Ministerio Público, modificado por Ley No. 29574, establece que: *"Denunciado un hecho que se considere delictuoso (…). Si el fiscal estima improcedente la denuncia la rechaza de plano en decisión debidamente motivada o alternativamente, apertura investigación preliminar (...)".*

**4.54.** Así, el artículo 334° inciso 1 del Nuevo Código Procesal Penal, prescribe que: *"si el fiscal al calificar la denuncia o después de haber realizado o dispuesto realizar diligencias preliminares, considera que el hecho denunciado no constituye delito, no es justiciable penalmente, o se presentan causas de extinción previstas en la ley, declarará que no procede formalizar y continuar con la investigación preparatoria, así como ordenará el archivo de lo actuado".* De igual modo, resulta imprescindible precisar que las condiciones para *formalizar y continuar con la investigación preparatoria* están establecidas en el numeral 1 del artículo 336° del Código Procesal Penal: *"si aparecen indicios reveladores de la existencia de un delito, que la acción penal no ha prescrito, que se ha individualizado al*



MINISTERIO PÚBLICO
REPÚBLICA DEL PERÚ

*"Año del Bicentenario, de la consolidación de nuestra Independencia, y de la conmemoración de las heroicas batallas de Junín y Ayacucho"*

*imputado y que, si fuera el caso, se han satisfecho los requisitos de procedibilidad, se dispondrá la formalización y la continuación de la Investigación Preparatoria".*

4.55. En esa línea de argumentación, entendemos que la obligación del Fiscal es asegurarse que toda investigación conducida por él contenga causa probable de imputación penal, esto es, no debe en lo absoluto *formalizar* por *formalizar*, sino, sólo debe poner en marcha el aparato jurisdiccional por existencia de suficientes elementos de convicción de la realidad y certeza del delito y de la vinculación del implicado en su comisión. En este orden de ideas, tal como lo hemos motivado[47], podemos concluir que en el presente caso no se cuentan con los elementos de convicción para formalizar ni continuar con la Investigación Preparatoria, por lo que corresponde archivar el caso.

**POR ESTAS CONSIDERACIONES:** Este Ministerio Público, Segunda Fiscalía Provincial Corporativa Especializada en Delitos de Corrupción de Funcionarios – Cuarto Despacho Fiscal de Investigación, con la autoridad que le confiere el Decreto Legislativo Nro. 052, Ley Orgánica del Ministerio Público. **DISPONE: NO FORMALIZAR NI CONTINUAR LA INVESTIGACIÓN PREPARATORIA** contra **LUCA G. RADICATI DI BROZOLO, DAVID ARIAS LOZANO y ELVIRA LEONOR MARTÍNEZ COCO** por la presunta comisión del delito de **COHECHO PASIVO ESPECÍFICO** y contra **GUILHERME BORGES DE QUEIROZ por la presunta comisión del delito de COHECHO ACTIVO ESPECÍFICO,** conductas previstas y sancionadas en los artículos 395° Y 398° respectivamente del Código Penal, en agravio del Estado peruano.  Representada por la Procuraduría Publica en Delitos de Corrupción de Funcionarios de Lima. **NOTIFICAR** la presente disposición conforme el artículo 334°.1 del Código Procesal Penal.

EDWIN MANRIQUE DURAND
Fiscal Adjunto Provincial
2° Fiscalía Provincial Corporativa Especializada en
Delitos de Corrupción de Funcionarios de Lima

*Firma el suscrito por disposición superior*

---

[47] *"La motivación, por cierto, puede ser escueta, concisa e incluso —en determinados ámbitos por remisión. La suficiencia de la misma —analizada desde el caso concreto, no apriorísticamente- requerirá que el razonamiento que contenga, constituya lógica y jurídicamente, suficiente explicación que permita conocer, aún de manera implícita, los criterios fácticos y jurídicos esenciales fundamentadores de la decisión" Acuerdo Plenario No. 06-2011/CJ-116.*